UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SAMUEL CLAY,

                         Plaintiff,

                                                          1:22-CV-0983
v.                                                        (GTS/ML)

STACEY BISHOP, An Individual; RANDY
HALL, As Commissioner Of Rensselaer
Cnty. Dep't Of Soc. Servs.; and THOMAS
GORDON, As Support Magistrate For
Rensselaer Cnty. Family Ct.,

                         Defendants.
_____

APPEARANCES:                                             OF COUNSEL:

SAMUEL CLAY
*Pro se*
Post Office Box 1184
Schenectady, New York 12301


MIROSLAV LOVRIC, United States Magistrate Judge


**<u>ORDER and REPORT-RECOMMENDATION</u>**

        The Clerk has sent this *pro se* Complaint (Dkt. No. 1) together with an *in forma pauperis*

application to the Court for review.  (Dkt. Nos. 1, 2.)  For the reasons discussed below, I grant

Plaintiff's *in forma pauperis* application, and recommend that the Complaint be dismissed in its

entirety (1) in part with leave to amend, and (2) in part without leave to amend.  (Dkt. Nos. 1, 2.)

## I.     BACKGROUND

Construed as liberally[1] as possible, Plaintiff's Complaint alleges that his civil rights were violated by defendants Stacey Bishop, Randy Hall, and Thomas Gordon (collectively "Defendants").  (*See generally* Dkt. No. 1.)  More specifically, Plaintiff alleges that on July 30, 1998, Defendant Bishop filed paternity petition against Plaintiff in the Rensselaer County Family Court.  (Dkt. No. 1.)  Plaintiff alleges that on August 26, 1998, the Rensselaer County Family Court deemed him the father of Defendant Bishop's child despite there being no DNA test.  (*Id*.) Plaintiff alleges that at some point in time, he began to contest the paternity finding and requested that a DNA test be administered.  (Dkt. No. 1 at ¶ 11.)  Plaintiff alleges that "Defendant Gordon refused to advise [P]lainitff of his rights, including his right to an attorney, refused to order a DNA test and refused to vacate any and all previous orders entered."  (*Id*. at ¶ 13.)  Plaintiff alleges that on October 14, 1998, Defendant Hall began to enforce an order of support against Plaintiff in favor of Defendant Bishop.  (*Id*. at ¶ 14.)

Plaintiff alleges that Defendants Bishop and Gordon are related and thus, there was a conflict of interest and that Defendant Gordon failed to protect Plaintiff's constitutional rights. (*Id*. at ¶¶ 16-17.)  Plaintiff alleges that he was not afforded an opportunity to be heard before the imposition of the Order of Support.  (*Id*. at ¶ 20.)  Plaintiff alleges that to date, he has been "deprived of over $80,000.00, has incurred expenses for alternate previous court filings, and has suffered extreme embarrassment, defamation of character, shame, anxiety, and mental distress." (*Id*. at ¶ 23.)

---

[1]     The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

Based on these factual allegations, Plaintiff appears to assert the following six causes of action: (1) a claim of unreasonable seizure pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (2) a claim that his rights pursuant to the First Amendment and 42 U.S.C. § 1983 were violated; (3) a claim that his rights pursuant to the Fifth Amendment and 42 U.S.C. § 1983 were violated; (4) a claim that his rights pursuant to the Sixth Amendment and 42 U.S.C. § 1983 were violated; (5) a claim that his rights pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 were violated; and (6) a claim that Defendants breached the peace in violation of Article 1, §§ 6, 14 of the New York State Constitution. (*See generally* Dkt. No. 1.) As relief, Plaintiff seeks an order "directing the termination of any and all child support orders and order of affiliation [sic]," and $1,000,000.00 in damages. (Dkt. No. 1 at 4.)

## II.    PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $402, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1).[2] After reviewing Plaintiff's *in forma pauperis* application (Dkt. No. 2), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed *in forma pauperis* is granted.[3]

---

[2]     The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[3]     Plaintiff is reminded that, although his application to proceed *in forma pauperis* has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

### III.    RELEVANT LEGAL STANDARD GOVERNING INTIAL REVIEW OF A COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2).

In addition, the Court shall dismiss any action where the Complaint fails to allege facts plausibly suggesting subject matter jurisdiction.  Fed. R. Civ. P. 12(h)(3); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1988) (holding that subject matter jurisdiction is a "threshold question that must be resolved . . . before proceeding to the merits."); *Humphrey v. Syracuse Police Dep't*, 758 F. App'x 205, 205-06 (2d Cir. 2019) (citing *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014)) ("[b]efore deciding any case on the merits, a district court must determine that it has subject matter jurisdiction over the matter."); *Koziel v. City of Yonkers*, 352 F. App'x 470, 471 (2d Cir. 2009) (summary order) (affirming *sua sponte* dismissal of complaint on initial review for lack of subject matter); *Talley v. LoanCare Serv., Div. of FNF*, 15-CV-5017, 2018 WL 4185705, at *5 (E.D.N.Y. Aug. 31, 2018) (dismissing on initial review, action challenging state court mortgage foreclosure judgment because the court lacked jurisdiction); *Eckert v. Schroeder, Joseph & Assoc.*, 364 F. Supp. 2d 326, 327 (W.D.N.Y. 2005) (citing *Hughes v. Patrolmen's Benevolent Ass'n of the City of N.Y., Inc.*, 850 F.2d 876, 881 (2d Cir. 1988), *cert. denied*, 488 U.S. 967 (1988)) ("[a] court shall, *sua sponte*, dismiss a complaint for lack of subject matter jurisdiction as soon as it is apparent that it lacks subject matter jurisdiction.").

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v.*

*Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim).  "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond."  *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV.    ANALYSIS

Having reviewed Plaintiff's Complaint, and construing the allegations liberally, I recommend that all causes of action be dismissed.

### A.    Claims Seeking Injunctive Relief Pursuant to 42 U.S.C. § 1983

I recommend that Plaintiff's claims seeking an order "directing the termination of any and all child support orders and order of affiliation [sic]," be dismissed as barred by the *Rooker-Feldman* doctrine.

The *Rooker-Feldman* doctrine bars federal claims "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)); *see Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005).  There are four "requirements" that must be satisfied before *Rooker-*

*Feldman* applies: (1) the "federal-court plaintiff must have lost in state court," (2) the plaintiff "must complain of injuries caused by a state-court judgment," (3) the plaintiff "must invite district court review and rejection of that judgment," and (4) the state-court judgment "must have been rendered before the district court proceedings commenced." *Green*, 585 F.3d at 101 (citing *Hoblock*, 422 F.3d at 85) (internal quotation marks and brackets omitted). The underlying principle of the *Rooker-Feldman* doctrine is that, "within the federal judicial system, only the Supreme Court may review state-court decisions." *Hoblock*, 422 F.3d at 85.

Plaintiff's Complaint, to the extent it seeks injunctive relief, satisfies all four factors for the application of the *Rooker-Feldman* doctrine: (1) Plaintiff lost the filiation claim in state court and, thus, was directed to provide financial support; (2) he complains of the injury caused by the state court order; (3) the state court determinations in question were rendered before this action was commenced;[4] and (4) Plaintiff seeks a declaration that the state court's judgment is unconstitutional and void. *See Edem v. Spitzer*, 204 F. App'x 95, 97 (2d Cir. 2006) (summary order) (dismissing pursuant to the *Rooker-Feldman* doctrine, the plaintiff's claims alleging that his constitutional rights were violated by a state court order of filiation and child support).

### B.    Claims Seeking Monetary Damages Pursuant to 42 U.S.C. § 1983

To the extent that Plaintiff seeks entitlement to relief beyond a nullification of the child support order and order of filiation, and that the Court has jurisdiction over such claims, I find that Plaintiff's claims pursuant to 42 U.S.C. § 1983 fail for the following four reasons.[5]

---

[4]     According to the Complaint, the Rensselaer County Family Court issued an order of filiation on or about August 26, 1998, and an order of support began being enforced on or about October 14, 1998. (Dkt. No. 1 at 2.)

[5]     It is unclear whether Plaintiff's claims seeking monetary damages based on allegations that Defendants violated his constitutional rights during the state court proceeding should also be dismissed because they are "inextricably intertwined with the substantive decisions of the state court." *Compare Edem*, 204 F. App'x at 97 (citing *Hoblock v. Albany Cnty. Bd. of Elections*,

First, Plaintiff's claims under § 1983 against Defendant Gordon, who acted as the support

magistrate judge, are barred under the doctrine of judicial immunity.  Under this doctrine, judges

are absolutely immune from suit for claims for damages for any actions taken within the scope of

their judicial responsibilities.  *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991).  Generally, "acts

arising out of, or related to, individual cases before [a] judge are considered judicial in nature."

*Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009).  "[E]ven allegations of bad faith or malice

cannot overcome judicial immunity."  *Bliven*, 579 F.3d at 209.  Moreover, courts have routinely

recognized that allegations that a judge improperly failed to recuse himself are insufficient to

---

422 F.3d at 86-87 ("*Rooker-Feldman* bars a federal claim, whether or not raised in state court,
that asserts injury based on a state judgment and seeks review and reversal of that judgment;
such a claim is 'inextricably intertwined' with the state judgment.")), *with Hansen v. Miller*, 52
F.4th 96, 100 (2d Cir. 2022) (quoting *Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d
423, 427 (2d Cir. 2014)) (holding that *Rooker-Feldman* "generally does not affect a federal
court's jurisdiction over claims for damages against third parties for alleged misconduct
occurring in the course of a state court proceeding, because the adjudication of such claims
would 'not require the federal court to sit in review of the state court judgment.'"), *and
McKnight v. Middleton*, 699 F. Supp. 2d 507, 515 (E.D.N.Y. 2010) (citing *McNamara v. Kaye*,
08-CV-4561, 2009 WL 3377914, at *1 (2d Cir. Oct. 20, 2009); *Green v. Mattingly*, 585 F.3d 97,
102 (2d Cir. 2009)) ("Thus, the Court reads *McNamara* and *Green* to suggest that a plaintiff's
claims seeking only monetary damages or prospective-only relief against court procedures rather
than modification of a family court's temporary custody or other orders would not run afoul of
the *Rooker-Feldman* doctrine.").  A claim is inextricably intertwined with the state court
judgment if "the federal claim succeeds only to the extent that the state court wrongly decided
the issues before it."  *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987).  "[A] plaintiff cannot
circumvent *Rooker-Feldman* by recasting her claims as federal civil rights violations."  *Kramer
v. Dane*, 17-CV-5253, 2018 WL 5077164, at *5 (E.D.N.Y. July 26, 2018) (citing *Davidson v.
Garry*, 956 F. Supp. 265, 268-69 (E.D.N.Y. 1996)), *report and recommendation adopted by*,
2018 WL 4489284 (E.D.N.Y. Sept. 19, 2018).  As a result, Plaintiff's constitutional claims
seeking monetary damages may also be subject to dismissal pursuant to the *Rooker-Feldman*
doctrine.  *See Johnston v. Queens Admin. For Children's Servs.*, 197 F. App'x 33, 34 (2d Cir.
2006) (summary order) ("to the extent [the plaintiff] was asserting claims regarding the adequacy
of the Family Court proceedings, the District Court lacked subject matter jurisdiction under the
*Rooker-Feldman* doctrine."); *Watley v. Dep't of Children and Families*, 13-CV-1858, 2019 WL
7067043, at *18 (D. Conn. Dec. 23, 2019) (dismissing the plaintiffs' substantive due process
claims arising from the termination of parental rights pursuant to *Rooker-Feldman*).

overcome judicial immunity.  *Jiggetts v. Rubin*, 22-CV-1238, 2022 WL 17834268, at *1

(N.D.N.Y. Dec. 1, 2022) (Stewart, M.J.) (citing *Parent v. New York*, 786 F. Supp. 2d 516, 534

(N.D.N.Y. 2011) (Hurd, J.), *aff'd*, 485 F. App'x 500 (2d Cir. 2012); *Bobrowsky v. Yonkers

Courthouse*, 777 F. Supp. 2d 692, 714 (S.D.N.Y. 2011)).  This is because "[w]ithout insulation

from liability, judges would be subject to harassment and intimidation."  *Young v. Selsky*, 41

F.3d 47, 51 (2d Cir. 1994).  Further, as amended in 1996, § 1983 provides that "in any action

brought against a judicial officer for an act or omission taken in such officer's judicial capacity,

injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief

was unavailable."  42 U.S.C. § 1983.

Judicial immunity does not apply when a judge takes action outside his or her judicial

capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete

absence of all jurisdiction."  *Mireles* 502 U.S. at 11-12; *see also Bliven,* 579 F.3d at 209-10

(describing actions that are judicial in nature).  However, "the scope of [a] judge's jurisdiction

must be construed broadly where the issue is the immunity of the judge."  *Stump v. Sparkman,*

435 U.S. 349, 356 (1978).  "District courts within this Circuit have applied this immunity

doctrine to New York Family Court Support Magistrates," like Defendant Gordon.  *Roger of the

Family Forest v. 45 C.F.R. § 75.2 IV-D Contractor Steve Banks*, 18-CV-10866, 2019 WL

4194332, at *4 (S.D.N.Y. Aug. 30, 2019) (collecting cases).

Plaintiff asserts claims arising from the efforts of Defendant Gordon, in his capacity as a

New York Family Court Support Magistrate, to assess and collect child support that Plaintiff

owes pursuant to Family Court orders and judgments.  Defendant Gordon is therefore immune

from suit under the doctrine of judicial immunity.  As a result, I recommend that Plaintiff's

claims against Defendant Gordon be dismissed.

Second, Plaintiff's claims against Defendants are untimely. The Supreme Court has held that, "[b]ecause § 1983 claims are best characterized as personal injury actions . . . a State's personal injury statute of limitations should be applied in all § 1983 claims." *Owens v. Okure*, 488 U.S. 235, 240-41 (1989). The Supreme Court found in particular that New York's general or residual statute related to personal injury actions should be applied, which sets a three-year statute of limitations. *Owens*, 488 U.S. at 249-50; *accord, Phillips v. City of New York*, 304 F. Supp. 3d 305, 311 (E.D.N.Y. 2018). Such statute of limitations begins "when a plaintiff has a complete and present cause of action, that is when the plaintiff can file suit and obtain relief," or, in other words, "when the wrongful act or omission results in damages, . . . and once the plaintiff knows or has reason to know of the injury which is the basis of his action." *McDonough v. Smith*, 898 F.3d 259, 265 (2d Cir. 2018) rev'd on other grounds *McDonough v. Smith*, 139 S.Ct. 2149 (2019).

In this case, Plaintiff's Complaint is clear that his alleged constitutional harms occurred as a result of the order of filiation and child support proceedings against him in 1998. (Dkt. No. 1 at 2.) It is therefore reasonable to find that Plaintiff knew or should have known of the proceedings against him and the child support order at the time those events occurred in 1998. "Of note, Plaintiff does not allege that he was never informed of either the proceedings against him or of the child support order itself until a later time." *Hall v. Clinton Cnty.*, 18-CV-1405, 2020 WL 1923236, at *5 (N.D.N.Y. Apr. 21, 2020) (Suddaby, C.J.) Nonetheless, Plaintiff did not file his Complaint in this action until September 19, 2022. (Dkt. No. 1.) As a result, I find that Plaintiff's claims are barred by the statute of limitations.

I also find that tolling is not warranted under the circumstances alleged. "Although the Second Circuit recognizes the continuing violation doctrine, it has qualified that the doctrine

applies only to claims 'composed of a series of separate acts that collectively constitute one unlawful practice,' or 'claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment.'" *Hall*, 2020 WL 1923236, at *6 (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015)). The mere fact that Plaintiff "continues to suffer an ongoing injury does not bring his claim under the auspices of the continuing violation doctrine. In other words, each payment Plaintiff is required to make under the child support order is not a new and separate act and injury, but merely a consequence of the initial act, namely, the proceedings and the issuance of the child support order in [1998]." *Id*. Plaintiff had a fully formed claim upon the occurrence of the relevant proceedings and the issuance of the child support order. I therefore recommend that the Court decline to find the continuing violation doctrine applicable to Plaintiff's claims, and instead find that there is no other apparent basis for tolling the statute of limitations. As a result, I recommend that Plaintiff's claims pursuant to 42 U.S.C. § 1983 be dismissed as time-barred.

Third, in the alternative, Plaintiff fails to state a claim upon which relief may be granted with respect to Defendant Bishop because she is not a state actor. A claim for relief under 42 U.S.C. § 1983 must allege facts showing that the defendant acted under color of state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Thus, to state a claim under § 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, <u>and</u> (2) the right was violated by a person acting under the color of state law, or a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988). Generally, private parties are not state actors, and are not liable under § 1983. *Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he

United States Constitution regulates only the Government, not private parties . . . .") (internal

quotation marks and citations omitted).  "Because the United States Constitution regulates only

the Government, not private parties, a litigant claiming that his constitutional rights have been

violated must first establish that the challenged conduct constitutes 'state action.'"  *United States*

*v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 941 F.2d 1292, 1295-

96 (2d Cir. 1991) (citing *Blum v. Yartsky*, 457 U.S. 991, 1002 (1982)).  A private defendant may

be held liable only as "a willing participant in joint activity with the State or its agents."  *Adickes*

*v. S.H. Kress & Co.*, 398 U.S. 144 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794

(1966)).  Claims under § 1983 can be brought against private entities by "showing that a person

acting under color of state law . . . collaborated with a private person . . . to deprive the plaintiff

of a constitutional right."  *Fries v. Barns*, 618 F.2d 988, 990 (2d Cir. 1980) (citing *Adickes*, 398

U.S. at 144).

Here, the Complaints fail to allege facts plausibly suggesting that Defendant Bishop was

a "state actor" or was "collaborating" with state actors.  (Dkt. No. 1 at 2 [alleging that Defendant

Bishop "instituted an action in the Rensselaer County Family Court entitled Paternity

Petition."]); *Dennis v. Sparks*, 449 U.S. 24, 28 (1980) ("merely resorting to the courts and being

on the winning side of a lawsuit does not make a party a co-conspirator or joint actor with the

judge"); *Deem v. DiMella-Deem*, 18-CV-11889, 2019 WL 1958107, at *8 (S.D.N.Y. May 2,

2019) (finding that the plaintiff failed to allege facts plausibly suggesting that his ex-spouse was

a state actor or conspired with state actors and thus, failed to state a claim for civil violations

against her); *Kashelkar v. Rubin & Rothman*, 97 F. Supp. 2d 383, 390 (S.D.N.Y. 2000)

("Plaintiff's attempt to allege state action via the lawyer Defendants' interactions with [a state

judge] is insufficient as a matter of law"); *Gangemi v. Johnson*, 98-CV-8470, 1999 WL 777861,

at *3 (S.D.N.Y. Sept. 30, 1999) ("Whether [a judge] made rulings based on information supplied by [an attorney] that was false or misleading is irrelevant to the constitutional analysis and cannot support a finding of cooperation between [the attorney] and the state jurist.  Clearly, a judge does not conspire with an attorney merely by ruling in an attorney's favor.").

Fourth, in the alternative, based on the allegations contained in the Complaint, I find that Plaintiff's claims against Defendant Hall are subject to dismissal pursuant to the doctrine of qualified immunity and failure to state a claim upon which relief may be granted.  During the time in question Defendant Hall was acting as Commissioner of the Rensselaer County Department of Social Services, which oversees the child support collection unit. (Dkt. No. 1 at 2.)  I find that Defendant Hall is "not entitled to judicial immunity because [his] responsibilities are not closely associated with the judicial process nor is [his] agency a quasi-judicial body.  However, [he is] entitled to qualified immunity." *Parent*, 786 F. Supp. 2d at 537; *but see Ramos v. Putnam Family Court*, 15-CV-1443, 2017 WL 3083727, at *3 (D. Conn. July 18, 2017) (quoting *Lomtevas v. Cardozo*, 05-CV-2779, 2006 WL 229908, at *5 (D. Conn. Jan. 31, 2006)) (finding that "[o]fficials involved with . . . the enforcement of [a] child support order are entitled to 'absolute quasi-judicial immunity.'").  Plaintiff does not allege any acts by Defendant Hall except that he "enforce[d] an Order of Support against [P]laintiff in favor of [D]efendant Bishop" (Dkt. No. 1 at ¶ 14), which he had authority to do, pursuant to the New York State Family Court Act.  His conduct in "enforcing the petition did not violate any clearly established right.  There is no right to refuse to pay child support.  Moreover, even if there was such a right and it was clearly established, it was objectively reasonable for [Defendant Hall] to believe that carrying out [his] duties and enforcing the petition did not violate [P]laintiff's rights." *Parent*, 786 F. Supp. 2d at 537.  As a result, I recommend that all claims against Defendant Hall in his

individual capacity be dismissed based on the doctrine of qualified immunity. *See also Chris H. v. New York*, 16-CV-6807, 2017 WL 2880848, at *9 (S.D.N.Y. July 5, 2017) (finding that the plaintiff's claims against the New York City Human Resources Administration/Department of Social Services Commissioner were subject to dismissal pursuant to the doctrine of qualified immunity).

Moreover, I recommend that any claims against Defendant Hall in his official capacity also be dismissed. Official capacity suits are merely an alternative way to plead a claim against an entity of which an officer is an employee. *Kentucky v. Graham,* 473 U.S. 159, 165 (1985). "[A] governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation." *Graham,* 473 U.S. at 166 (quoting *Polk Cnty. v. Dodson,* 454 U.S. 312, 326 (1981)). In an official capacity suit against a municipal employee, a plaintiff must show that the acts were performed pursuant to a policy or custom. *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 226 (2d Cir. 2004).

Here, the suit against Defendant Hall in his official capacity is essentially an action against Rensselaer County. Plaintiff fails to allege facts plausibly suggesting that Defendant Hall performed any acts pursuant to a policy or custom. As a result, I recommend that Plaintiff's claims against Defendant Hall in his official capacity be dismissed.

### C.   State Law Claims

Having found that all of Plaintiff's federal claims are subject to dismissal, I recommend that, to the extent that he has asserted any state law claims, the Court decline to exercise jurisdiction over those claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over [pendent state law claims] if . . . the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v.*

*Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (citing *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (1974)) (holding that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment").

In the alternative, I recommend that Plaintiff's state law claims be dismissed. "The New York State Constitution provides a private right of action where remedies are otherwise unavailable at common law or under § 1983." *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (summary order). The private right of action under the New York State Constitution "is a 'narrow remedy' available only when 'necessary to effectuate the purposes of the State constitutional protections that the plaintiff invokes' or 'appropriate to ensure full realization of the plaintiff's rights.'" *Biswas v. City of New York*, 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013) (alterations omitted) (quoting *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 84 (N.Y. 2001)). Accordingly, a private cause of action under the New York State Constitution "is usually available only in cases in which a plaintiff[ ] . . . has no alternative remedy." *Biswas*, 973 F. Supp. 2d at 522.

Plaintiff has asserted claims for damages under section 1983 related to his experiences in Rensselaer Family Court. (Dkt. No. 1.) Those claims relate to the same conduct that Plaintiff says also violated his rights under the New York State Constitution. (*See id.*) "In light of those alternative remedies for the conduct challenged in this case, [I recommend that] this Court decline[] to break new ground in state constitutional law and fashion a cause of action directly

under the New York State Constitution." *Orens v. Amherst Police Dep't*, 20-CV-0778, 2022 WL 4485292, at *7 (W.D.N.Y. Sept. 27, 2022) (citing *Biswas*, 973 F. Supp. 2d at 522 ("Actions for damages at common law and under § 1983 are both considered adequate alternative remedies that preclude the assertion of a claim for damages under the state Constitution."); *see also Wahad v. F.B.I.*, 994 F. Supp. 237, 238 (S.D.N.Y. 1998) ("Section 1983 need not provide the exact same standard of relief in order to provide an adequate remedy.")); *see Donovan v. Norwich City Sch. Dist.*, 2022 WL 623904, at *19 (N.D.N.Y. Mar. 3, 2022) (McAvoy, J.) (citing *Wahad*, 994 F. Supp. at 240) (dismissing the plaintiff's claim under the New York State Constitution and noting that "[t]he availability of Section 1983 claims precludes recognition of state constitutional tort claims, even if the Section 1983 claims are ultimately unsuccessful.").  As a result, I recommend that, in the alternative, Plaintiff's claims pursuant to the New York State Constitution be dismissed for failure to state a claim upon which relief may be granted.

## V.    OPPORTUNITY TO AMEND

Generally, "[a] *pro se* complaint should not be dismissed without the court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Nielson v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (citation and internal quotation marks omitted); *see also* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  Leave to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

Although I have serious doubts about whether Plaintiff can amend to assert actionable claims I recommend that he be granted leave to amend the Complaint to the extent that it asserts claims pursuant to 42 U.S.C § 1983 seeking monetary damages against (1) Defendant Bishop,

and (2) Defendant Hall in his official capacity. *See Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir.

2007) (citing *Jones v. Bock*, 549 U.S. 199, 213 (2007)) ("The pleading requirements in the

Federal Rules of Civil Procedure, however, do not compel a litigant to anticipate potential

affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in

avoidance of such defenses.").

However, I recommend that Plaintiff's claims (1) seeking an order "directing the

termination of any and all child support orders and order of affiliation [sic]," (2) against

Defendant Gordon, and (3) against Defendant Hall in his individual capacity be dismissed

without leave to amend because a better pleading will not cure the defects associated with those

claims. *See Dickson v. Schenectady Family Court*, 22-CV-0499, 2022 WL 16966549, at *5

(N.D.N.Y. Oct. 27, 2022) (Hummel, M.J.) (citing *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d

114, 116 (2d Cir. 2017) ("[A] complaint must be dismissed without prejudice where the

dismissal is due to the court's lack of subject matter jurisdiction[.]"); *Johnson v. Bieling*, 20-CV-

1124, 2021 WL 1841470, at *12 (N.D.N.Y. Jan. 6, 2021) (Lovric, M.J.) (collecting cases

dismissing with prejudice and without leave to amend on judicial immunity grounds), *report and

recommendation adopted by*, 2021 WL 1840591 (N.D.N.Y. May 7, 2021); *see also Edwardsen v.

Aloi*, 17-CV-0202, 2017 WL 1283496, at *3 (N.D.N.Y. Mar. 3, 2017) (Dancks, M.J.))

("dismissals for lack of subject matter jurisdiction are dismissed without prejudice . . . however,

because the Schenectady County Family Court and Judge Polk are immune from suit, the

undersigned recommends dismissing the complaint with prejudice and without leave to

amend."), *report and recommendation adopted by*, 2022 WL 16961389 (N.D.N.Y. Nov. 16,

2022) (Hurd, J.); *Kramer v. Dane*, 17-CV-5253, 2018 WL 4489284, at *5 (E.D.N.Y. Sept. 19,

2018) (denying leave to amend where "the defects in the Amended Complaint are jurisdictional

and substantive and cannot be cured through better pleading"); *Chris H.*, 2017 WL 2880848, at

*10 (holding that "amending the Complaint would be futile as to the claims that are . . . barred

by the *Rooker-Feldman* doctrine, judicial immunity or qualified immunity.").

If Plaintiff chooses to file an amended complaint, he should note that the law in this

circuit clearly provides that "'complaints relying on the civil rights statutes are insufficient

unless they contain some specific allegations of fact indicating a deprivation of rights, instead of

a litany of general conclusions that shock but have no meaning.'" *Hunt v. Budd*, 895 F. Supp.

35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.

1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y.

May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth

facts that give rise to the claims, including the dates, times, and places of the alleged underlying

acts, and each individual who committed each alleged wrongful act. In addition, the revised

pleading should allege facts demonstrating the specific involvement of any of the named

defendants in the constitutional deprivations alleged in sufficient detail to establish that they

were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir.

1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing

Complaint, and must be a wholly integrated and complete pleading that does not rely upon or

incorporate by reference any pleading or document previously filed with the Court. *See Shields*

*v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an

amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED only for purposes of filing and any appeal unless the trial court certifies in writing that the appeal is not taken in good faith**; and it is further respectfully

**RECOMMENDED** that the Complaint be **DISMISSED WITH LEAVE TO AMEND**, to the extent that it asserts claims pursuant to 42 U.S.C. § 1983 seeking monetary damages against (1) Defendant Bishop, and (2) Defendant Hall in his official capacity, for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915; and it is further respectfully

**RECOMMENDED** that the Complaint be **DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND**, to the extent that it asserts claims against (1) Defendant Gordon, and (2) Defendant Hall in his individual capacity because it seeks monetary relief against defendants who are immune from such relief pursuant to 28 U.S.C. § 1915; and it is further respectfully

**RECOMMENDED** that the Complaint be **DISMISSED WITHOUT PREJUDICE BUT WITHOUT LEAVE TO AMEND**, to the extent that it asserts claims seeking an order "directing the termination of any and all child support orders and order of affiliation [sic]," because the court lacks subject matter jurisdiction; and it is further respectfully

**RECOMMENDED** that the Court decline to exercise supplemental jurisdiction over Plaintiff's New York State Constitutional claims pursuant to 28 U.S.C. § 1367(c)(3); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on the parties, along with copies of the unpublished decisions cited herein in

accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

    **NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013); FED. R. CIV. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: February  7 , 2023
       Binghamton, New York

                             Miroslav Lovric
                             U.S. Magistrate Judge

---

[6]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  FED. R. CIV. P. 6(a)(1)(C).

2018 WL 4185705
Only the Westlaw citation is currently available.
<u>For Online Publication Only</u>
United States District Court, E.D. New York.

Nicholas TALLEY, Donna Evans Talley, Plaintiffs,

v.

LOANCARE SERVICING, DIV. OF
FNF, Selene Finance, Defendants.

15-CV-5017 (JMA) (AKT)
|
Signed 08/31/2018

**Attorneys and Law Firms**

Donna Evans Talley, Nicholas Talley, pro se.

Stuart L. Kossar, Esq., Knuckles, Komosinski & Manfro, LLP, 565 Taxter Road, Suite 590, Elmsford, New York 10523, Attorney for Defendant Selene Finance, LP.

Edward Rugino, Rosicki, Rosicki and Associates, P.C., 51 East Bethpage Road, Plainview, New York 11803, Attorney for Defendant LoanCare Servicing.

**MEMORANDUM AND ORDER**

Joan M. Azrack, United States District Judge

 **\*1**  On August 18, 2015, Donna Evans Talley and Nicholas Talley (together "plaintiffs" or the "Talleys") filed a *pro se* complaint in this Court against Selene Financing ("Selene") and LoanCare Servicing, Division of FNF ("LoanCare") (together "defendants"). On January 21, 2016, the Court granted plaintiffs' applications to proceed *in forma pauperis*, but dismissed the complaint *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Plaintiffs were given an opportunity to file an amended complaint. On February 16, 2016, plaintiffs filed an amended complaint, which seeks, among other things, injunctive relief to "[s]top illegal and fraudulent foreclosure." (Am. Compl. at 4.) Simultaneous with the filing of the amended complaint, plaintiffs filed an Order to Show Cause for a Preliminary Injunction and Temporary Restraining Order seeking to enjoin LoanCare from pursuing a foreclosure sale scheduled for March 3, 2016. In an Order dated February 24, 2016, this Court, *sua sponte* dismissed, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), the

prayer for injunctive relief in plaintiffs' amended complaint and denied plaintiffs' request for a preliminary injunction and temporary restraining order. Before the Court are defendants' motions to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons stated below, the Court grants defendants' motions and dismisses plaintiffs' amended complaint in its entirety.

## I. BACKGROUND

The following facts are taken from plaintiffs' amended complaint, the record before the Court and fillings from the foreclosure action. In deciding a motion to dismiss under Rule 12(b)(6), the Court may take judicial notice of public records, including state court filings. Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). The Court can also consider exhibits—such as copies of the mortgage and mortgage assignments—which are attached or integral to the amended complaint. Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004).

**A.** <u>The Bay Shore Mortgage</u>

On March 7, 2009, Nicholas Talley and Donna Evans Talley executed a mortgage in favor of non-party Lend America (the lender) in the principal sum of $311,558 concerning a property located at 22 Lakeland Street, Bay Shore, New York ("the Bay Shore property"). (Am. Compl., ECF No. 7 at 15-16.) Plaintiffs claim that there was no recording of the original title or delivery of the mortgage or deed to plaintiffs. (Id. at 5.) Plaintiffs further allege that Lend America became defunct in December of 2009 and that no assignments of the mortgage occurred prior to 2012. (Id.) By way of an endorsement to the note and two assignments of the mortgage, the loan instruments were transferred to defendant LoanCare on February 27, 2012. (Id. at 5, 8-12.) The assignment to LoanCare was recorded on April 10, 2012 in the Suffolk County Clerk's Office. (Id. at 5.) On March 31, 2015, LoanCare assigned the mortgage to defendant Selene. (Id. at 24-25.)

**B.** <u>The Foreclosure Proceeding</u>

 **\*2**  Plaintiffs defaulted on the note and mortgage by failing to make their monthly payment due in January 2011 and each month thereafter. (Kossar Decl. Ex. J, ECF No. 42-11 at 3.) As a result, LoanCare commenced an action against

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 21 of 185

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

plaintiffs in New York State Supreme Court, Suffolk County on March 19, 2012. (Id.) In the Talleys' verified joint answer, they admitted their default in payments but requested a judicially mandated loan modification. (Id. at 8.) The state court denied the Talleys' request, noting that after numerous prior attempts the parties had not been able to reach an agreement to modify the loan or settle the action. (Id.) The Talleys also asserted fifteen affirmative defenses, alleging, among other things: lack of personal jurisdiction; lack of standing and legal capacity; fraud in connection with the origination and the servicing of the loan; lack of good faith with respect to a loan modification; and LoanCare's failure to state a cause of action, mitigate damages and comply with the provisions of Real Property Actions and Proceedings Law and Banking Law. (Id. at 3.) LoanCare moved for summary judgment against the Talleys seeking to strike their answer and dismiss their affirmative defenses amongst other relief. (Id.) The Talleys opposed the motion and cross moved for summary judgment seeking dismissal of the complaint on the grounds that LoanCare lacked standing. (Id. at 4.)

In an Order dated April 11, 2014, the state court denied the Talleys' cross motion for summary judgment in its entirety. (Id.) In response to the Talleys' lack of standing defense, the court found that, "as holder of the endorsed note and as the assignee of the mortgage, [LoanCare] ha[d] standing to commence [the foreclosure] action. (Id. at 5.) The court noted that LoanCare demonstrated that it had been in "continuous possession of the note and mortgage since February 27, 2012," concluding that LoanCare "is the transferee and holder of the original note as well as the assignee of the mortgage by virtue of the written assignments." (Id. at 6.) In sum, the court held that LoanCare satisfied its *prima facie* burden as to the merits of the foreclosure action as it produced the endorsed note, the mortgage and assignments as well as evidence of plaintiffs' nonpayment. (Id. at 5.) Further, the court noted that LoanCare submitted proof of its compliance with the notice requirements of the ⚑ RPAPL § 1303 and § 1304. (Id.) Thus, the court found that LoanCare established its entitlement to summary judgement and dismissed the Talleys' remaining affirmative defenses finding that plaintiff submitted sufficient proof to establish, *prima facie*, that such defenses were unmeritorious. (Id. at 5, 7-9) (noting that circumstances of fraud must be "stated in detail" and that a defense based upon the "doctrine of unclean hands" lacks merit where a defendant fails to come forward with admissible evidence of immoral or unconscionable behavior). The court also noted that the Talleys "failed to demonstrate that they made a reasonable attempt to discover the facts

which would give rise to a triable issue of fact or that further discovery might lead to relevant evidence." (Id. at 8.) The court further rejected the Talleys' contention that they were entitled to a judicially mandated loan modification and ordered the appointment of a referee to compute amounts due under the subject note and mortgage. (Id. at 8, 9.)

On September 29, 2014, the state court entered final judgment for foreclosure and sale of the Bay Shore property. (Kossar Decl. Ex. K, ECF No. 42-12 at 3-8.) The state court further ordered that LoanCare was entitled to judgment establishing the validity of the mortgage and to recover $390,013.50 with interest to date of the closing of time of the referee's sale of the subject property. (Id.)

## C. The Instant Action

Plaintiffs' amended complaint alleges fraud against defendants LoanCare and Selene along with other claims under: (1) the Real Estate Settlement Procedures Act ("RESPA"), ⚑ 12 U.S.C. § 2605, § 2608; (2) federal regulation 24 C.F.R. § 203.350 [1] associated with the National Housing Act, 12 U.S.C. § 1701; (3) various provisions of the Uniform Commercial Code ("UCC"); (4) the Pooling and Servicing Agreement ("PSA") that governs plaintiffs' mortgage; and (5) fraud. [2] (Amend. Compl.) Though stated somewhat differently, plaintiffs' amended complaint appears to reiterate their contentions from the prior state court foreclosure action, specifically alleging that LoanCare did not have standing to foreclose on the Bay Shore property and that the mortgage and its assignment to LoanCare, and subsequently to Selene, were invalid and therefore unenforceable. [3] (See Am. Compl.)

**\*3** Specifically, plaintiffs allege that the original deed has never been delivered since the inception of the mortgage. (Id. at 3.) Plaintiffs claim that although the original lender, Lend America ceased to exist as of December 2009, the mortgage was never assigned in the years 2009 through 2012. (Id.) Plaintiffs allege that Lend America "acquired the loan without providing principal/issuer resulting in no securitization of an FHA security instrument from 2009-2012." (Id.) Plaintiffs appear to allege that "no delivery of deed and title" concerning plaintiffs' mortgage "proves deceptive practices and fraud was the intention from the origination of the mortgage." (Id.) Plaintiffs further allege that defendants have no standing under Article III of the Constitution because the original title was not recorded or delivered to plaintiffs. (Id. at 5-6.) Finally,

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 22 of 185

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

plaintiffs allege that "even if this was a legal foreclosure, we were not given our due process because we were not notified by LoanCare or the Court of our Right to Appeal thereby denying us 'due process'." [4] (Id. at 6.) Specifically, plaintiffs allege that they did not receive the Notice of Entry of Final Judgment for Foreclosure and Sale from LoanCare until February 6, 2015 and that the September 29, 2014 judgment is in violation of the PSA, RESPA and the UCC because the mortgage and note were transferred to Selene on August 1, 2014. [5] (Id.)

Plaintiffs seek the following relief: "[d]efendants produce orig[inal] deed of mortgage, title with covenants"; "[r]eimburse[ment] [of] $4,336 for services not rendered (deed/title)"; "[p]rove securitization of mortgage from 2009 to present"; "[p]roduce chain of assignment"; "[e]xplain no recordation of closing documents"; "[r]eveal identity of principal/issuer"; "LoanCare cease and desist from harassing us and placing us under duress since the mortgage has been sold to Selene"; "[s]top illegal and fraudulent foreclosure by prior servicer, LoanCare without assignment." (Id. at 4.)

Defendants filed separate motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), claiming that plaintiffs' claims should be dismissed because (a) they are barred by the *Rooker-Feldman* doctrine; (b) are barred by the doctrines of *res judicata* and collateral estoppel; and (c) fail to state a claim upon which relief can be granted. [6]

## II. DISCUSSION

**A. Standard of review**

The court is mindful that when considering a motion to dismiss a *pro se* complaint, the court must construe the complaint liberally and interpret the complaint "to raise the strongest arguments they suggest." Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006). "However, mere conclusions of law or unwarranted deductions need not be accepted." Bobrowsky, 777 F. Supp. 2d at 703 (internal quotation marks and citations omitted).

### 1. Fed. R. Civ. P. 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) requires the dismissal of a claim when there is a "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). A case is properly

dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see Fed. R. Civ. P. 12(b)(1). In reviewing a motion to dismiss under this Rule, the Court accepts all factual allegations in the complaint as true. Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998). However, the Court should not draw inferences favorable to the party asserting jurisdiction. Id. In resolving a jurisdictional issue, the Court may consider affidavits and other materials beyond the pleadings, but may not rely on mere conclusions or hearsay statements contained therein. J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004); see also All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 89, n. 8 (2d Cir. 2006) ("The presentation of affidavits on a motion under Rule 12(b)(1) ... does not convert the motion into a motion for summary judgment under Rule 56.").

### 2. Fed. R. Civ. P. 12(b)(6)

**\*4** To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). Mere labels and legal conclusions will not suffice. Twombly, 550 U.S. at 555. In reviewing a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). Motions to dismiss invoking *res judicata* and collateral estoppel are properly brought under Rule 12(b)(6). See Hirsch v. Desmond, No. 08–CV–2660, 2010 WL 3937303, at *2 (E.D.N.Y. Sept. 30, 2010) (collateral estoppel); Wiercinski v. Mangia 57, Inc., No. 09–CV–4413, 2010 WL 2681168, at *1 (E.D.N.Y. July 2, 2010) (*res judicata* ).

**B. *Rooker-Feldman* Doctrine**

Defendants' initial argument is that this Court lacks jurisdiction to hear this case under the *Rooker-Feldman*

Case 1:22-cv-00983-GTS-ML   Document 6   Filed 02/07/23   Page 23 of 185

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

doctrine. See Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) (holding that only the Supreme Court can entertain a direct appeal from a state court judgment);

District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 483, n.3 (1983) (finding that federal courts do not have jurisdiction over claims which are "inextricably intertwined" with prior state court determinations). The *Rooker-Feldman* doctrine "recognizes that 'federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments.' " Alston v. Sebelius, CV 13-4537, 2014 U.S. Dist. LEXIS 123613, at *23-24 (E.D.N.Y. July 31, 2014) (report and recommendation), adopted by, 2014 U.S. Dist. LEXIS 122970, 2014 WL 4374644 (E.D.N.Y. Sept. 2, 2014) (quoting Hoblock v. Albany Cnty. Bd. of Elections, 422 F.3d 77, 84 (2d Cir. 2005) ). "The doctrine applies when a litigant seeks to reverse or modify a state court judgment or asserts claims that are 'inextricably intertwined' with state court determinations." Park v. City of N.Y., No. 99–Civ–2981, 2003 WL 133232, at *7 (S.D.N.Y. Jan. 16, 2003) (citations omitted). The doctrine precludes a district court from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).

The Second Circuit has established four requirements that must be satisfied for the *Rooker–Feldman* doctrine to apply: (1) "the federal-court plaintiff must have lost in state court;" (2) "the plaintiff must complain of injuries caused by a state court judgment;" (3) "the plaintiff must invite district court review and rejection of the judgment;" and (4) "the state-court judgment must have been rendered before the district court proceedings commenced." Hoblock, 422 F.3d at 85 (internal quotation marks and citations omitted). The first and fourth requirements are procedural and the second and third are substantive. Id.

Specifically, with respect to foreclosure proceedings, "courts in this Circuit have consistently held that any attack on a judgment of foreclosure is clearly barred by the *Rooker–Feldman* doctrine." Ashby v. Polinsky, No. 06–CV–6778, 2007 WL 608268, at *1 (E.D.N.Y. Feb. 22, 2007) (internal quotation marks and citation omitted), aff'd, 328 F. App'x 20 (2d Cir. 2009); see also Done v. Wells Fargo Bank, N.A., No. 08–CV–3040, 2009 WL 2959619, at *3 (E.D.N.Y. Sept. 14,

2009); Ward v. Bankers Trust Co. of California, N.A., No. 09–CV–1943, 2011 WL 1322205, at *5 (E.D.N.Y. Mar. 29, 2011). This even includes challenges to a judgment of foreclosure that was allegedly procured by fraud, as plaintiffs have alleged herein. See, e.g., Swiatkowski v. Citibank, 745 F. Supp. 2d 150, 164–65 (E.D.N.Y. 2010) aff'd, 446 F. App'x 360, 361 (2d Cir. 2011) (finding *Rooker–Feldman* doctrine applied to allegations that defendants engaged in a pattern of submitting fraudulent and perjurious documents related to the judgment of foreclosure and sale in other courts and that the allegations and relief sought were "inextricably intertwined with the state court judgment and would require overturning the state court judgment"); Parra v. Greenpoint Mortgage Co., No. Civ.A. 01–CV–02010, 2002 WL 32442231, at *2 (E.D.N.Y. Mar. 26, 2002) ("The fact that [a] plaintiff alleges that a state court judgment was procured by fraud does not remove [the] claims from the ambit of *Rooker–Feldman*"); Dockery v. Cullen & Dykman, 90 F. Supp. 2d 233, 236 (E.D.N.Y. 2000) (same).

**\*5** In the instant case, *Rooker-Feldman* bars plaintiffs' claims. The procedural requirements of *Rooker–Feldman* are satisfied. First, plaintiffs lost in state court. (Kossar Decl. Exs. J, K.) Second, the state court granted LoanCare summary judgment and denied plaintiffs' cross-motion for summary judgment by Order dated April 9, 2014, and issued a foreclosure judgment on September 29, 2014. (See id.) Since those judgments predate the August 18, 2015 filing of the initial complaint in the instant action, (see Compl., ECF 1), all pertinent state-court decisions were issued before the proceedings in this Court commenced.

The substantive requirements of *Rooker–Feldman* are also satisfied because plaintiffs' amended complaint seeks review and rejection of those state court decisions. Plaintiffs' claims complain of injuries, including, "deceptive practices and fraud" at the origination of the mortgage due to no delivery or recording of closing documents and seeks to "[s]top illegal and fraudulent foreclosure," in contravention of the state court judgment of foreclosure and the state court's acceptance of the validity of the mortgage documents that formed the basis for that judgement. (Am. Compl. at 4-6.) See Trakansook v. Astoria Fed. Sav. & Loan Ass'n, No. 06–Civ–1640, 2007 WL 1160433, at *5 (E.D.N.Y. Apr. 18, 2007), aff'd, No. 07–2224–CV, 2008 WL 4962990 (2d Cir. Nov. 21, 2008) (holding that because plaintiff's complaint asked the court "to vacate the judgment of foreclosure and sale and award her title to the property, it [was] plain that she [was] inviting

[the] court to 'reject' the [state court] order."); Done v. Option One Mortgage, No. 09–civ–4770, 2011 WL 1260820, at *6 (E.D.N.Y. Mar. 30, 2011) (concluding substantive requirements of *Rooker-Feldman* met where "[a]lthough plaintiff ha[d] made a cursory reference to seeking monetary damages, it [was] abundantly clear that the whole purpose of th[e] action [was] to undo the foreclosure judgment").

In their amended complaint, plaintiffs contend that LoanCare had no standing to bring the state court foreclosure action. (See Am. Compl.) However, as plaintiffs admit, the state court rejected this exact contention in its final judgment. (Pls.' Supplemental Opp. to defendant LoanCare's Mot. to Dismiss, ECF No. 43 at 4; Kossar Decl. Ex. J at 7 ("The assertions by the defendant mortgagors as to the plaintiff's alleged lack of standing, which rest, *inter alia*, upon alleged defects in the assignments, rife with speculation, are rejected as unmeritorious ...").) In opposition to defendants' motion to dismiss, plaintiffs specifically state that they are seeking "[r]escission of [f]inal [s]ummary [j]udgment", that this Court "[r]ender the lien unenforceable due to fraudulent concealment", and seek "[d]ismissal of the [f]oreclosure due to lack of [s]tanding." (Pls.' Opp. to defendant LoanCare's Mot. to Dismiss, ECF No. 39-12.) Plaintiffs are requesting this Court to do exactly what *Rooker-Feldman* forbids— to overturn the New York Supreme Court judgment of foreclosure. See Trakansook, 2007 WL 1160433, at *5 ("Because [plaintiff's] complaint asks this court to vacate the judgment of foreclosure and sale and award her title to the property, it is plain that she is inviting this court to 'reject' the [state court order].") A ruling in plaintiffs' favor "would effectively declare the state court judgment [of foreclosure] fraudulently procured and thus void, ... which is precisely the result that the *Rooker–Feldman* doctrine seeks to avoid." Kropelnicki v. Siegel, 290 F.3d 118, 129 (2d Cir. 2002).

Moreover, plaintiffs' attempt to thwart application of *Rooker-Feldman* by labeling their claims as "fraud in the inducement" and "fraudulent concealment" rather than the "fraud" they alleged in the state action fails. Plaintiffs' claim of "newly discovered facts of fraud in the inducement" based on the actions of third parties at the time of the loan origination fails to preclude application of *Rooker-Feldman*.[7] (Pls.' Opp. to defendant Selene's Mot. to Dismiss, ECF No. 42-26 at 1.) Plaintiffs' claims relate not to defendants' conduct in the course of the state court foreclosure action, but, rather, to the validity of the underlying mortgage documents and defendants' standing to commence the foreclosure

proceeding. Thus, "the injury complained of is the judgment permitting the foreclosure, which implicitly held that the mortgage[ ] w[as] valid." Webster v. Wells Fargo Bank, N.A., No. 08–civ–10145, 2009 WL 5178654, at *8 (S.D.N.Y. Dec. 23, 2009), aff'd sub nom. as amended (Jan. 24, 2012) Webster v. Penzetta, 458 F. App'x 23 (2d Cir. 2012) (finding the Court "plainly lack[ed] subject matter jurisdiction" over plaintiff's claims "attacking the validity of the foreclosure proceedings and the validity of the underlying mortgage loan documents" pursuant to *Rooker-Feldman* because "the injury complained of is the judgment permitting foreclosure, which implicitly held that the mortgages were valid."); see also Feliciano v. U.S. Bank Nat. Ass'n, No. 13–CV–5555, 2014 WL 2945798, at *2–4 & n. 7 (S.D.N.Y. June 27, 2014) (finding that plaintiffs' claims that "[defendant] wrongfully foreclosed upon their home because it lacked the legal capacity to accept the assignment of the underlying mortgage, and therefore lacked standing in the Foreclosure Action" failed under *Rooker-Feldman* and the fraud exception did not apply because "the complaint alleges fraudulent conduct (generally) by defendant prior to the institution of the Foreclosure Action rather than on the state court itself." (internal citations and quotations omitted) ). Therefore, plaintiffs attempt to invoke a fraudulent procurement exception to the *Rooker–Feldman* doctrine fails.

**\*6** Accordingly, the Court lacks subject matter jurisdiction over plaintiffs' claims and the amended complaint should be dismissed in its entirety.

## C. *Res judicata*

Alternatively, to the extent the *Rooker-Feldman* doctrine does not deprive the Court of subject matter jurisdiction, all of plaintiffs' claims are barred by the doctrine of *res judicata*. Under the doctrine of *res judicata*, "a final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action." Flaherty v. Lang, 199 F.3d 607, 612 (2d Cir. 1999) (quotation omitted). "In applying the doctrine of *res judicata*, [a court] must keep in mind that a state court judgment has the same preclusive effect in federal court as the judgment would have had in state court." Burka v. New York City Transit Auth., 32 F.3d 654, 657 (2d Cir. 1994). Further, federal courts must apply the doctrine of *res judicata* according to the rules of the state from which the judgment is taken. See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 373 (1996); Giardina v. Nassau Cnty., No. 08–CV–2007, 2010 WL 1850793, at *3 (E.D.N.Y. May 7, 2010). New York State

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 25 of 185

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

courts apply a transactional analysis, "barring a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." Burka, 32 F.3d at 657 (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) ); see Done, 2009 WL 2959619, at *3 (same).

*Res judicata* applies when there was: (1) a previous action that resulted in a final adjudication on the merits, (2) the party against whom *res judicata* is to be invoked was party to the previous action or in privity with a party to that action, and (3) the claims involved in the current case were, or could have been, raised in the previous action. Swiatkowski, 745 F. Supp. 2d at 171 (quoting Whelton v. Educ. Credit Mgmt. Corp., 432 F.3d 150, 155 (2d Cir. 2005) ). *Res judicata* applies to defenses that could have been raised in the prior action as well. Waldman v. Vill. of Kiryas Joel, 39 F. Supp. 2d 370, 377 (S.D.N.Y. 1999) (*res judicata* "prevents a party from litigating any issue or defense that could have been raised or decided in a previous suit, even if the issue or defense was not actually raised or decided") (quoting Woods v. Dunlop Tire Corp., 972 F.2d 36, 38 (2d Cir. 1992) ); Robbins v. Growney, 229 A.D.2d 356, 645 N.Y.S.2d 791, 792 (N.Y. App. Div. [1st] Dep't 1996) ("The doctrine of *res judicata* is applicable ... to defenses raised in the prior action or which, though not raised, could have been.") (internal citation omitted). "All litigants, including *pro se* plaintiffs, are bound by the principles of *res judicata.* Done, 2009 WL 2959619, at *3.

Here, plaintiffs' claims are barred from further adjudication by *res judicata.* First, the judgment of foreclosure entered against plaintiffs is an adjudication on the merits, which prevents reconsideration of any claim that is based on the same facts as the foreclosure judgment and which would disturb LoanCare's (or Selene's) ability to enforce rights provided pursuant to the mortgage and the note securing the Bay Shore property. See id. at *4. Second, the facts pled by plaintiffs in their amended complaint—that LoanCare brought the foreclosure suit in the Suffolk County Supreme Court and was not the holder of a valid mortgage note at the time of assignment, (see Am. Compl.)—would have been central to deciding any entitlement to a judgment of foreclosure, and thus demonstrates that their claims in the current suit arise from the same transaction as LoanCare's claim in the previous foreclosure action. Done, 2009 WL 2959619, at *4. Plaintiffs' claims arising from the origination of the mortgage and attacking the ability of defendants to enforce it in the foreclosure proceedings, (see Am. Compl.),

not only could have been raised as a defense to foreclosure in the state court, but were actually raised, (see Kossar Decl. Exs. I, J) and therefore cannot be relitigated in this Court.

See, e.g., Hinds v. Option One Mortg. Corp., No. 11–CV–6149, 2012 WL 6827477, at *5 (E.D.N.Y. Dec. 6, 2012) (report & recommendation), adopted by 2013 WL 132719 (E.D.N.Y. Jan. 10, 2013) ("Inasmuch as Plaintiff's fraud claim is premised on his allegations that Defendants obtained the underlying mortgage through predatory lending tactics and fraud, *res judicata* operates to preclude federal review of such a claim ... [since the plaintiff's claims] arise from the same factual grouping—namely the validity of Plaintiff's mortgage, and the right of Defendants to enforce that agreement in a state court foreclosure proceeding"): Solomon v. Ocwen Loan Servicing, LLC, No. 12-CV-2856, 2013 WL 1715878, at *5 (E.D.N.Y. Apr. 12, 2013) ("The state-law claims asserted by plaintiff arise from the origination of the [m]ortgage and attack the ability of defendants to enforce it in the foreclosure proceedings. These claims could have been raised as a defense to foreclosure in state court, and therefore cannot be relitigated in a subsequent suit in federal court."); Swiatkowski, 745 F. Supp. 2d at 171 ("Many of the factual allegations plaintiff raises in opposition to the instant motion to dismiss involve issues that could have been raised as claims or defenses in the state court [foreclosure] proceedings."); Gray v. Americredit Fin. Servs., Inc., No. 07 Civ. 4039, 2009 WL 1787710, at *6 n. 2 (S.D.N.Y. June 23, 2009) ("Plaintiff's allegations of fraud regarding the underlying loan transaction do not appear to be of the type recognized by certain courts as immune from *res judicata.*"); Yeiser v. GMAC Mortg. Corp., 535 F.Supp.2d 413, 421 (S.D.N.Y. 2008) ("According to New York law, ... *res judicata* ... applies to defenses that could have been litigated, including defenses to a foreclosure.").

**\*7** Whether cast as violations of RESPA, or regulations governing the National Housing Act, plaintiffs effectively allege that defendants improperly obtained the foreclosure judgment due to lack of standing based on fraud or "fraud in the inducement". (See Am. Compl.) However, plaintiffs asserted these claims, *albeit* in different form, in the state foreclosure action as affirmative defenses in their verified answer, in their opposition to LoanCare's summary judgment motion, and in support of their own cross motion for summary judgment. (Kossar Decl. Exs. I, J.) Specifically, in the state action, plaintiffs alleged that LoanCare had no standing to bring a foreclosure action, had "unclean hands," and

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 26 of 185

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

misled, overcharged and defrauded plaintiffs in the mortgage application, closing and servicing process. (Id., Ex. I at ¶¶ 3, 8, 14, 18) The state court considered and ultimately dismissed plaintiffs' affirmative defenses and denied plaintiffs' summary judgment; instead, granting summary judgment in LoanCare's favor. (Kossar Decl. Ex. J.) "If plaintiffs were unhappy with the result of that proceeding, the proper recourse was a state court appeal. Because plaintiffs could have presented the same claims they now assert, including the RESPA claim, as defenses or counterclaims in the action for foreclosure, the doctrine of *res judicata* bars this litigation." Yeiser, 535 F. Supp. 2d at 422 (citing 12 U.S.C. § 2614, which authorizes an action, pursuant to the provisions of RESPA, to be brought in the federal district court or in any other court of competent jurisdiction in which the property involved is located, or where the violation is alleged to have occurred); Mercado v. Playa Realty Corp., No. CV 03-3427, 2005 WL 1594306, at *7 (E.D.N.Y. July 7, 2005) (determining that because plaintiff could have asserted the new claims she was raising in her federal action during the foreclosure action as counterclaims and the relief sought by plaintiff was inconsistent with the ruling in the foreclosure action, the new claims were barred by the doctrine of *res judicata*). [8]

Lastly, the present action satisfies the privity requirement for claim preclusion since LoanCare commenced the foreclosure proceeding and is a named party to the current action. Further, Selene, a non-party to the earlier state court action may still invoke claim preclusion if it can demonstrate that it was in privity with a party to the earlier action. See Houdet v. U.S. Tennis Ass'n, No. 13-CV-5131, 2014 WL 6804109, at *4 (E.D.N.Y. Dec. 3, 2014) (finding *res judicata* to apply "not just to the parties in a prior action but also to those in privity with them" where the "new defendants have a sufficiently close relationship to justify [its] application" (internal quotation marks omitted) ). "A relationship of privity 'includes those who are successors to a property interest, those who control an action although not formal parties to it, [and] those whose interests are represented by a party to the action.' " Modular Devices, Inc. v. Alcatel Alenia Space Espana, No. 08-CV-1441, 2010 WL 3236779, at *4 (E.D.N.Y. Aug. 12, 2010) (quoting Ferris v. Cuevas, 118 F.3d 122, 126 (2d Cir. 1997) ). Under New York law, both the party servicing the mortgage and the party that later acquires it (becoming a successor in interest) are considered to be in privity with the party to the original action concerning the mortgage for purposes of *res judicata*. Yeiser, 535 F. Supp. 2d at 423.

The facts alleged in the amended complaint establish privity between Selene and LoanCare, as LoanCare assigned the mortgage to Selene on March 31, 2015—after final judgment in the state foreclosure action. See Yeiser, 535 F. Supp. 2d at 423 ("[s]ince the loan was transferred to GRP in May 2005," almost one year after the state foreclosure action, "GRP is a successor to that interest and is also in privity with [the original note holder]," which was the plaintiff in the foreclosure litigation); Hinds, 2012 WL 6827477, at *4 n.8 (finding the privity requirement satisfied where Wells Fargo was not a party in the state court proceeding, but bought the subject property at a foreclosure sale, rendering it a successor in interest). Thus, the requirements of *res judicata* are satisfied here.

Therefore, to the extent *Rooker-Feldman* does not deprive this Court of subject matter jurisdiction over plaintiffs' claims, the claims are barred by the doctrine of *res judicata* and must be dismissed.

### D. Collateral Estoppel

Plaintiffs' claims are also precluded under the narrower doctrine of collateral estoppel. "Collateral estoppel, or issue preclusion, 'precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party ... whether or not the tribunals or causes of action are the same.' " Sullivan v. Gagnier, 225 F.3d 161, 166 (2d Cir. 2000). Whether relitigation of an issue is precluded is determined by the rules of the court that rendered the prior judgment. Id. "Under New York law, the doctrine of collateral estoppel requires that 'the issue in the second action [be] identical to an issue which was raised, necessarily decided and material in the first action.' " Hines v. HSBC Bank USA, No. 15-CV-3082, 2016 WL 5716749, at *9 (E.D.N.Y. Sept. 30, 2016) (quoting Parker v. Blauvelt Volunteer Fire Co., 93 N.Y.2d 343, 349 (1999) ). Thus, "[b]efore collateral estoppel can be invoked, the court must find that an identical issue was necessarily decided in the prior action and is decisive of the present action, and that there was a full and fair opportunity to contest the decision now said to be controlling." Yeiser, 535 F. Supp. 2d at 424 (internal citation omitted).

**\*8** "To determine whether the issue in the first litigation was necessarily decided, the focus is on the rights, questions or facts that underlie a judicial decision, not the legal theories

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 27 of 185

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

underlying the complaint." Id. at 424-25 (citing Coveal v. Consumer Home Mortgage, Inc., 2005 WL 2708388, at *5 (E.D.N.Y. Oct. 21, 2005)) "New York requires only that the issue have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding." Id. (finding collateral estoppel to be applicable where all the facts giving rise to the amended complaint were presented in the foreclosure proceeding even though plaintiffs did not allege all of the same causes of action).

Here, plaintiffs had a full and fair opportunity to litigate the factual issues raised in the amended complaint in the state foreclosure action. And, those issues were decided in LoanCare's favor. As discussed *supra*, plaintiffs already challenged the validity of the assignment of the mortgage to LoanCare and its standing to foreclose on the Bay Shore property in state court, and the state court necessarily rejected those arguments when it found LoanCare had a valid claim to the Bay Shore property and entered judgment of foreclosure on that property. No appeal was filed in that action. Accordingly, plaintiffs cannot relitigate these issues against defendant LoanCare in federal court. See Graham v. Select Portfolio Servicing, Inc., 156 F. Supp. 3d 491, 505–06 (S.D.N.Y. 2016).

Plaintiffs are also precluded from litigating these same issues against Selene, despite the fact that Selene was not a party to the initial suit in state court. See Jasper v. Sony Music Entm't, Inc., 378 F. Supp. 2d 334, 343 (S.D.N.Y. 2005) ("By binding the plaintiff to earlier judicial decisions in which he was a party, defensive collateral estoppel precludes a plaintiff from getting a second bite at the apple merely by choosing a new adversary."); see also Fequiere v. Tribeca Lending, No. 14-CV-812, 2016 WL 1057000, at *9–10 (E.D.N.Y. Mar. 11, 2016) (applying defensive non-mutual collateral estoppel to FDCPA claim).

Accordingly, the Court grants defendants' motions to dismiss plaintiffs' claims because they are precluded pursuant to the doctrine of collateral estoppel.[9]

**E. Sanctions**

Pursuant to Rule 11 of the Federal Rules of Civil Procedure ("Rule 11"), defendant LoanCare seeks to impose sanctions on plaintiffs in the form of attorneys' fees incurred in defendant's defense of the instant action. (Def. LoanCare's Mot. to Dismiss, ECF No. 39-7 at 19-20.) For the reasons discussed below, defendant's motion is denied.

As an initial matter, the Court notes that LoanCare has not satisfied the procedural requirements for filing a sanctions motion. Rule 11 requires that a motion for sanctions "be made separately from any other motion and ... describe the specific conduct that allegedly violates Rule 11(b)." Fed. R. Civ. P. 11(c)(2). In any event, the Court denies LoanCare's motion for sanctions. Plaintiffs' claims against defendants are plainly without merit. Nevertheless, this alone does not warrant sanctions, particularly as plaintiff is proceeding *pro se*. Although Rule 11 does apply to *pro se* litigants, the court may take into account the "special circumstances of litigants who are untutored in the law," Maduakolam v. Columbia Univ., 866 F.2d 53, 56 (2d Cir. 1989), as well as whether such a litigant has been warned of the possible imposition of sanctions. See Kuntz v. Pardo, 160 B.R. 35, 40 (S.D.N.Y. 1993); see also Fed. R. Civ. P. 11 advisory committee's note to the 1993 amendments (stating that the court should consider, *inter alia*, whether the motion was made in bad faith). There are no facts indicating that plaintiff instituted or maintained this lawsuit in bad faith or that they were warned of the imposition of sanctions. For all of the above reasons, LoanCare's request for sanctions is denied.

**F. Leave to Amend**

**\*9** *Pro se* plaintiffs are ordinarily given the opportunity "to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Shomo v. City of New York, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotation omitted). Nevertheless, "a district court may deny a *pro se* plaintiff leave to amend when amendment would be futile." Boddie v. N.Y. State Div. of Parole, No. 08-CV-911, 2009 WL 1033786, at *5 (E.D.N.Y. Apr. 17, 2009).

Here, the Court has carefully considered whether plaintiffs should be granted leave to amend the complaint. Having decided plaintiffs' claims are barred by *Rooker-Feldman, res judicata* and collateral estoppel, the Court finds that any amendment of these claims would be futile. For these reasons, the Court declines to grant plaintiffs leave to amend.

**III. CONCLUSION**

**Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)**

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 28 of 185

For the reasons stated above, the Court grants defendants' motions and dismisses plaintiffs' amended complaint in its entirety. The Clerk of Court is directed to close this case and send a copy of this Order to *pro se* plaintiffs.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4185705

## Footnotes

1    Plaintiffs also allege a violation of 24 C.F.R. § 203.35 in their amended complaint, (Am. Compl. at 5), but note in their opposition to defendant LoanCare's motion to dismiss that this was an error. (Pls.' Opp. to LoanCare's Mot. to Dismiss, ECF No. 39-12 at 3.)

2    Though the amended complaint seeks relief from "LoanCare harassing us and placing us under duress" (Am. Compl. at 5-6), the only allegation of such harassment appears in plaintiffs' opposition to defendant LoanCare's motion to dismiss. (See Pls.' Opp. to LoanCare's Mot. to Dismiss, ECF No. 39-12 at 5-6.) A plaintiff "cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to [d]efendants' motion to dismiss", K.D. ex rel. Duncan v. White Plains Sch. Dist., 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013). In any event, plaintiff's conclusory assertions of harassment are insufficient to state any plausible claims.

3    The Court notes that plaintiffs appear to use the terms "fraud", "fraudulent concealment" and "fraud in the inducement" interchangeably.

4    To the extent that plaintiffs attempt to allege a due process violation under 42 U.S.C. § 1983, such claim is unwarranted as the defendants are private parties, not state actors.

5    According to the loan transfer documents attached to plaintiffs' amended complaint, the mortgage and note were transferred to Selene on March 31, 2015. (See Am. Compl. at 23-24.) However, Selene first became involved with plaintiffs' loan when it became a servicer of the loan on August 1, 2014. (Pls.' Opp. to Def. LoanCare's Mot. to Dismiss, ECF No. 35-1, Ex. H at 17.)

6    Plaintiffs filed for Chapter 13 bankruptcy on June 5, 2017. (Pls.' Opp. to Mot. to Dismiss, Ex. J, ECF No. 35 at 37.)

7    Plaintiffs appear to allege newly discovered facts in relation to the alleged fraudulent closing of the mortgage in 2009. (Pls.' Opp to defendant Selene's Mot. to Dismiss, ECF No. 42-26 at 1.) Specifically, plaintiffs now argue, in conclusory fashion, that at the time of the closing of their mortgage in 2009, the Title Company was a "shell company" and the attorney at the closing table was fraudulent. (Id.)

8    "Although New York's permissive counterclaim rule means that res judicata generally will not necessarily bar claims that could have been counterclaims in a prior action, this exception for counterclaims does not permit an attack on a judgment" previously issued by the state court. Beckford v. Citibank N.A., No. 00 Civ. 205, 2000 WL 1585684, at *3 (S.D.N.Y. Oct. 24, 2000) (internal quotation omitted).

9    Because plaintiffs' claims fail under *Rooker-Feldman, res judicata* and collateral estoppel, the Court need not reach the defendants' alternative arguments in support of dismissal.

**Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)**

Case 1:22-cv-00983-GTS-ML     Document 6     Filed 02/07/23     Page 29 of 185

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 17834268
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Alexander JIGGETTS, Plaintiff,

v.

United States District Court for Maryland
Judge Julie RUBIN, Defendant.

1:22-CV-1238 (GLS/DJS)
|
Signed December 1, 2022

**Attorneys and Law Firms**

ALEXANDER JIGGETTS, Plaintiff Pro Se, Randallstown, MD 21133.

## REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** The Clerk has sent to the Court Plaintiff's *pro se* Complaint. Dkt. No. 1, Compl. The Court has previously granted leave to proceed *in forma pauperis*. In accordance with 28 U.S.C. § 1915(e), the Court will *sua sponte* review the sufficiency of the Complaint. Section 1915(e) directs that, when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is a court's responsibility to determine that a plaintiff may properly maintain his or her complaint before permitting the matter to proceed further.

The Complaint in this action is a single page, typed document captioned "1983 Civil Suit." *See generally* Compl. Plaintiff alleges facts regarding the role of Defendant, a United States District Court Judge in Maryland, in proceedings commenced by Plaintiff in Maryland. Specifically, Plaintiff appears to allege that Judge Rubin is biased against men in favor of female defendants. The Complaint also alleges that Judge Rubin improperly refused to recuse herself from cases. *Id.*

In actions brought under 42 U.S.C. § 1983 judges enjoy absolute immunity from suit for actions taken in the performance of their duties. *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994) (noting that "[j]udges enjoy absolute immunity from personal liability for 'acts committed within their judicial jurisdiction' ") (quoting *Pierson v. Ray*, 386 U.S. 547 (1967)). The Complaint specifically alleges that Defendant, in her judicial capacity, violated Plaintiff's rights in the manner by which she has conducted judicial proceedings. *See* Compl. This conduct clearly relates to the official duties of a judge and so Plaintiff's claims in this regard are barred by absolute immunity. *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009) ("acts arising out of, or related to, individual cases before the judge are considered judicial in nature"); *Young v. Selsky*, 41 F.3d at 51. Courts routinely recognize that claims that a judge is biased are insufficient to overcome judicial immunity. *See, e.g.*, *Mireles v. Waco*, 502 U.S. 9, 11 (1991) ("[J]udicial immunity is not overcome by allegations of bad faith or malice...."); *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999). The same is true of a claim that a judge improperly failed to recuse herself. *Parent v. New York*, 786 F. Supp. 2d 516, 534 (N.D.N.Y. 2011), *aff'd*, 485 F. App'x 500 (2d Cir. 2012); *Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 714 (S.D.N.Y. 2011).

Thus, Plaintiff cannot state cognizable claims against Defendant under 42 U.S.C. § 1983 and the Complaint should be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii). [1]

**\*2 ACCORDINGLY**, it is hereby

**RECOMMENDED**, that Plaintiff's Complaint be **DISMISSED with prejudice**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [2] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**

**WILL PRECLUDE APPELLATE REVIEW.** 🚩*Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing 🚩*Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); *see also* 🚩28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2022 WL 17834268

## Footnotes

1    In the alternative, the Court recommends that the matter be transferred to the District of Maryland which would be the proper venue for this action. *See* 🚩28 U.S.C. § 1391(b).

2    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 32 of 185

Roger of the Family Forrest v. 45 C.F.R.§ 75.2 IV-D..., Not Reported in Fed....

2019 WL 4194332
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

ROGER OF THE FAMILY FORREST, Plaintiff,

v.

45 C.F.R.§ 75.2 IV-D CONTRACTOR STEVE
BANKS; 31 U.S.C. § 6305; 42 U.S.C. § 654(3) Child
Support Enforcement Franchise; 45 CFR § 75.2 New
York County; 45 C.F.R. § 75.2 IV-D Contractor
Family Court of New York County; 45 C.F.R. §
75.2 IV-D Contractor Vanessa Evans; 45 C.F.R.
§ 75.2 IV-D Contractor Joseph Fucito; 45 C.F.R.
75.2 IV-D Contractor, George Cafasso, Defendants.

18-CV-10866 (CM)
|
Signed 08/30/2019

**Attorneys and Law Firms**

Roger of the Family Forrest Party Aggrieved, Decatur, GA,
pro se.

ORDER OF DISMISSAL

COLLEEN McMAHON, Chief United States District Judge:

 **\*1** Plaintiff, of Decatur, Georgia, brings this *pro se*
action under 42 U.S.C. § 1983.[1] He sues (1) Steven
Banks, Commissioner of the New York City Department
of Social Services and the New York City Human
Resources Administration, (2) "Child Support Enforcement
Franchise," (3) New York County,[2] (4) the New York Family
Court, New York County, (4) Vanessa Evans, a Support
Magistrate of the New York Family Court, New York County,
(5) Joseph Fucito, the Sheriff of the City of New York, and
(6) George Cafasso, the current or former First Deputy Clerk
of the New York Family Court, New York County. For the
reasons discussed below, the Court dismisses this action.

**STANDARD OF REVIEW**

The Court has the authority to dismiss a complaint, even
when the plaintiff has paid the relevant fees, if it determines
that the action is frivolous, *see Fitzgerald v. First E. Seventh*

*Tenants Corp.*, 221 F.3d 362, 363–64 (2d Cir. 2000), or that
the Court lacks subject matter jurisdiction, Fed. R. Civ. P.
12(h)(3); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574,
583 (1999). The Court is obliged, however, to construe *pro
se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d
Cir. 2009), and interpret them to raise the "strongest [claims]
that they *suggest*," *Triestman v. Fed. Bureau of Prisons*,
470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks
and citations omitted).

**BACKGROUND**

Plaintiff's complaint is difficult to understand. Plaintiff asserts
that in enforcing Title IV-D of the Social Security Act ("Title
IV-D"), defendants have forced him to enter into a contract
in which he must pay the defendants the child support that he
owes. He alleges that Title IV-D

> contracts create[ ] a mutually binding,
> legal relationship obligating [the
> New York City Department of
> Social Services], Family Court, Clerk
> of Court, Sheriff, Prosecutor, Law
> Enforcement Officials, Treasurer's
> Office, and other government entities
> to offer and sell [Title] IV-D services
> in order to create [Title] IV-D cases
> and perform other services of the
> [United States Department of Health
> & Human Service's ("HHS") Office of
> Child Support Enforcement].

(ECF 1, p. 2.) He alleges that the defendants, in enforcing
Title IV-D, "fraudulently induced him to become a customer
of their private for profit business against his will...." (*Id.*
p. 1.) He requests that the Court "terminate the private
for profit contractual non-judicial IV-D Collections Case
#NS71649U1 effective immediately to end the deprivation
of his rights privileges and immunities and uphold his right
to provide for his offspring in private." (*Id.* pp. 17-18.) He
also seeks damages and fees. (*Id.* pp. 18.) In addition, he asks
that the Court order the removal of "any and all negative
reporting to all credit bureau[s] affecting his private person

Case 1:22-cv-00983-GTS-ML   Document 6   Filed 02/07/23   Page 33 of 185

Roger of the Family Forrest v. 45 C.F.R.§ 75.2 IV-D..., Not Reported in Fed....

and professional credit reputation." (*Id.*) And he seeks a letter of apology from each of the defendants. (*Id.* p. 19.)

**\*2** Plaintiff alleges that the defendants, in a "manner in which involuntary financial servitude developed upon [him] [ ] by [the defendants'] application of" Title IV-D, placed liens on his property in an effort to collect the child support that he owes. (*Id.* p. 11.) He asserts that "[s]tate postdeprivation remedies are not available," and that the defendants deprived him of due process by not providing him with a hearing before depriving him of his property. (*Id.* pp. 5, 8.) Plaintiff seems to challenge the legal basis upon which the defendants can collect the child support that he owes. (*See id.* pp. 6-7.) And he asserts that the State of New York has waived its immunity from suit under the Eleventh Amendment with regard to suits brought against it about its duties under Title IV-D. (*See id.* pp. 7-8.)

**DISCUSSION**

**A. Domestic relations exception**

The domestic relations exception to federal jurisdiction bars this Court from considering any of Plaintiff's claims in which Plaintiff seeks to nullify any determination of the New York Family Court, New York County, with regard to the assessment and collection of child support that Plaintiff owes. In *Ankenbrandt v. Richards*, the United States Supreme Court reaffirmed the continued validity of the domestic relations exception, stating that this exception divests federal courts of jurisdiction "to issue divorce, alimony and child custody decrees." 504 U.S. 689, 703 (1992); *see also* *Am. Airlines v. Block*, 905 F.2d 12, 14 (2d Cir. 1990) (federal courts generally decline jurisdiction when they are "asked to grant a divorce or annulment, determine support payments, or award custody of a child") (internal quotation marks and citation omitted).

While this exception arose from an interpretation of the federal diversity statute, courts "routinely apply the exception to cases brought under the federal courts' federal question jurisdiction." *Fernandez v. Turetsky*, No. 12-CV-4092, 2014 WL 5823116, at \*2 (E.D.N.Y. Nov. 7, 2014), *aff'd on other grounds*, 645 F. App'x 103 (2d Cir. 2016) (summary order); *see also* *Mitchell-Angel v. Cronin*, 101 F.3d 108 (2d Cir. Mar. 8, 1996) (unpublished decision) ("District courts in this Circuit have held that the exception includes civil rights actions directed at challenging the results of domestic

relations proceedings."); *Block*, 905 F.2d at 14 ("A federal court presented with matrimonial issues or issues 'on the verge' of being matrimonial in nature should abstain from exercising jurisdiction so long as there is no obstacle to their full and fair determination in state courts.").

Moreover, district courts within this Circuit have specifically applied the domestic relations exception to challenges to the child support decisions of New York Family Court Support Magistrates and Judges. *See, e.g.,* *Wahmann v. Kaur*, No. 15-CV-4326, 2015 WL 6680220, at \*3 (E.D.N.Y. Nov. 2, 2015) ("Here, Plaintiff challenges orders entered by a Family Court Support Magistrate and a Family Court Judge modifying his child support obligations and he also challenges the [New York State and Local Retirement System's] deduction of $3675 from his pension which is related to his child support obligations. The Court cannot review Plaintiff's claims as they are a matter of state domestic relations law.") (citation omitted); *Fernandez*, 2014 WL 5823116, at \*2-3; *Sobel v. Prudenti*, 25 F. Supp. 3d 340, 353-54 (E.D.N.Y. 2014); *see also* *Donohue v. Pataki*, 28 F. App'x 59, 60 (2d Cir. 2002) (summary order) (affirming district court's "conclusion that it lacked jurisdiction to invalidate or otherwise review the state court's decision affirming the modification of ... child support payments"); *cf. Sykes v. Bank of Am.*, 723 F.3d 399, 404 (2d Cir. 2013) (appellant "does not ask us to issue a new child support decree in this case. Instead, we are tasked only with determining the lawfulness of [a bank's and two child support enforcement agencies'] actions, pursuant to a state court's child support order, requiring [appellant] to pay portions of his [Social Security Income] benefits toward his child support arrearage. The domestic relations exception, therefore, does not bar our jurisdiction to decide this issue.").

**\*3** Plaintiff asks this Court to "terminate" a collection proceeding brought against him in what appears to be the New York Family Court, New York County, in which Plaintiff has been ordered to pay child support. Under the domestic relations exception, this Court lacks subject matter jurisdiction to do that. The Court therefore dismisses, under the domestic relations exception, Plaintiff's claims in which Plaintiff seeks to nullify a determination of the New York Family Court, New York County, with regard to the assessment and collection of child support that Plaintiff owes. *See* Fed. R. Civ. P. 12(h)(3).

**B. New York Family Court, New York County**

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 34 of 185

Roger of the Family Forrest v. 45 C.F.R.§ 75.2 IV-D..., Not Reported in Fed....

Plaintiff's claims under 42 U.S.C. § 1983 against the New York Family Court, New York County, are also barred by the doctrine of Eleventh Amendment immunity. "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity or unless Congress has abrogate[d] the states' Eleventh Amendment immunity...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (internal quotation marks and citation omitted, second alteration in original). This immunity shields States from claims for money damages, injunctive relief, and retrospective declaratory relief. *See Green v. Mansour*, 474 U.S. 64, 72-74 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984). "[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Gollomp*, 568 F.3d at 366 (internal quotation marks and citation omitted).

Congress has not abrogated the States' immunity for claims under § 1983. *See Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990). And the State of New York has not waived its immunity to suit in federal court. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977); *see also Chris H. v. New York*, No. 1:16-CV-6807, 2017 WL 2880848, at *7 (S.D.N.Y. July 5, 2017) ("[T]o the extent that Plaintiff suggests that the State's receipt of [federal] Title IV-D funds resulted in a general waiver of immunity that entitles him to sue the State and state officials, the argument is incorrect. Title IV-D of the Social Security Act, which funds agencies tasked with collecting child support payments, does not condition receipt of funds on a waiver of sovereign immunity nor does it prohibit discrimination by recipients of such funds."), *aff'd*, 764 F. App'x 53 (2d Cir. 2019) (summary order).

Moreover, "the New York State Unified Court System is unquestionably an 'arm of the State,' and is entitled to Eleventh Amendment sovereign immunity." *Gollomp*, 568 F.3d at 368 (citation omitted); *see Deem v. DiMella-Deem*, No. 7:18-CV-11889, 2019 WL 1958107, at *10 n.6 (S.D.N.Y. May 2, 2019) ("Any claims against the Family Court would thus be barred by the Eleventh Amendment.").

The Court therefore additionally dismisses Plaintiff's § 1983 claims against the New York Family Court, New York County – a New York State court – under the doctrine of Eleventh Amendment immunity and because those claims are frivolous. [3] *See Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999) ("A complaint will be dismissed as 'frivolous' when 'it is clear that the defendants are immune from suit.'" (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989))).

## C. Vanessa Evans and George Cafasso

**\*4** Plaintiff's claims under 42 U.S.C. § 1983 against Vanessa Evans and George Cafasso – a New York Family Court Support Magistrate and a current or former New York Family Court First Deputy Clerk – are also barred under the doctrine of judicial immunity. Under this doctrine, judges are absolutely immune from suit for claims for damages for any actions taken within the scope of their judicial responsibilities. *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991) (§ 1983). Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Id.* at 209. This is because "[w]ithout insulation from liability, judges would be subject to harassment and intimidation...." *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994). And as amended in 1996, § 1983 provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983.

Judicial immunity does not apply when a judge takes action outside his or her judicial capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete absence of all jurisdiction." *Mireles* 502 U.S. at 11-12; *see also Bliven*, 579 F.3d at 209-10 (describing actions that are judicial in nature). But "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978). District courts within this Circuit have applied this immunity doctrine to New York Family Court Support Magistrates, like Evans. *See Herbert v. Cattaraugus Cnty.*, No. 17-CV-248S, 2017 WL 5300009, at *5-6 (W.D.N.Y. Nov. 13, 2017); *Cruz v. New York*, No. 5:17-CV-0510, 2017 WL 6021838, at *17-18 (N.D.N.Y. Oct. 27,

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 35 of 185

Roger of the Family Forrest v. 45 C.F.R.§ 75.2 IV-D..., Not Reported in Fed....

2017), *report & recommendation adopted*, 2017 WL 6001833 (N.D.N.Y. Dec. 4, 2017); *Chris H.*, 2017 WL 2880848, at *7; *Corrado v. N.Y. Office of Temporary & Disability Assistance*, No. 15-CV-7316, 2016 WL 3181128, at *4-5 (E.D.N.Y. June 2, 2016).

Courts have also extended this immunity to court clerks, like Cafasso, and "others who perform functions closely associated with the judicial process" when they are performing discretionary acts of a judicial nature which are essential to the judicial process. *See* Cleavinger v. Saxner, 474 U.S. 193, 200 (1985); *see* Rodriguez v. Weprin, 116 F.3d 62, 66 (2d Cir. 1997) (extending judicial immunity to state-court clerks who were ordered by judges not to provide a litigant with documents and not to expand the record on appeal); *Fariello v. Campbell*, 860 F. Supp. 54, 67-69 (E.D.N.Y. 1994) (applying to judicial immunity to § 1983 claims against a New York Family Court clerk arising out of the performance of one of his or her duties).

Plaintiff seems to assert claims arising from the efforts of Evans, a New York Family Court Support Magistrate, to assess and collect child support that Plaintiff owes pursuant to a Family Court order, and the efforts of Cafasso to assist the Family Court in enforcing that order against Plaintiff. These defendants are therefore immune from suit under the doctrine of judicial immunity. Accordingly, the Court dismisses Plaintiff's § 1983 claims against these defendants under the doctrine of judicial immunity and because these claims are frivolous. *See* Montero, 171 F.3d at 760.[4]

**D. Defendants' enforcement of Title IV-D**

**\*5** The Court also construes Plaintiff's complaint as asserting claims under 42 U.S.C. § 1983 arising from the defendants' allegedly incorrect enforcement of Title IV-D. Title IV-D underwrites States' child-support efforts and requires States "to establish a comprehensive system to establish paternity, locate absent parents, and help families obtain support orders." Blessing v. Freestone, 520 U.S. 329, 333-34 (1997).

The United States Supreme Court has made clear, however, that "Title IV-D does not give individuals a federal right to force a state agency to substantially comply with Title IV-D." Blessing, 520 U.S. at 333. "Title IV-D contains no

private remedy – either judicial or administrative – through which aggrieved persons can seek redress. The only way that Title IV-D assures that States live up to their child support plans is through the [HHS] Secretary's oversight." Id. at 348; *see also* Simmons v. N.Y.S. Dep't of Soc. Servs., No. 1:19-CV-3633, 2019 WL 1988673, at *3 (S.D.N.Y. May 3, 2019) ("Because there is no private right of action for an individual to bring any claim based on an alleged failure to comply with Title IV-D, the Court dismisses Plaintiff's claim invoking Title IV-D of the Social Security Act."). Thus, because Plaintiff does not have a private right of action to sue the defendants for the incorrect enforcement of Title IV-D, the Court dismisses these claims as frivolous.

**E. Leave to amend**

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See* Hill v. Curcione, 657 F.3d 116, 123-24 (2d Cir. 2011); Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988). Because the defects in Plaintiff's complaint cannot be cured with an amendment, the Court declines to grant Plaintiff leave to amend.

## CONCLUSION

The Court directs the Clerk of Court to assign this matter to my docket, mail a copy of this order to Plaintiff, and note service on the docket. The Court dismisses this action for lack of subject matter jurisdiction and as frivolous.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See* Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

The Court further directs the Clerk of Court to docket this order as a "written opinion" within the meaning of Section 205(a)(5) of the E-Government Act of 2002.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4194332

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 36 of 185

Roger of the Family Forrest v. 45 C.F.R.§ 75.2 IV-D..., Not Reported in Fed....

## Footnotes

1     Plaintiff has paid the relevant fees to bring this action.

2     The Court understands Plaintiff's claims against New York County to be brought against the City of New York.

3     *See also Zuckerman v. Appellate Div., Second Dep't, Supreme Court*, 421 F.2d 625, 626 (2d Cir. 1970) (holding that a state court is not a "person" for the purpose of § 1983 liability); *see generally Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) (holding that a state agency is not a "person" for the purpose of § 1983 liability).

4     The amendment to § 1983, allowing for injunctive relief against a judge only if a state-court declaratory decree was violated or state-court declaratory relief is unavailable, precludes Plaintiff from seeking injunctive and declaratory relief against Evans and Cafasso. This is so because Plaintiff can seek review, by a Family Court Judge, of a Support Magistrate's rulings, and if unsuccessful, appeal a Family Court Judge's decision in the state appellate courts. *See* N.Y. Family Court Act §§ 439(e), 1112; *see generally, Berlin v. Meijia*, No. 15-CV-5308, 2017 WL 4402457, at *4 (E.D.N.Y. Sept. 30, 2017) ("Here, no declaratory decree was violated and declaratory relief is available to plaintiffs through an appeal of the state court judges' decisions in state court."), *appeal dismissed*, No. 17-3589 (2d Cir. Apr. 18, 2018) (effective May 18, 2018). Federal district courts do not supervise the state courts.

---

**End of Document**          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1923236
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Milan HALL, Plaintiff,

v.

CLINTON COUNTY, Defendant.

8:18-CV-1405 (GTS/CFH)

|

Signed 04/21/2020

**Attorneys and Law Firms**

MILAN HALL, Plaintiff, Pro Se, 36 Bell Road, Chazy, NY 12921.

OF COUNSEL: THOMAS K. MURPHY, ESQ., MURPHY BURNS LLP, Counsel for Defendant, 407 Albany Shaker Road, Loudonville, NY 12211.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* civil rights action filed by Milan Hall ("Plaintiff") against Clinton County ("Defendant"), is Defendant's motion to dismiss Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted. (Dkt. No. 13.) For the reasons set forth below, Defendant's motion is granted.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Amended Complaint**

Plaintiff filed an Amended Complaint in accordance with this Court's Decision and Order of August 26, 2019. (Dkt. No. 11 [Decision and Order filed Aug. 26, 2019].) Generally, in his Amended Complaint, Plaintiff alleges that, "commencing on the 28 th day of June 2012," Defendant has violated his rights in five ways by using his marriage license as proof of paternity: (1) Defendant has stripped him of his status as a man and termed him a non-custodial parent and obligor; (2) Defendant has wrongfully denied him the right to raise his child as he pleases and to do so in privacy; (3) Defendant has damaged his reputation in his community; (4) Defendant has denied him the right to a trial by jury before ordering him to pay child support; and (5) Defendant denied him

his right to due process when it failed to disclose to him the legal consequences that would result from the signing of his marriage license. (Dkt. No. 12 [Pl.'s Am. Compl.].) Generally, based on these factual allegations, and construed with special liberality, Plaintiff's Amended Complaint claims that Defendant violated his rights to due process under the Fifth and Fourteenth Amendments, and his right to a jury trial under the Sixth and/or Seventh Amendments to the United States Constitution and 42 U.S.C. § 1983. (*Id.*)

**B. Parties' Briefing on Defendant's Motion to Dismiss**

**1. Defendant's Memorandum of Law**

Generally, in its motion to dismiss Plaintiff's Amended Complaint, Defendant makes two arguments. (Dkt. No. 13, Attach. 2 [Def.'s Mem. of Law].) First, Defendant argues that Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted. (*Id.* at 7-8.) More specifically, Defendant argues that Plaintiff has not pled facts plausibly suggesting the existence of any municipal custom, policy, or practice that caused his alleged constitutional deprivations, but rather has merely alleged that New York's valid paternity laws are not fair. (*Id.*) Defendant also argues that Plaintiff is essentially seeking a nullification of a New York State Family Court Order of Child Support against him, triggering the domestic relations exception to federal court jurisdiction, and thus, even if the Court were to find that Plaintiff has stated a claim, the Court would not possess subject-matter jurisdiction over any such claim. (*Id.*)

Second, Defendant argues that, based on the Amended Complaint's own factual allegations, Plaintiff's claims are untimely as a matter of law. (*Id.* at 8-9.) More specifically, Defendant argues that the statute of limitations for personal injury actions in New York is three years from when the plaintiff knew or had reason to know of the injury, and that the Amended Complaint expressly alleges that the child support proceedings were initiated on June 28, 2012; yet Plaintiff did not file this lawsuit until December 2018. (*Id.*) Defendant argues that any allegations that the injury is ongoing (because Plaintiff is under a continuous obligation to pay child support) would not render his claim timely under the continuing violation doctrine because, based on the factual allegations of the Amended Complaint, he was (or reasonably should have been) aware of that injury as early as June 28, 2012. (*Id.*)

Hall v. Clinton County, Not Reported in Fed. Supp. (2020)

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 38 of 185

### 2. Plaintiff's Opposition Memorandum of Law

**\*2** Generally, in opposition to Defendant's motion, Plaintiff makes four arguments. (Dkt. No. 15, at 4-5 [Pl.'s Opp'n Mem. of Law].) First, Plaintiff argues that he is not alleging that Defendant failed to inform him of the responsibilities that could possibly result from children born during his marriage at the time he signed the marriage license, but that "Defendants failed to employ Due Process Safeguards to ensure that the rights of the Plaintiff were protected, and as a result the Plaintiff was defaulted into a Title IV-D case from which he now suffers the deprivation of his inherent rights"; however, he concedes that "[t]his deprivation is extrinsically linked to the Defendants failure to employ due process safeguards when presenting the Plaintiff with a marriage certificate, the legal instrument that would later be used to default the Plaintiff into a Title IV-D case." (*Id.* at 4.) Pointing to a federal statute requiring a state to have a civil process for voluntarily acknowledging paternity that includes the provision of due process and an explanation by the state of the individual's rights and responsibilities of acknowledging paternity, he appears to argue that Defendant violated his right to due process by summoning him to a "fact finding" hearing before a "Family Court Support Magistrate" because the Federal Manual of Child Support requires that such a proceeding should not have been presided over by "a judge of the court." (*Id.*)

Second, Plaintiff argues that he is not merely asking the Court to overturn the child support order as Defendant suggests, but is seeking a remedy for the violation of his constitutional rights. (*Id.* at 4-5.)

Third, Plaintiff argues that it is a crime to deprive an individual of his or her constitutional rights. (*Id.* at 5.)

Fourth, Plaintiff argues that his claims should not be found to be untimely because he promptly filed his original Complaint in 2018 as soon as he discovered that his rights had been violated. (*Id.* at 5.)

## II. GOVERNING LEGAL STANDARDS

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp.2d 204, 211 nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J.) (adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212 n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212 n.17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212 n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*, 629 F. Supp. 2d at 213 n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

**\*3** Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In doing so, the Court "retire[d]" the famous

statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S. Ct. at 560-61, 577. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 555-70. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 555. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal,* 129 S. Ct. at 1950 (internal quotation marks and citations omitted). However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case. [1]

### III. ANALYSIS

**\*4** After carefully considering whether Plaintiff's Amended Complaint should be dismissed, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 13, Attach. 2, at 7-9 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

As an initial matter, the Court finds that Plaintiff's claims, to the extent that they seek an invalidation of a Family Court child support order, are barred by the *Rooker-Feldman* doctrine. Under the *Rooker-Feldman* doctrine, a federal court lacks subject-matter jurisdiction where the following four elements are met: (1) the plaintiff has lost in state court; (2) the plaintiff complains of injuries caused by the state court judgment; (3) the plaintiff invites the district court to review and reject the state court judgment; and (4) the state court judgment was rendered before the district court proceedings commenced. *Ganiyu v. Lopez,* 19-CV-11605, 2020 WL 1467356, at *2 (S.D.N.Y. Mar. 25, 2020) (citing *Hoblock v. Albany Cnty. Bd. of Elections,* 422 F.3d 77, 85 [2d Cir. 2005]). It is evident from the Amended Complaint that Plaintiff received a child support order against him, that he now complains that the proceedings that resulted in that order caused his alleged constitutional injuries, and that the child support order was rendered before he commenced this action. Additionally, although Plaintiff frames his argument in terms of constitutional violations and inadequacies in the proceedings underlying the support order, such arguments amount to little more than a request for this Court to assess whether the Family Court's reliance on the marriage license to

establish paternity was correct, something which this Court is not permitted to do. *See Kramer v. Dane*, 17-CV-5253, 2018 WL 4489284, at *3 (E.D.N.Y. Sept. 19, 2018) ("[T]he fact that plaintiffs assert that their constitutional rights were violated during the state court proceedings does not except their claims from the *Rooker-Feldman* doctrine."); *Davis v. Westchester Cnty. Family Court*, 16-CV-9487, 2017 WL 4311039, at *8 (S.D.N.Y. Sept. 26, 2017) (finding "[t]he fact that Plaintiff is challenging the constitutional adequacy of the proceedings is of no help to him" in precluding application of the *Rooker-Feldman* doctrine to his claims) (collecting cases). [2]

**\*5** To the extent that Plaintiff seeks entitlement to relief beyond a nullification of the child support order that would be excepted from jurisdiction by the *Rooker-Feldman* doctrine, the Court also finds that Plaintiff's claims pursuant to 🏷42 U.S.C. § 1983 fail under Fed. R. Civ. P. 12(b)(6) as time-barred. Plaintiff attached to the Amended Complaint a copy of the Family Court's summons to a fact-finding hearing to be held on July 30, 2012, before Support Magistrate Michael J. Howley, and a copy of the Petition for Child Support filed against Plaintiff that was the basis for that hearing. (Dkt. No. 12, Attach. 1.) The Amended Complaint alleges that it was the commencement of the proceedings against Plaintiff through this petition in June 2012 that caused the deprivation of his rights. (Dkt. No. 12, at 5 [Pl.'s Am. Compl.].) The Supreme Court has held that, "[b]ecause § 1983 claims are best characterized as personal injury actions ... a State's personal injury statute of limitations should be applied in all 🏷§ 1983 claims." *Owens v. Okure*, 488 U.S. 235, 240-41 (1989). The Supreme Court found in particular that New York's general or residual statute related to personal injury actions should be applied, which sets a three-year statute of limitations. 🏷*Owens*, 488 U.S. at 249-50; *accord, Phillips v. City of New York*, 304 F. Supp. 3d 305, 311 (E.D.N.Y. 2018). Such statute of limitations begins "when a plaintiff has a complete and present cause of action, that is when the plaintiff can file suit and obtain relief," or, in other words, "when the wrongful act or omission results in damages, ... and once the plaintiff knows or has reason to know of the injury which is the basis of his action." 🏷*McDonough v. Smith*, 898 F.3d 259, 265 (2d Cir. 2018) rev'd on other grounds 🏷*McDonough v. Smith*, 139 S.Ct. 2149 (2019).

In this case, Plaintiff acknowledges in his Amended Complaint that his alleged constitutional harms occurred as a result of the child support proceedings against him in late June 2012. (Dkt. No. 12, at 5 [Pl.'s Am. Compl.].) It is therefore reasonable to find that Plaintiff knew or should have known of the proceedings against him and the child support order at the time those events occurred in 2012. Of note, Plaintiff does not allege that he was never informed of either the proceedings against him or of the child support order itself until a later time. Nonetheless, Plaintiff did not file his initial Complaint in this action until December 3, 2018, more than six years later. (Dkt. No. 1 [Pl.'s Compl.].) Although Plaintiff argues in his opposition memorandum of law that he "promptly filed a complaint with the Federal District Court as soon as he discovered his rights had indeed been violated," he offers no explanation in either the Amended Complaint or his opposition memorandum of law as to why he seemingly did not know of the alleged constitutional violations until 2018. (Dkt. No. 15, at 5 [Pl.'s Opp'n Mem. of Law].) Additionally, it does not matter when Plaintiff actually discovered a violation. The relevant consideration is when he knew *or had reason to know* of the alleged injury, and without any factual allegation that Plaintiff was somehow left in the dark for six years about the basis for the child support proceedings and order against him (despite the factual statement in the order that the proceeding against Plaintiff was authorized because he and the child's mother had gotten married on July 24, 2010), the Court cannot find that he has alleged facts plausibly suggesting that he did not have reason to know of the alleged injury as long ago as June of 2012. As a result, the Court finds that Plaintiff's claims are barred by the statute of limitations.

The Court also finds that tolling is not warranted under the circumstances alleged. Although the Second Circuit recognizes the continuing violation doctrine, it has qualified that the doctrine applies only to claims "composed of a series of separate acts that collectively constitute one unlawful practice," or "claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015). Although Plaintiff alleges that the violations of his rights "continue to this day" because he is still subject to the child support order, the fact that he continues to suffer an ongoing injury does not bring his claim under the auspices of the continuing violation doctrine. In other words, each payment Plaintiff is required to make under the child support order is not a new and separate act and injury, but merely a consequence of the initial act, namely, the proceedings and the issuance of the child support order in 2012. Plaintiff had a fully formed claim upon the occurrence of the relevant proceedings and the issuance of the child support order. The

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 41 of 185

Hall v. Clinton County, Not Reported in Fed. Supp. (2020)

Court therefore declines to find that the continuing violation doctrine applies to Plaintiff's claims, and finds instead that there is no other apparent basis for tolling the statute of limitations. Plaintiff's claims pursuant to ⚑ 42 U.S.C. § 1983 are therefore time-barred and must be dismissed.

**\*6** In the alternative to the finding that Plaintiff's claims are time-barred and/or covered by the *Rooker-Feldman* doctrine, the Court finds that he has not alleged facts plausibly stating any claim upon which relief can be granted. As an initial matter, Defendant is correct that Plaintiff has again failed to allege any facts plausibly suggesting a municipal custom, policy, or practice to merit holding Defendant liable for the alleged constitutional violations. The only apparent policy identified by Plaintiff is the policy of allowing use of a marriage license to create a presumption of paternity. (Dkt. No. 12, at 5 [Pl.'s Am. Compl.].) However, as Defendant argues, this "policy" is in fact a long-standing part of New York common law, not merely a practice or rule put in place by Defendant or the Clinton County Family Court. *See* ⚑ *In re Findlay*, 253 N.Y. 1, 6-7 (N.Y. 1930) (discussing the presumption of legitimacy). Notably, Plaintiff has not alleged facts plausibly suggesting that Defendant had a policy of disallowing rebuttal of the presumption of legitimacy or any other action of that nature that would have prevented Plaintiff from providing evidence to rebut that presumption. As a result, Plaintiff has not alleged facts plausibly suggesting that the alleged constitutional violations were a result of any policy imposed by Defendant, and the Court therefore finds that Defendant cannot be held liable for the claims asserted against it.

Even if Plaintiff had alleged facts plausibly suggesting the existence of a municipal custom, policy, or practice, the Court finds that Plaintiff has not stated a claim upon which relief can be granted. Many of the claims asserted by Plaintiff (i.e., that Defendant has stripped him of his status as a man, violated his right to privacy, violated his right to raise his child as he pleases, violated his right to trial by jury, and defamed him) are either not facially viable legal claims under the circumstances or are so vaguely asserted (i.e., without sufficient supporting factual allegations) that they cannot be found to plausibly state a claim upon which relief can be granted. The Court therefore finds little need to discuss these claims in any detail, but finds that they must be dismissed.

With regard to Plaintiff's due process claim, and particularly Plaintiff's argument that Defendant's acceptance of the

marriage license as proof of paternity was a violation of his right to due process, as the Court has previously found, Plaintiff has not alleged facts plausibly suggesting that he was denied the opportunity to present counter-evidence to overcome the presumption that a child born in the context of a marriage is the child of the married spouses. Rather, the summons attached to the Amended Complaint notified him of a fact-finding hearing that preceded the issuance of the child support order. Plaintiff has not alleged facts plausibly suggesting that he did not receive sufficient notice of the commencement of the proceedings before the child support order was enacted against him (or that he even attended the hearing). Moreover, the summons specifically states that "failure to appear will result in the entry of an order on default unless service has been made by mail alone, in which event no default may be entered without proof satisfactory to the court that you have received actual notice of the commencement of this proceeding." (Dkt. No. 12, Attach. 1, at 1.) Without any factual allegation plausibly suggesting that Plaintiff (a) lacked notice of the hearing such that a default was improper, or (b) attended the hearing but was denied the opportunity to provide evidence to counter the presumption created by the marriage license, the Court cannot find that he has alleged facts plausibly suggesting that Defendant violated his due process rights in relying on the marriage license when issuing the child support order.

Plaintiff also argues that his due process rights were violated by the fact that a Support Magistrate of the Family Court granted the petition for child support because the Federal Manual of Child Support requires that "[p]roceedings conducted pursuant to either the expedited judicial or expedited administrative process must be presided over an individual who is not a judge of the court." (Dkt. No. 15, at 4 [Pl.'s Opp'n Mem. of Law].) However, even if Plaintiff has alleged facts plausibly suggesting that Defendant violated this provision of the Federal Manual of Child Support (a finding that the Court does not make), he has made no factual allegation plausibly suggesting how any such violation in turn violated his due process rights under the United States Constitution. [3]

**\*7** Having already afforded Plaintiff an opportunity to amend his Complaint, the Court finds that it need not grant Plaintiff an opportunity to amend the Amended Complaint to attempt to cure any of the above-mentioned deficiencies, In any event, it finds those deficiencies to be substantive in nature, due to the findings that the Court lacks subject-matter jurisdiction to consider any claims that fall under the *Rooker-*

Hall v. Clinton County, Not Reported in Fed. Supp. (2020)

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 42 of 185

*Feldman* doctrine, and that any other potential claims are untimely (and Plaintiff has not offered any indication that he could allege facts to plausibly suggest that those claims were in fact timely).

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 13) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 12) is **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1923236

---

## Footnotes

1    *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, No. 10-573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

2    The Court notes that, although Defendant argues that subject-matter jurisdiction is lacking over Plaintiff's claims based on the domestic relations exception, the Second Circuit recently held that the domestic relations exception does not apply in federal-question cases. *Deem v. DiMell-Deem*, 941 F.3d 618, 621 (2d Cir. 2019). Although the Second Circuit also found that, notwithstanding the inapplicability of the domestic relations exception, the separate domestic relations abstention doctrine does apply to federal-question cases, the Court need not determine whether abstention would be appropriate in this case based on its finding that the *Rooker-Feldman* doctrine divests the Court of subject-matter jurisdiction over any claims that would be covered by that abstention. Finally, the Court notes that it may *sua sponte* consider the *Rooker-Feldman*

**Hall v. Clinton County, Not Reported in Fed. Supp. (2020)**

Case 1:22-cv-00983-GTS-ML   Document 6   Filed 02/07/23   Page 43 of 185

doctrine (even though Defendant never invoked it) because pursuant to Fed. R. Civ. P. 12(h)(3), the Court may *sua sponte* consider whether it lacks subject-matter jurisdiction over a claim.

3    Of note, the New York Family Court Act indicates that support magistrates are in fact not "a judge of the court" as Plaintiff appears to assert. *See* ⚑ N.Y. Fam. Ct. § 439(a) (indicating that, although support magistrates are appointed to have authority over certain matters related to support proceedings, their findings in many cases are limited or overseen by "a judge of the court"). Given that Plaintiff himself acknowledges that the decision-maker on the support petition was a "Family Court Support Magistrate" (an acknowledgment that is confirmed by the attachment to the Amended Complaint), the Court finds that Plaintiff has not alleged facts plausibly suggesting that the use of a support magistrate was in anyway contrary to federal law or policy.

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1958107

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Michael DEEM, Plaintiff,

v.

Lorna DIMELLA-DEEM; Linda Eichen, Esq.; Hon.
Hal Greenwald; and Hon. Joseph Egitto, Defendants.

No. 18-CV-11889 (KMK)
|
Signed 05/01/2019
|
Filed 05/02/2019

**Attorneys and Law Firms**

Michael A. Deem, Yonkers, NY, Pro Se Plaintiff.

Anthony P. Colavita, Esq., Noah Nunberg, Esq., L'Abbate,
Balkan, Colavita and Contini, LLP, Garden City, NY, Counsel
for Defendant Linda Eichen.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT
JUDGE

**\*1** Plaintiff, Michael Deem ("Plaintiff"), an attorney
proceeding pro se, brings this action pursuant to 42 U.S.C.
§ 1983, and 22 U.S.C. §§ 2201 and 2202, against his estranged
wife, Lorna M. DiMella-Deem ("DiMella-Deem"), his wife's
attorney, Linda Eichen, Esq. ("Eichen"), the Westchester
County Family Court Judge presiding over his child custody
proceedings, the Honorable Hal B. Greenwald ("Judge
Greenwald"), in his individual capacity, and the Supervising
Judge of the New York Family Courts in the Ninth Judicial
District, the Honorable Joseph A. Egitto ("Judge Egitto"), in
his official capacity, alleging violations of his First, Second,
Ninth, and Fourteenth Amendment rights. (Compl. (Dkt.
No. 1).) [1] Before the Court are Eichen and DiMella-Deem's
Motions to Dismiss. (Eichen Not. of Mot. (Dkt. No. 9);
DiMella-Deem Not. of Mot. (Dkt. No. 13).) [2] For the follow
reasons, Defendants' Motions are granted.

I. Background

A. Factual Background

1. Plaintiff's State Child-Custody Proceedings

The facts recounted below are taken from Plaintiff's
Complaint and are assumed to be true for purposes of
resolving the Motions.

Plaintiff alleges that he and DiMella-Deem are parents to
two adoptive children, a thirteen-year-old daughter and a
twelve-year-old son. (Compl. ¶ 9.) Plaintiff and DiMella-
Deem allegedly agreed to raise their children in the Catholic
faith and Plaintiff was an active participant in the children's
practice of their religion, including attending mass and
participating in catechesis. (Id. ¶ 10.) Plaintiff alleges he
enjoyed "an excellent relationship with his children" until
DiMella-Deem and her "co-conspirators" interfered with his
"parental relations by fabricating allegations." (Id. ¶ 11.)

**\*2** Plaintiff alleges that on May 17, 2016, he placed various
handguns in the care of Blueline Tactical Supply & Shooting
Sports, in Elmsford, New York, and that DiMella-Deem
willingly gave him $ 500 cash to cover the storage fee.
(Compl. ¶ 12.)

On November 7, 2017, Plaintiff filed an action for divorce
in Westchester County Supreme Court seeking resolution of
custody and equitable distribution of the marital assets. (Id.
¶ 13.) On December 6, 2017, DiMella-Deem filed an answer
seeking sole custody of the children, which created a custody
dispute between her and Plaintiff. (Id. ¶ 14.) Plaintiff alleges
that in February 2018, DiMella-Deem offered to settle the
divorce by giving Plaintiff $ 10,000 and having him move
out of the marital home. Plaintiff rejected the offer. (Id. ¶
15.) DiMella-Deem then allegedly yelled in a loud and hostile
tone, "You better back off Michael! You better back off! You
don't think I'll throw my money at this! Huh?! You don't think
I'll throw my money at this! You're going to be sorry! You're
going to have nothing! No money. No home. No family.
Nothing! You better back off!" (Id.)

"In March and April 2018, Plaintiff and DiMella-Deem filed
petitions against each other in Westchester Family Court
pursuant to the New York State Family Court Act, Article
8." (Id. ¶ 16.) Plaintiff alleges that on April 19, 2018,
DiMella-Deem filed fabricated allegations with Westchester

County Child Protective Services ("CPS"), resulting in a no contact temporary order of protection ("TOP") that precluded Plaintiff from, inter alia, having any contact with his children and being escorted from the marital home by local law enforcement. (*Id.* ¶ 17.) The TOP also required Plaintiff to surrender all firearms to local law enforcement and prohibited him from obtaining any others. (*Id.*) Plaintiff alleges that the Family Court then entered the TOP into the statewide registry of orders of protection and notified local authorities of the same. Local police authorities then entered Plaintiff's name into the National Instant Criminal Background Check System ("NICS") that same day. (*Id.* ¶ 20.)

Plaintiff alleges that he surrendered various long guns to local law enforcement and explained that his handguns were stored at Blueline. Plaintiff informed a police officer that in order to comply with the letter of the TOP both he and Blueline would have to violate criminal provisions of federal and state laws governing firearms because his name had been entered into NICS and his pistol license had expired. (Compl. ¶ 21.) The police officer allegedly declined to retrieve the handguns himself, agreed that Blueline and Plaintiff would have to violate federal and state laws governing firearms to comply with the TOP, and directed Plaintiff not to try to obtain the handguns while the TOP was in effect. Plaintiff alleges that he complied with this instruction. (*Id.* ¶ 22.)

Plaintiff alleges that on April 25, 2018, DiMella-Deem filed a petition under New York law containing additional fabricated allegations against Plaintiff. (*Id.* ¶ 23.) Plaintiff alleges that he informed the Family Court judge through counsel that he had unequivocal evidence that DiMella-Deem's allegations were fabricated, but that his statements and the evidence were ignored. A new "no contact" TOP was issued, which allowed for only six hours of supervised visits with his children. (*Id.*) Plaintiff alleges that he asked his attorney if he would be afforded a hearing to present his evidence and re-establish contact with his children, and that his attorney "blurted out" in response that "[i]t doesn't work like that here." (*Id.* ¶ 31.)

**\*3** On May 10, 2018, DiMella-Deem filed a violation petition in Family Court falsely alleging that Plaintiff stopped DiMella-Deem's mail at the marital residence and that he "engaged in conduct protected by the First Amendment." (*Id.* ¶ 24.) Plaintiff alleges that he only stopped by the house to get his own mail and that he "provided proof that day." (*Id.*) Nonetheless, the "no contact" TOP was extended, and again allowed for only six hours of supervised visits with his children. (*Id.*)

Plaintiff alleges that on May 15, 2018, DiMella-Deem conceded, and the Family Court acknowledged, that Plaintiff was not a threat to the children. Despite that concession, the Family Court appointed an attorney for the children ("AFC"), Faith Miller, Esq. ("Miller"). At the time Plaintiff was not informed who the AFC would be. (Compl. ¶ 25.) Plaintiff alleges that at this point he again asked his attorney if he would be afforded a hearing to present his evidence and re-establish contact with his children, and that his attorney again "blurted out" in response that "[i]t doesn't work like that here." (*Id.* ¶ 32.)

On June 12, 2018, CPS received an "unfounded an[d] anonymous complaint" of alleged child neglect against Plaintiff. Plaintiff alleges that the complaint "could have only originated" with DiMella-Deem. (*Id.* ¶ 26.) On June 13, 2018, the AFC filed an emergency order to show cause seeking to suspend all contact between Plaintiff and his children, allegedly "in retaliation for Plaintiff filing a violation petition against [DiMella-]Deem in Family Court." (*Id.* ¶ 27.) The Family Court signed the order a few hours later, ex parte, and the "no contact" TOP was extended to September 28, 2018, sua sponte. (*Id.*)

Plaintiff alleges that he subsequently learned that the AFC was prohibited from accepting "private pay" assignments pursuant to court rules regarding conflicts of interest, because she is married to the Presiding Judge of the New York State Supreme Court, Second Department. (*Id.* ¶ 28.) On August 17, 2018, DiMella-Deem's second attorney was relieved as counsel. (*Id.* ¶ 29.)

On September 24, 2018, Eichen filed a notice of appearance in Family Court on behalf of DiMella-Deem. (Compl. ¶ 33.) On September 26, 2018, Eichen filed an ex parte application to modify the TOP entered on April 19, 2018 to include surrender of Plaintiff's handguns to Blueline. The application was granted. A new TOP was issued continuing the suspension of all contact between Plaintiff and his children and ordering him to surrender all firearms to local law enforcement or Blueline. (*Id.* ¶ 34.) Plaintiff alleges that Eichen and DiMella-Deem made affirmative misrepresentations that Plaintiff had access to his handguns at Blueline in support of their application, and that Judge Greenwald knew they were affirmative misrepresentations. (*Id.* ¶ 48.)

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 46 of 185

Deem v. DiMella-Deem, Not Reported in Fed. Supp. (2019)

On September 28, 2018, a conference was held by Judge Greenwald. Plaintiff stated that he was in compliance with the TOP filed on April 19, 2018, but Judge Greenwald allegedly refused to hear the matter until he appointed new AFCs for the children. The matter was adjourned to November 9, 2018, and the "no contact" TOP extended to the same day. (*Id.* ¶ 35.)

On September 28, 2018, the Family Court granted AFC Miller's application to be relieved. (*Id.* ¶ 30.) Between September 28 and November 9, 2018, Judge Greenwald appointed an AFC for each of Plaintiff's children. Plaintiff was allegedly not informed of the appointments. (*Id.* ¶ 36.)

**\*4** On September 29, 2018, Plaintiff wrote a letter to Judge Egitto seeking, inter alia, assistance in being afforded a hearing pursuant to the ⚐ New York State Family Court Act ("FCA"), § 842-a(7), which provides for hearings related to any firearm revocation, suspension, ineligibility, or surrender order. (*Id.* ¶ 37.) On October 2, 2018, Judge Egitto responded to Plaintiff and pointed out that a hearing was already scheduled for November 9, 2018 and a trial on the underlying petitions for January 8 and 9, 2019. (*Id.* ¶ 38.)

On November 9, 2018, Plaintiff learned that Judge Greenwald appointed AFCs for each of his children when they appeared in Family Court. Plaintiff objected to the appointment of the AFCs and requested to know the authority by which Judge Greenwald had appointed them. (Compl. ¶ 39.) Plaintiff alleges that one of the newly-appointed AFCs is precluded from accepting "private pay" assignments pursuant to court rules regarding conflicts of interest, because he is married to an employee of the Westchester County Family Court. (*Id.* ¶ 40.)

Plaintiff alleges that on November 10, 2018, he was "willfully and maliciously deceived and believing that no TOP was in place," and thus attempted to re-establish contact with his children by sending texts, calling their cell phones, and leaving a voicemail for his son. (*Id.* ¶ 49.) That same day, Plaintiff went to the local police department near the marital home and requested an escort to the house because he believed DiMella-Deem would fabricate new allegations. The police informed Plaintiff that DiMella-Deem had just filed a complaint that Plaintiff violated a TOP, and showed Plaintiff a "no contact" TOP that was signed by Judge Greenwald on November 9, 2018. (*Id.* ¶ 50.)

Plaintiff alleges that the TOP incorrectly stated that the Plaintiff was advised in court of the issuance and contents of the TOP, and that the order was personally served upon Plaintiff in court. (*Id.* ¶ 51.) Plaintiff was subsequently arrested and arraigned that day for violating the TOP which he alleges was "secreted from him the day prior." (*Id.* ¶ 52.)

Plaintiff subsequently contacted Judge Greenwald's chambers and asked that a corrected TOP be issued to reflect that Plaintiff was not advised of the existing TOP in Court and was not personally served with it. Judge Greenwald denied the request. Plaintiff alleges that Judge Greenwald never stated that Plaintiff was wrong in his assessment of the accuracy of the TOP. (*Id.* ¶ 53.)

Every TOP issued by the Family Court from April 19, 2018 through the present time has required Plaintiff to, inter alia, surrender his firearms. (Compl. ¶54.) Plaintiff alleges that the Westchester Family Court never made a finding that Plaintiff presented a physical danger to the children or anyone else, or any other basis to order Plaintiff to surrender his firearms or enter a "no contact" TOP. (*Id.* ¶55.)

Plaintiff alleges that on multiple occasions while entering the Westchester County Courthouse, he observed a man holding a large sign stating that he has been denied all contact with his children for six years by the Westchester County Family Court, but has never been afforded a hearing. (*Id.* ¶56.) Plaintiff alleges that the "Westchester County Family Court has an unconstitutional custom and practice of issuing TOPs without proper cause and rarely, if ever, providing the party against whom the TOP is entered a hearing pursuant to ⚐ FCA, § 842-a(7)." (*Id.* ¶57.) Plaintiff alleges that as a result of Defendants' "constitutional misconduct Plaintiff is the targeted parent of parental alienation." (*Id.* ¶ 58.)

## 2. Plaintiff's Claims

**\*5** Plaintiff's first claim is against DiMella-Deem and Eichen under ⚐ § 1983 for violating his First Amendment religious freedom rights by allegedly denying him the right to practice his religion by participation in family mass and catechesis with his children. (*Id.* ¶¶ 60–62.)

Plaintiff's second claim is against DiMella-Deem and Eichen under ⚐ § 1983 for violating his First, Ninth, and Fourteenth Amendment rights by allegedly denying him his "right to parental relations." (*Id.* ¶¶ 63–65.)

Plaintiff's third claim is against DiMella-Deem and Eichen under 🚩 § 1983 for violating his Fourteenth Amendment due process rights by allegedly conspiring "with Judge Greenwald to enter a restraining order against Plaintiff in secrecy and without cause to deny Plaintiff his right to a hearing pursuant to 🚩 FCA § 842-a(7)." (*Id.* ¶¶ 66–69.)

Plaintiff's fourth claim is against DiMella-Deem and Eichen under 🚩 § 1983 for violating his Second Amendment right to keep and bear arms by allegedly agreeing with Judge Greenwald to enter a restraining order against Plaintiff. (Compl. ¶¶ 70–72.)

Plaintiff's fifth claim is against Judge Greenwald under 🚩 § 1983 for violating his First, Second, Ninth, and Fourteenth Amendment rights "by his prolonged and repeated refusal to perform his constitutional and statutory duties, specifically to hold a post-deprivation hearing pursuant to 🚩 FCA § 842-a(7)." (*Id.* ¶¶ 73–75.)

Plaintiff's sixth claim is against Judge Egitto, "in his official capacity as the Supervising Judge of the Family Courts, in the 9th Judicial District, State of New York," under 🚩 § 1983 and 22 U.S.C. §§ 2201 and 2202, for failing or refusing to "correct a custom and practice in the Westchester County Family Court of denying litigants their constitutional right[s] to" freedom of religion, parental relations, due process, keep and bear arms, and a hearing pursuant to 🚩 FCA, § 842-a(7). (*Id.* ¶¶ 77–82.) Plaintiff alleges Judge Egitto also failed or refused to correct a custom and practice of appointing AFCs without jurisdiction, (*id.* ¶ 83), and a custom and practice of "failing to inform parents when AFCs are appointed, the legal authority for the appointment, the factual basis for the appointment, the identity of the AFC and if the AFC is precluded from accepting any appointments," (*id.* ¶ 84).[3]

Plaintiff seeks various forms of declaratory relief and damages, (*id.* ¶¶ A–M, S), but also injunctive relief in the form of "an order compelling the Westchester County Family Court to hold post-deprivation hearings within three days of entering 'no contact' TOPs," (*id.* ¶ N), and "an order compelling the Westchester County Family Court to hold post-deprivation hearings within fourteen days of ordering litigants to surrender their firearms," (*id.* ¶ O).

### B. Plaintiff's Previous Litigation

This is Plaintiff's third action seeking relief from the District Court for the Southern District of New York related to Plaintiff's state court divorce proceedings. *See Deem v. DiMella-Deem*, No. 18-CV-6186; *Deem v. Scheinkman*, No. 18-CV-10777. In both actions, Plaintiff filed suit against DiMella-Deem and other parties involved in the state divorce and child-custody proceedings including attorneys and judges. Plaintiff's complaints were both dismissed *sua sponte*, first by Judge Román and subsequently by Judge Seibel. Plaintiff's first complaint was dismissed by Judge Román on July 24, 2018 on the grounds of judicial immunity, the *Younger* abstention doctrine, and the domestic relations exception. *See Deem v. DiMella-Deem*, No. 18-CV-6186 (Order of Dismissal (Dkt. No. 18).) Judge Seibel dismissed Plaintiff's second action on December 18, 2018, finding that he was not entitled to federal *mandamus* relief and that his claims were barred by the *Younger* abstention doctrine. *See Deem v. Scheinkman*, No 18-CV-10777 (Order of Dismissal (Dkt. No. 7).) Judge Seibel also issued Plaintiff a warning, stating that "further duplicative or frivolous litigation in this Court may result in an order requiring Plaintiff to obtain written permission before filing new actions in this Court challenging the actions of his wife, judges, and other officials involved in the divorce and custody proceedings pending in Westchester County." *Id.* at 7.

### C. Procedural Background

**\*6** Plaintiff filed his Complaint on December 18, 2018. (Compl. (Dkt. No. 1).) On January 10, 2019, counsel for Eichen submitted a pre-motion letter requesting permission to file a Motion to Dismiss. (Letter from Anthony P. Colavita, Esq., to Court (Dkt. No. 5).)

On January 22, 2019, DiMella-Deem, proceeding pro se, submitted a letter requesting that the Court dismiss Plaintiff's Complaint. (Letter from Lorna M. Deem to Court (Dkt. No. 6).) DiMella-Deem stated that this Action represents the third federal complaint Plaintiff has filed against her, that Plaintiff has "terrorized" her and her children, that there is currently a temporary order of protection in effect against Plaintiff on behalf of DiMella-Deem and her children, and that Plaintiff is having increasingly severe mental health issues. (*Id.*)

On January 22, 2019, the Court set a briefing schedule for Eichen's Motion To Dismiss. (Dkt. No. 7.) On January 23, 2019, the Court instructed DiMella-Deem that she could join Eichen's Motion if she chose to do so. (Dkt. No. 8.) On

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 48 of 185

Deem v. DiMella-Deem, Not Reported in Fed. Supp. (2019)

February 22, 2019, Eichen filed her Motion To Dismiss and accompanying papers. (Eichen Not. of Mot.; Decl. of Noah Nunberg, Esq. (Dkt. No. 10); Eichen's Mem. of Law in Supp. of Mot. To Dismiss ("Eichen's Mem.") (Dkt. No. 11); Aff. of Service of Not. of Mot. on Plaintiff (Dkt. No. 12).) DiMella-Deem joined Eichen's Motion that same day. (DiMella-Deem Not. of Mot.)

On March 20, 2019, after the window during which Plaintiff could amend his Complaint as a matter of course had closed, Plaintiff submitted a letter requesting leave to file an amended complaint in lieu of responding to Defendants' Motions, in order to add a false arrest claim based on the November 10, 2018 arrest that he referenced in his Complaint, and in order to add facts about "various decisions [that] have been made in state court" since he filed his original Complaint. (Letter from Michael Deem, Esq., to Court ("Pl.'s Nov. 2018 Letter") (Dkt. No. 15).)

On March 21, 2019, counsel for Eichen submitted a letter opposing Plaintiff's request. (Letter from Anthony P. Colavita, Esq., to Court (Dkt. No. 17).) Plaintiff did not separately request an extension to file his response to the Motions to Dismiss which was due on March 22, 2019 and he has not filed his response to the Motions to Dismiss.

On April 22, 2019, just as this Opinion was in the final stages of drafting, Plaintiff filed another letter seeking leave to amend his Complaint and attached a Proposed Amended Complaint. (Letter from Michael Deem, Esq., to Court ("Pl.'s Apr. 2019 Letter") (Dkt. No. 18).) The Proposed Amended Complaint adds defendants, most of whom are involved in Plaintiff's Family Court proceedings and are state court judges, and describes recent developments in the Family Court proceedings.

## II. Discussion

### A. Standard of Review

#### 1. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*7** In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014) (same). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.,* 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012)).

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 49 of 185

Deem v. DiMella-Deem, Not Reported in Fed. Supp. (2019)

### 2. Sua Sponte Dismissal

The Court has the authority to dismiss sua sponte a complaint, or a portion thereof, for which a plaintiff has paid the filing fee where the plaintiff presents no arguably meritorious issue. *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363–64 (2d Cir. 2000) (holding that a district court may dismiss a frivolous complaint sua sponte even when the plaintiff has paid the required filing fee); *Pillay v. Immigration & Naturalization Serv.*, 45 F.3d 14, 17 (2d Cir. 1995) (holding that the court has "inherent authority" to dismiss a petition that presents "no arguably meritorious issue").

### B. Analysis

#### 1. Claims Against DiMella-Deem and Eichen

Plaintiff brings all his claims against DiMella-Deem and Eichen pursuant to § 1983. Moving Defendants argue that all claims against them fail because they are not state actors and cannot be sued pursuant to § 1983. (Eichen's Mem. 5–9.)

"Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia*, 132 S. Ct. 1657, 1661 (2012). Thus, to state a claim pursuant to § 1983, a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quotation marks omitted). Thus, to state a viable § 1983 claim against DiMella-Deem and Eichen, Plaintiff must allege that they were state actors.

With respect to Eichen, Plaintiff alleges that she represented DiMella-Deem in Family Court and filed false ex parte applications on DiMella-Deem's behalf. (Compl. ¶¶ 33–34, 48.) Plaintiff does not allege that Eichen acted in any capacity other than as DiMella-Deem's privately-retained attorney. "[I]t is well-established that ... attorneys performing a lawyer's traditional functions as counsel ... do not act 'under color of

state law' and therefore are not subject to suit under 42 U.S.C. § 1983." *Rodriguez v. Weprin*, 116 F.3d 62, 65–66 (2d Cir. 1997); *see also Licari v. Voog*, 374 F. App'x 230, 231 (2d Cir. 2010) ("It is well established that private attorneys—even if the attorney was court appointed—are not state actors for the purposes of § 1983 claims." (citation omitted)); *Harrison v. New York*, 95 F. Supp. 3d 293, 328 (E.D.N.Y. 2015) (holding that "public defenders[,] ... court-appointed counsel[,] and private attorneys do not act under the color of state law merely by virtue of their position"); *Shorter v. Rice*, No. 12-CV-0111, 2012 WL 1340088, at *4 (E.D.N.Y. Apr. 10, 2012) (holding that neither "public defenders ... nor court-appointed counsel, nor private attorneys, act under the color of state law merely by virtue of their position").

**\*8** With respect to DiMella-Deem, Plaintiff fails to offer any factual assertions from which it could be inferred that DiMella-Deem was a state actor or that there was any nexus between DiMella-Deem and the state. *See Daniels v. Murphy*, No. 06-CV-5841, 2007 WL 1965303, at *2 (E.D.N.Y. July 2, 2007) (dismissing § 1983 claim against husband where wife failed to allege he had any nexus to the state during their divorce proceedings); *Elmasri v. England*, 111 F. Supp. 2d 212, 221 (E.D.N.Y. 2000) (dismissing § 1983 claims where defendants, including plaintiff's ex-wife, "acted purely as private individuals in connection with the state court [divorce and child custody] proceedings").

Plaintiff does appear to allege a conspiracy to violate his civil rights. For example, Plaintiff alleges that DiMella-Deem and her "co-conspirators" interfered with his "parental relations by fabricating allegations." (Compl. ¶ 11.) Plaintiff also alleges that Eichen and DiMella-Deem made affirmative misrepresentations that Plaintiff had access to his handguns at Blueline in support of their September 26, 2018 ex parte application to modify the TRO, and that Judge Greenwald knew they were affirmative misrepresentations. (*Id.* ¶¶ 34, 48.) Furthermore, DiMella-Deem, Eichen, and Greenwald allegedly agreed to enter a restraining order against Plaintiff to deny him his right to keep and bear arms. (*Id.* ¶¶ 70–72.) However, allegations of a conspiracy to violate civil rights must be pleaded with specificity, and "[a]n otherwise invalid [§] 1983 claim cannot survive a motion to dismiss merely by mentioning the word 'conspiracy.'" *Brewster v. Nassau County*, 349 F. Supp. 2d 540, 547 (E.D.N.Y. 2004); *see also Anilao v. Spota*, 774 F. Supp.

2d 457, 499 (E.D.N.Y. 2011) ("Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed."). Rather, a plaintiff must allege: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. County of Nassau, 292 F.3d 307, 324–25 (2d Cir. 2002). With this heightened standard in mind, the Court finds Plaintiff's conclusory allegations insufficient to support a conspiracy claim under § 1983. Plaintiff does not allege any specific facts indicating an agreement to act in concert to harm him. See Baines v. City of N.Y., No. 10-CV-9545, 2015 WL 3555758, at *12 (S.D.N.Y. June 8, 2015) ("Although [the] [p]laintiff repeatedly asserts that [the d]efendants entered an agreement to violate his civil rights ..., the [complaint] is devoid of facts that would render that allegation plausible as opposed to merely conceivable." (citation omitted)); Harrison, 95 F. Supp. 3d at 325 ("Critically absent from the [c]omplaint are any specific facts identifying a willful collaboration between [the defendants] to deny [the] [p]laintiff's constitutional rights, or an overt act or the agreement between the private actors and state actor forming the conspiracy." (citation and quotation marks omitted)). In particular, Plaintiff fails to plausibly allege a conspiracy between DiMella-Deem, Eichen, and Judge Greenwald. See Parent v. New York, 786 F. Supp. 2d 516, 540 (N.D.N.Y. 2011) (holding that wife's private divorce attorney was not liable for allegedly conspiring to violate plaintiff husband's constitutional rights, because allegations that attorney engaged in ex parte conversation with judges, and unlawfully engaged a bar disciplinary committee in domestic relations process, were insufficient to establish liability under § 1983 because plaintiff "set forth no facts suggesting concerted action" between the wife, the attorney, and the judges); McKnight v. Middleton, 699 F. Supp. 2d 507, 531 (E.D.N.Y. 2010) (dismissing § 1983 claims against attorneys who represented mother in state custody proceedings because plaintiff father's conclusory allegations that attorneys conspired with family court to deprive him of constitutional rights were insufficient to state a conspiracy claim).

**\*9** Because Plaintiff fails to plausibly allege that DiMella-Deem and Eichen were state actors, or that they conspired with state actors, Plaintiff cannot state a claim for civil rights violations against DiMella-Deem and Eichen. Therefore,

Plaintiff's claims against DiMella-Deem and Eichen are dismissed.

### 2. Claims Against Judge Greenwald and Judge Egitto

#### a. Judge Greenwald

Judges are absolutely immune from suit for damages with respect to claims under 42 U.S.C. § 1983 for any actions taken within the scope of their judicial responsibilities. See Mireles v. Waco, 502 U.S. 9, 11–12 (1991) (holding that judge was immune from § 1983 suit for actions in directing police officers to bring an attorney before the judge, even though judge allegedly directed officers to carry out order with excessive force); Turner v. Boyle, 116 F. Supp. 3d 58, 82 (D. Conn. 2015) ("[A]bsolute immunity extends to all civil suits, including suits brought under Section 1983 and [S]ection 1985."). Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." Bliven v. Hunt, 579 F.3d 204, 210 (2d Cir. 2009). "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." Id. at 209. This is because "[w]ithout insulation from liability, judges would be subject to harassment and intimidation...." Young v. Selsky, 41 F.3d 47, 51 (2d Cir. 1994). In addition, as amended in 1996, § 1983 provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983.

Judicial immunity does not apply when a judge takes action outside his or her judicial capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete absence of all jurisdiction." Mireles, 502 U.S. at 12; see also Huminski v. Corsones, 396 F.3d 53, 75 (2d Cir. 2005) ("[I]f the relevant action is judicial in nature, the judge is immune so long as it was not taken in the complete absence of jurisdiction."). But "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." Stump v. Sparkman, 435 U.S. 349, 356 (1978). The Second Circuit and district

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 51 of 185

Deem v. DiMella-Deem, Not Reported in Fed. Supp. (2019)

courts therein have specifically applied such immunity to Family Court judges. *See Wrobleski v. Bellevue Hosp.*, No. 13-CV-8736, 2015 WL 585817, at \*3 (S.D.N.Y. Jan. 30, 2015) (dismissing § 1983 claims against state family court judges on ground of absolute judicial immunity); *Koger v. New York*, No. 13-CV-7969, 2014 WL 3767008, at \*6 (S.D.N.Y. July 31, 2014) (same), *appeal dismissed*, No. 15-092 (2d Cir. June 23, 2015); *see also Parent v. New York*, 485 F. App'x 500, 504 (2d Cir. 2012) (same).

Plaintiff alleges that Judge Greenwald violated his First, Second, Ninth, and Fourteenth Amendment rights "by his prolonged and repeated refusal to ... hold a post-deprivation hearing pursuant to FCA § 842-a(7)." (Compl. ¶¶ 73–75.) [4] Plaintiff alleges that at the September 28, 2018 conference, Judge Greenwald refused to hear Plaintiff's explanation for why he was in compliance with the April 19, 2018 TOP, and instead adjourned the matter to November 9, 2018 and extended the "no contact" TOP. (*Id.* ¶ 35.) Plaintiff also alleges that between September 28 and November 9, 2018, Judge Greenwald appointed an AFC for each of Plaintiff's children but failed to inform the Plaintiff of those appointments, (*id.* ¶ 36), and that Plaintiff objected to the appointment of the AFCs and requested to know the authority by which Judge Greenwald was appointing them, (*id.* ¶ 39). Finally, Plaintiff alleges that Judge Greenwald declined to modify the November 9, 2018 TOP to reflect that Plaintiff was not advised of the existing TOP in Court and was not personally served. (*Id.* ¶¶ 51, 53.)

 **\*10** Each of the actions Plaintiff alleges Judge Greenwald took falls within the scope of judicial responsibility and represents a judicial function. Plaintiff alleges that Judge Greenwald did not have the authority to appoint AFCs for his children, but the Family Court Act expressly authorizes Family Court judges to "appoint a law guardian to represent the child, when, in the opinion of the family court judge, such representation will serve the purposes of this act...." N.Y. Fam. Ct. Act § 249. Issuing and modifying protective orders, and setting hearing schedules are also clearly judicial functions and subject to judicial immunity. *See Hsu v. Braun*, No. 17-CV-1828, 2017 WL 4350595, at \*5 (S.D.N.Y. June 7, 2017) (holding that setting the court's schedule and dismissing claims from a complaint "f[e]ll well within the scope of judicial responsibility" and were protected by judicial immunity); *Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 712–13 (S.D.N.Y. 2011) (holding that state court judge's action of issuing a protective order

was "clearly a judicial function" and protected by judicial immunity); *Tota v. Ward*, No. 07-CV-26, 2008 WL 619163, at \*3 (W.D.N.Y. Mar. 3, 2008) ("There is no dispute that [the defendant judge] had jurisdiction to issue an Order of Protection. The dispute is whether he did so properly. But whether he did or did not, [the judge] is nonetheless protected from suit by the doctrine of judicial immunity.").

Accordingly, Plaintiff's claims against Judge Greenwald are dismissed. *See Sage-El v. Tully*, No. 15-CV-5606, 2015 WL 6455242, at \*2 (E.D.N.Y. Oct. 26, 2015) ("To the extent [the] plaintiff seeks to bring claims against the judges involved in his state court proceedings his claims must be dismissed, as judges have absolute immunity for their judicial acts performed in their judicial capacities.").

### b. Judge Egitto

Plaintiff sues Judge Egitto, "in his official capacity as the Supervising Judge of the Family Courts, in the 9th Judicial District, State of New York," under § 1983 and 22 U.S.C. §§ 2201 and 2202, for failing or refusing to "correct a custom and practice in the Westchester County Family Court of denying litigants their constitutional right[s] to" freedom of religion, parental relations, due process, keep and bear arms, and a hearing pursuant to FCA § 842-a(7). (Compl. ¶¶ 76–82.) Plaintiff alleges Judge Egitto failed or refused to correct a custom and practice of appointing AFCs without jurisdiction, (*id.* ¶ 83), and a custom and practice of "failing to inform parents when AFCs are appointed, the legal authority for the appointment, the factual basis for the appointment, the identity of the AFC and if the AFC is precluded from accepting any appointments," (*id.* ¶ 84).

Plaintiff's claims against Judge Egitto in his official capacity are barred by the Eleventh Amendment because they are essentially claims against the State of New York. *See Myers v. Cholakis*, No. 08-CV-126, 2008 WL 5147042, at \*2 (N.D.N.Y. Dec. 5, 2008) ("Thus, to the extent that [the plaintiff] purports to sue [the state judge] in her official capacity as a New York State Judge, such claims are barred by the Eleventh Amendment."); *Sassower v. Mangano*, 927 F. Supp. 113, 121 (S.D.N.Y. 1996) (holding that claims asserted against the presiding and associate justices of the New York State Appellate Division, Second Department, were barred by the Eleventh Amendment), *aff'd*, 122 F.3d 1057 (2d Cir. 1997). "[A]s a general rule, state governments may not be

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 52 of 185

Deem v. DiMella-Deem, Not Reported in Fed. Supp. (2019)

sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (quotation marks omitted). "[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id.* (quotation marks omitted). New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977). Plaintiff's § 1983 claim against Judge Egitto in his official capacity is therefore barred by the Eleventh Amendment and is dismissed. [5] [6]

### 3. Younger Abstention

**\*11** Even if DiMella-Deem and Eichen were state actors, and Judge Greenwald and Judge Egitto were not protected by judicial immunity, this Court would have to abstain from exercising jurisdiction over this case under *Younger v. Harris*, 401 U.S. 37, 43–44 (1971). Plaintiff seeks declaratory and injunctive relief that would cause this Court to intervene in Plaintiff's ongoing state-court child custody and divorce proceedings.

*Younger* abstention provides that "federal courts should generally refrain from enjoining or otherwise interfering in ongoing state proceedings." *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 74 (2d Cir. 2003). The Court is mindful that "abstention is generally disfavored, and federal courts have a virtually unflagging obligation to exercise their jurisdiction," *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (quotation marks omitted), and that "*Younger* abstention is a 'prudential limitation' grounded in considerations of comity rather than a 'jurisdictional bar' derived from Article III of the Constitution," *Sullivan v. New York State Unified Court Sys.*, No. 15-CV-4023, 2016 WL 3406124, at \*6 (S.D.N.Y. June 17, 2016) (quoting *Kaufman v. Kaye*, 466 F.3d 83, 88 n.1 (2d Cir. 2006)). However, "*Younger* abstention is *required* when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding;

and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (emphasis added).

All three *Younger* requirements are clearly met in this case. First, Plaintiff's Complaint and recent correspondence with the Court reflects that state proceedings are ongoing in the divorce and custody dispute underlying this Action. (*See* Compl. ¶¶ 50, 54; Pl.'s Nov. 2018 Letter; Pl.'s Apr. 2019 Letter.) Plaintiff does not, in fact, allege that his state-court proceedings have concluded. Second, the underlying divorce and child custody proceeding undoubtedly involves an "important state interest." *Diamond "D" Const. Corp.*, 282 F.3d at 198. Indeed, the Supreme Court has long recognized a "domestic relations exception" that "divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992); *see also Reno v. Flores*, 507 U.S. 292, 310 (1993) (noting that states have "special proficiency in the field of domestic relations, including child custody" (quotation marks omitted)); *Khalid v. Sessions*, 904 F.3d 129, 133 (2d Cir. 2018) ("Family law, after all, is an area of law that federal courts and Congress leave almost exclusively to state law and state courts."). Third and finally, Plaintiff would have an adequate opportunity for judicial review of the federal constitutional claims in state court. After the Family Court enters a final order, Plaintiff may appeal that decision within the state court system and raise there all federal constitutional claims. *See Donkor v. City of New York Human Resources Admin. Special Servs. for Children*, 673 F. Supp. 1221, 1226 (S.D.N.Y. 1987) ("[The Second] Circuit has often recognized the obligation and competence of state courts to decide federal constitutional questions." (citing *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1142 (2d Cir. 1986) and *Star Distributors, Ltd. v. Marino*, 613 F.2d 4, 8 n.10 (2d Cir. 1980))). Plaintiff has "not shown any procedural barrier to [his] assertion of constitutional issues in the state court proceeding." *Id.* (citing *Moore v. Sims*, 442 U.S. 415, 430 (1979)). "So long as a plaintiff is not barred on procedural or technical grounds from raising alleged constitutional infirmities, it cannot be said that state court review of constitutional claims is inadequate for *Younger*

purposes." 🔖 *Hansel v. Town Court for Springfield*, 56 F.3d 391, 394 (2d Cir. 1995).

**\*12** The Court therefore dismisses Plaintiff's Complaint on *Younger* abstention grounds as well.

### 4. Domestic Relations Abstention Doctrine

The Supreme Court has recognized a domestic relations exception to subject matter jurisdiction that "divests the federal courts of power to issue divorce, alimony, and child custody decrees." 🔖 *Ankenbrandt*, 504 U.S. at 703. "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *In re* 🔖 *Burrus*, 136 U.S. 586, 593–94 (1890). The exception is narrow, but even in cases where the Court may properly exercise original subject matter jurisdiction, "[a] federal court presented with matrimonial issues or issues 'on the verge' of being matrimonial in nature should abstain from exercising jurisdiction so long as there is no obstacle to their full and fair determination in state courts." 🔖 *American Airlines, Inc. v. Block*, 905 F.2d 12, 14 (2d Cir. 1990) (per curiam); *see also Ranney v. Bauza*, No. 10-CV-7519, 2011 WL 4056896, at \*3 (S.D.N.Y. Aug. 31, 2011) (distinguishing the narrow domestic relations exception from the broader "*American Airlines* abstention doctrine" upon which courts in the Second Circuit routinely rely). Applying these principles, courts in the Second Circuit have abstained from controversies that, regardless of how a plaintiff characterizes them, "begin and end in a domestic dispute." *Tail v. Powell*, 241 F. Supp. 3d 372, 377 (E.D.N.Y. 2017) (citation and quotation marks omitted); *see also Martinez v. Queens Cnty. Dist. Atty.*, 596 F. App'x 10, 12 (2d Cir. 2015) (applying domestic relations exception to plaintiff's conspiracy claim against state judges and officials involved in divorce proceeding and reasoning that "subject matter jurisdiction may be lacking in actions directed at challenging the results of domestic relations proceedings," even if parties are not seeking a custody decree); *see also Schottel v. Kutyba*, No. 06–1577, —— Fed. App'x ——, 2009 WL 230106, at \*1 (2d Cir. Feb. 2, 2009) ("Although we recognize that the domestic relations 'exception is very narrow,' a plaintiff cannot obtain federal jurisdiction merely by rewriting a domestic dispute as a tort claim for monetary damages." (citation omitted)).

Here, the Court must abstain from exercising jurisdiction over Plaintiff's federal claims because Plaintiff presents issues that are, or are on the verge of being, about child custody and divorce. Plaintiff's claims arise from the Defendants' alleged actions in the child custody and divorce proceedings that are pending in a state court. Plaintiff seeks declaratory and injunctive relief, as well as damages, from the Family Court Judges overseeing the divorce and child custody proceedings, his wife, and his wife's attorney representing her in those proceedings. (*See generally* Compl.) That Plaintiff invokes rights guaranteed him by the federal Constitutional and federal law does not change the fact that all the alleged violations occurred during the course of his state divorce and child-custody proceedings. (Compl. ¶¶ 22–53.) Plaintiff does not allege, and there is no indication, that Plaintiff will not be able to vindicate those rights on appeal in the state court system.

**\*13** Accordingly, the Court dismisses the remainder of Plaintiffs federal claims under the abstention doctrine articulated in *American Airlines. See Tait*, 241 F. Supp. 3d at 376 ("[T]he [domestic relations] exception is ... understood to grant to federal courts the discretion to abstain from exercising jurisdiction over issues on the verge of being matrimonial in nature as long as full and fair adjudication is available in state courts." (quotation omitted)); 🔖 *McKnight*, 699 F. Supp. 2d at 517 (applying domestic relations abstention doctrine to plaintiff's claims arising out of state child-custody proceedings); ⚠️ *Neustein v. Orbach*, 732 F. Supp. 333, 339–40 (E.D.N.Y. 1990) (applying domestic relations abstention doctrine to plaintiff's federal constitutional claims against actors involved in state court child-custody proceedings, and concluding that jurisdiction was lacking where the "[p]laintiff's sole purpose in bringing this domestic relations dispute to the federal courts [was] a frivolous attempt to engage the [c]ourt in a manner over which it ha[d] no jurisdiction"). [7]

### III. Conclusion

**\*14** For the foregoing reasons, Eichen and DiMella-Deem's Motions are granted. The remainder of Plaintiff's federal claims are barred by judicial and state immunity, and this Action is dismissed in its entirety on abstention grounds. The Court denies Plaintiff's outstanding application as moot. (Dkt. Nos. 15, 18.) Although courts generally grant a pro se plaintiff an opportunity to amend a complaint to cure its

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 54 of 185

**Deem v. DiMella-Deem, Not Reported in Fed. Supp. (2019)**

defects, leave to amend is not required where it would be futile. *See* Hill v. Curcione, 657 F.3d 116, 123–24 (2d Cir. 2011); Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988). Plaintiff is an attorney whose prior cases involving the same Family Court proceedings were dismissed on similar grounds. Because the defects in Plaintiff's Complaint cannot be cured, Plaintiff's Complaint is dismissed with prejudice.

The Clerk of the Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 9, 13), enter judgment for all Defendants, close this case, and mail a copy of this Opinion and Order to Plaintiff. [8]

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1958107

## Footnotes

1    Plaintiff is an attorney licensed to practice law in the state of New York. He is currently suspended from practicing law in this Court. On June 17, 2016, the Court's Committee on Grievances suspended him from practicing in this Court "for a period of six months and until further order of this Court." *In re: Michael Deem*, M-2-238 (S.D.N.Y. June 17, 2016). Plaintiff has not filed an application for reinstatement and the Committee has not reinstated him. Plaintiff makes no mention of his status as an attorney or his suspension in his Complaint.

The Court is ordinarily obliged to construe pro se pleadings liberally, Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they suggest," Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474–75 (2d Cir. 2006) (per curiam) (quotation marks omitted). Because Plaintiff is an attorney, however, he is not entitled to the special solicitude usually granted to pro se litigants. *See* Tracy v. Freshwater, 623 F.3d 90, 102 (2d Cir. 2010) ("[A] lawyer representing himself ordinarily receives no such solicitude at all."); *Zappin v. Doyle*, No. 17-CV-8837, 2018 WL 2376502, at *6 (S.D.N.Y. Apr. 10, 2018) (declining to treat attorney proceeding pro se with special solicitude because he was an experienced litigator, had access to the court's electronic filing system, and had previously represented himself in multiple cases).

2    Judge Greenwald and Judge Egitto have not been served and have not appeared in this Action.

3    22 U.S.C. § 2201 authorizes the U.S. President to expend funds towards "[a]ssistance to disadvantaged children in Asia." Plaintiff makes no allegations regarding the President's provision of assistance to children in Asia in his Complaint, and it is not clear that Plaintiff has a private cause of action under this provision in any event. 22 U.S.C. § 2202 does not exist. The Court therefore treats Plaintiff's claims against Judge Egitto as § 1983 claims only.

4    Inasmuch as Plaintiff is seeking declaratory relief that his right to a § 842-a(7) hearing was violated, Plaintiff fails to allege any facts supporting his conclusory assertion. Section 842-a(7) provides that where a court issues a protective order revoking or suspending a firearm license or ordering the surrender of firearms prior to a hearing, it "shall commence such hearing within fourteen days of the date such order was issued." § 842-a(7). Plaintiff alleges that a modified TOP ordering him to surrender certain firearms was entered against him on September 26, 2018. (Compl. ¶ 34.) According to Plaintiff, Judge Greenwald held a conference on September 28, 2018 to discuss the terms of the TOP, but then adjourned the conference to November 9,

2018, so that he could appoint counsel for the children. (*Id.* ¶ 35.) Thus, on its face, Plaintiff's Complaint fails to allege that he was denied a hearing—the hearing commenced two days after the issuance of the order.

When Plaintiff wrote to Judge Egitto on September 29, 2018 to ask for a 🚩 § 842-a(7) hearing, Judge Egitto responded by pointing to a hearing that was already scheduled for November 9, 2018. (*Id.* ¶¶ 37–38.) Plaintiff does not deny that the November 9, 2018 hearing took place and in fact contests that he was provided certain information in court that day. (*Id.* ¶¶ 51–53.) 🚩 Section 842-a(7) provides that a hearing must be commenced within fourteen days—it does not bar state judges from adjourning such hearings for legitimate purposes.

5    Even if Plaintiff had sued Judge Egitto in his individual capacity, the suit would have been barred by judicial immunity because all the actions Plaintiff alleges Judge Egitto took are judicial functions well within the scope of judicial responsibility. Plaintiff alleges that Judge Egitto granted a September 26, 2018 ex parte application for the modification of the TOP against Plaintiff although he knew that Eichen and DiMella-Deem made affirmative misrepresentations in that application. (Compl. ¶¶ 34, 48.) Plaintiff also alleges that Judge Egitto ignored his September 29, 2018 letter requesting a 🚩 § 842-a(7) hearing, (*id.* ¶ 37), and instead responded on October 2, 2018 by referencing a future court date of November 9, 2018 and a trial on the underlying petitions scheduled for January 8 and 9, 2019, (*id.* ¶ 38). As the Court explained with respect to Judge Greenwald, issuing and modifying protective orders, and setting hearing schedules are also clearly judicial functions. *See Hsu,* 2017 WL 4350595, at *5 (holding that setting the court's schedule and dismissing claims from a complaint "fall well within the scope of judicial responsibility"); 🚩 *Bobrowsky,* 777 F. Supp. 2d at 712–13 (holding that state court judge's action of issuing a protective order was "clearly a judicial function"); *see also* 🚩 *Bliven,* 579 F.3d at 209 ("[E]ven allegations of bad faith or malice cannot overcome judicial immunity.").

6    Plaintiff notably does not name the Westchester County Family Court as a defendant in this Action. And indeed, he could not, because the New York State Unified Court System is "unquestionably an 'arm of the State,' and is entitled to Eleventh Amendment sovereign immunity." 🚩 *Gollomp,* 568 F.3d at 368 (citation omitted); *see also O'Dette v. N.Y. State Unified Court Sys.,* No. 12-CV-2680, 2013 WL 1623597, at *4 (E.D.N.Y. Apr. 15, 2013) ("An arm of the State, such as the New York State Unified Court System, is immune [under the Eleventh Amendment]."). Any claims against the Family Court would thus be barred by the Eleventh Amendment.

Nevertheless, Plaintiff requests injunctive relief against the Westchester County Family Court in the form of "an order compelling the Westchester County Family Court to hold post-deprivation hearings within three days of entering 'no contact' TOPs," (Compl. ¶ N), and "an order compelling the Westchester County Family Court to hold post-deprivation hearings within fourteen days of ordering litigants to surrender their firearms," (*id.* ¶ O). Not only do courts generally not order injunctive relief against non-parties, 🚩 *United States v. Regan,* 858 F.2d 115, 120 (2d Cir. 1988), it is also "well-settled that 'federal courts have no general power to compel action by state officials,' " *Columbia Artists Mgmt., LLC v. Swenson & Burnakus, Inc.,* No. 05-CV-7314, 2008 WL 4387808, at *8 (S.D.N.Y. Sept. 24, 2008) (citation omitted); *see also Davis v. Lansing,* 851 F.2d 72, 74 (2d Cir. 1988) (rejecting application for writ of mandamus compelling state court judge to permit defense counsel's use of race-based peremptory challenges). Therefore, Plaintiff's request for injunctive relief against non-party Westchester County Family Court is denied.

7    The Court notes that there is some precedent in the Second Circuit that *Younger* abstention does not apply to claims for money damages. *See* ⚠️ *Rivers v. McLeod,* 252 F.3d 99, 101–02 (2d Cir. 2001) (stating that the "application of the *Younger* doctrine is inappropriate where the litigant seeks money damages for an alleged violation of 🚩 § 1983"); 🚩 *McKnight,* 699 F. Supp. 2d at 520 (applying *Younger* abstention to plaintiff's claims for injunctive relief but not to plaintiff's claims for money damages). However, these cases

Deem v. DiMella-Deem, Not Reported in Fed. Supp. (2019)

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 56 of 185

cite 🚩 *Kirschner v. Klemons*, 225 F.3d 227, 238 (2d Cir. 2000), in which the Second Circuit did not expressly decide whether *Younger* applies to claims for money damages, but instead noted that the Supreme Court has also declined to reach the issue and held that even if *Younger* did apply to claims for money damages, the federal suit should be stayed rather than dismissed. 🚩 *Id.* at 238. Because the question has not been conclusively decided, some district courts in the Second Circuit have applied the *Younger* abstention doctrine to claims for monetary relief. *See, e.g., Torres v. Gaines*, 130 F. Supp. 3d 630, 637 (D. Conn. 2015) (applying *Younger* abstention doctrine to claim for money damages); *McCulley v. N.Y.S. Dept. of Envtl. Conservation*, 593 F. Supp. 2d 422, 434 (N.D.N.Y. 2006) (same). *Cf.* 🚩 *Simpson v. Rowan*, 73 F.3d 134, 138 & n. 6 (7th Cir. 1995) (observing that "a plurality [of Circuits] now applies *Younger* in some fashion to damage claims").

Here Plaintiff seeks primarily declaratory and injunctive relief, (Compl. ¶¶ A–P), but also compensatory damages, and fees, costs, and expenditures, (*id.* ¶¶ Q–R). It is clear that the *Younger* abstention doctrine applies at least to bar Plaintiff's claims for declaratory and injunctive relief. The Court need not decide whether it can dismiss Plaintiff's claims for monetary relief based on *Younger* abstention grounds because it otherwise dismisses those claims on the merits. However, even if the Court did not herein dismiss all claims on the merits, and the *Younger* abstention doctrine did not bar Plaintiff's claims for monetary relief, the domestic relations abstention doctrine clearly does apply to bar even Plaintiff's claims for monetary relief. *See* 🚩 *McKnight*, 699 F. Supp. 2d at 517 (applying domestic relations abstention doctrine to claims for monetary relief because the court was "deprived of jurisdiction over claims that 'begin and end in a domestic dispute,' even if the plaintiff [was] seeking only monetary damages" (citation omitted); *see also Schottel*, 2009 WL 230106, at *1 (holding that "a plaintiff cannot obtain federal jurisdiction merely by rewriting a domestic dispute as a tort claim for monetary damages" and applying domestic relations abstention doctrine to claims for monetary relief). Thus, Plaintiff's claims for damages are barred by the domestic relations exception.

8    A district court may impose a leave-to-file sanction on a plaintiff if the court (1) notifies the litigant that future frivolous or duplicative filings could result in sanctions; (2) if the litigant continues such behavior, orders the litigant to show cause as to why a leave-to-file sanction order should not be issued; and (3) if the litigant's response does not explain why sanctions are inappropriate. 🚩 *Iwachiw v. N.Y. State Dep't of Motor Vehicles*, 396 F.3d 525, 529 (2d Cir. 2005); 🚩 *Moates v. Barkley*, 147 F.3d 207, 208 (2d Cir. 1998). Plaintiff was expressly warned by Judge Seibel that future frivolous actions could result in the imposition of a leave-to-file sanction, the Court will also separately issue an Order directing Plaintiff to show cause why the Court should not enjoin him from making any additional filings in this Court regarding the actions of his wife, attorneys, judges, and other officials involved in the state divorce and custody proceedings.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 777861
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

John M. GANGEMI, Plaintiff,

v.

Bruce JOHNSON, Esq., Defendant.

No. 98 Civ. 8470(SHS).
|
Sept. 30, 1999.

*OPINION AND ORDER*

STEIN, J.

**\*1** Plaintiff John M. Gangemi brings this action pursuant to 42 U.S.C. § 1983. He alleges that Bruce Johnson violated his Fourteenth Amendment rights by committing perjury and conspiring with New York State Supreme Court Justice Beatrice Shainswit. [1] Plaintiff seeks $2 million in damages. Defendant moves to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the following reasons, defendant's motion is granted and the complaint is dismissed.

BACKGROUND

This action stems from a lawsuit originally filed in July, 1996, in Supreme Court, New York County. Plaintiff's Complaint at ¶ 8. In that case, *Helms v. Gangemi,* Index No. 111842/96 (Sup.Ct., N .Y. Co.), Kent Helms sued John M. Gangemi, the plaintiff here, claiming that "Helms, a minority shareholder, was wrongfully ousted from the corporation known as Professional Patient Management." Plaintiff's Complaint at ¶ 9–10. On May 12, 1997, Bruce Johnson, the defendant here, made his first appearance as co-counsel for Helms. Over the next year-and-one-half, the parties engaged in an acrimonious discovery battle that resulted in motions and cross-motions for sanctions for failure to comply with discovery orders. *See, e.g., id.* at ¶¶ 20, 32.

On December 1, 1998, while the New York County Supreme Court action was still pending, plaintiff filed this action against Johnson "in response to [Johnson's] patterns of perjurious and dishonest behavior that, in conjunction with Hon. Beatrice Shainswit, J.S.C., has led to a denial of

plaintiff's due process rights." Plaintiff's Memo. of Law at 2; *see* Plaintiff's Complaint at ¶ 8. Plaintiff's complaint, devoted almost entirely to rehashing the parties' tortuous discovery battle, claims that Johnson made various misrepresentations and conspired with Justice Shainswit—whom he does not name as a defendant—to deny plaintiff due process in the state court action. Johnson has now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

DISCUSSION

When reviewing a motion to dismiss for failure to state a claim for relief, a court must accept as true the allegations of the complaint and must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of the non-moving party. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993); *Schnall v. Marine Midland Bank,* 1999 WL 498194, \* 1 (S.D.N.Y. July 14, 1999). Dismissal of the complaint is only proper when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957); *Duferco Steel, Inc. v. M/V Festivity,* 1998 WL 474197, \* 1 (S.D.N.Y. Aug. 13, 1998).

Viewing plaintiff's complaint in the most favorable light, it must still be dismissed. It is well settled that to state a § 1983 claim, plaintiff must allege: first, that the defendant's conduct deprived plaintiff of a constitutionally protected right; and second, "that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988); *see Flagg Bros, Inc. v. Brooks,* 436 U.S. 149, 155–56 (1978).

**\*2** The Supreme Court has held that the requirement of "acting under color of state law" is "essential" to an action under 42 U.S.C. § 1983. *West,* 487 U.S. at 48. Determining whether a party is "acting under color of state law" is a two-part test. First, plaintiff's constitutional deprivation must have been caused by conduct performed during the exercise of a right or privilege authorized by the State. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982); *see Edmondson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 620 (1991). Second, the person charged with committing the deprivation may be fairly characterized as a

state actor. *Lugar,* 457 U.S. at 937; *see Edmondson,* 500 U.S. at 620. Because plaintiff is unable to show either that Johnson was exercising a right or privilege authorized by the state or that Johnson is a state actor, Johnson was not "acting under color of state law" pursuant to 42 U.S.C. § 1983 and the motion to dismiss should be granted.

First, any constitutional deprivation that plaintiff suffered was not the result of the exercise of a right or privilege authorized by the state. An individual attorney's actions and misuse of the law can be fairly attributed to the state only under certain limited circumstances. *Lugar,* 457 U.S. at 938–41; *Dahlberg v. Becker,* 748 F.2d 85, 90 (2d Cir.1984), cert. denied, 470 U.S. 1084 (1985).

In *Dahlberg v. Becker,* the Second Circuit determined that "[s]ince a State is charged with the responsibility of assuring that its laws are constitutional," an attorney is not exercising a right or privilege authorized by the state if he allegedly misuses a valid state statute. *Dahlberg,* 748 F.2d at 90–91; *see also Lugar,* 457 U.S. at 937–40; *Srubar v. Rosenberg,* 875 F.Supp. 155, 163 (S.D.N.Y.1994), aff'd, 71 F.3d 406 (2d Cir.1995) ( "[L]awyers ... are not clothed with the state's authority because they are using the state's judicial process or because they are officers of the court."). The facts in *Dahlberg,* similar to the facts here, alleged that the defendant, who was the opposing attorney to the plaintiff in a prior action, submitted perjurious documents and omitted statutorily required notice provisions from an order to show cause. *Dahlberg,* 748 F.2d at 87–88. The plaintiff in *Dahlberg* was forced to spend a night in jail due to his failure to comply with a court order. *Id.* The plaintiff in *Dahlberg* then sued his opposing attorney pursuant to 42 U.S.C. § 1983 and the defendant attorney successfully moved to dismiss the complaint for failure to state a claim for relief.

On appeal, the United States Court of Appeals for the Second Circuit affirmed because the plaintiff was not challenging the constitutionality of a statute but rather was claiming that the constitutional deprivation "resulted from private party defendants' 'malicious, wanton, willful, oppressive [sic], [and] unlawful acts.' " *Dahlberg,* 748 F.2d at 90 (quoting *Lugar,* 457 U.S. at 940). The Second Circuit went on to find that plaintiff's "private misuse of a state statute does not describe conduct that can be attributed to the State...."

*Dahlberg,* 748 F.2d at 90 (citations omitted); *see also Stevens v. Frick,* 372 F .2d 378, 381 (2d Cir.), cert. denied, 387 U.S. 920 (1967) (holding that "courts open to litigation of complaints, regardless of how baseless they eventually prove to be, ... [do] not clothe persons who use [the] judicial processes with the authority of the state").

**\*3** The complaint in this case challenges Johnson's alleged perjurious remarks and misuse of the discovery process —a process that the parties have been pursuing with considerable heat and mutual invective. Gangemi does not attack the constitutionality of New York State discovery rules, but challenges solely the manner in which defendant has "fraudulently" used them. *See Dahlberg,* 748 F.2d at 90– 91; *see also Johnson v. Chemical Bank,* 1996 WL 706893 (S.D.N.Y. Dec. 9, 1996) ("The mere fact that defendants utilized state statutes to pursue a state court remedy against the plaintiff does not constitute 'state action' by private parties"); *Katz v. Morgenthau,* 709 F.Supp. 1219, 1230 (S.D.N.Y.1989) (holding that misuse of valid state statute is not exercise of state action). Accordingly, Johnson's alleged conduct was not caused by a right or privilege authorized by the State.

Not only does Gangemi fail to satisfy the first prong of the "acting under color of state law" requirement that defendant's actions must be authorized by the State, but he also fails to satisfy the second prong that defendant must be a state actor. While a private individual need not be a state official to be considered a state actor, he must have "acted together with or ha[ve] obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State" to be considered a state actor. *Lugar,* 457 U.S. at 937. Further, it is well settled that "[i]n the absence of specific claims of unlawful cooperation with state officials, an attorney engaged in civil litigation on behalf of a private client cannot be said to be acting under color of state law." *Katz,* 709 F.Supp. at 1230 (quoting *Ragosta v. State of Vermont,* 556 F.Supp. 220, 227 (D.Vt.1981), aff'd. without opinion, 697 F.2d 296 (2d Cir.1982)); *see Dahlberg,* 748 F.2d at 90; *Fine v. City of New York,* 529 F.2d 70, 74 (2d Cir.1975); *Yaba v. Cadwalader, Wickersham & Taft,* 931 F.Supp. 271, 274 (S.D.N.Y.1996); *Srubar,* 875 F.Supp. at 163; *Peavey v. Polytechnic Institute of New York,* 775 F.Supp. 75, 77 (S.D.N.Y.1991), aff'd, 969 F.2d 1042 (2d Cir.1992).

A claim of unlawful cooperation with state officials must allege "concerted activity" between the private individual and the state officials. *Fine,* 529 F.2d at 74; *see McArthur v. Bell,* 788 F.Supp. at 706, 711 (E.D.N.Y.1992) (holding that conspiracy claims are "highly disruptive" and therefore "vague and conclusory allegations" are insufficient); *see also Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990) (holding that complaint must not rely on "vague, prolix allegations of a conspiracy" and must allege overt acts); *Oster v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *James v. Artuz,* 1998 WL 50206,* 4–5 (S.D.N.Y. Feb. 6, 1998).

Even when drawing all reasonable inferences in favor of plaintiff, he fails to allege facts indicating "concerted activity" between Johnson and his alleged co-conspirator, Justice Shainswit. Plaintiff only alleges that by ruling in Johnson's favor, Justice Shainswit violated plaintiff's right to due process. There are no allegations of overt acts that Justice Shainswit and Johnson entered into a conspiracy. Whether Justice Shainswit made rulings based on information supplied by Johnson that was false or misleading is irrelevant to the constitutional analysis and cannot support a finding of cooperation between Johnson and the state jurist.[2] *Dahlberg,* 748 F.2d at 90. Clearly, a judge does not conspire with an attorney simply by ruling in an attorney's favor.

**\*4** Plaintiff cites *Dennis v. Sparks,* 449 U.S. 24 (1980), for the proposition that simply alleging action in conjunction with a state actor automatically satisfies the "acting under color of state law" requirement. There are, however, key differences between the allegations in *Dennis* and those in the instant complaint. Specifically, the private parties in *Dennis* allegedly entered into a bribery scheme with the judge, *Dennis,* 449 U.S. at 26—a factual assertion totally absent in this action, where the alleged conspiracy is based simply on plaintiff's frustration with the state judge's rulings in his state litigation. In fact, the United States Supreme Court specifically noted this difference in *Dennis* writing that:

> Of course, merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge. But here the allegations were that an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge. *Dennis,* 449 U.S. at 28.

The allegations in *Dennis* are not present here. Accordingly, plaintiff has failed to allege that defendant "acted under color of state law" and the complaint must be dismissed.

CONCLUSION

For the reasons set forth above, defendant's motion to dismiss the complaint for failure to state a claim for relief is granted and the Clerk of Court is directed to enter judgment dismissing the complaint in its entirety.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 777861

---

**Footnotes**

1    Plaintiff's complaint sets forth one cause of action pursuant to the Fourteenth Amendment and one pursuant to 42 U.S.C. § 1983. *See* Plaintiff's Complaint at 21, 24. However, plaintiff's Fourteenth Amendment claim is technically a claim subsumed under § 1983. Therefore, plaintiff's Fourteenth Amendment and § 1983 claims will be addressed simultaneously. *See generally Adickes v. S.H. Kress Co.,* 398 U.S. 144, 187 (1970); *Dahlberg v. Becker,* 748 F.2d 85, 88 (2d Cir.1984) ("By enacting 42 U.S.C. § 1983 Congress provided a remedy for a claimed violation of [the Fourteenth Amendment's] constitutional guarantee.").

2    Plaintiff purports to bring this action pursuant to "42 U.S.C. § 1983(3)." While § 1983 does not have subsections, subsection (3) of 42 U.S.C. § 1985 does address conspiracy claims. A claim under § 1985(3), like § 1983, cannot be sustained in the absence of state involvement. *United Brotherhood of Carpenters & Joiners v. Scott,* 463 U.S. 825, 831–34 (1983); *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 384–85 (1979) (concurrence); *Hickey–McAllister v. British Airways,* 978 F.Supp. 133, 139 (E.D.N.Y.1997); *New York State National Organization for Women,* 704 F.Supp. 1247, 1258 (S.D.N.Y.1989); *Weiss v. Willow Tree Civic Ass'n,* 467 F.Supp. 803, 813 (S.D.N.Y.1979); *Perrotta v. Irizarry,* 430 F.Supp. 1274 (S.D.N.Y.), aff'd, 573 F.2d 1294 (2d Cir.1977).

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 61 of 185

Ramos v. Putnam Family Court, Not Reported in Fed. Supp. (2017)

2017 WL 3083727
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Jose Eric RAMOS, Plaintiff,

v.

PUTNAM FAMILY COURT, et al., Defendants.

No. 15-cv-1443 (VAB)
|
Signed 07/18/2017

**Attorneys and Law Firms**

Jose Eric Ramos, Suffield, CT, pro se.

**INITIAL REVIEW ORDER**

Victor A. Bolden, United States District Judge

*1 Jose Eric Ramos ("Plaintiff"), currently incarcerated at MacDougall-Walker Correctional Institute ("MacDougall-Walker"), brings this case *pro se* under 42 U.S.C. § 1983 ("Section 1983"), against the Putnam Family Court, Peter Barbone from Social Family Services at the Putnam Superior Court, Judge Michael E. Riley of the Connecticut Superior Court, Support Enforcement Agent Johara Craig at the Putnam Superior Court, and Connecticut Support Enforcement Services at the Putnam Superior Court (collectively, "Defendants"). ECF No. 1.

**I. STANDARD OF REVIEW**

Under 28 U.S.C. § 1915A(b), the Court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint ... [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A complaint that includes only "labels and conclusions," "a formulaic recitation of the elements of a cause of action" or "naked assertions devoid of further factual enhancement," does not meet the facial plausibility standard. *Id.* (internal quotation marks omitted) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007)). Although courts have an obligation to interpret "a *pro se* complaint liberally," a *pro se* complaint must still include sufficient factual allegations to meet the standard of facial plausibility. *See* Harris v. Mills, 572 F.3d 66, 72-73 (2d Cir. 2009) ("Even after *Twombly*, though, we remain obligated to construe a pro se complaint liberally.... We conclude, nonetheless, that the amended complaint fails to state [a claim] ... even under liberal standards of review for *pro se* pleadings.").

**II. FACTUAL ALLEGATIONS**

Mr. Ramos's allegations arise from an underlying custody case in the Putnam Family Court. Compl. at 3, ECF No. 1. Mr. Ramos alleges that he was "denied equal rights, privileges [and] immunity of the law as well as equal protection of the law" in the custody case by all Defendants. *Id.* Mr. Ramos requests money damages, "to be reconnected [sic] with [his] children," to be able to resume contact with his children, and "visitation upon release." *Id.* at 6.

Mr. Ramos alleges that he filed for visitation rights and for joint custody of his children at the Putnam Superior Court, and that he was instructed to meet with Mr. Barbone, an employee of Family Services. Compl. at 5. Mr. Ramos alleges that he complied "with all stipulations nd instructions mandated by the court," and that Judge Riley than ruled that Mr. Ramos be granted "visitation and contact rights" as to his children. *Id.*

*2 Mr. Ramos alleges that, throughout the course of his underlying family court case, the mother of his children "did not comply [with court orders] or appear for court on multiple occasions." Compl. at 5. Mr. Ramos alleges that, in response, he contacted and spoke with Mr. Barbone and Judge Riley multiple times and filed motions for contempt multiple times, but that they took no action. *Id.* Mr. Ramos further alleges that the mother then moved the children out of state without consulting him first, and that Mr. Barbone and Judge Riley took no action, even after Mr. Riley spoke to them and filed

motions for contempt. *Id.* Mr. Ramos alleges that the law provided that no party to a custody case could remove the children from the state while the custody case was pending, and that if a party failed to appear before the court, the court should rule in favor of the opposing party. *Id.* at 6. He alleges that Mr. Barbone and Judge Riley denied him the protection of those laws and caused him harm. *Id.*

Mr. Ramos further alleges that Child Support Enforcement Services has a mission statement "to provide for people who pay support." Compl. at 6. Mr. Ramos implies that because he paid child support, he is allegedly entitled to have a relationship with and see his children, and that he has been denied access to his children. *Id.* He claims that some of the Defendants, without specifying which of the Defendants, still "want [him] to pay [child] support even though they claim to not even know where or how my kids are." *Id.*

Mr. Ramos also alleges that Defendants, without specifying which of the Defendants, issued a warrant for his arrest because he allegedly missed one court date in March of 2009, for which he had not received notice. Compl. at 6.

## III. DISCUSSION

All of the allegations in Mr. Ramos's Complaint arise from a Connecticut state court adjudication of his custody case, state court decisions as to child support, and the state's enforcement of child support orders. As explained below, the Court concludes that all of Mr. Ramos's claims, against all Defendants, are barred by the *Rooker-Feldman* doctrine.

*See* 🚩 *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983); 🚩 *Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923). Furthermore, certain of his claims would also be barred on other grounds, including by Eleventh Amendment sovereign immunity, by judicial immunity, and by the domestic relations exception.

### A. *Rooker-Feldman* Doctrine

"The *Rooker-Feldman* doctrine ... is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries causes by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." 🚩 *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 284 (2005). Under the *Rooker-Feldman* doctrine, "federal district courts do not have jurisdiction over claims that have already been

decided, or that are 'inextricably intertwined' with issues that have already been decided, by a state court." 🚩 *Mitchell v. Fishbein,* 377 F.3d 157, 165 (2d Cir. 2004). "The *Rooker–Feldman* doctrine provides that the lower federal courts lack subject matter jurisdiction over a case if the exercise of jurisdiction over that case would result in the reversal or modification of a state court judgment," because "within the federal system, only the Supreme Court may review a state court judgment." 🚩 ⚠️ *Hachamovitch v. DeBuono,* 159 F.3d 687, 693 (2d Cir. 1998).

Specifically, the *Rooker-Feldman* doctrine "directs federal courts to abstain from considering claims when four requirements are met: (1) the plaintiff lost in state court, (2) the plaintiff complains of injuries caused by the state court judgment, (3) the plaintiff invites district court review of that judgment, and (4) the state court judgment was entered before the plaintiff's federal suit commenced." 🚩 *McKithen v. Brown,* 626 F.3d 143, 154 (2d Cir. 2010). Under the doctrine, "federal district courts lack jurisdiction to review state court decisions whether final or interlocutory in nature."

🚩 *Gentner v. Shulman,* 55 F.3d 87, 89 (2d Cir. 1995).

**\*3** Claims based on the actions of state officials, such as those affiliated with the department of child support enforcement or with social or family services, are generally claims that are "inextricably intertwined" with the family "court proceedings themselves," and therefore also barred by the *Rooker-Feldman* doctrine. *Inkel v. Connecticut Dep't of Children & Families,* 421 F. Supp. 2d 513, 522 (D. Conn. 2006) (finding suit against Connecticut Department of Children and Families barred where plaintiff alleged that DCF officials gave false information that contributed to the family court's adverse determinations against them). A plaintiff's allegations that he or she was denied "due process and equal protection" in the context of child support determinations and the enforcement thereof are therefore barred by the *Rooker-Feldman* doctrine. ⚠️ *Cogswell v. Rodriguez,* 304 F. Supp. 2d 350, 355-56 (E.D.N.Y. 2004) (holding that plaintiff's claims that she was not given notice of child support hearing or of the fact that her car could be seized for failure to pay child support are "inextricably intertwined with the state court's determinations and could have been raised in state court" and barred by *Rooker-Feldman*).

All of the allegations in Mr. Ramos's Complaint are "inextricably intertwined" with the underlying family court

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 63 of 185

Ramos v. Putnam Family Court, Not Reported in Fed. Supp. (2017)

proceedings regarding the custody of his children and his child support obligations. *See Inkel*, 421 F. Supp. 2d at 522. Thus, under the *Rooker-Feldman* doctrine, the Court has no jurisdiction to review Mr. Ramos's claims. *See, e.g., Exxon Mobil*, 544 U.S. at 284. The Court therefore dismisses Mr. Ramos's entire Complaint under 28 U.S.C. § 1915A(b). As discussed below, the Court could also dismiss Mr. Ramos's Complaint on additional grounds.

**B. Judicial Immunity**

**1. Judge Riley**

As a judicial officer, Judge Riley is protected by judicial immunity. Judges are immune from suit, not just from the ultimate assessment of damages. *See Mirales v. Waco*, 502 U.S. 9, 11 (1991). Judicial immunity applies even if "the action [the judge] took was in error, was done maliciously, or was in excess of his authority." *Gross v. Rell*, 585 F.3d 72, 84 (2d Cir. 2009) (quoting *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978)); *see also Heath v. Justices of Supreme Court*, 550 Fed.Appx. 64 (2d Cir. 2014) (summary order) ("Judges when acting in a judicial capacity, are entitled to absolute immunity" (internal quotation marks omitted)).

Judicial immunity is overcome in only two situations. A judge is not immune from suit for actions "not taken in [his] judicial capacity" or for actions that are judicial in nature but "taken in the complete absence of all jurisdiction." *See Mirales*, 502 U.S. at 11-12. "[T]he Supreme Court has generally concluded that acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). The allegations against Judge Riley concern actions taken during the adjudication of a state custody case. Thus, neither exception applies. Judge Riley is immune from suit. All claims against Judge Riley must also, therefore, be dismissed under 28 U.S.C. § 1915A(b) on judicial immunity grounds.

**2. Mr. Barbone and Ms. Craig**

Judicial immunity also entitles state officials that make decisions as to child support payments and enforcement to "absolute quasi-judicial immunity" because, in that capacity, their "actions [are] the same as those of a judge," in that their decisions are "both judicial in nature and subject to review." *See Lomtevas v. Cardozo*, No. 05-CV-2779 (DLI)(LB), 2006 WL 229908, at *5 (E.D.N.Y. Jan. 31, 2006) (finding absolute judicial immunity applicable to New York support magistrate in New York family court despite plaintiff's contention that the support magistrate is "not a 'judge,' but only a 'government attorney' "). Such "[a]bsolute immunity" under "the doctrine of quasi-judicial immunity" applies where a "private actor's acts are integrally related to an ongoing judicial proceeding," and has been found to apply to "social workers and child welfare workers whose challenged actions involve the initiation and prosecution of child custody or dependency proceedings, guardians ad litem in child custody proceedings," for instance. *McKnight v. Middleton*, 699 F. Supp. 2d 507, 526-27 (E.D.N.Y. 2010), *aff'd*, 434 Fed.Appx. 32 (2d Cir. 2011) (citing *Mitchell v. Fishbein*, 377 F.3d 157, 172-73 (2d Cir. 2004)). According to Mr. Ramos's Complaint, Mr. Barbone works for Social Family Services at the Putnam Superior Court and Ms. Craig is a Support Enforcement Agent at the Putnam Superior Court. *See* Compl. at 1-3. Officials involved with making decisions as to child support payments and the enforcement of child support order are entitled to "absolute quasi-judicial immunity." *Lomtevas*, 2006 WL 229908 at *5. All claims against Mr. Barbone and Ms. Craig must also, therefore, be dismissed under 28 U.S.C. § 1915A(b) under quasi-judicial immunity grounds.

**C. Eleventh Amendment Sovereign Immunity**

**\*4** To the extent that Mr. Ramos seeks money damages, his claims against the Putnam Family Court and Connecticut Support Enforcement Services at the Putnam Family Court are also barred by the Eleventh Amendment of the United States Constitution.

Under the Eleventh Amendment, "as a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity when acting pursuant to its authority under Section 5 of the Fourteenth Amendment." *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009) (internal quotation marks omitted). "[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id.* (internal quotation marks omitted). Section 1983 does not abrogate state sovereign immunity. *See*

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 64 of 185

Ramos v. Putnam Family Court, Not Reported in Fed. Supp. (2017)

*Quern v. Jordan*, 440 U.S. 332, 343 (1979); *Sargent v. Emons*, 582 Fed.Appx. 51, 52 (2d Cir. 2014) (summary order) ("[I]t is well established that Congress did not abrogate state sovereign immunity in enacting 42 U.S.C. § 1983.").

The Putnam Family Court and the Support Enforcement Services division under the Putnam Family Court are, "unquestionably an 'arm of the State' " and therefore "entitled to Eleventh Amendment sovereign immunity." *Gollomp*, 568 F.3d at 368 (discussing New York State Unified Court System and finding that it was an arm of the state); *see also Zahl v. Kosovsky*, No. 08-CIV-8308 (LTS)(THK), 2011 WL 779784, at *7 (S.D.N.Y. Mar. 3, 2011), *aff'd*, 471 Fed.Appx. 34 (2d Cir. 2012) ("Therefore, Plaintiff's claims against [New York's Unified Court System] and [Office of Court Administration] ... are barred by the Eleventh Amendment."). Mr. Ramos has provided no evidence suggesting that the State has waived immunity. Thus, any claims for damages against the Putnam Family Court and the Support Enforcement Services division of the Putnam Family Court must also be dismissed under 28 U.S.C. § 1915A(b) on Eleventh Amendment Grounds.

**D. Domestic Relations Exception**

To the extent that Mr. Ramos's Complaint also requests that the Court "reconnect[ ]" him with his children and "visitation upon release," his claims are barred by the domestic relations exception. Compl. at 6. Under the "domestic relations exception," federal court have no "power to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992) ("We conclude, therefore, that the domestic relations exception ... divests the federal courts of power to issue divorce, alimony, and child custody decrees."). "Though the domestic relations doctrine has been narrowly construed, covering only matrimonial actions, i.e., cases on the subjects of divorce, alimony, or the custody of children, a number of courts have recognized that federal courts should nevertheless abstain from exercising jurisdiction when issues are 'on the verge' of being matrimonial in nature if full and fair adjudication is available in state courts. Abstention is particularly urged for cases concerning visitation rights." *Lomtevas*, 2006 WL 229908 at *3 (internal quotation marks omitted) (citing *Am. Airlines, Inc. v. Block*, 905 F.2d 12, 14 (2d Cir. 1990)). Furthermore "[a]bstention under the domestic relations doctrine is also warranted when a plaintiff makes frivolous constitutional

claims that are actually impermissible attempts to embroil the federal courts in matrimonial matters best left to the states." *Id.* (internal quotation marks omitted) (citing *Hernstadt v. Hernstadt*, 373 F.2d 316, 318 (2d Cir. 1967)) (rejecting constitutional due process and equal protection claims arising from underlying custody case and noting that while plaintiff "frames his claims in constitutional terms, he is effectively asking this court to affirm or reverse a child custody decree and determine visitation rights").

**\*5** Even to the extent that Mr. Ramos requests monetary relief, his claims may still be precluded by the domestic relations exception. *See Schottel v. Kutyba*, No. 06-1577-CV, 2009 WL 230106, at *1 (2d Cir. Feb. 2, 2009) ("Even if [plaintiff] had only requested monetary damages ... federal jurisdiction would still be lacking. Although we recognize that the domestic relations exception is very narrow, a plaintiff cannot obtain federal jurisdiction merely by rewriting a domestic dispute as a tort claim for monetary damages." (internal quotation marks omitted)) (summary order).

All of Mr. Ramos's constitutional claims are essentially about the state court's disposition of his custody case, and are "impermissible attempts to embroil the federal courts in matrimonial matters best left to the states." *Lomtevas*, 2006 WL 229908 at *3. Thus, whether he requests visitation rights and the right to contact his children or whether he requests monetary damages, the Court will abstain from deciding his claims on domestic relations exception grounds. *See Ankenbrandt*, 504 U.S. at 703 (preventing federal courts from deciding divorce, alimony, and child custody issues); *Schottel*, 2009 WL 230106 at *1 (2d Cir. Feb. 2, 2009) (applying domestic relations exception to monetary damages claim). All of Mr. Ramos's claims can, therefore, be dismissed under U.S.C. § 1915A(b) on domestic relations exception grounds.

**IV. CONCLUSION**

For the foregoing reasons, all of Mr. Ramos's claims against all of the Defendants are **DISMISSED** under 28 U.S.C. § 1915A(b). The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED at Bridgeport, Connecticut, this 18th day of July, 2017.

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 65 of 185

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3083727

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 229908
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Peter C. LOMTEVAS, pro se, Plaintiff,

v.

Michael A CARDOZO, Esq., individually and
as Corporation Counsel of the City of New
York, Joseph Greenberg, Esq., individually and
as Assistant Corporation Counsel, New York
State Office of Court Administration, Elaine
C. Clark, Esq., individually and as Support
Magistrate of the Queens Family Court, Defendants.

No. 05-CV-2779(DLI)(LB).
|
Jan. 31, 2006.

**Attorneys and Law Firms**

Peter Christopher Lomtevas, Ozone Park, NY, pro se.

Jane R. Goldberg, Corporation Counsel of the City of NY,
Anthony J. Tomari, Attorney General State of New York, New
York, NY, for Defendants.

*MEMORANDUM AND ORDER*

DORA L. IRIZARRY, U.S. District Judge:

**\*1** Peter C. Lomtevas ("Lomtevas" or "plaintiff") brings this
action against New York Corporation Counsel Michael A.
Cardozo, Esq. ("Cardozo"), Assistant Corporation Counsel
Joseph Greenberg, Esq. ("Greenberg"), the New York State
Office of Court Administration ("OCA"), and New York
Family Court Support Magistrate Elaine A. Clark, Esq.
("Clark") (collectively "defendants"), pursuant to 42
U.S.C. § 1983, alleging conspiracy to violate and violations
of his First, Fifth, Ninth, and Fourteenth Amendment rights.

Plaintiff seeks a judgment ordering that he be reunited with
his son and enjoining defendants from attempting to assert
jurisdiction in the New York State Family Court. He seeks
declaratory relief and compensatory and punitive damages
against Clark, and he seeks compensatory and punitive

damages against Cardozo and Greenberg. He also requests
that the court award him attorney's fees.

Defendants move to dismiss under Fed.R.Civ.P. 12(b)(6) and
(1). For the foregoing reasons, defendants' motion to dismiss
is granted in its entirety.

**I. Factual Background**
This action arises out of plaintiff's divorce from his wife
Gisela Lomtevas (now Gisela Strom) ("Strom") on February
2, 1987. At the conclusion of that proceeding, the New York
Supreme Court, Queens County, awarded plaintiff custody of
their child and ordered him to pay Strom $50.00 a week in
child support. (Compl. Ex. A at 2-3.) In the divorce judgment,
Judge Zelman stated that "this court retains jurisdiction
of this matter concurrently with the Family Court for the
purposes of making such further decree with respect to
alimony, support, and visitation as it finds appropriate under
the circumstances." (*Id.* at 3.) Later that year, on June 5,
1987, Judge DePhillips of the Queens County Family Court
awarded Strom temporary custody of the child. (Compl.Ex.
C.) Lomtevas appealed that decision several times over a
period of years.

Lomtevas filed an action in the New York Supreme Court,
Queens County, to resettle the divorce judgment. The divorce
settlement was reworded to state that, "the Supreme Court
retains jurisdiction with respect to custody, alimony, support,
and visitation ... the Family Court shall not have any
concurrent jurisdiction." (Compl. Ex. B at 3.) There was
a subsequent period of confusion concerning which court
had jurisdiction to hear the various custody claims and
appeals filed by plaintiff. Ultimately, on December 4, 1989,
the Appellate Division, Second Department, in declining to
modify DePhillips' order granting Strom temporary custody
of the child, noted that Lomtevas "may pursue his application
for a change of custody in the Supreme Court." *Lomtevas
v. Lomtevas,* 156 A.D.2d 367, 548 N.Y.S.2d 901 (2d Dep't
1989). Lomtevas never returned to the Supreme Court to
apply for a change of custody nor, apparently, did he ever try
to modify the November 5, 1987 child support order. (Compl.
Ex. H at 2-3.)

Around 1991, Gisela Strom left for Germany with the child.
According to Lomtevas, he never saw his child again. In
March 2003, Strom reappeared to collect child support arrears
by petition in the Queens County Family Court. On October
28, 2003, Support Magistrate Clark of the Queens County
Family Court issued a temporary order of support directing

Lomtevas to pay Strom $50.00 a week effective October 31, 2003. (Compl. Ex. G at 1-2.) Plaintiff filed several orders to show cause before the Supreme Court, Queens County, seeking to dismiss the Family Court proceeding. (Compl.Ex. F.)

**\*2** Plaintiff's Order to Show Cause was adjourned several times and finally considered fully submitted on January 25, 2005. (Compl. Ex. H at 4.) On April 14, 2005, Judge Lebowitz of the Queens County Supreme Court denied the motion to dismiss the Family Court proceedings, explaining that his court did "not have the jurisdiction to dismiss a proceeding pending in another court." (*Id.*) Lebowitz recommended that Lomtevas raise the jurisdictional issue in the Family Court proceeding. Lomtevas appealed Lebowitz's decision to the Appellate Division, Second Department, but the Second Department Clerk's Office reports that the appeal was withdrawn on October 15, 2005. (*See* Goldberg Decl. at 2, Ex. B.)

As per Judge Lebowitz's recommendation, plaintiff filed a motion in Family Court to dismiss Clark's order of support for lack of subject matter jurisdiction. On June 6, 2005, Strom's petition was dismissed, and the dismissal was affirmed by Judge Lubow in the Family Court on August 10, 2005. (Goldberg Decl, Ex. C.) Corporation counsel reports that Strom will appeal Judge Lubow's decision. (Goldberg Decl. at 2.)

On June 9, 2005, Lomtevas filed this complaint. He alleges that Clark issued the order of temporary support without subject matter jurisdiction and in violation of his due process rights. He alleges that OCA, as Clark's employer and supervisor, is also culpable. He further alleges that Greenberg and Cardozo's refusal to acknowledge that the Family Court did not have jurisdiction and their zealous prosecution of Strom's child support enforcement petition violated his constitutional rights.

## II. Discussion

### Standard of Review

In reviewing a complaint under Fed.R.Civ.P. 12(b)(1), the court accepts as true all factual allegations in the plaintiff's complaint. *Atlantic Mut. Ins. Co. v. Balfour Maclaine Intern. Ltd.,* 968 F.2d 196, 198 (2d Cir.1992). However, "inferences favorable to the party asserting jurisdiction

should not be drawn." *Id.* A case is properly dismissed under 12(b)(1) when "the district court lacks statutory or constitutional power to adjudicate it." *Makarova v. U.S.,* 201 F.3d 110, 113 (2d Cir.2000).

When evaluating a complaint under Fed.R.Civ.P. 12(b)(6), the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1999). A motion to dismiss under 12(b)(6) must be denied "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 335 U.S. 41, 45-446, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### 11th Amendment Immunity

Plaintiff's complaint against OCA must be dismissed for lack of subject matter jurisdiction. "Absent consent to suit in federal court, or an express statutory waiver, the Eleventh Amendment bars a suit in federal court by a citizen of a state against that state or one of its agencies." *Bland v. New York,* 236 F.Supp.2d 526, 534 (E.D.N.Y.2003) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). New York has not consented to suits pursuant to § 1983 in federal court, nor has Congress enacted an Eleventh Amendment waiver for § 1983 claims. *See id.* Therefore, as an agency of the state, OCA is immune from suit. *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999).

### Abstention Under the Domestic Relations Doctrine

**\*3** The court must abstain from exercising jurisdiction over plaintiff's request that he be reunited with his son. The domestic relations exception "divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards,* 504 U.S. 689, 703, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). Arguably, plaintiff's request is "aimed at changing the results of [an] order[ ] of child custody," which the court is required to dismiss under the domestic relations doctrine. *Rabinowitz v. New York,* 329 F.Supp.2d 373, 376 (E.D.N.Y.2004).

Though the domestic relations doctrine has been narrowly construed, covering only matrimonial actions, i.e., cases on the subjects of divorce, alimony, or the custody of children, *Williams v. Lambert,* 46 F.3d 1275, 1283 (2d Cir.1995), a number of courts have recognized that federal courts should nevertheless abstain from exercising jurisdiction when issues are " 'on the verge' of being matrimonial in nature" if full and fair adjudication is available in state courts. *Am. Airlines, Inc. v. Block,* 905 F.2d 12, 14 (2d Cir.1990); *Melnick v. Adelson-Melnick,* 346 F.Supp.2d 499, 505 (S.D.N.Y.2004). Abstention is particularly urged for cases concerning visitation rights. *See, e.g., Melnick,* 346 F.Supp.2d at 506; *Neustein v. Orbach,* 732 F.Supp. 333, 339 (E.D.N.Y.1990). Interfering in such cases would "embroil the federal courts in matters over which the state courts have continuing supervision." *Melnick,* 346 F.Supp.2d at 506. Since consideration of plaintiff's request for relief would result in a decision regarding visitation, and both the New York Supreme Court and appellate courts are available to plaintiff concerning this matter, abstention is warranted.

Abstention under the domestic relations doctrine is also warranted when a plaintiff makes frivolous constitutional claims that are actually "impermissible attempt[s] to embroil the federal courts in matrimonial matters best left to the states." *Hernstadt v. Hernstadt,* 373 F.2d 316, 318 (2d Cir.1967); *Fariello v. Campbell,* 860 F.Supp. 54, 70 (E.D.N.Y.1994). Plaintiff's claims that Greenberg's pursuit of the petition in Family Court violated his due process rights, that Clark's alleged disparaging behavior towards him violated the equal protection clause, and that defendants' failure to reunite him with his son abridged his due process rights are such claims. (Compl.¶¶ 39, 45, 52.) Though he frames his claims in constitutional terms, he is effectively asking this court to affirm or reverse a child custody decree and determine visitation rights. Consideration of this claim would require the court to analyze the New York State Supreme Court's custody decree, determine its force and validity, and possibly modify it or subsequent custody proceedings. Since the New York courts clearly offer plaintiff a forum in which to adjudicate this claim, this court will not exercise jurisdiction.

### Younger Abstention Doctrine

**\*4** Abstention is proper regarding plaintiff's request that the court declare Clark's order of support to have been without legal basis and, therefore, unconstitutional. Abstention is also proper inasmuch as plaintiff requests that the court enjoin defendants from continuing to violate his rights by prosecuting the matter in the Family Court. Under the *Younger* abstention doctrine, federal courts generally must abstain from adjudicating federal claims that "involve or call into question ongoing state proceedings." *Diamond "D" Constr. Corp. v. McGowan,* 282 F.3d 191, 198 (2d Cir.2002) (citing *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)). *Younger* abstention is proper when: "(1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." *Diamond "D" Constr. Corp.,* 282 F.3d at 198. All three conditions are met in the case at bar: (1) there is at least one ongoing state proceeding concerning the Family Court's exercise of jurisdiction,[1] with an appeal of Judge Lubow's decision imminent; (2) the state has a clear interest in overseeing the regulations governing the interrelationship of its courts and the proper adjudication of alimony, custody, and visitation matters, *see, e.g., Moore v. Sims,* 442 U.S. 415, 435, 99 S.Ct. 2317, 60 L.Ed.2d 994 (1979) ("Family relations are a traditional area of state concern."); *Melnick,* 346 F.Supp.2d at 505-06; *Neustein,* 732 F.Supp. at 341 (quoting *Mendez v. Heller,* 530 F.2d 457, 461 (2d Cir.1976) ("we should be especially careful to avoid unnecessary or untimely interference with the State's administration of its domestic policies"); and (3) there is no indication that plaintiff lacks the opportunity to air his complaints in New York's appellate courts. Therefore, *Younger* abstention is appropriate over this claim.

### Absolute Judicial and Prosecutorial Immunity

Admittedly, *Younger* abstention is "inappropriate where the litigant seeks money damages for an alleged violation of § 1983." *Rivers v. McLeod,* 252 F.3d 99, 101-02 (2d Cir.2001). However, inasmuch as plaintiff requests punitive and compensatory damages against Clark, Greenberg, and Cardozo in their individual and official capacities, his claims must be dismissed based on the doctrines of absolute judicial and prosecutorial immunity.

The sole claims against Clark over which this court may assert jurisdiction concern her conspiracy to assert and assertion of jurisdiction in the Family Court and her allegedly intimidating and disparaging behavior. Plaintiff's request for damages flowing from these accusations is barred by the doctrine of absolute judicial immunity. *See, e.g.,* ⚠ *Pierson v. Ray,* 386 U.S. 547, 553-54, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); 🔖 *Bradley v. Fisher,* 13 Wall. 335, 80 U.S. 335, 347, 20 L.Ed. 646 (1871). Judicial immunity can only be overcome for "nonjudicial actions, *i.e.,* actions not taken in the judge's judicial capacity" or for actions "taken in the complete absence of all jurisdiction." 🔖 *Mireless v. Waco,* 502 U.S. 9, 11-12, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991).

**\*5** Plaintiff only alleges the latter situation: that Clark "overstepped her authority in issuing a temporary support enforcement order despite [p]laintiff's motion to dismiss for lack of subject matter jurisdiction." (Compl.¶ 1.) In light of § 411 of the Family Court Act, which states that "[t]he family court has exclusive original jurisdiction over proceedings for support or maintenance under this article and in proceedings under article five-B of this act, known as the uniform interstate family support act," Clark did not act in clear absence of all jurisdiction. At most, the complaint alleges that Clark assumed jurisdiction erroneously since the divorce settlement vested jurisdiction in the Supreme Court only.

Plaintiff's contention that a support magistrate is not a "judge," but only a "government attorney," does not topple Clark's entitlement to immunity. (Pl.'s Affirmation in Opp'n ¶ 14.) "Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities." 🔖 *Butz v. Economou,* 438 U.S. 478, 511, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Absolute immunity is accorded to grand jurors and prosecutors under a "quasi-judicial" theory so that they "can perform their respective functions without harassment or intimidation." 🔖 *Id.* at 512. Persons "performing adjudicatory functions within a federal agency" are also entitled to absolute immunity, as their role is "'functionally comparable' to that of a judge." 🔖 *Id.* at 513-14. This absolute quasi-judicial immunity is afforded to state government officials as well. *See, e.g.,* 🔖 *Imbler v. Pachtman,* 424 U.S. 409, 420-24, 96 S.Ct. 984, 47

L.Ed.2d 128 (1976) (quasi-judicial immunity afforded to a state prosecuting attorney); 🔖 *Quartararo v. Catterson,* 917 F.Supp. 919, 949 (E.D.N.Y.1996) (state parole officers entitled to absolute immunity). As a support magistrate in the Family Court, Clark's actions were the same as those of a judge. Her decisions were both judicial in nature and subject to review. Therefore, she is entitled to absolute immunity for her role as a support magistrate.

Plaintiff's allegations that Clark screamed at him, "cackled 'denied' as if to belittle [him]," and "in a fit of rage and temper" ordered him to pay child support are also insufficient to overcome judicial immunity. (*See* Compl. ¶¶ 27, 29.) Judges are immune from suit even when they are accused of malicious or corrupt actions. 🔖 *Stump v. Sparkman,* 435 U.S. 349, 356-64, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); 🔖 *Bradley,* 80 U.S. at 347, 351. This immunity is not abridged regardless of how injurious the consequences of their erroneous actions may have been for the plaintiff. *Stump,* U.S. 435 at 356 n. 5, 363-64.

Plaintiff's claims that Greenberg conspired to prosecute and prosecuted in the wrong court similarly must be dismissed based on absolute prosecutorial immunity. Prosecutors are absolutely immune from suit for all "activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation." 🔖 *Barrett v. United States,* 798 F.2d 565, 572 (2d Cir.1986). Activities of this type include initiating prosecution and presenting evidence to a grand jury, or choosing not to do so, and conducting plea bargaining negotiations. *Id.* Absolute immunity is not abridged even when an attorney's decision to prosecute is malicious. 🔖 *Kalina v. Fletcher,* 522 U.S. 118, 124-25, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Municipal attorneys who institute civil lawsuits are also afforded absolute immunity. *Cetenich v. Alden,* 11 F.Supp.2d 238, 241 (N.D.N.Y.1998); *see also* 🔖 *Rudow v. New York,* 822 F.2d 324 (2d Cir.1987) (municipal agency attorney held immune from suit because of absolute prosecutorial immunity).

**\*6** Plaintiff's allegation that "Greenberg could have moved to dismiss [the] Petition, and could have advised ... Strom to file an action in Queens Supreme Court to claim her arrears" is insufficient to overcome absolute immunity. (Compl.¶ 39.) Greenberg's decision to pursue Strom's UIFSA petition in Family Court was a decision made in his function as Assistant Corporation Counsel. As such, he is absolutely immune from

suit for his conduct, and plaintiff's claims against him must be dismissed.

Finally, plaintiff's claim that Cardozo is liable for compensatory and punitive damages as Greenberg's supervisor must be dismissed. Plaintiff's only complaint is that Cardozo, "whose policy and procedure it is to enforce child support orders emanating from any Courts worldwide," supported Greenberg's child support petition in the Family Court. (Compl.¶¶ 9, 41, 42.) "[W]hen the actions of a prosecutor are subject to absolute immunity, a supervising prosecuting attorney is also covered by that immunity." *Pinaud v. County of Suffolk,* 798 F.Supp. 913, 918 (E.D.N.Y.1992) (citing *Buckley v. Fitzsimmons,* 952 F.2d 965, 966 (7th Cir.1992)), *aff'd in part, rev'd in part,* 52 F.3d 1139 (2d Cir.1995); *see also* *Haynesworth v. Miller,* 820 F.2d 1245, 1269 (D.C.Cir.1987). Since Greenberg has absolute immunity over the only claims that this court has jurisdiction to adjudicate, Cardozo is also immune.

*Declaratory Relief*

The only claim remaining is plaintiff's request for relief against Clark declaring that her actions in "scowling, yelling and baring her teeth" were unconstitutional. However, in order to state a claim under § 1983, the plaintiff must allege facts showing that defendants, acting "under color of any statute, ordinance, regulation, custom, or usage, of any State ... subject[ed], or cause[d] to be subjected, any citizen of the United States or other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Plaintiff's mere allegations that Clark "cackled" at him and "in a fit of rage" ordered him to pay child support are insufficient to state a claim under § 1983 and dismissed under Fed.R.Civ.P. 12(b)(6).

## III. Conclusion

For the reasons set forth above, the court grants the defendants' motion to dismiss for lack of subject matter jurisdiction and failure to state a claim.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 229908

## Footnotes

1    The court has no information as to why the appeal of Judge Lebowitz's decision was withdrawn.

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2880848
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

CHRIS H., Plaintiff,
v.
The State of NEW YORK, et al., Defendants.

16 Civ. 6807 (LGS)
|
Signed 07/05/2017

**Attorneys and Law Firms**

Chris H., New York, NY, pro se.

Angel Manuel Guardiola, II, New York State Office of the Attorney General, Evan F. Jaffe, New York City Law Depart. Office of the Corporation Counsel, Gary Moy, New York City Law Department, New York, NY, for Defendants.

Department of Social Services, pro se.

**OPINION AND ORDER**

Lorna G. Schofield, United States District Judge

 **\*1** Pro se Plaintiff Christopher Henry brings this action against the State of New York ("State"), the City of New York ("City"), Police Officer Orlando Rios, the Commissioner of the New York City Human Resources Administration/Department of Social Services ("Commissioner"), Justice Tandra L. Dawson, Support Magistrate Paul Ryneski and Support Magistrate Tionnei Clarke (collectively, "Defendants"), asserting claims under federal and state law arising from Plaintiff's arrest and unrelated state court proceedings. Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendants' motion is granted.

**I. BACKGROUND**
The following facts are based on the Complaint and court records from Plaintiff's state court proceedings, of which the Court is entitled to take judicial notice. *See* Apotex Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 60 (2d Cir. 2016) (at motion to dismiss stage, court may take judicial notice

of documents that are publicly available and whose accuracy cannot reasonably be questioned); In re WorldCom, Inc., 708 F.3d 327, 339 n.63 (2d Cir. 2013) (taking judicial notice of court records). These facts are accepted as true solely for the purpose of this motion. *See* Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56–57 (2d Cir. 2016).

**A. Initiation of Matrimonial Proceedings**
Plaintiff Christopher Henry is a black male who resides in New York County. On January 2, 2009, Plaintiff's wife Marisa Henry filed a family offense petition against Plaintiff following an alleged incident of domestic violence. On March 12, 2009, Plaintiff initiated divorce proceedings against his wife in the Supreme Court of the State of New York, New York County.

On April 2, 2009, the Criminal Court of the City of New York entered a Temporary Order of Protection directing Plaintiff stay away from his wife and her home—the marital residence —from April 2, 2009, to May 21, 2009.

**B. May 2009 Arrest and Imprisonment**
On May 10, 2009, Plaintiff was walking outside the marital residence when he was knocked to the ground by City police officers including Defendant Rios. Plaintiff was assaulted, handcuffed and placed in the back of a patrol car, after which he was transported to the 30th Precinct. Plaintiff was charged with resisting arrest, disorderly conduct and violating an order of protection. If the police officers had looked into the address listed on the order of protection, they would have learned that Plaintiff was the owner of the marital residence. Supervisory police officers had the authority and ability to prevent Plaintiff's arrest. The Complaint alleges conclusorily that Plaintiff was arrested and assaulted pursuant to City policy and practice and that inadequate training and procedure led to his injuries.

Plaintiff was held in a cell at the 30th Precinct for approximately 24 hours, after which he was transported by van to the New York Supreme Court. During the ride to the Supreme Court, Plaintiff was kept in handcuffs and slammed into the side of the van multiple times. Once at the Supreme Court, he was placed in a basement cell with approximately 45 other people. The cell was crowded, dirty, smelly and slimy. Plaintiff's clothes became soiled from sitting on the floor, and Plaintiff did not sleep well due to fear of assault from the other detainees. He was held in this cell for 24 hours before being

arraigned in Manhattan Criminal Court. At his arraignment, Plaintiff pleaded not guilty to all charges and was eventually released. The Complaint does not specify when Plaintiff was released, but alleges both that all charges were terminated in Plaintiff's favor on or about March 10, 2010, and that the criminal proceedings against Plaintiff continued until March 2012.

### C. Continuation of Matrimonial Proceedings

**\*2** Separate from Plaintiff's arrest, Plaintiff's divorce proceeding was transferred from the Supreme Court Matrimonial Term to the Supreme Court Integrated Domestic Violence Part on May 8, 2009, where it was assigned to Tandra L. Dawson, an Acting Justice of the New York Supreme Court and a Judge on the New York Family Court. On June 28, 2009, Justice Dawson issued a warrant for Plaintiff's arrest and issued an order of protection directing Plaintiff to stay away from the marital property.

On July 16, 2010, Justice Dawson issued a Final Order of Protection requiring Plaintiff to stay away from his wife, and to stay away from the marital home except as per court order. From June 2009 until October 2010, Plaintiff kept away from the marital home. Sometime thereafter, Plaintiff states that he learned the protective order was void and had no legal effect. Plaintiff questioned Justice Dawson about the "void Order of Protection" on or about July 31, 2012, leading to an extremely contentious environment in the courtroom.

From March 2009 to October 2012, Justice Dawson permitted Donnie Williams, a convicted felon, to live and work in the marital property. While Williams lived there, Plaintiff paid housing expenses of approximately $40,000 on the property.

On October 21, 2010, Plaintiff sold the marital residence. On March 1, 2012, Plaintiff's wife filed an action for fraudulent conveyance relating to the sale. Justice Dawson referred the action to a special referee, who recommended that the sale of the marital residence be deemed a fraudulent conveyance. Justice Dawson confirmed the special referee's report in orders dated March 29, 2016, and May 13, 2016.

In handling the matrimonial proceedings, Justice Dawson made a number of additional rulings that were adverse to Plaintiff. For instance, on October 8, 2015, Justice Dawson denied Plaintiff's motion for access to court documents. In addition, the Complaint alleges that Justice Dawson falsely stated in a February 27, 2015, Decision and Order that Plaintiff had violated a direct order of the Supreme Court and

that she wanted to charge Plaintiff with a criminal offense. Though the February 27, 2015, Decision and Order states that Plaintiff had brought "an exorbitant number" of unnecessary motions, it does not reference wanting to charge Plaintiff with a criminal offense.

### D. Child Support Proceedings

On January 26, 2009, Plaintiff appeared before Support Magistrate Matthew Troy in Family Court. At that hearing, Plaintiff submitted a receipt showing a mortgage payment of approximately $2,000.

Sometime later, Plaintiff appeared before Support Magistrate Paul Ryneski. On November 26, 2010, Plaintiff sought a downward modification of a support order entered on October 15, 2009. On April 27, 2011, his wife sought increased child support from Plaintiff. On October 5, 2012, Support Magistrate Ryneski modified the October 15, 2009, support order and ordered Plaintiff to pay approximately $150 more in basic child support and $250 less in child care costs per cycle than the 2009 order. Plaintiff objected to the modification, and on January 16, 2013, Justice Dawson found that two of Plaintiff's seven objections required remand. However, Justice Dawson rejected Plaintiff's claim that he was entitled to a credit for his housing payments.

On April 11, 2013, Support Magistrate Ryneski issued a revised order of support. Plaintiff objected to that order, and Justice Dawson denied the objection in its entirety on June 7, 2013.

**\*3** According to the Complaint, Support Magistrate Ryneski took affirmative steps to falsify evidence and eliminate the receipt that Plaintiff submitted to Support Magistrate Troy in order to ensure that Plaintiff paid the maximum amount of child support permitted by law. The Complaint further alleges that Support Magistrate Ryneski lives within a fifteen-minute drive of the marital property, and could not believe that a black man owned property in his neighborhood.

Between February 2009 and the date the Complaint was filed, Support Magistrate Ryneski authorized the Child Support Enforcement Unit ("CSEU") to take over $100,000 in wages from Plaintiff. As a result of these garnishments, Plaintiff did not have enough money to pay his mortgage, and was forced into foreclosure in October 2012. He was homeless for several months.

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 73 of 185

Chris H. v. New York, Not Reported in Fed. Supp. (2017)

At some point, Justice Dawson and Support Magistrate Ryneski "conspire[ed]" to "fabricate [Plaintiff]'s total income ... to ensure that the maximum amount of child support payments was sent" to CSEU and the State Treasury. On or about July 19, 2011, Support Magistrate Ryneski "ordered that Plaintiff should spend six months in jail." On or about January 30, 2015, Justice Dawson affirmed Support Magistrate Ryneski's Findings of Fact despite the findings containing "false information."

On or about September 15, 2015, the Commissioner served Plaintiff with a notice to appear in Family Court. On or about February 8, 2016, Plaintiff filed a Notice of Special Appearance stating that he would not accept the jurisdiction of the Family Court. Nonetheless, on March 8, 2016, Support Magistrate Tionnei Clarke issued an Order of Money Judgment against Plaintiff and in favor of the Commissioner in the amount of $26,000. Plaintiff objected to the decision in May 2016. On May 17, 2016, Justice Dawson denied the objection in its entirety.

### E. Letters of Complaint

Plaintiff submitted multiple letters to State and City authorities regarding the allegedly unlawful actions taken by Magistrate Ryneski, Justice Dawson and Officer Rios. The authorities declined to take action in response to the letters.

### F. Racial Animus

In undertaking the actions outlined above, each of the Defendants was motivated by a "desire to injure, oppress, threaten and intimidate Plaintiff because of his African-American race."

Plaintiff commenced this action on August 30, 2016.

### II. STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

Courts are obligated to construe pro se pleadings liberally. *See Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012). A pro se complaint must be afforded "special solicitude, interpreting the complaint to raise the strongest claims that it suggests." *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (citation omitted).

### III. DISCUSSION

Plaintiff alleges 39 causes of action, including 26 causes of action arising under federal law (Counts 1–7, 10–26, 33 and 34). A majority of these causes of action are brought against multiple Defendants for unrelated reasons. Where a cause of action relates to multiple events, the Opinion addresses it separately as to each event.

### A. Federal Claims Arising from Plaintiff's May 2009 Arrest and Imprisonment

**\*4** Plaintiff brings 15 claims under 42 U.S.C § 1983 against either or both Officer Rios and the City [1] arising from his May 10, 2009, arrest and subsequent imprisonment (Counts 1–3, 10, 14–19, 24–26, 33 and 34). The claims against Officer Rios are dismissed as time barred. The claims against the City are dismissed because of insufficient pleading.

The Complaint alleges a violation of Plaintiff's First Amendment right to assemble outside his property, racially motivated assault, false arrest and imprisonment, failure of supervisors to intervene to prevent his allegedly unlawful arrest, failure to ensure his safety while in custody, excessive force, malicious prosecution, violation of his due process rights and violation of his Fourth Amendment rights (Counts 1–3, 10, 14–19 and 33). [2] The Complaint also alleges that the City systemically developed and maintained policies that permit violations of constitutional rights and engaged in a conspiracy to establish policies that let the police believe they can use excessive force with impunity in violation of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (Counts 14, 17, 24–26 and 34).

In addition, Plaintiff brings three claims against Officer Rios and the City under 42 U.S.C. § 1985 for conspiracy to

threaten his rights and deny him equal protection (Counts 20–22) and one claim against the same Defendants under 42 U.S.C. § 1986 for failure to report police brutality to supervisors, which allegedly allowed the claimed conspiracy to continue (Count 23). [3]

Section 1983 actions filed in New York are "subject to a three-year statute of limitations," which generally accrues when the "plaintiff knows or has reason to know of the injury" which is the basis of his action. *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) (internal quotation marks and citation omitted).

The statute of limitations on the § 1983 claims against Officer Rios for assault, excessive force and loss of Plaintiff's First Amendment rights during the course of his May 10, 2009, arrest all accrued when the alleged injuries occurred that day. *See Milan*, 808 F.3d at 963. The statute of limitations for claims related to those injuries thus expired on May 10, 2012. As this action was commenced in 2016, these claims are untimely.

**\*5** The statute of limitations on § 1983 claims of false arrest, false imprisonment and failure to prevent false arrest begins to run "when the alleged false imprisonment ends" and "the victim becomes held pursuant to [legal] process," including upon arraignment. *Wallace v. Kato*, 549 U.S. 384, 389 (2007). As Plaintiff was arraigned on May 12, 2009, the statute of limitations for his false arrest and false imprisonment claims against Officer Rios began to run on that day and expired on May 12, 2012, rendering those claims untimely.

Applying the pro se presumption in favor of Plaintiff, the last possible date of injury pertaining to Plaintiff's claims of excessive force in custody, failure to ensure safety in custody, failure to provide a duty of care in custody, malicious prosecution, violation of due process and violation of his Fourth Amendment rights was in March 2012, when the Complaint states that criminal proceedings against Plaintiff ended. Thus, the statute of limitations for these claims expired in March 2015 at the latest. *See, e.g.*, *Milan*, 808 F.3d at 963; *Poventud v. City of New York*, 750 F.3d 121, 130–31 (2d Cir. 2014) (malicious prosecution claim accrues upon termination of proceeding in favor of defendant). As the Complaint was not filed until August 25, 2016, the portions

of Counts 1, 2, 10, 14, 15, 16, 17, 18, 19 and 33 that relate to Plaintiff's May 2009 arrest and imprisonment are dismissed as time barred as they relate to Officer Rios.

Plaintiff's §§ 1985 and 1986 claims against Officer Rios are likewise untimely. Claims brought under § 1985 are subject to a three-year statute of limitations. *See Allen v. Antal*, 665 Fed.Appx. 9, 12 (2d Cir. 2016) (summary order); *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994). Claims under § 1986 are subject to a one-year statute of limitations. *See* 42 U.S.C. 1986; *see also Paige v. Police Dep't of Schenectady*, 264 F.3d 197, 199 n.2 (2d Cir. 2001). Like § 1983 claims, §§ 1985 and 1986 claims accrue when a plaintiff knew or had reason to know of his injury. *See, e.g.*, *Andrews v. Fremantlemedia, N.A., Inc.*, 613 Fed.Appx. 67, 68 (2d Cir. 2015) (summary order); *Young v. Lord & Taylor, LLC*, 937 F. Supp. 2d 346, 354 (E.D.N.Y. 2013). As explained above, each of Plaintiff's alleged injuries occurred on or before March 2012. Thus, Plaintiff was required—but failed—to file his §§ 1985 and 1986 claims by March 2015 at the latest. The portions of Counts 20, 21, 22 and 23 that relate to Plaintiff's May 2009 arrest and imprisonment are therefore dismissed as to Officer Rios.

The claims against the City are dismissed for failure to state a claim on which relief can be granted. In order to sue a municipality for a constitutional violation under § 1983 or § 1985, a plaintiff must allege facts sufficient to demonstrate that "the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality" and that "the municipality was the moving force behind the injury alleged" through the municipality's own deliberate conduct. *Jones ex rel. Jones v. Town of E. Haven*, 691 F.3d 72, 80–81 (2d Cir. 2012) (citation omitted) (applying *Monell* to § 1983 claims); *accord Mitchell v. City of New York*, 841 F.3d 72, 80 (2d Cir. 2016) (same); *Zherka v. City of New York*, 459 Fed.Appx. 10, 12 (2d Cir. 2012) (summary order) (citing *Owen v. Haas*, 601 F.2d 1242, 1247 (2d Cir. 1979)) (applying *Monell* to § 1985 claims). Boilerplate allegations of unconstitutional policies are insufficient to plead a municipality's liability under § 1983 or § 1985.

See, e.g., Butler v. Brito, No. 15 Civ. 9718, 2017 WL 2116687, at *6 (S.D.N.Y. May 15, 2017).

**\*6** The Complaint does not allege any facts that would support a finding of any City policy or practice that led to the deprivation of Plaintiff's rights in conjunction with his May 2009 arrest and imprisonment. The portions of Counts 3, 14, 15, 16, 17, 18, 19, 20, 21, 22, 24, 25, 26, 33 and 34 that assert claims against the City arising out of Plaintiff's May 2009 arrest and imprisonment are therefore dismissed.

Because a viable § 1985 claim against the City is required to allege a viable § 1986 claim against the City, see, e.g., Noonan v. City of New York, No. 14 Civ. 4084, 2015 WL 3948836, at *6 (S.D.N.Y. June 26, 2015) (citing Gagliardi v. Vill. of Pawling, 18 F.3d 188, 194 (2d Cir. 1994)), the portion of Count 23 that asserts claims against the City arising from Plaintiff's May 2009 arrest and imprisonment is also dismissed.

Should Plaintiff seek to replead to allege more specifically a policy or custom, those repleaded Monell claims may or may not be timely. The statute of limitations for Monell claims may begin to run later than it did for the claims against Officer Rios. In Pinaud v. Cty. of Suffolk, 52 F.3d 1139 (2d Cir. 1995), the Court of Appeals stated:

> Since an actionable [Monell] claim ... against a ... municipality depends on a harm stemming from the municipality's "policy or custom," ... a cause of action against the municipality does not necessarily accrue upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a [municipality's] "policy or custom."

Id. at 1157 (2d Cir. 1995) (citing Monell, 436 U.S. at 694); see also Birch v. City of New York, 675 Fed.Appx. 43, 45 (2d Cir. 2017) (summary order) ("In light of Pinaud, the limitations period for [plaintiff's] Monell claims did not begin until such time as he should have known that his adverse actions resulted from the City's 'policy or custom.' "). However, the Second Circuit has also referred to its

discussion of limitations periods for Monell claims in Pinaud as "demonstrably dictum." Lawson v. Rochester City Sch. Dist., 446 Fed.Appx. 327, 329 (2d Cir. 2011) (summary order).

Plaintiff ultimately would have to show that he neither knew nor should have known that the City's challenged conduct resulted from a policy or custom until on or after August 30, 2013, three years before this action was filed. Any Amended Complaint would be subject to dismissal if it were plain on its face that Plaintiff knew or should have known of the alleged policy or custom before that date. See Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 n.12 (2d Cir. 2014) ("Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint.").

### B. Federal Claims Arising from Matrimonial and Child Support Proceedings

#### 1. Claims Against the State and Justice Dawson, Support Magistrate Ryneski and Support Magistrate Clarke in Their Official Capacities

Plaintiff brings 21 claims against one or more of Justice Dawson, Support Magistrate Ryneski and Support Magistrate Clarke (collectively, the "Judicial Defendants") in their official capacities and the State for purported violations of 42 U.S.C. §§ 1983, 1985 and 1986 (Counts 1–7, 10–15, 18–24 and 33). As both the State and state officials acting in their official capacities are immune from such claims under the Eleventh Amendment, see, e.g., Will v. Mich. Dep't of State Police, 491 US 58, 65–66, 71 (1989); Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178, 193 (2d Cir. 2015), the portions of Counts 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 13, 14, 15, 18, 19, 20, 21, 22, 23, 24 and 33 that purport to bring claims against the State and the Judicial Defendants in their official capacities are dismissed.

**\*7** In his response memorandum, Plaintiff argues that the State has waived its Eleventh Amendment immunity as to his claims against the State and the Judicial Defendants because federal statutes can condition receipt of federal funds on a state waiver of sovereign immunity, and the State accepted federal funds to run the Social Security Administration's Title

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 76 of 185

Chris H. v. New York, Not Reported in Fed. Supp. (2017)

IV-D program. This argument is unavailing. First, to the extent that Plaintiff suggests that the State's receipt of Title IV-D funds resulted in a general waiver of immunity that entitles him to sue the State and state officials, the argument is incorrect. Title IV-D of the Social Security Act, which funds agencies tasked with collecting child support payments, does not condition receipt of funds on a waiver of sovereign immunity nor does it prohibit discrimination by recipients of such funds. *See* 42 U.S.C. §§ 651–669b (Title IV-D), 2000d-7 (waiving Eleventh Amendment immunity for states who accept funds under statutes prohibiting discrimination by recipients of federal financial assistance); *Parent v. New York*, 786 F. Supp. 2d 516, 531 (N.D.N.Y. 2011) ("Moreover, Congress did not explicitly require states to waive immunity under Title IV–D.").

Second, to the extent that Plaintiff's reference to Title VI of the Civil Rights Act in his response memorandum can be liberally construed to argue that the State and state officials can be sued under Title VI by virtue of receiving Title IV-D funds, Plaintiff lacks standing to make any such claim. Though Congress has expressly abrogated state sovereign immunity for actions filed under Title VI, *see* 42 U.S.C. § 2000d-7, in order to bring a Title VI claim, Plaintiff must be the "intended beneficiar[y] of the federal spending program" about which he complains. *Scelsa v. City Univ. of N.Y.*, 806 F. Supp. 1126, 1140 (S.D.N.Y. 1992); *accord Bary v. Delta Airlines, Inc.*, 553 Fed.Appx. 51, 53 (2d Cir. 2014) (summary order). As Plaintiff is not the intended beneficiary of Title IV-D funds, he lacks standing to bring a Title VI claim.

### 2. Claims Against the Judicial Defendants in Their Individual Capacities

Plaintiff also brings 19 claims against one or more of the Judicial Defendants in their individual capacities for purported violations of 42 U.S.C. §§ 1983, 1985 and 1986 (Counts 1, 2, 4–7, 10–15, 18–23 and 33).

Of these claims, 10 are clearly based on decisions made by the Judicial Defendants in the course of presiding over various portions of Plaintiff's state court proceedings (Counts 1, 2, 5–7, 11–13, 20 and 21); 8 are vague and/or do not appear to be related to the Judicial Defendants at all (Counts 10, 14, 15, 18, 19, 22, 23 and 33); and 3 allege that the Judicial Defendants took affirmative steps to falsify evidence or otherwise engage in a cover-up (Counts 4, 11 and 20). [4]

A majority of these claims are barred by the doctrine of judicial immunity. A judge or Support Magistrate acting in a judicial capacity is entitled to absolute judicial immunity if (1) the judge or Support Magistrate had jurisdiction over the subject matter before her at the time she took the challenged action and (2) the relevant action was judicial in nature. *See, e.g.*, *Huminski v. Corsones*, 396 F.3d 53, 74–75 (2d Cir. 2005); *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009) (private actor may be afforded the absolute immunity afforded to judges if the private actor's role is "functionally comparable" to those of the judges). In determining whether an action was judicial in nature, courts look to "the nature of the act itself, *i.e.,* whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.,* whether they dealt with the judge in his judicial capacity." *Bliven*, 579 F.3d at 209–10 (quoting *Stump v. Sparkman*, 435 U.S. 349, 362 (1978)). A judge or Support Magistrate is not deprived of immunity because the action she took "was in error, was done maliciously, or was in excess of [her] authority; rather, [she] will be subject to liability *only when [she] has acted in the clear absence of all jurisdiction*." *Gross v. Rell*, 585 F.3d 72, 84 (2d Cir. 2009) (citing *Stump*, 435 U.S. at 356–57). Allegations of conspiracy also do not defeat judicial immunity. *See, e.g.*, *Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987).

**\*8** Here, Counts 1, 2, 5, 6, 7, 11, 12, 13, 20 and 21 arise from decisions made by one or more of the Judicial Defendants in the course of presiding over state legal proceedings over which they had jurisdiction. *See* N.Y Const. art. VI §§ 7(b), 13(b), (c); N.Y. Fam. Ct. Act §§ 411, 439(a), 812. Even if the Court found that the state courts had no jurisdiction over Plaintiff, as he alleges in the Complaint, the *Rooker-Feldman* doctrine requires a finding that the state courts had jurisdiction over the challenged state court proceedings.

Under the *Rooker-Feldman* doctrine, federal district courts lack subject-matter jurisdiction to review a claim when "(1) the plaintiff lost in state court, (2) the plaintiff complains of injuries caused by the state court judgment, (3) the plaintiff invites district court review of that judgment, and (4) the state court judgment was entered before the plaintiff's federal suit commenced." *McKithen v. Brown*, 626 F.3d 143, 154

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 77 of 185

**Chris H. v. New York, Not Reported in Fed. Supp. (2017)**

(2d Cir. 2010). The doctrine also prohibits a district court's review of claims that are "inextricably intertwined" with a state court's determinations. *See* 🚩⚠️ *Kropelnicki v. Siegel,* 290 F.3d 118, 128 (2d Cir. 2002). A claim is inextricably intertwined where the plaintiff had an opportunity to litigate a claim in a state proceeding and the claim would be barred under the principles of preclusion. *See id.*

All four elements of the doctrine are present here. Plaintiff lost his cases in state court, complains of injuries as a result of the state court judgments and invites this Court to review and overturn findings that underpin the state court judgments. In addition, the state court judgments were rendered prior to the filing of the Complaint in this case. The *Rooker-Feldman* doctrine thus deprives the Court of jurisdiction to analyze whether the Judicial Defendants lacked jurisdiction to make their rulings. *See Fernandez v. Turetsky,* 645 Fed.Appx. 103, 104–05 (2d Cir. 2016) (summary order) (finding that *Rooker-Feldman* doctrine applies to bar federal court review of alleged constitutional violations resulting from state child support judgments). Consequently, the portions of Counts 1, 2, 5, 6, 7, 11, 12, 13, 20 and 21 that pertain to the judicial decisions made by the Judicial Defendants are barred by the doctrine of judicial immunity and are dismissed.

To the extent that Counts 10, 14, 15, 18, 19, 22, 23 and 33 can be read to state a claim on which relief can be granted against the Judicial Defendants—which they do not—those claims would be based upon the effects of decisions made by the Judicial Defendants in the course of their judicial duties. As explained above, such claims are barred by the doctrine of judicial immunity. Thus, the portions of Counts 10, 14, 15, 18, 19, 22, 23 and 33 that purport to sue the Judicial Defendants in their individual capacities are dismissed.

The portions of Counts 4, 11 and 20 that allege that one or more of the Judicial Defendants engaged in fraud are barred by the *Rooker-Feldman* doctrine, as Plaintiff already had an opportunity to raise his fraud claims in state court, and in fact did raise the allegations underpinning his fraud claim against Support Magistrate Ryneski before Justice Dawson. *See* 🚩⚠️ *Kropelnicki,* 290 F.3d at 128; 🚩⚠️ *Sharp v. Bivona,* 304 F. Supp. 2d 357, 363 (E.D.N.Y. 2004) (finding that plaintiff's constitutional claim arising out of alleged fraud by a state court judge was barred by the *Rooker-Feldman* doctrine).

### 3. Claims Against the Commissioner and City

**\*9** Lastly, Plaintiff brings 17 claims against one or more of the Commissioner, City and CSEU,[5] alleging violations of 🚩 42 U.S.C. §§ 1983, 🚩 1985 and 1986 (Counts 1–3, 5–7, 10, 12, 18, 20–26 and 33).

Liberally construed, the Complaint alleges that the Commissioner's conduct in enforcing Plaintiff's child support obligations violated 🚩 § 1983 by causing the loss of the marital property in violation of the First Amendment, imposing limits on Plaintiff's freedom to act on his own behalf, failing to act after receiving letters of complaint from Plaintiff, bringing a child support proceeding against Plaintiff, conspiring with the Judicial Defendants to bring Plaintiff into court and make him pay child support, developing policies to garnish wages aggressively and engaging in the "malicious prosecution" of Plaintiff's child support case (Counts 1, 2, 3, 5, 12, 24, 25 and 33). The Complaint also alleges a number of 🚩 § 1983 claims against the Commissioner that are so vague that they cannot be understood and/or do not appear to implicate actions taken by the Commissioner, no matter how liberally construed (Counts 10, 18 and 26). In addition, the Complaint alleges that the Commissioner violated 🚩 § 1985 by engaging in a racially-motivated conspiracy with the other Defendants to deny Plaintiff equal protection under law (Counts 20–22), and violated § 1986 by failing to prevent the conspiracy (Count 23).

Each of these claims is barred by the *Rooker-Feldman* doctrine for the same reasons discussed above. *See, e.g., Fernandez,* 645 Fed.Appx. at 104–05. Moreover, as the Complaint does not "plead[ ] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct," the Commissioner is entitled to qualified immunity. *See* 🚩 *McGowan v. United States,* 825 F.3d 118, 124 (2d Cir. 2016) (quoting 🚩 *Wood v. Moss,* 134 S. Ct. 2056, 2066–67 (2014)) (affirming dismissal on a motion to dismiss based on qualified immunity although the issue was not considered by the district court). The portions of Counts 1, 2, 3, 5, 10, 12, 18, 20, 21, 22, 23, 24, 25, 26 and 33 that pertain to the Commissioner are therefore dismissed. *See, e.g., Parent,* 786 F. Supp. 2d 516 at 536–37 (finding that commissioner of county department of social services was entitled to qualified

immunity for alleged violations resulting from filing and enforcing child support petition, given that there is "no right to refuse to pay child support" and that, even if there were, it would be "objectively reasonable for [the commissioner] to believe that carrying out [his] duties and enforcing the petition did not violate plaintiff's rights.").

The Complaint further alleges that the City violated 🚩 § 1983 by garnishing Plaintiff's wages, authorizing the collection of Plaintiff's tax refund, failing to act after receiving complaints from Plaintiff and maintaining a policy of aggressively garnishing paychecks (Counts 2, 3, 4, 24 and 25), and violated 🚩 §§ 1985 and 1986 by both engaging in, and failing to prevent, the same conspiracy alleged against the Commissioner (Counts 20–23). The Complaint also alleges multiple claims against the City that do not appear to be related to the City at all (Counts 5, 6, 7 and 26).

**\*10** In order to sue a municipality under 🚩 §§ 1983 or 🚩 1985, a plaintiff must allege facts sufficient to state a claim under *Monell*. *See Zherka*, 459 Fed.Appx. at 12. The only claims in the Complaint that allege that the City violated Plaintiff's rights due to a "custom, policy, or usage of the municipality" pertain to the City's allegedly aggressive policy of garnishing paychecks. However, even assuming that the City was aggressive in garnishing Plaintiff's paychecks, it did so according to state court orders. Not only is such garnishment not a constitutional violation, *cf., generally,* 🚩 *McCahey v. L.P. Investors*, 774 F.2d 543 (2d Cir. 1985) (upholding post-judgment garnishment procedures against constitutional attack), but to second-guess those state court orders would violate the *Rooker-Feldman* doctrine. *See, e.g., Galtieri v. Kelly*, 441 F. Supp. 2d 447, 454–55 (E.D.N.Y. 2006) (*Rooker-Feldman* doctrine barred 🚩 § 1983 claim where fund administrator was acting pursuant to earlier state court order directing the fund be garnished for alimony payments). To the extent that any of the other claims against the City can be construed as *Monell* claims, they would also be barred by the *Rooker-Feldman* doctrine for the reasons discussed above. *See, e.g., Fernandez*, 645 Fed.Appx. at 104–05. Thus, Plaintiff cannot state a claim on the basis of the City's actions pertaining to the state court proceedings. Absent any viable 🚩 § 1985 claim against the City, Plaintiff cannot allege a § 1986 claim against the City. *See, e.g., Noonan*, 2015 WL 3948836, at \*6.

The portions of Counts 2, 3, 4, 5, 6, 7, 20, 21, 22, 23, 24, 25 and 26 that pertain to Plaintiff's family law allegations against the City are therefore dismissed.

### C. State Law Claims

As each of Plaintiff's federal claims is dismissed for the reasons discussed above, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and does not address them. *See, e.g.,* 🚩 *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014) (a district court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction") (quoting 🚩 28 U.S.C. § 1367(c)); *accord Silverman v. Teamsters Local 210 Affiliated Health & Ins. Fund*, 761 F.3d 277, 288 (2d Cir. 2014) (noting that district courts "normally decline to retain jurisdiction in such circumstances").

### D. Motion for Leave to Amend

Plaintiff seeks leave to amend his Complaint in the event the motion to dismiss is granted. While leave to amend should be "freely give[n] ... when justice so requires," a court may properly deny leave to amend if the amendment would be futile. 🚩⚠ *F5 Capital v. Pappas*, 856 F.3d 61, 88–89 (2d Cir. 2017). As detailed above, amending the Complaint would be futile as to the claims that are time barred or barred by the *Rooker-Feldman* doctrine, judicial immunity or qualified immunity. Plaintiff's request for leave to amend the Complaint is denied as to these claims.

The only claims not barred on these grounds are claims against the City arising from the May 2009 arrest and imprisonment—namely, portions of Counts 3, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 33 and 34. By July 31, 2017, Plaintiff may submit a letter of no more than three pages, detailing any additional facts he can plead to show a policy or practice that led to the alleged deprivation of Plaintiff's rights in conjunction with his May 2009 arrest and imprisonment. The letter shall not include information pertaining to any other issues or claims. No exhibits may be filed. Plaintiff may not submit any Amended Complaint or proposed Amended Complaint without permission from this Court. Submission of a letter longer than three pages, exhibits or an Amended Complaint will lead to an automatic denial of Plaintiff's requested motion for leave to amend.

Chris H. v. New York, Not Reported in Fed. Supp. (2017)

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 79 of 185

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint is GRANTED. The Clerk of Court is respectfully directed to close the motions at Docket Numbers 52 and 55 and mail a copy of this Opinion and Order to the pro se Plaintiff.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2880848

## Footnotes

1    The Complaint also occasionally refers to claims against the New York Police Department ("NYPD"), which is not named as a defendant, and in any event is not a suable entity. *See* N.Y.C. Charter § 396. In light of the special solicitude afforded to pro se litigants, the Court construes Plaintiff's allegations against the NYPD as allegations against the City. *See* *Josey v. N.Y.C. Police Dep't*, No. 07 Civ. 6420, 2008 WL 2676620, at *1 n.1 (S.D.N.Y. July 7, 2008)* (substituting the City as a defendant in place of the NYPD in case with pro se plaintiff).

2    Counts 3, 15, 18, 19 and 33 are alleged against the City in addition to Officer Rios. None of these claims allege that the City acted according to a governmental custom, policy or usage, as is necessary to sue a municipality under § 1983. *See* *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–691 (1978). Applying the special solicitude afforded to pro se litigants, these claims are nonetheless construed as *Monell* claims against the City.

3    These claims likewise fail to allege that the City acted according to a governmental custom, policy or usage, and are liberally construed as *Monell* claims.

4    Counts 11 and 20 assert claims directly related to judicial decision-making and claims related to falsification of evidence, and are therefore counted in each category.

5    The Complaint occasionally references causes of action against the CSEU, despite not naming the CSEU as a defendant. As with the NYPD, the CSEU is a non-suable entity. *See* N.Y.C. Charter § 396. To the extent that the Complaint raises claims against CSEU, they are construed as claims against the City. *Cf.* *Josey*, 2008 WL 2676620, at *1 n.1.

---

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    9

2022 WL 4485292
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Richard ORENS, Plaintiff,
v.
AMHERST POLICE DEPARTMENT, et al., Defendants.

20-CV-778-LJV-LGF
|
Signed September 27, 2022

**Attorneys and Law Firms**

Frank S. Falzone, Buffalo, NY, for Plaintiff.

Katie L. Renda, Michael J. Chmiel, Chelus, Herdzik, Speyer & Monte, P.C., Buffalo, NY, for Defendants Amherst Police Department, Town of Amherst New York.

DECISION & ORDER

LAWRENCE J. VILARDO, UNITED STATES DISTRICT JUDGE

 *1  On January 14, 2020, the plaintiff, Richard Orens, commenced this action in New York State Supreme Court, Erie County. Docket Item 1-1. He has sued the Amherst Police Department and the Town of Amherst (the "Amherst defendants") as well as Erie County Central Police Services ("Erie County CPS"), the Erie County Sheriff's Office, and the County of Erie (the "Erie defendants"). Docket Item 1-6. And he alleges that the defendants violated his federal and state constitutional rights and New York State law by detaining and incarcerating him based on an invalid arrest warrant in January 2019. *See id.*

Because Orens's claims were brought under 42 U.S.C. § 1983 as well as under state law, the Erie defendants removed the case to this Court on June 23, 2020. Docket Item 1. A day later, the Erie defendants moved to dismiss Orens's claims against them under Federal Rule of Civil Procedure 12(b)(6). Docket Item 2. Orens responded to that motion on August 29, 2020, and the Erie defendants replied on September 1, 2020. Docket Items 11, 13.

In the meantime, this Court referred this case to United States Magistrate Judge Leslie G. Foschio for all proceedings

under 28 U.S.C. § 636(b)(1)(A) and (B). Docket Item 5. On June 17, 2022, Judge Foschio issued a Report and Recommendation ("R&R") finding that the Erie defendants' motion should be granted. Docket Item 16.

Orens objected to the R&R on July 1, 2022, and the Erie defendants responded to Orens's objection on July 6, 2022. [1] Docket Items 17, 20. Orens did not reply, and the time to do so has expired. *See* Docket Item 18.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R; the record in this case; the objection and response; and the materials submitted to Judge Foschio. Based on that *de novo* review, the Court accepts and adopts Judge Foschio's recommendation to grant the Erie defendants' motion to dismiss. [2]

**FACTUAL BACKGROUND** [3]

 *2  On January 14, 2019, Orens "was stopped while driving a motor vehicle" in Kenmore, New York, because of "an improper license[ ] pla[te]" which had "paint peeling from the plate and an expired inspection sticker." Docket Item 1-6 at ¶ 8. "During the investigation" for that improper license plate, Orens "was informed by [o]fficers of the Kenmore Police Department that he had an active [a]rrest [w]arrant in the Town of Amherst" for "the charge of [i]ssuing a [b]ad [c]heck in violation of" New York Penal Law § 190.05 and that "he was wanted by the Amherst Police Department for th[at] charge." *Id.* Orens consequently "was placed in custody by the Village of Kenmore Police Department and turned over to the Town of Amherst Police Department." *Id.* at ¶ 14.

After Orens was taken into custody, he "appeared in the Town of Amherst Justice Court ... where [the presiding judge] informed [Orens] that he had not been arraigned for the charge of [i]ssuing a [b]ad [c]heck." *Id.* Orens then "was remanded to the [c]ustody of the Sheriff of Erie County," where "he remained in custody from January 14, 2019[,] to January 17,

2019." *Id.* at ¶ 15. At that point, "the 'charge' was 'dismissed' pursuant to 🔖 Section 30.30 of the Criminal Procedure Law." *Id.* (quotation marks in original); *see* 🔖 N.Y. Crim. Proc. Law § 30.30 (speedy trial and time limitations).

But Orens never should have been arrested in 2019 for issuing a bad check. That charge had been "legally closed" when Orens pleaded guilty to "two [ ] charges of [i]ssuing a [b]ad [c]heck" back in 2003. *Id.* at ¶¶ 8, 11. Orens had been sentenced to two to four years' imprisonment on those two charges and had long completed that sentence when he was stopped in 2019. *Id.* at ¶¶ 11-12.

According to Orens, his arrest on the invalid warrant was the result of "[t]he actions of the Town of Amherst Police Department," which "enter[ed] [Orens's] name for an 'active warrant' into [the] New York State Spectrum Justice System [ ] and in turn the Federal Bureau of Investigation National Crime Information Center [ ] for a criminal case that was disposed of years earlier." *Id.* at ¶ 16. And Orens says that Erie County CPS, an entity that "was established to provide support services to law enforcement and criminal justice agencies on a countywide basis," was negligent in providing those services to the Amherst Police Department and "not reviewing the data for accuracy." *Id.* at ¶¶ 17-18.

About a year after Orens's arrest and incarceration on the invalid arrest warrant, he commenced this case in New York State Supreme Court, Erie County. Docket Item 1-1. Orens brings eight claims: (1) false arrest, (2) false imprisonment, (3) abuse of process, (4) negligent infliction of emotional distress, (5) double jeopardy, (6) "civil rights violations pursuant to 🔖 42 [U.S.C.] § 1983," (7) constitutional tort, and (8) municipal liability.[4] Docket Item 1-6.

## LEGAL PRINCIPLES

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " 🔖 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting 🔖 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing 🔖 *Twombly*, 550 U.S.

at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting 🔖 *Twombly,* 550 U.S. at 556).

## DISCUSSION

## I. ORAL ARGUMENT

**\*3** As an initial matter, Orens argues that Judge Foschio "erred in failing to grant [Orens's m]otion for [o]ral [a]rgument."[5] Docket Item 19 at ¶ 7. Orens maintains that Judge Foschio erred in issuing the R&R "with[out] the assistance of wise and learned legal arguments from all counsel at bar." *Id.* at ¶ 12. And he observes that "[Orens's] [c]ounsel could not in real time" answer any of Judge Foschio's potential questions and could not "attack[ the] opposing legal arguments of the [d]efendants in their filed paperwork and oral argument." *Id.* at ¶ 14.

Because Judge Foschio's decision to deny Orens's request for oral argument was not clearly erroneous, *see* 🔖 28 U.S.C. § 636(b)(1)(A), Orens's objection to the R&R on this score lacks merit. As Judge Foschio explained, "oral argument [is] scheduled in the court's discretion." *See* Docket Item 15 (citing 🔖 *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 448 (2d Cir. 1995)). And in his objection, Orens offers nothing more than his own conclusory assertions that Judge Foschio's decision to issue an R&R without oral argument "prejudiced" him. *See, e.g.*, Docket Item 19 at ¶ 14 (generally describing possible benefits of oral argument). The decision to not hear oral argument was well within Judge Foschio's discretion, and there is no reason to revisit that decision here.

## II. ORENS'S FEDERAL AND STATE LAW CLAIMS

More substantively, Orens objects to Judge Foschio's recommendations to dismiss his claims against Erie County CPS and the Erie County Sheriff's Office, his 🔖 section 1983 claims against Erie County, and his state law claims against all Erie defendants. *See* Docket Item 19 at ¶¶ 15-29, 32. None of Orens's arguments warrant denying the Erie defendants' motion.

### A. Claims Against Erie County Central Police Services and the Erie County Sheriff's Office

Judge Foschio recommended dismissing Orens's claims against Erie County CPS and the Erie County Sheriff's Office because those entities "are administrative arms of Erie County and[ therefore] cannot be sued." Docket Item 16 at 11. Orens contends that Judge Foschio's "finding ... that [Erie County CPS] is a division of the Erie County Sheriff's Department may be in error." Docket Item 19 at ¶ 32. Orens offers a "screen capture" of an Erie County website to support that argument, *id.*, although he does not explain or elaborate on the significance of that screen shot.

As Judge Foschio correctly concluded, only a county itself—not an administrative arm of the county—is a viable defendant, and other courts have dismissed claims against the administrative arms of a county because those entities are not themselves amenable to suit. *See* Docket Item 16 at 10-11 (collecting cases). And even if Orens is correct that Erie County CPS is not a "division of the Erie County Sheriff's Department," he has not offered anything to suggest that Erie County CPS is not an administrative arm of *Erie County* itself. So this Court agrees with Judge Foschio that Orens's claims against Erie County CPS and the Erie County Sheriff's Office are not viable.

### B. 🚩 **Section 1983** Claims

A municipality cannot be held liable under 🚩 section 1983 unless the challenged action was undertaken pursuant to a municipal policy or custom. *See* 🚩 *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). To state such a claim, a plaintiff must plead three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." 🚩 *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting 🚩 *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). Judge Foschio recommended dismissing Orens's claims against Erie County because Orens had not sufficiently alleged that any policy or custom of Erie County "was the moving force behind [his] alleged injury." Docket Item 16 at 13 (quoting ⚠️ *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011)).

**\*4** In his objection, Orens offers a one-paragraph quotation from 🚩 *Maine v. Thiboutot*, 448 U.S. 1 (1980), apparently for the general proposition that municipalities do not enjoy qualified immunity for constitutional violations. *See* Docket Item 19 at ¶¶ 15-17. True enough, but that nonspecific objection does not address Judge Foschio's conclusion that Orens's 🚩 section 1983 claims against Erie County must be dismissed because "they are not predicated on any plausibly alleged unconstitutional policy or practice." Docket Item 16 at 15. And this Court agrees with Judge Foschio on that score: Orens's 🚩 section 1983 claims, which hinge on a single example of purported misconduct, are insufficient under *Monell*. *See generally* 🚩 *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 637 (S.D.N.Y. 2015) ("Generally, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (alterations and internal quotation marks omitted)).

### C. State Law Claims

Judge Foschio also concluded that Erie County "cannot be held vicariously liable for the acts of the Sheriff's deputies alleged as violations of state law" and therefore recommended dismissing Orens's remaining state law claims against Erie County. [6] Docket Item 16 at 17. As Judge Foschio noted, other courts in this Circuit have concluded that counties are not liable for the tortious conduct of their sheriff or sheriff's deputies and therefore granted motions to dismiss on that ground. *See, e.g.*, 🚩 *Belsito v. County of Erie*, 2019 WL 6292143, at \*4 (W.D.N.Y. Nov. 25, 2019) (collecting cases).

Orens does not address Judge Foschio's recommendation on that score or otherwise explain how Erie County can be liable for his claims; instead, Orens's objection largely recycles arguments from his response brief verbatim. *Compare, e.g.*, Docket Item 19 at ¶¶ 19-24 (arguing that "the [c]omplaint has met all of the above four (4) elements for [f]alse [a]rrest and/or [f]alse [i]mprisonment, especially the element that the confinement was not otherwise privileged" and quoting 🚩 *People v. Jennings*, 54 N.Y.2d 518, 430 N.E.2d 1282 (1981); ⚠️ *People v. Watson*, 100 A.D.2d 452, 474 N.Y.S.2d 978 (2d Dep't 1984); 🚩 *United States v. Santa*, 180 F.3d 20 (2d Cir. 1999); and 🚩 *State v. Moore*, 260 N.J. Super. 12 (N.J. Super. Ct. App. Div. 1992)), *with* Docket Item 11-1 at ¶¶ 13-18 (arguing that "the [c]omplaint has met all of the above four (4) elements for [f]alse [a]rrest and/or [f]alse [i]mprisonment, especially the element that the confinement was not otherwise privileged" and quoting the same four cases). For that reason alone, Orens's arguments are insufficient. *See* ⚠️ *Camardo v. Gen. Motors Hourly-Rate*

*Emps. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) ("It is improper for an objecting party to attempt to relitigate the entire content of the hearing before the Magistrate Judge by submitting papers to a district court which are nothing more than a rehashing of the same arguments."); *see also*

*Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009) ("When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the Report strictly for clear error.").

**\*5** And even if the County could be held liable in this case for the tortious conduct of its sheriff and sheriff's deputies, all of Orens's claims are deficient for other reasons as well.

### 1. False Arrest/False Imprisonment

First, Orens has failed to state a viable claim for false arrest or false imprisonment. [7] "Under New York law, to prevail on a claim for false arrest, a plaintiff must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.' " *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021) (alterations omitted) (quoting

*Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003)).

According to Orens, he was taken into Erie County custody only after he was "placed in custody by the Village of Kenmore Police Department," "turned over to the Town of Amherst Police Department," arraigned in "the Town of Amherst Justice Court" on the charge, and "remanded to the [c]ustody of the Sheriff of Erie County." Docket Item 1-6 at ¶¶ 14-15. In other words, Orens was taken into Erie County custody only after one municipality's police department arrested him, another municipality's police department took him into custody, and a town judge arraigned him and remanded him into Erie County custody.

Other courts have dismissed false arrest or false imprisonment claims against a county under similar circumstances. *See, e.g.*, *Bryant v. Monroe County*, 2022 WL 23221, at \*7-8 (W.D.N.Y. Jan. 3, 2022) (collecting cases). That is because once an individual is remanded into county custody, New York law "require[s] [the county] to detain [that individual] until a court ... order[s] his release." *See id.* (quoting *Maddox v. Fowler*, 2015 WL 4366222, at \*9 (N.D.N.Y. July 16,

2015) (citing N.Y. Correct. Law § 500-c)). In other words, Orens's confinement was privileged as to Erie County because Orens was remanded into Erie County custody by a town judge, and Erie County and its sheriff could not release him from custody once he was remanded. *Id.* And while Orens suggests that Erie County has some freestanding duty to inquire about the circumstances of every person taken into Erie County custody, *see* Docket Item 1-6 at ¶ 19, he does not argue that the County or its sheriff could have released him or that state law did not require his detention after he was remanded. Because Orens's confinement by Erie County was privileged, his claim for false arrest or false imprisonment cannot proceed against Erie County. *See Ashley*, 992 F.3d at 136.

### 2. Abuse of Process

Orens's abuse of process claim is likewise deficient. "Under New York law, a plaintiff may assert an abuse of process claim against a defendant who '(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.' " *Burton v. County of Westchester*, 2022 WL 2340478, at \*6 (S.D.N.Y. June 29, 2022) (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)). To allege a collateral objective, the plaintiff must allege that the defendant "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77.

**\*6** Even assuming that Orens has sufficiently alleged the first two elements of an abuse of process claim, any such claim founders on the third. "To plead a collateral objective, a plaintiff must plausibly plead not that [the] defendant acted with an 'improper motive,' but rather an 'improper purpose.' " *Burton*, 2022 WL 2340478, at \*6 (quoting *Savino*, 331 F.3d at 77). "Examples of collateral objectives can include 'infliction of economic harm, extortion, blackmail or retribution.' " *Id.* (quoting *Wagner v. Hyra*, 2021 WL 475331, at \*8 (N.D.N.Y. Feb. 10, 2021)). "In other words, 'abuse of process resembles a form of extortion, by which the defendant invokes legal process to coerce the plaintiff into doing something *other than* what the process necessitates.' " *Folk v. City of New York*, 243 F. Supp. 3d 363, 375 (E.D.N.Y. 2017) (emphasis added) (alterations omitted) (quoting *Krebs*

*v. United States*, 1999 WL 185263, at *5 (S.D.N.Y. Mar. 31, 1999)).

Orens has not alleged that Erie County or anyone affiliated with it had a collateral objective in Orens's prosecution. Instead, he has alleged at most that negligence on the part of Erie County employees resulted in his arrest and incarceration. *See, e.g.*, Docket Item 1-6 at ¶¶ 18 (alleging that Erie County CPS "was negligent in not reviewing the data for accuracy"), 20 (alleging that the Erie County Sheriff's Office "did not inquire and/or investigate the arrest warrant's legitimacy"). And Orens's conclusory allegations in his objection—that the Erie defendants "use[d] the criminal justice system" to deprive him of various constitutional rights, *see* Docket Item 19 at ¶ 26—are all related to his prosecution and not "reasons wholly outside of [it]." [8] *See Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 448 (E.D.N.Y. 2012), *aff'd*, 523 F. App'x 770, 772 (2d Cir. 2013) (summary order) (affirming dismissal of abuse of process claim where the claimed collateral purposes "are directly related to the underlying litigation rather than collateral to it"). For that reason, Orens's abuse of process claim is not viable.

### 3. Negligent Infliction of Emotional Distress

Orens also asserts a claim for negligent infliction of emotional distress. Docket Item 1-6 at ¶¶ 59-66. "To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021). "To establish the fourth element, the plaintiff generally must plead that the breach endangered his physical safety or caused him to fear for his physical safety." *Id.* at 81 n.57; *see also SB on behalf of AB v. Newark Cent. Sch. Dist.*, 2022 WL 541773, at *10 (W.D.N.Y. Feb. 23, 2022) ("Plaintiff[']s cause of action for negligent infliction of emotional distress requires [him] to show a breach of duty owed to [him] which unreasonably endangered [his] physical safety, or caused [him] to fear for [his] own safety." (internal quotation marks omitted)).

**\*7** In their motion to dismiss, the Erie defendants contended that Orens "fail[ed] to allege that [he] was in physical danger or feared for his safety." Docket Item 2-1 at 12. Orens failed to address this argument in his response or objection, so this

Court therefore could consider the point conceded. *See CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 383 (S.D.N.Y. 2019) ("[A] party may be deemed to have conceded an argument by failing to address it in its briefing."). In any event, this Court agrees with the Erie defendants: Orens has not alleged any facts "showing that he was endangered or feared for his safety" because of any breach of duty by the Erie defendants. *See Kruglov v. Copart of Conn., Inc.*, 771 F. App'x 117, 119-20 (2d Cir. 2019) (summary order). Orens's negligent infliction of emotional distress claim therefore is dismissed.

### 4. Claims Under the New York State Constitution

Finally, Orens asserts claims for damages directly under the New York State Constitution. Docket Item 1-6 at ¶¶ 67-76, 83-88. "The New York State Constitution provides a private right of action where remedies are otherwise unavailable at common law or under § 1983." *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (summary order). The private right of action under the New York State Constitution "is a 'narrow remedy' available only when 'necessary to effectuate the purposes of the State constitutional protections that the plaintiff invokes' or 'appropriate to ensure full realization of the plaintiff's rights.'" *Biswas v. City of New York*, 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013) (alterations omitted) (quoting *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 84, 761 N.E.2d 560, 563 (2001)). Accordingly, a private cause of action under the New York State Constitution "is usually available only in cases in which a plaintiff[ ] ... has no alternative remedy." *Id.*

Orens has asserted claims for damages under section 1983 and New York State law related to his arrest, arraignment, and incarceration in 2019. *See* Docket Item 1-6. Those claims relate to the same conduct that Orens says also violated his rights under the New York State Constitution. *See id.* In light of those alternative remedies for the conduct challenged in this case, this Court declines to break new ground in state constitutional law and fashion a cause of action directly under the New York State Constitution. [9] *See Biswas*, 973 F. Supp. 2d at 522 ("Actions for damages at common law and under § 1983 are both considered adequate alternative remedies that preclude the assertion of a claim for damages under the state Constitution."); *see also Wahad v. F.B.I.*,

994 F. Supp. 237, 240 n.4 (S.D.N.Y. 1998) ("Section 1983 need not provide the exact same standard of relief in order to provide an adequate remedy."). Orens's claims brought directly under the New York State Constitution therefore are not viable.

## III. LEAVE TO AMEND

**\*8** Judge Foschio considered whether Orens should have the opportunity to replead his claims against the Erie defendants and ultimately concluded that leave to amend would be "futile." Docket Item 16 at 18-19 (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)). Orens did not separately object to that recommendation, nor did he request leave to amend in his response brief or move to amend his complaint. And Orens did not reply to any of the Erie defendants' arguments opposing his objection, nor has he suggested how the deficiencies in his complaint might be remedied.

"While leave to amend under the Federal Rules of Civil Procedure is 'freely g[iven],' no court can be said to have erred in failing to grant a request that was not made." *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (quoting Fed. R. Civ. P. 15(a)). Orens now has had two opportunities to request leave to amend—before Judge Foschio and before this Court—but has taken neither. And Orens's objection does not explain how any amendment could cure the deficiencies in his complaint or even address much of Judge Foschio's reasoning

in the R&R; instead, Orens devotes significant sections of his objection to arguments that are directly copied from his response to the motion to dismiss. *Compare, e.g.*, Docket Item 19 at ¶¶ 19-27, *with* Docket Item 11-1 at ¶¶ 13-20.

In light of all that, this Court agrees with Judge Foschio that "leave to amend is unlikely to be productive." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Orens's claims against the Erie defendants are dismissed without leave to amend.

## <u>CONCLUSION</u>

For the reasons stated above and in the R&R, the Erie defendants' motion to dismiss, Docket Item 2, is GRANTED, and Orens's claims against the Erie defendants are dismissed. The Clerk of the Court shall terminate Erie County Central Police Services, the Erie County Sheriff's Office, and the County of Erie as defendants to this case. The case is referred back to Judge Foschio for further proceedings consistent with the referral order of July 28, 2020, Docket Item 5.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 4485292

## Footnotes

1    Orens filed a corrected objection on July 5. Docket Item 19.

2    Judge Foschio also recommended dismissing the Amherst defendants' crossclaims against the Erie defendants. Docket Item 16 at 17. No party objected to that recommendation, so this Court need not review it. *See Thomas v. Arn*, 474 U.S. 140, 149-50 (1985). Accordingly, the Amherst defendants' crossclaims against the Erie defendants are dismissed.

3    The Court assumes familiarity with the facts alleged in the complaint, *see* Docket Item 1-6, and Judge Foschio's analysis in the R&R, *see* Docket Item 16. Accordingly, the Court provides only a brief recitation of those facts relevant to Orens's objection. On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

4    While Orens styles his "civil rights violations" and "municipal liability" claims as standalone causes of action, those claims are theories of liability asserted against the Erie defendants based on alleged underlying violations of federal and state law. *See* Docket Item 1-6 at ¶¶ 77-82, 89-94.

5    On August 29, 2020, Orens filed a motion for oral argument. Docket Item 12. That motion offered no reason why oral argument "would have assisted [Judge Foschio] [by] amplifying all the parties' papers [ ] filed in this [a]ction." Docket Item 19 at ¶ 14; *see also* Docket Item 12.

6    Judge Foschio also recommended, in the alternative, declining to exercise supplemental jurisdiction over Orens's state law claims against the Erie defendants. Docket Item 16 at 15-16. Because federal claims remain against the Amherst defendants, however, this Court may lack the discretion to decline to exercise supplemental jurisdiction. *See* *Mejia v. Davis*, 2018 WL 333829, at *7 (S.D.N.Y. Jan. 8, 2018) ("The Second Circuit has made clear that a district court may not decline to exercise jurisdiction over state law claims where federal claims remain against other defendants and the state law claims form part of the same case or controversy." (internal quotation marks omitted)); *see also* *Oladokun v. Ryan*, 2011 WL 4471882, at *11 (S.D.N.Y. Sept. 27, 2011) (collecting cases). So this Court follows Judge Foschio's alternative recommendation to dismiss Orens's state law claims.

7    Because false arrest and false imprisonment are "largely synonymous," this Court addresses those claims together. *See* 🚩 *Jenkins v. City of New York*, 478 F.3d 76, 88 n.10 (2d Cir. 2007).

8    Orens's argument in his objection about his abuse of process claim largely quotes Justice Ginsburg's dissent in 🚩 *Arizona v. Evans*, 514 U.S. 1 (1995), an appeal from the Arizona Supreme Court that involved the application of the exclusionary rule to "evidence seized ... by an officer who acted in reliance on a police record indicating the existence of an outstanding arrest warrant." 🚩 *Id.* at 3-4; *see* Docket Item 19 at ¶ 27. The relevance of *Evans* to Orens's abuse of process claim under New York State law is unclear.

9    In his objection, Orens argues that another court in this Circuit "recognized a limited damages remedy for violations of rights protected under the New York State Constitution." *See* Docket Item 19 at ¶ 28 (citing 🚩 *Isaac v. City of New York*, 2018 WL 5020173 (E.D.N.Y. Aug. 6, 2018), *report and recommendation adopted*, 2018 WL 4583481 (E.D.N.Y. Sept. 24, 2018)). But as Orens concedes, the court in that case "found [ ] that [the] plaintiff could not seek damages" directly under the New York State Constitution because "the same conduct complained of [was] the subject of a [🚩 section] 1983 claim and[ ] ... a state law [and] tort claim." *Id.*; *see also* 🚩 *Isaac*, 2018 WL 5020173, at *19 ("Because [the] plaintiff's state constitutional claims are based on the same conduct as those he asserts under 🚩 section 1983, this Court recommends dismissal of his state constitutional claims against the individual defendants.").

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 623904
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Regina M. DONOVAN, individually
and o/b/o A.M.Y., an Infant, Plaintiff,

v.

NORWICH CITY SCHOOL DISTRICT, the City
of Norwich, New York, Gerard O'Sullivan in his
official capacity as an Employee of the Norwich City
School District, Scott Ryan in his official capacity as
an employee of the Norwich City School District, and
Joseph Downey, in his official capacity as an employee
of the Norwich City School District, Defendants.

3:19-CV-1638
|
Signed 03/03/2022

**Attorneys and Law Firms**

Douglas W. Drazen, Office of Douglas W. Drazen, Binghamton, NY, for Plaintiff.

John Patrick Lynch, Hogan, Sarzynski, Lynch DeWind & Gregory, Johnson City, NY, for Defendants Norwich City School District, Gerard O'Sullivan, Scott Ryan, Joseph Downey.

Charles C. Spagnoli, Frank W. Miller, Office of Frank W. Miller, East Syracuse, NY, for Defendant The City of Norwich, New York.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Regina M. Donovan, individually and on behalf of her daughter, A.M.Y., commenced this action through counsel asserting that defendants violated her and her daughter's rights in connection with criminal charges brought against Donovan. These criminal charges, which were dropped after Donovan was indicted, arose because Donovan purportedly stated during a March 20, 2018 telephone conversation with Norwich Middle School official Joseph Downey: "If someone touches my daughter again, I will make it rain blood on the Norwich Middle School." *See* Second

Am. Compl. ("SAC"), Dkt. 27, Ex. A. Presently before the Court are Defendant the City of Norwich, New York's ("City") motion to dismiss the claims against it, Dkt. 29; the Norwich City School District ("School District"), Gerald O'Sullivan, Scott Ryan, and Joseph Downey's (collectively, "School District Defendants") motion to dismiss the claims against them, Dkt. 34; and Plaintiff's motion to amend the SAC. Dkt. 38.

**II. MOTION TO AMEND**
The Court starts with Plaintiff's motion to amend to determine the operative pleading to which to apply the dismissal motions.

The Federal Rules of Civil Procedure provide that "leave to amend the pleadings should be 'freely give[n] ... when justice so requires.' " *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010)). Generally, courts in this Circuit have permitted " 'a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.' " *Id.* (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d. Cir. 1993)). Still, "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)).

In support of her motion to amend, Plaintiff presents her counsel's affirmation. *See* Drazen Affirm., Dkt. 38-1.[1] Although Counsel asserts the proposed third amended complaint is annexed to his affirmation, it is not. While Plaintiff references some of the proposed amendments in her opposition to the defendants' motions, Plaintiff has not provided a complete copy of the proposed third amended complaint.

**\*2** "An amended complaint is intended to replace and supercede in its entirety the previous complaint. Once accepted for filing, the amended complaint becomes the operative pleading, and the original complaint is no longer considered." *Bennett v. Fletcher*, No. 9:17-CV-849 (GTS/CFH), 2018 WL 557885, at \*1 (N.D.N.Y. Jan. 18, 2018)(citing *Dluhos v. Floating & Abandoned Vessel,*

*Known as New York*, 162 F.3d 63, 68 (2d Cir. 1998)("[I]t is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect.")). "This requirement is buttressed by the Local Rules of Practice of this District ("Local Rules")." *Id.*

Local Rule 15.1(a) provides in pertinent part:

> A party moving to amend a pleading ... must attach an unsigned copy of the proposed amended pleading to its motion papers. Except if the Court otherwise orders, the proposed amended pleading must be a complete pleading, which will supersede the pleading sought to be amended in all respects. A party shall not incorporate any portion of its prior pleading or exhibits thereto into the proposed amended pleading by reference.

N.D.N.Y. L.R. 15.1(a). "One of the purposes of the requirement that an amended complaint be itself a complete pleading is to ensure that all of the allegations asserted against the defendants are contained in a single document, thereby reducing the likelihood that a party will overlook one or more allegations against him." *Bennett,* 2018 WL 557885, at *1 (citation omitted). "This requirement also eliminates the confusing nature of 'piecemeal' amended complaints." *Id.* (citation omitted). "In other words, an amended complaint must include all of the allegations against each of the defendants against whom the case is going forward so that the amended complaint may stand alone as the sole complaint in the action." *Id.* The failure to provide a complete proposed amended complaint is sufficient reason to deny a motion to amend as it precludes the Court from "examin[ing] the exact amendment that it is being asked to permit[;] ... ensur[ing] that all of the allegations asserted against the [defendants] are contained in a single document[;] ... [and] eliminat[ing] the confusing nature of piecemeal amended pleadings." *Allevato v. Howard*, No. 9:21-CV-1159 (GTS), 2022 WL 42436, at *2, n. 2 (N.D.N.Y. Jan. 5, 2022)(quoting ⚠️*Cusamano v. Sobek*, 604 F. Supp.2d 416, 508 (N.D.N.Y. 2009)). This rule is "not merely technical in nature," ⚠️*Cusamano,* 604 F. Supp.2d at 508, and Plaintiff had a prior motion to amend denied, in part,

because she failed to comply with Local Rule 15.1(a). *See* 02/16/21 Dec. & Ord., Dkt. 26, at 4.

Plaintiff's motion to amend again fails to comply with Local Rule 15.1(a). While the Court could adjourn the motions and allow Plaintiff to submit a proposed third amended complaint, she has not requested permission to do so even though defendants raise the Local Rule 15.1(a) deficiency. *See* Dkt. 41-1 at 2; Dkt. 43 at 23. Moreover, as discussed below, an adjournment would be contrary to the interests of justice and the speedy resolution of this case.

Plaintiff seeks to add the names of School District board members to the caption and paragraph 5 (describing "Defendant Norwich City School") although their names are not provided. *See* Drazen Affirm. ¶ 2. It would be unfair to the existing defendants, and to the unnamed School District board members, to allow the proposed amendment on this incomplete record. Furthermore, and perhaps more importantly, it appears that Plaintiff seeks to add school board members in response to the School District Defendants' contention that municipal liability against the School District can only be accomplished by suing the Norwich City School District Board of Education or its members. *See* Dkt. 34-1 at 9-12. This appears to be part of Plaintiff's practice of seeking to amend the complaint in response to defendants' motions to dismiss in order to cure deficiencies in the pleading. As the City points out, the SAC on the docket is the fifth iteration of the complaint. Each time defendants moved to dismiss claims in this action, Plaintiff responded by amending, or seeking to amend, the complaint to rectify deficiencies defendants raised in their motions. [2] The Court expects that Plaintiff's counsel would have analyzed the pertinent legal issues presented by the claims in the SAC and included in that pleading all factual and legal bases to withstand a motion to dismiss. It is unfair to the defendants to file several motions addressed to claims arising under the same facts only to allow Plaintiff additional time to rectify purported deficiencies in her pleading pointed out by the defendants. The Court will not allow this multiple-amendment approach to pleading to further delay this matter.

**\*3** Similarly, Plaintiff seeks to add a substantive allegation to paragraph 68, seemingly to provide a basis to conclude that her First Amendment free speech rights were chilled by defendants' actions. *See id.* ¶ 4. The circumstances underlying this proposed amendment appear to have existed at least by the time the Court granted leave to file the SAC on February 16, 2021, and therefore should have been included in that pleading.

Plaintiff also seeks to amend the SAC so that it names Defendants O'Sullivan, Ryan and Downey in their individual capacities, and add "[t]he words individual capacity ... anywhere O'Sullivan, Ryan and Downey are referenced in their official capacity [sic] in the complaint." Drazen Affirm. ¶ 2. It is unclear whether Plaintiff intended to sue Defendants O'Sullivan, Ryan and Downey in the SAC in their individual capacities. The SAC's caption names them in their official capacities only, and the SAC indicates throughout that these defendants acted, or failed to act, in their official capacities. *See generally* SAC. However, these defendants, who were named for the first time in the SAC, were each served summonses, and Plaintiff brings claims against them separate from the claims against the School District. The question of whether Plaintiff filed only official capacity claims against these defendants in the SAC and now wants to bring individual capacity claims against them has substantive significance. *See, e.g.,* 🔖 *Tanvir v. Tanzin,* 894 F.3d 449, 459 (2d Cir. 2018) ("In an official capacity suit, the real party in interest is the governmental entity and not the named official. By contrast, individual capacity suits seek to impose individual liability upon a government officer for her actions under color of law.")(citations omitted). It seems Plaintiff concedes that if individual capacity claims are now asserted against these defendants, they would be entitled to hire their own counsel. *See* Dkt. 38-4, p. 26 ("It is respectfully submitted that apart from perhaps having to obtain their own counsel, Ryan, Downey and O'Sullivan will not be unduly prejudiced as they are already on notice of the nature of plaintiff's claims."). To allow Ryan, Downey and O'Sullivan the opportunity to explore retaining separate counsel would require the motions to be adjourned, further delaying the proceedings. An amendment without this opportunity could prejudice Ryan, Downey and O'Sullivan.

In addition, Plaintiff seeks to change each reference in the SAC from "final decision makers" to "final policymakers." *See id.* ¶ 3. Without a complete proposed third amended complaint showing all the amendments in redline version as required by Local Rule 15.1(a), the defendants and Court are required to search through the 90-page, 379-paragraph SAC to determine where the proposed amendments apply. While not an insurmountable chore because it is a proposed global amendment, it is Plaintiff's job to do this - not that the defendants' or the Court's. Furthermore, as pointed out by the defendants, the amendment has substantive significance when determining whether Plaintiff has asserted viable claims

under 🔖 *Monell v. Department of Social Services,* 436 U.S. 658 (1978). The proposed amendment appears to be a reaction to defendants' motions to dismiss the *Monell* claims, and Plaintiff's counsel should have realized the distinction between "final decision makers" and "final policymakers" when the SAC was filed.

**\*4** Plaintiff has failed to comply with Local Rule 15.1(a), and any adjournment of the motions will cause undue delay arising from Plaintiff's failure to cure deficiencies through prior amendment. Under the particular circumstances of this case, delaying this case any longer is contrary to the interests of justice and the speedy resolution of this case resulting in prejudice to the defendants. Accordingly, Plaintiff's motion to amend is denied. The Court proceeds to analyze the dismissal motions as applied to the SAC.

## III. ALLEGATIONS IN THE SAC

The SAC alleges that Plaintiff's daughter, A.M.Y., was born "with a disabling physiological condition/genetic disorder known as Prader-Willi Syndrome, which has noticeable physical characteristics, and affects A.M.Y.'s musculoskeletal and digestive systems to the extent it substantially limits her activities involving those systems." SAC ¶ 4. Plaintiff contends that her daughter "was being regularly taunted and terrorized verbally and physically at school about her disabling condition by a group of her fellow male students" at Norwich Middle School. *Id.* ¶ 13. On the morning of March 20, 2018, Plaintiff emailed the Norwich Middle School Principal, Defendant Ryan, "indicating if action was not taken to address the situation with her child, she would be taking her concerns to higher authorities." *Id.* at 16. At 9:42 AM that day, Plaintiff received a telephone call from "Norwich Middle School official Joseph Downey." *Id.* ¶ 12. "The ostensible reason for the call, which Downey told plaintiff was being recorded, was to address plaintiff's repeatedly expressed concerns to school officials about how her daughter" was being treated by fellow students. *Id.* ¶ 13. Plaintiff believes that Ryan directed Downey to call in response to Plaintiff's email earlier that day. *Id.* ¶ 16. During the phone call, Plaintiff

rejected Downey's explanation of what plaintiff believed were school officials' minimization of the issue, voiced her dissatisfaction to Downey about the nonchalant and/or dismissive way it was being handled, and asserted

that talking to the students bullying her daughter about their behavior had been tried repeatedly without result. She told him that due to the lack of action to protect her daughter, she would seek intervention by authorities in the state or federal education departments, as well as speak with an attorney about civil action against the school district.

*Id.* ¶ 17.

"[A]t approximately 11:42 AM [on March 20, 2018] a call complaining about plaintiff was made to the Norwich Police Department by a school district official, of whose identity plaintiff is unaware." *Id.* ¶ 18. Donovan "believes during the approximately two hour time period between the end of Downey's call to her, and the call to the police, Downey sought and received instructions from defendant Ryan, and from ranking school district officials, including defendant O'Sullivan - whose offices are housed within the same building as the Norwich Middle School - on how to proceed, and that such a call to the police would not have occurred without such officials' knowledge or consent, and reflected a school district policy, or the decision of school district final decision makers." *Id.* ¶ 19. "The police incident report lists defendant Ryan and defendant O'Sullivan as persons involved, along with plaintiff and Downey." *Id.* ¶ 20. "At no point since then has any school district official disavowed the course of action taken that day, or disavowed any subsequent actions taken by the school district, nor has any school district official indicated Downey acted on his own, without authorization, or in violation of any school district policy." *Id.* Downey told the police that during his telephone conversation with Donovan, she stated: "If someone touches my daughter again, I will make it rain blood on the Norwich Middle School." *See* SAC, Ex. A.

**\*5** At 4:00 PM on March 20, 2018, Donovan received a telephone call from someone at the Norwich Police Department "who led her to believe they were concerned about what was happening to her daughter at the school, that they wanted to help, and asked her to come in to the station, so they could talk to her about it." *Id.* 21. Plaintiff voluntarily went and was interviewed for approximately three hours by various officers. *Id.* ¶¶ 22-41. A portion of the interviews "was videotaped and preserved by police, as the recording of the plaintiff being questioned by the uniformed officers

was subsequently produced in connection with the criminal matter." *Id.* at 41. During the interviews Donovan explained the problems her daughter was having with other students and the failure of the School District to rectify the situation despite Donovan's threats to take civil action against the District (including in her email to Ryan earlier that morning), asserted that she believed that "what was occurring was retaliation for her trying to advocate for/protect her daughter," asked to hear the recording of the telephone call with Downey (which she was told the police did not have and which Donovan does not believe the police ever listened to "as no recording of the conversation has ever emerged"), denied making a threat to commit a violent act, told police that were witnesses to her talking on the phone with Downey (although the police made no contact with these witnesses), demanded that charges be pressed against Downey for making a false deposition, and believes she was handcuffed in the booking room "as an intimidation tactic to force an admission from her." *Id.* ¶¶ 22-41. In a voluntary statement given to the City of Norwich Police Department on March 20, 2018, Plaintiff describers her conversation with Downey during which she purportedly expressed frustration with the School District's inadequate response to her complaints about how her daughter was treated by other students, and contends: "I then said that I had contacted New York State Department of Education and they're going to launch an investigation and its going to rain at your school; your faculty will be fired." SAC Ex B, p. 3.

During one interview on March 20 at the police station, a "non-uniformed police official" told Donovan "that Mr. Downey - son of a former Norwich City Court judge - was a known local figure, and she was not, so she was unworthy of belief." SAC ¶ 32. Plaintiff asserts that "[t]he official kept re-iterating how reputable, and influential Mr. Downey and his family were, and essentially repeating his effort to get plaintiff to change her story." *Id.* ¶ 33. Plaintiff contends that she "believes - based on the manner in which she was treated, and the manner in which she was told she was unworthy of belief-the Norwich Police Department's separation of people into the class worthy of belief, and that unworthy of belief, because of who they knew or who knew them, reflected a policy, custom or a practice approved, or silently assented to by final decision makers in the Norwich Police Department and in Norwich city government." *Id.* ¶ 39. Plaintiff asserts that she "now knows of another individual involved in a dispute with a member of another former local judicial official's family, subjected to similar mistreatment during roughly the same time frame she was." *Id.* ¶ 40. "During the criminal proceeding, plaintiff's demand for any other video recording

of her time at the police station - after initial indication it did exist - was ultimately met with a response that no other video existed." *Id.* ¶ 42.

The police released Plaintiff with an appearance ticket for Aggravated Harassment in the Second Degree in violation of 🔖 N.Y. Penal Law § 240.30(1). *Id.* ¶ 46, and Ex. A. Plaintiff was later arraigned on this charge and released on her own recognizance. *Id.* ¶ 47. The March 23, 2018 Criminal Information charging Plaintiff with Aggravated Harassment in the Second Degree alleges:

> The said defendant did, with intent to harass, annoy, threaten, or alarm another person, communicated by telephone with the victim, JOESEPH (sic) DOWNEY, by stating "If someone touches my daughter again, I will make it rain blood on the Norwich Middle School". All contrary to the provisions of the statute in such case made and provided.

> The foregoing factual allegations are based upon information and belief, the sources of complainant[']s information and belief being, a sworn statement by the victim, JOESEPH (sic) DOWNEY, and an investigation conducted by the City of Norwich Police Department.

SAC Ex. A. Downey's Supporting Deposition recounts the afore-mentioned threat as well as other parts of his March 20, 2018 telephone conversation with Plaintiff. *Id.*

Donovan was later notified that a felony charge would be lodged against her based upon what occurred on the phone call with Downey. A felony complaint made by Norwich Police Detective Sergeant Reuben Roach, supported by Downey's statement, was received by the Norwich City Court March 23, 2018 at 4:15PM. SAC ¶ 49. "Plaintiff believes the more serious charge was lodged with defendants' final decision makers' full knowledge and at least some input, and was done with no regard to the truth, but was intended as a further retaliatory measure, and a means of pressuring her into pleading guilty to something, or otherwise compelling her to put herself in a position that she could take no civil action against defendants, particularly the school district." *Id.*

 **\*6**  On May 18, 2018, a grand jury indicted Donovan on the felony charge of Making a Terrorist Threat in violation of N.Y. Penal Law § 490.20. *Id.* ¶ 50. Donovan asserts that she

is unaware of who testified or the substance of the Grand Jury testimony, but maintains a belief deliberately false statements, or those attributable to plain incompetence were made to induce the Grand Jury to indict her, since she committed no act constituting conduct prohibited by section 490.20, or by any other Penal Law provision, and further believes defendants knew or should have known from the very outset, no basis existed for claiming reasonable expectation or fear of plaintiff's imminent commission of such offense as two hours elapsed between the alleged imminent threat, and a call to the police, and over three hours after that until police contacted her.

*Id.* ¶ 51.

The matter made the broadcast and print news locally, around New York State, as well as in the Orlando, Florida area, the Columbus, Ohio area, and other areas nationwide. *Id.* ¶ 52. "Those events stunned and overwhelmed plaintiff, causing her extreme distress, loss of sleep, and substantial disruption of her regular activities outside of work." *Id.* ¶ 53. "When things settled down slightly in June 2018, plaintiff was looking back through her emails" and discovered in her Google e-mail (or "gmail") account an e-mail from Downey, purportedly sent on March 21, 2018. This e-mail stated:

> I have not been able to sleep all night. I want to apologize for not being completely honest yesterday in the report I filed. I hope you did not get into any trouble as I was caught in the moment and stretched the truth. I am going to correct what I said. I am so sorry never (sic) thought it would go this far. I preach to children how honesty is most important but I my self (sic) found my self (sic) in a situation

yesterday altering words. I promise I will retract my statement.

*Id.* ¶ 54 and SAC Ex. C. Plaintiff contends that she "contacted Google to verify the electronic path the email took from Downey's computer over the school district's server to plaintiff's account," *id.* ¶ 55, and that "Google supplied plaintiff with a printout certified with raised seals upon each page, showing the email had in fact come from Downey over the school district servers." *Id.* ¶ 57. The printout was sent under cover of a letter from Google's legal department. *Id.*; *see* SAC Ex. E. [3] "Based at least in part upon the Downey email, plaintiff moved through counsel to dismiss the charges against her in July 2018, which motion was denied." *Id.* ¶ 56

 **\*7** On November 2, 2018, Donovan appeared in Chenango County Court with counsel, "and despite plaintiff's proof - presented in hand there to the Chenango County District Attorney, with police officials, including the arresting officer and Detective Sergeant Roach present - that the only other individual with personal knowledge of what occurred in the March 20, 2018 phone conversation had disavowed their claim as to what occurred, the charges against plaintiff continued, and pre-trial hearings scheduled." *Id.* ¶ 58. Thereafter, "the Norwich Police Department sought a warrant to get all plaintiff's email records between March 20, 2018 and October 25, 2018 from Google." *Id.* ¶ 59. Donovan, "through motion by counsel returnable December 10, 2018, tried to have the warrant denied and/or quashed, pointing out again with police officials present that the chief complaining witness had certifiably disavowed his initial statement. But plaintiff's motion was denied, and a pre-trial hearing held over plaintiff's counsel's objection." *Id.* ¶ 61. Donovan asserts that:

[a]lthough whatever supported the warrant application was never revealed to plaintiff, plaintiff verily believes deliberately false statements, or those attributable to plain incompetence, were made by Norwich Police officials to secure the warrant, that such statements were made at the instance of school officials and were based upon representations made by school district officials they and the police knew to be untrue, or that should have been known to

be untrue and, that the sole basis for seeking the warrant was to fish for unfavorable, embarrassing, and/or incriminating material about plaintiff, so the school district could manage to be shielded from or evade future civil liability to plaintiff.

*Id.* ¶ 62. Plaintiff contends that "[o]ther than Downey's and school district officials' like Ryan and O'Sullivan's say so, plaintiff believes no reasonable grounds existed for any warrant application to be made, as the notion she, as an auto parts store employee, had sufficient specialized knowledge and skill to mimic the communications of someone to whom she had spoken only one time, then create an email from that person, infiltrate it into the school district's servers, and fool Google into certifying it, is totally implausible." *Id.* ¶ 63. Plaintiff also asserts that no proof existed that she hired someone to do these things, and contends that no further charges against her "arose from whatever materials were secured under the warrant." *Id.* ¶¶ 64-65.

On April 15, 2019, the newly-elected District Attorney opted "to move for dismissal of the indictment against plaintiff, which was granted April 17, 2019 in the interests of justice, and mailed to plaintiff's counsel April 23, 2019." *Id.* ¶ 67.

69. Plaintiff believes that in advance of criminal charges being brought against plaintiff by the Norwich Police at the school district's instance, during the Grand Jury process, as well as after plaintiff's motion to dismiss the charges against her, and in applying for the search warrant, school district officials and the Norwich Police conspired by concerted action to accomplish an unlawful purpose by unlawful means, namely to criminally charge the plaintiff for exercising her constitutionally protected and statutorily guaranteed rights, and to unlawfully employ the Penal Law of New York State, as well as the Grand Jury process and search warrant application process available under New York's Criminal Procedure Law, as a means for shielding the school district from civil liability to the plaintiff for their failure to uphold their legal obligations to plaintiff as a parent of a special needs child, as well as their legal obligations to plaintiff's child as a student with disability and an IEP.

70. Plaintiff's belief in that regard is based, at least in part, upon a March 22, 2018 public statement made by defendant O'Sullivan published in the Norwich Evening

Sun newspaper, indicating the matter was discussed at a school board meeting held the day after plaintiff was charged. He is quoted as saying "[w]e did a brief investigation, we called the police, sent out an email to all staff ... We thought it warranted the attention of the Norwich Police who followed up with an investigation." A copy of the March 23, 2018 Norwich Evening Sun article is attached as exhibit "h".

**\*8** 71. Plaintiff is unaware of any demand the school district or defendant O'Sullivan made for that statement to be revised or retracted, or any school district claim that Downey acted without authority.

72. The article containing defendant O'Sullivan's statement also indicated the school district and police had been meeting, would be meeting regarding school safety issues, and that Det. Sergeant Ruben Roach would be involved for the Police Department. Plaintiff was never contacted by any school district investigator, or is she aware that any other witnesses she named to police were contacted.

73. Plaintiff further believes when at the police station, and officers/officials were leaving the rooms in which she was held, they were communicating with those at the final decision making level about how to proceed, and that those at the final decision making level for both institutional defendants were communicating with each other on how to proceed, and that defendant city of Norwich final decision makers were watching the video feed of plaintiff being questioned live, based upon the allegation of an imminent mass casualty event involving children.

74. She also believes that the initial charge could never have been brought without communication and/or agreement between school district officials and the police, and that it can be reasonably inferred from Downey's email to plaintiff as well as the accusatory instrument he signed, he had spoken to the police, and had done so with approval from and/or based upon consultation with someone at the final decision making level in the school district.

75. Plaintiff similarly believes the felony complaint against her was issued in consultation with and the agreement of those at the final decision making level of both institutional defendants, that the Grand Jury either heard from Downey directly, or from police via hearsay, and that in either event such testimony could not have occurred without at least some agreement, communication and/or coordination between the school district and police.

76. Plaintiff also believes that in the approximately two hours between Downey's call to her, and the call to the police, Downey, Ryan and O'Sullivan concocted the claim that plaintiff had threatened a mass casualty event in her conversation with him, when she had only reiterated the statement she made to Ryan via email earlier that day stating she would be going to higher authorities with her complaints, and/or engaging counsel to pursue civil action, and that the concocted claim was intended to stop plaintiff from doing so.

77. Plaintiff believes that if Downey testified before the Grand Jury, he did so with final decision making school district officials' knowledge, consent and at their direction, that any police testimony was based on communications with Downey and/or other school district officials like Ryan and O'Sullivan.

78. Plaintiff also believes that once the police learned of Downey's email to plaintiff, they communicated and/or coordinated with him in their efforts to get a search warrant, that such an effort was based upon Downey's denial he sent the email or his suggestion plaintiff had somehow been able to concoct it, and that final decision making school district officials were at the very least aware of such communication and/or coordination, if not directly involved, as the email had gone out over their servers.

**\*9** 79. Plaintiff further believes that since the Police Chief is designated by Norwich City Charter as having "[j]urisdiction and control over all functions and duties customarily conferred upon a police department and police officers pursuant to the laws of the State of New York", and since the charges and allegations against her involved significantly more serious and broad ranging implications than usual - a possible mass casualty event involving children - police actions taken in relation to them could not have occurred without final decision makers' knowledge and approval, and that due to the seriousness of the allegations, such people were aware of events as they were happening, or very shortly thereafter, and were giving direction regarding any actions taken against plaintiff.

80. Plaintiff believes such actions and failures to act by the institutional defendants, and the individual defendants acting in their official capacity (sic) were taken at the direction of those with final decision making authority on such matters, and/or with their approval, toleration and ratification, were all performed with malice and premeditation under color of state law with willful and

wanton disregard of plaintiff's constitutional and statutory rights.

*Id.* ¶¶ 69-80.

Donovan "duly served a notice of claim June 3, 2019 upon the school district, which had been previously served notices June 27, 2018 and July 6, 2018, and duly served the city July 12, 2019." *Id.* ¶ 81.

## IV. STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See Marcotte v. City of Rochester*, 677 F. App'x 723, 724 (2d Cir. 2017); *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The complaint must contain "more than labels and conclusions, and a formulaic recitation of a cause of action will not do." *Twombly*, 550 U.S. at 555. "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). "A complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion." *Port Dock & Stone Corp. v. Old Castle NC. Inc.*, 507 F.3d 117, 121 (2d Cir. 2007); *see Mayor & City Council of Balt.*, 709 F.3d at 135 ("a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' "). Unless a plaintiff's well-pleaded allegations have "nudged [her] claims across the line from conceivable to plausible," the complaint must be

dismissed. *Twombly*, 550 U.S. at 570. Stated a different way, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Mayor & City Council of Balt.*, 709 F.3d at 135. "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

## V. DISCUSSION

### a. The City's Motion to Dismiss

**\*10** Plaintiff does not sequentially number her causes of action against all defendants, but rather groups them against each defendant. The SAC purports to present the following causes of action against the City:

First Claim: First Amendment free speech violation;

Second Claim: First Amendment retaliation;

Third Claim: Fourth Amendment unlawful seizure;

Fourth Claim: Fourteenth Amendment due process violations;

Fifth Claim: Fourteenth Amendment due process violation based on deprivation of liberty interests;

Fifth Claim (second): Fourteenth Amendment due process violation based on deprivation of liberty interests;

Sixth Claim: Fourteenth Amendment equal protection violation;

Seventh Claim: Rehabilitation Act "interference;"

Eighth Claim: Americans with Disabilities Act retaliation;

Ninth Claim: Negligence;

Tenth Claim: Negligent failure to train or supervise;

Tenth Claim (second):Negligent failure to train or supervise (via Section 1983);

Eleventh Claim: Intentional infliction of emotional distress;

Twelfth Claim: Violation of New York State Human Rights Law;

Thirteenth Claim: Violation of state constitutional provisions;

Fourteenth Claim: Violation of state constitutional provisions; and

Fifteenth Claim: Violation of state constitutional provisions.

SAC ¶¶ 142-207.

### 1. Municipal Liability

The City maintains that Plaintiffs' First, Second, Third, Fourth, Fifth, Fifth (second), Sixth, and Tenth (second) Claims must be asserted via 42 U.S.C. § 1983, and may only be brought against the City if the alleged violations were the acts of the City itself – that is, pursuant to a policy, custom, or practice satisfying the requirements of liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The City argues that because the SAC presents no nonconclusory allegations meeting those requirements, the claims fail. Plaintiff counters that City "final policymakers" approved or ratified all actions taken against Plaintiff. Dkt. 38-4 at 7-9.

"[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Rather, a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. "To hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). Where, as here, there is no formal policy officially promulgated by the municipality in issue, municipal policy may arise from

action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986); unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1985); or a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

**\*11** *Hill v. Cty. of Montgomery*, No. 9:14-CV-00933 (BKS/DJS), 2019 WL 5842822, at \*17 (N.D.N.Y. Nov. 7, 2019).

A single act by a municipality may amount to municipal policy "if ordered by a person 'whose edicts or acts may fairly be said to represent official policy.' " *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)(quoting *Monell*, 436 U.S. at 694); *see Montero v. City of Yonkers, New York*, 890 F.3d 386, 403 (2d Cir. 2018)("[W]hen a municipality 'chooses a course of action tailored to a particular situation,' this may also 'represent[ ] an act of official government 'policy' as that term is commonly understood.' ")(quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004), in turn quoting *Pembaur*, 475 U.S. at 480-81). "Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy." *Rookard*, 710 F.2d at 45; *see Montero*, 890 F.3d at 403 (" '[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered' may deprive the plaintiff of his or her constitutional rights.")(quoting *Amnesty Am.*, 361 F.3d at 126, in turn quoting *Pembaur*, 475 U.S. at 481). "An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the

municipality's final decisions." *Rookard,* 710 F.2d at 45 (citation omitted). "An allegation of policy-making authority thus requires proof of the official's scope of employment and his role within the municipal or corporate organization." *Id.* (citation omitted). "An official's title, though not dispositive of his authority to make policy, is relevant for the inferences fairly to be drawn therefrom." *Id.* (citation omitted).

"When a non-decisionmaker committed the constitutional violation, however, the plaintiff must show that the decisionmaker ordered or ratified such a subordinate's conduct or 'was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.' " *Montero,* 890 F.3d at 403 (quoting *Amnesty Am.,* 361 F.3d at 126); *see Bowers v. City of Salamanca,* No. 20-CV-1206-LJV, 2021 WL 2917672, at *3 (W.D.N.Y. July 12, 2021)(" '[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials,' such as 'the persistent failure to discipline subordinates who violate [persons'] civil rights.' ")(quoting *Zahra,* 48 F.3d at 685).

Plaintiff argues in opposition to the City's motion that given "a possible mass casualty event involving children," a City final policymaker such as the Mayor would have been alerted to the circumstances and either monitored police action or directed it. Dkt. 38-4 p. 8. "Mayors may be treated as policy-makers without proof of their specific powers and responsibilities. Lesser officials, however, cannot similarly be presumed to embody plenary municipal power." *Rookard,* 710 F.2d at 45, n. 4. Plaintiff's speculation that the Mayor was aware of Donovan's criminal charge and prosecution and directed or allowed it to continue is not based on facts from which a plausible inference could be drawn that the Mayor was actually aware of the events in issue, or that the Mayor directed police action or allowed it to continue. First, it is alleged that Donovan told Downey that if someone touched her daughter again she would make it rain blood on the Norwich Middle School. The threat was contingent on some further action involving Donovan's daughter. As Plaintiff argues, "[n]othing prevented the police from refraining from acting precipitously, as they knew there was no imminent threat." Dkt. 38-4 pp. 20-21. [4] It is not a plausible inference that the Mayor would be included in discussions involving a threat arising from what was essentially a dispute between a parent and the school district about how Donovan's daughter was being treated by other students. Second, Plaintiff provides

no allegations from which to reasonably infer that the Mayor was actually involved in or advised of Donovan's arrest and criminal prosecution. Her speculation is insufficient. Third, after Donovan's arrest and charges laid by the police, the criminal prosecution was essentially handled by the District Attorney. "When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State." *Baez v. Hennessy,* 853 F.2d 73, 77 (2d Cir. 1988), *cert. denied,* 488 U.S. 1014 (1989). Thus, "a district attorney's misconduct in prosecuting an individual could not give rise to municipal liability." *Walker v. City of New York,* 974 F.2d 293, 301 (2d Cir. 1992) (citing *Baez,* 853 F.2d at 77). Furthermore, "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." *Id.* The Mayor would not have had final decision making authority over the District Attorney in either of these roles. While Donovan alleges that the City police were involved in the request for the search warrant, she does not assert that the Mayor was involved in this action, and it is not a reasonable inference that the Mayor would be involved in or consulted about such proceedings in a criminal case. Under these circumstances, Plaintiff fails to plausibly allege that the Mayor's actions or omissions established municipal policy with respect to the particular issues in this case. *See Pembaur,* 475 U.S. at 483–84.

**\*12** Plaintiff also asserts that the City Police Chief had jurisdiction and control over matters involving the City police department's actions in issue here. Donovan believes that since the allegations against her involved "a possible mass casualty event involving children," police action in this matter "could not have occurred without final decision makers knowledge and approval," and she believes that these final decision makers were "giving direction regarding any actions taken against plaintiff." SAC ¶ 79. Plaintiff further believes the "actions and failures to act by the institutional defendants, and the individual defendants acting in their official capacity (sic), were taken at the direction of those with final decision making authority on such matters, and/or with their approval, toleration and ratification." *Id.* ¶ 80.

Plaintiff has plausibly alleged that the Police Chief is a final policymaker for purposes of some of the relevant events, that is, to the extent the Chief had the authority to train, supervise and/or discipline officers, and to enforce policies and procedures for the police department. *See Ocasio v. City of Canandaigua,* 513 F. Supp. 3d 310, 325 (W.D.N.Y. 2021).

That being the case, however, Plaintiff's contention that the Chief was actually aware of and involved in City police officers' actions relative to Donovan's arrest, charge, and prosecution is based upon mere speculation.

Citing to a newspaper article about Donovan's arrest, SAC Ex. H, Plaintiff contends:

> Surely during ongoing meetings between school officials and city police regarding school safety (complaint exhibit "h"), a mass casualty contingency plan was developed or contemplated, and how school officials and city officials would communicate in such circumstances was at least to some degree planned in advance. It's hard to believe as part of such arrangements school officials would be expected to wait two hours prior to alerting police about a terroristic threat. It's also hard to imagine top officials willing to be in a position of having to say on the day after, that they knew nothing of events as they were developing with the terroristic threat, and left leadership decisions to others. It seems far more likely that in the face of such a threat, anyone and everyone in authority would know relatively quickly, especially if there had been any kind of advance planning and coordination between school and city officials, as suggested by the District Superintendent in a public statement the day after the alleged terroristic threat occurred (exhibit "h").

Doc. No. 38-4, p. 8. The newspaper article does not support Plaintiff's contention that there were "ongoing meetings between school officials and city police regarding school safety" and that "a mass casualty contingency plan was developed." *See* SAC Ex. H. [5] Furthermore, the article does not mention the Police Chief.

*13 Likewise, Plaintiff's allegation that she believes that "school district officials and the Norwich Police conspired by concerted action to accomplish an unlawful purpose by unlawful means, namely to criminally charge the plaintiff for exercising her constitutionally protected and statutorily guaranteed rights, and to unlawfully employ the Penal Law of New York State, as well as the Grand Jury process and search warrant application process available under New York's Criminal Procedure Law, as a means for shielding the school district from civil liability," SAC ¶69, is insufficient to plausibly establish that the asserted conspiracy existed or that the Police Chief was part of it.

Plaintiff has not asserted an independent conspiracy claim, and her assertion of a conspiracy between the City police and the School District fails to present factual allegations plausibly supporting the existence of the alleged conspiracy. To establish a § 1983 conspiracy, "a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (collecting cases). A complaint alleging a § 1983 conspiracy must allege more than "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002)(quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)). "In setting forth the claim, a plaintiff must make an 'effort to provide some details of time and place and the alleged effects of the conspiracy....' " *Ocasio*, 513 F. Supp. 3d at 323 (quoting *Ivery v. Baldauf*, 284 F. Supp.3d 426, 439 (W.D.N.Y. 2018)).

Plaintiff's contention that the City police's motivation for going forward on the criminal charges was to protect the School District from civil liability is based on nothing more than mere speculation. Even if the City police had been aware of evidence of improper motivations on the part of the School District, that is not enough to show conspiracy. It is not a factual allegation plausibly suggesting the City police and the School District came to an agreement and a meeting of the minds to persecute Plaintiff Donovan for exercising her rights. *See id.* ("Plaintiffs do not allege any specific meeting of the minds. They fail to allege that Kadien and the DOCCS defendants knew or communicated

with one another. In sum and substance, their conspiracy claim amounts only to allegations that defendants jointly filed a false report.")(quotation marks, citations and brackets omitted); *see also* 🚩 *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (a conspiracy claim under 🚩 42 U.S.C. § 1985 requires allegations showing a "meeting of the minds," such that the defendants entered into an agreement to achieve an unlawful end). Plaintiff's claim of the lapse in time between her alleged threat and the School District's report to the police, and the temporal connection between Donovan's email to Ryan that she would be pursuing remedies and the School District's report to the police, may support Donovan's claim that the School District made the report to the police to retaliate against her, but it does not bear on the plausibility of her claims against the City or the existence of the asserted conspiracy. Furthermore, Plaintiff does not allege that the Police Chief was involved in the purported conspiracy. Plaintiff fails to assert facts plausibly establishing that the Police Chief was actually involved in and made decisions relative to Donovan's arrest and prosecution such to amount to municipal policy with respect to these and related issues. *See* 🚩 *Pembaur*, 475 U.S. at 483–84.

**\*14** Nevertheless, citing to *Zahra*'s statement that "a municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials," Plaintiff contends that the Police Chief likely knew of Donovan's criminal charge and prosecution and allowed it to continue, establishing *Monell* liability because the Police Chief was a "supervisory official." DKt. 38-4, pp. 8-9. [6] Plaintiff argues that the Police Chief ratified or acquiesced in police action in this matter.

Plaintiff has not adequately alleged *Monell* claims against the City premised on a theory of ratification. "Municipal policy" for purposes of *Monell* liability "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." 🚩 *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[W]here senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." 🚩 *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980). However, to state a *Monell* claim premised on ratification, a plaintiff must plausibly

allege that the unconstitutional conduct which the municipal policymaker ratified was part of "a pattern of constitutionally offensive acts," rather than an isolated event. *Ocasio*, 513 F. Supp. 3d at 325. "In order to state a claim for ratification of repeated unconstitutional acts, there must be 'well-pleaded allegations in the complaint supporting the inference that the City employed a policy of ratifying the unlawful conduct of its officers': a 'single instance' of ratification is insufficient." *Id.* (quoting 🚩 *Waller v. City of Middletown*, 89 F. Supp. 3d 279, 287 n.3 (D. Conn. 2015), in turn quoting 🚩 *Batista*, 702 F.2d at 398; and citing 🚩 *Deferio v. City of Syracuse*, 770 Fed. Appx. 587, 591 (2d Cir. 2019)(holding that a *Monell* claim premised on ratification requires allegations that constitutional liberties were "systematically" violated: a "single incident of illegality" cannot, by itself, evidence a "custom")(unpublished opinion)(quoting 🚩 *Turpin*, 619 F.2d at 202)).

**\*15** Plaintiff has not plausibly alleged that the purportedly unconstitutional conduct of arresting and charging Donovan despite her claims of innocence, of seeking a search warrant, or providing evidence from the police investigation to a grand jury (if in fact the City made some decisions or played some role in the District Attorney's grand jury presentation), and allowing the prosecution to continue despite Plaintiff's presentation of evidence that Downey recanted his claim (presuming the City played some role in the decision to continue the prosecution) amounted to ratification by the Police Chief or some other senior supervisory personnel of "a pattern of constitutionally offensive acts," rather than isolated events. The closest the SAC comes to alleging a purported pattern or "persistent and widespread" practice is in paragraphs 39 and 40, where Plaintiff claims that she was told she was "unworthy of belief," and asserts that this represented a practice by the City's police department of treating people differently based on "who they knew." SAC ¶ 39. Plaintiff claims to know of "another individual involved in a dispute with a member of another former judicial official's family [who was] subjected to similar mistreatment." *Id.* ¶ 40. However, two instances are insufficient to plead a widespread or persistent practice to justify the imposition of municipal liability. *See* 🚩 *Jones v. Town of East Haven*, 691 F.3d 72, 85 (2d Cir. 2012)(concluding that evidence of two or three instances in which police officers "abused the rights of black people" fell "far short of showing a policy, custom, or usage of officers to abuse the rights of black people, and far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities");

*Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (stating that the plaintiff "identifie[d], at most, only four examples where the defendants might have disclosed positive drug test results," and holding such "evidence [fell] far short of establishing a practice that is so persistent or widespread as to justify the imposition of municipal liability" (citations and internal quotation marks omitted); *LoPorto v. Cty. of Rensselaer*, No. 1:15-CV-0866 (LEK/DJS), 2018 WL 4565768, at *19 (N.D.N.Y. Sept. 24, 2018)("[T]he fact that Plaintiff can only point to two allegedly unlawful prosecutions—his own and McDonough's—undermines his claims of widespread, systemic wrongdoing and fails to support an inference that Rensselaer had a policy or practice of wrongfully prosecuting criminal defendants.").

Plaintiff has also not adequately alleged *Monell* claims premised on a theory of acquiescence by the Police Chief or some other senior supervisory personnel. "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city "policy or custom" that is actionable under § 1983.' " *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)(quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (internal citation omitted). "To prove such deliberate indifference, plaintiffs must show that the need for more or better supervision to protect against constitutional violations was obvious." *Ocasio*, 513 F. Supp. 3d at 325 (citing *Canton*, 489 U.S. at 390). " 'An obvious need may be demonstrated through proof of repeated complaints of civil rights violations [and] deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.' " *Id.* (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), in turn citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

Furthermore, under *Zahra* and the cases it cites, municipal policy can arise from supervisory officials' conduct involving "persistent failure to discipline subordinates who violate [persons'] civil rights," "evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force," and "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps." *See*

*Zahra*, 48 F.3d at 685. [7] Indeed, in concluding that "Zahra failed to establish that the Town had a municipal policy that rendered it liable for any deprivation of Zahra's constitutional rights," the Circuit cited to *Turpin* in concluding that "Zahra did not present evidence demonstrating that the Town's purported inaction constituted deliberate indifference or tacit encouragement of a violation of his constitutional rights."

*Zahra*, 48 F.3d at 685 (citing *Turpin*, 619 F.2d at 201). *Turpin* stands for the proposition that municipal liability can arise from senior supervisory personnel's inaction in situations concerning a pattern of constitutionally offensive conduct. *See Turpin*, 619 F.2d at 201 ("where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts");

*Lucente v. County of Suffolk*, 980 F.3d 284, 306 (2d Cir. 2020)(" '[E]ven if a policy can be inferred from omissions of a municipality, such as where it acquiesces in a pattern of illegal conduct, such a policy cannot be inferred from the failure of those in charge to discipline a single police officer for a single incident of illegality'; instead, there must be 'more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct.' ")(quoting *Turpin*, 619 F.2d at 201-02).

**\*16** Here, there are no plausible allegations of a persistent failure to discipline subordinates or a pattern of constitutionally offensive acts by City police officers. Instead, Plaintiff's claims involve the singular event of Donovan's arrest and prosecution. Under these circumstances, the acts or omissions of the Police Chief or other senior supervisory personnel do not represent official City policy. *See Deferio*, 770 Fed. Appx. at 591 (holding that a *Monell* claim premised on a theory of ratification of illegal acts requires allegations that constitutional liberties were "systematically" violated: a "single incident of illegality" cannot, by itself, evidence a "custom")(quoting *Turpin*, 619 F.2d at 202); *Ocasio*, 513 F. Supp. 3d at 325("Plaintiffs have not plausibly alleged that the unconstitutional conduct which Hedworth ratified was part of a pattern of constitutionally offensive acts, rather than an isolated event. In order to state a claim for ratification of repeated unconstitutional acts, there must be well-pleaded allegations in the complaint supporting the inference that the City employed a policy of ratifying the unlawful conduct of

its officers: a single instance of ratification is insufficient.") (internal quotation marks and citation omitted).

For the reasons discussed above, Plaintiff's claims against the City under 🚩 Section 1983 (Plaintiffs' First, Second, Third, Fourth, Fifth, Fifth (second), Sixth, and Tenth (second) Claims) fail as a matter of law and are dismissed.

### 2. Rehabilitation Act and ADA Claims

Plaintiff's claims under the Rehabilitation Act and the Americans with Disabilities Act ("ADA") against the City (Seventh and Eighth Claims) are deficient because Plaintiff has not plausibly alleged the City or its police officers took any actions based on A.M.Y.'s disability or Donovan's opposition to discrimination relating to A.M.Y.'s disability.

To allege a violation of the ADA or the Rehabilitation Act, a plaintiff must provide adequate factual allegations that she is a qualified individual with a disability; that she was excluded from participating in a public agency's services, programs, or activities, or otherwise discriminated against by the public entity; and, that such exclusion or discrimination was due to her disability. *Fulton v. Goord*, 591 F.3d 37, 43, 42 n.1 (2d Cir. 2009). "To recover compensatory damages under the ADA or the Rehabilitation Act, a plaintiff must prove that the defendant exhibited 'deliberate indifference' as to the 'strong likelihood' that its actions were unlawful under the statutes." *Feltenstein v. City of New Rochelle*, 254 F. Supp. 3d 647, 657 (S.D.N.Y. 2017) (quoting 🚩 *Loeffler v. Staten Island University Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009)). "In this context, a plaintiff demonstrates deliberate indifference by pointing to evidence the official with authority to address the alleged discrimination and to institute corrective measures on Plaintiff's behalf had actual knowledge of ongoing discrimination against Plaintiff but failed to respond adequately." *Id.* (quotation marks and citations omitted). "A defendant's actions must demonstrate 'deliberate choice ... rather than negligence or bureaucratic inaction.' " *Id.* (citing 🚩 *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007)).

As the City notes, Plaintiff alleges the City police began taking actions adverse to Donovan before she revealed her daughter was disabled or that she had threatened to bring litigation against the School District over alleged disability discrimination. Plaintiff's insistence that she did not make a threat against the School District, and that Downey

"disavowed his sworn deposition less than 24 hours after he made it," Dkt. 38-4 p. 22, ignores that the City police were provided information that Donovan did make a threat, and that Downey's "disavowal" was not presented to the police until June 2018, roughly three months after Donovan was arrested and charged, and after she was indicted by a grand jury. The City police's failure to accept Donovan's denial at face value is not plausibly linked by any factual allegation to her daughter's disability. Furthermore, Plaintiff cannot rely on the e-mail from Downey as shedding any light on the motives of the City police when they questioned Donovan, issued her an appearance ticket, or filed a felony complaint. Nor do the factual allegations plausibly support Plaintiffs' claim that the issuance of a search warrant – which was the sole act of the City police allegedly undertaken after the revelation of the e-mail from Defendant Downey – was prompted by A.M.Y.'s disability or her mother's advocacy on her behalf.

**\*17** Plaintiff's argument that the delay by the School District in reporting the threat gave the police "ample basis to question [the] school officials['] story from the outset, and to suspect plaintiff was the target of retaliation for defending her child," Dkt. 38-4 p 23, amounts to, at most, an argument that the City police should have suspected the School District was engaging in retaliation. However, negligence cannot be the basis for a claim under the ADA or the Rehabilitation Act, and Plaintiff has not presented allegations plausibly suggesting that the City police actually knew retaliation was occurring and deliberately aided it. Further, Plaintiff's claim that the City police were "deliberately indifferent" to Donovan's descriptions of "violations of well-established rights of hers and her daughter's" by the School District, Dkt. 38-4 p. 23, fails to plausibly establish ADA and Rehabilitation Act claims against the City. As the City points out, violations of these statutes are not crimes, and the City police do not do not have jurisdiction to enforce the anti-discrimination laws.

For these reasons, Plaintiff's ADA and Rehabilitation Act claims against the City are dismissed.

### 3. State Law Negligence - Ninth Claim

#### A. Negligent Arrest and/or Prosecution

The City argues that to the extent Plaintiff's negligence claim is for negligent arrest and/or prosecution, no such claim exists under New York State law. *See* Dkt. 29-3 at 20. In this regard, the City argues that under a claim of general

negligence a plaintiff may not recover for a claim that law enforcement officers failed to exercise the appropriate degree of care in effectuating an arrest or initiating a prosecution.

*See id.* (citing *Bernard v. U.S.*, 25 F.3d 98, 102 (2d Cir. 1994))("Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effectuating an arrest or initiating a prosecution."); *Frederique v. County of Nassau*, 168 F. Supp.3d 455, 485 (E.D.N.Y. 2016) (Such a plaintiff is restricted to the traditional remedies of false arrest and malicious prosecution, and cannot recover in negligence.). Plaintiff has not responded to this argument.

The Local Rules provide that "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting ... of the motion." N.D.N.Y. L.R. 7.1(a)(3). "In the Northern District, where a plaintiff, in her opposition papers, fails to oppose several arguments by a defendant in its motion to dismiss, 'the movant's burden is lightened such that, in order to succeed, the movant need only show facial merit in support of its motion, which has appropriately been characterized as a lightened burden.' " *Baldwin v. United States*, No. 1:20-CV-214 (GLS/CFH), 2021 WL 431145, at *2 (N.D.N.Y. Feb. 8, 2021)(quoting *Breezee v. Colvin*, No. 5:14-CV-1114 GTS, 2015 WL 5725083, at *2 (N.D.N.Y. Sept. 28, 2015) (citations omitted), and citing *Lefevre v. Cty. of Albany*, No. 1:14-CV-155, 2015 WL 1626005, at *3 (N.D.N.Y. Apr. 13, 2015) (citations omitted) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion.")). Thus, because Donovan failed to respond to the City's argument that a state law claim for unlawful arrest and prosecution cannot be asserted under general negligence principles, the remaining issue is whether the City has " 'met its burden to demonstrate entitlement to the relief requested through that argument.' " *Id.* (quoting *Cossey v. David*, No. 9:04-CV-1501, 2007 WL 3171819, at *4 (N.D.N.Y. Oct. 29, 2007)(internal quotation marks and citations omitted)). The City has met its burden in this regard. *See Bernard*, 25 F.3d at 102; *Frederique*, 168 F. Supp.3d at 485; *see also Ellis v. Gannon*, No. 10–CV–1373, 2011 WL 5513184, at *6 (E.D.N.Y. Nov. 10, 2011) ("For claims seeking damages based upon a purportedly unlawful arrest and prosecution,

a plaintiff must resort to the traditional remedies of false imprisonment and malicious prosecution and cannot recover under the broader principles of negligence."); *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp.2d 384, 395 n. 3 (S.D.N.Y. 2008) ("To the extent that plaintiff is alleging an alternate theory of liability for false arrest, imprisonment and prosecution sounding in negligence, New York does not provide a cause of action under such a theory."). Accordingly, the Ninth Claim is dismissed to the extent it purports to assert a claim for negligent arrest and/or prosecution.

### B. Failure to Protect A.M.Y.

**\*18** The Ninth Claim also asserts a negligence claim premised on the theory that the City had various duties relating to protecting A.M.Y. from abuse at school. SAC ¶ 178. "As a general rule, a municipality may not be held liable for injuries resulting from a simple failure to provide police protection." *Cuffy v. New York*, 69 N.Y.2d 255, 260 (N.Y. 1987). "There exists, however, a narrow class of cases in which we have recognized an exception to this general rule and have upheld tort claims based upon a 'special relationship' between the municipality and the claimant." *Id.* "The elements of this 'special relationship' are: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." *Id.*

Here, there is no allegation Donovan sought the assistance of the City police in regard to the matters involving her daughter, or that the City police made any promises, explicitly or by implication, to take any steps in what was plainly a school matter involving minor students. Accordingly, the Ninth Claim is dismissed to the extent it purports to assert a claim for negligent failure to provide police protection to A.M.Y.

### 4. Negligent Failure to Train or Supervise

The "first" Tenth Claim alleges that the City police "allowed such improperly trained, supervised and disciplined personnel to spoliate or otherwise improperly handle evidence (the

video of the non-uniformed official questioning plaintiff), to interact with school personnel and plaintiff, to make decisions concerning plaintiff, such that plaintiff, and her child were unnecessarily subject to the circumstances set forth herein, allowing their law enforcement function to be effectively hijacked, and their officers used as the school district's private security arm and civil action prevention squad, willingly and/or negligently becoming facilitators of retaliation against complaints of sexual harassment, and other mistreatment of plaintiff's child while in the school's care." SAC ¶ 180. Plaintiff further contends that "had they been properly trained or supervised, police would have recognized what she told them made the matter civil, not criminal. *Id.* ¶ 182.

The City argues that the overall context of Plaintiff's allegations, "most notably [the] frequent railing at the City police officers' decision to proceed on the information provided by the school district official rather than accept ... Donovan's version of events," demonstrates that Plaintiff seeks "to challenge the adequacy of the City police officers' training and supervision with regard to investigative procedures." Dkt. 29-3 at 21. Pointing to New York law, the City maintains that claims based on a theory of negligent training or supervision under these circumstances are properly dismissed because "a claim for negligent training in investigative procedures is akin to a claim for negligent investigation or prosecution, which is not actionable in New York." *Russ v. State Employees Federal Credit Union*, 298 A.D.2d 791, 793 (N.Y. App. Div. 2002); *see Brown v. State of New York*, 45 A.D.3d 15, 26 (N.Y. App. Div. 2007)(same); *see also* ⚑ *Pandolfo v. U.A. Cable Systems*, 171 A.D.2d 1013, 1014 (N.Y. App. Div. 1991)(claims for negligent prosecution and investigation are barred as a matter of public policy).

Plaintiff has not responded to the argument, and the City has met it burden of establishing entitlement to relief on this argument. Accordingly, the "first" Tenth Claim is dismissed.

### 5. Intentional Infliction of Emotional Distress - Eleventh Claim

The City argues that Plaintiff's Eleventh Claim for intentional infliction of emotional distress may not be brought against the City as a matter of public policy. Dkt. 29-3 at 23 (citing *Crevlin v. Board of Education of City School District of City of Niagara Falls*, 144 A.D.3d 1649, 1650 (N.Y. App. Div. 2016)("[I]t is well settled that public policy bars claims sounding in intentional infliction of emotional distress against

a governmental entity."); *Afifi v. City of New York*, 104 A.D.3d 712, 713 (N.Y. App. Div. 2013)("Public policy bars claims alleging intentional infliction of emotional distress against governmental entities.")).

**\*19** Plaintiff has not responded to the argument, and the City has met it burden of establishing entitlement to relief on this argument. Accordingly, the Eleventh Claim is dismissed.

### 6. New York State Human Rights Law Claim-Twelfth Claim

The Twelfth Claim asserts a violation of the New York State Human Rights Law. The City argues that the discriminatory exercise of the police power by a municipality is not covered by the New York Human Rights Law. Dkt. 29-3, pp. 23-24 (citing *D.H. v. City of New York*, 309 F. Supp.3d 52, 81 (S.D.N.Y. 2018)). Plaintiff has not responded to or opposed this argument. The City has satisfied its burden of demonstrating its entitlement to relief as to this claim. *See D.H.*, 309 F. Supp.3d at 81. Accordingly, the City's motion in this regard is granted and the New York Human Rights Law claim against the City is dismissed.

### 7. Claims under the New York State Constitution

As the City contends, the Thirteenth, Fourteenth, and Fifteenth Claims assert claims under the New York State Constitution, without any indication that they are founded upon facts distinct from those underlying the ⚑ Section 1983 claims. The City argues that because Plaintiff has adequate remedies for such violations under ⚑ Section 1983 and/or at common law, no state constitutional tort claims may be asserted. In this regard, the City maintains:

"Although the New York Court of Appeals has recognized a cause of action for damages based on official conduct violating the State's Constitution, the same court has made clear that such a cause of action is a 'narrow remedy' available only when 'necessary to effectuate the purposes of the State constitutional protections [that the] plaintiff invokes' or 'appropriate to ensure full realization of [the plaintiff's] rights.' " Thus, the state constitutional tort is usually available only in cases in which a plaintiff ... has no alternative remedy." ⚑ *Biswas v. City of New York*, 973 F. Supp.2d 504, 522 (S.D.N.Y. 2013) (citing

*Brown v. State*, 89 N.Y.2d 172 (1996) and *Martinez v. City of Schenectady*, 97 N.Y.2d 78 (2001)). Here, Plaintiffs have actually attempted to assert Section 1983 claims which the state constitutional tort claims entirely track. The availability of Section 1983 claims precludes recognition of state constitutional tort claims, even if the Section 1983 claims are ultimately unsuccessful. *See, e.g., Wahad v. F.B.I.*, 994 F. Supp. 237, 240 (S.D.N.Y. 1998).

Dkt. 29-3, pp. 24-25.

Plaintiff has not responded to the argument, and the City has met it burden of establishing entitlement to relief on this argument. Accordingly, the Thirteenth, Fourteenth, and Fifteenth Claims against the City are dismissed.

### 8. Other Arguments

Because Plaintiff's Ninth, Tenth, Eleventh, Thirteenth, Fourteenth, and Fifteenth Claims are dismissed, the Court need not reach the City's contentions that no timely notice of claim was served as to these purported causes of action, that the Notice of Claim that was served did not include all state law tort causes of action, and that the original Complaint was filed after the expiration of the applicable statute of limitations for these claims.

### b. School District Defendants' Motion

### 1. Plausibility of Claims in the SAC

**\*20** The School District Defendants argue that even when viewed in the light most favorable to Plaintiff, "the allegations fail to make a case for concerted action between the Defendants Gerard O'Sullivan, Scott Ryan and Joseph Downey, the Norwich City School District and the Norwich City Police Department to deprive Plaintiff of her rights guaranteed by the United States Constitution, the Constitution of the State of New York, and the New York Human Rights Law." Dkt. 34-1 at 5. The School District Defendants contend that "the allegations of the deprivation of rights are formed from mere conclusory statements founded on the Plaintiffs beliefs, lacking any plausibility." *Id.* The Court agrees to a certain extent.

The majority of Plaintiff's claims proceed from the proposition that Downey fabricated Donovan's threat, that Downey, Ryan and O'Sullivan agreed amongst themselves to seek to charge Plaintiff with a crime in order to prevent or inhibit her from bringing civil action against the School District, and that to facilitate this scheme policy makers with the School District conspired and participated with the Norwich Police Department to prosecute Plaintiff. As the School District Defendants cite throughout their briefs, Plaintiff's allegations are based primarily on Plaintiff's speculation as to what occurred at the School District and after the matter was presented to the police. *See* Dkt. 34-1 at 5-6; Dkt. 39 at 2-3. These bald conclusory contentions supported only by Plaintiff's speculation are insufficient to support a plausible claim of a conspiracy between the School District and the Norwich Police, or claims based on Plaintiff's speculation that the Norwich Police did the School District's bidding through the criminal prosecution. Accordingly, any claim based upon conduct occurring after the School District reported Plaintiff's purported threat to the police must be dismissed.

Nevertheless, there are some facts alleged that, when accepted as true for purposes of this motion and when drawing reasonable inferences in Plaintiff's favor, are sufficient (although barely so) to state plausible claims premised on the proposition that School District personnel and officials agreed amongst themselves to seek to falsely charge Plaintiff with a crime. Primary to this position is Plaintiff's allegation that Downey sent an email the day after Plaintiff was charged indicating that he "stretched the truth" and "alter[ed] words" as to what Donovan purportedly said during their telephone call. While a factfinder might ultimately find that this claim is unworthy of belief, on this motion the Court must accept as true Plaintiff's allegations. When the Court accepts as true that Downey admitted that he was incorrect about Donovan's threat, that Donovan threatened civil action against the School District in her email to Ryan on March 20 and in her telephone conversation with Downey that day, that Donovan stated during her conversation with Downey that civil action against the School District would make it rain at the school, and that School District Superintendent O'Sullivan and others discussed the purported threat before bringing the matter to the police, an inference could be drawn that Downey divulged to School Officials that Donovan's statement did not clearly articulate a physical threat but that School District officials determined to seek to prosecute Donovan anyway to stave off any civil liability. That being the case, any claim premised on

the decision by a School District policy maker to bring the matter to the police can go forward.

### 2. School District Policy or Custom

The School District Defendants contend that any claim brought against the School District under Section 1983 must be dismissed because Plaintiff fails to allege that any deprivations to her or her daughter were caused by a School District policy or custom.

**\*21** "Municipal entities, including school districts, are 'persons' within the meaning of § 1983 and therefore subject to suit under that provision." *Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (citing *Monell*, 436 U.S. at 663). "A school district can only be held liable under [§ 1983] if its policy or custom, whether made by its lawmakers or by those whose edicts may fairly be said to represent official policy, inflicts the injury." *Rys v. Grimm*, No. 6:19-CV-1251 (FJS/ATB), 2021 WL 827671, at \*10 (N.D.N.Y. Mar. 4, 2021)(internal quotation marks and citations omitted). "This means that a school district can be held liable under § 1983 for conduct that was undertaken pursuant to its own unlawful policy or custom or for the actions of an individual whose actions may fairly be said to represent official policy." *Id.* (internal quotation marks and initial citation omitted, also citing *Roe v. City of Waterbury*, 542 F.3d 31, 36-37 (2d Cir. 2008) (stating that, "[w]here a plaintiff seeks to hold a municipality liable for a 'single decision by [a] municipal policymaker, the plaintiff must show that the official had final policymaking power....")) (internal quotation marks, citations, and brackets omitted). The Second Circuit has clarified "that a municipal employee's authority or discretion to make a 'final decision' is not equivalent to that employee having the authority to set the municipality's policy for reaching such decision." *Id.* (citing *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020)). "State law determines whether an individual has the authority to adopt rules for the conduct of the municipal government; and a municipality merely going along with discretionary decisions made by its subordinates does not convert them into final policymakers." *Id.* (internal quotation marks omitted, citing *Agosto*, 982 F.3d at 98, 100).

The School District Defendants contend that New York Education Law § 2503 empowers the Norwich City School District Board of Education with the final decision making authority to "prescribe such regulations and by-laws as may be necessary ... for the general management, operation, control, maintenance and discipline of the schools, and of all other educational, social or recreational activities and other interests under its charge or direction," and "[s]hall have in all respects the superintendence, management and control of the educational affairs of the district, and, therefore, shall have all the powers reasonably necessary to exercise powers granted expressly or by implication and to discharge duties imposed expressly or by implication by this chapter or other statutes." N.Y. Educ. Law § 2503(2) and (3). The School District Defendants argue that because Plaintiff did not sue the Board of Education or any of its members, Plaintiff cannot establish that any deprivation was caused by a municipal policy.

Plaintiff responds to the School District Defendants' argument with supposition. Plaintiff cites to *Rookard* where the Second Circuit held that a single act by a municipality may amount to municipal policy "if ordered by a person 'whose edicts or acts may fairly be said to represent official policy,' " that "[w]here an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy," and that "[a]n official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." 710 F.2d at 45. Plaintiff contends:

> Surely, the call to police could not have been made absent an official with final authority over significant matters in the school district knowing and giving the go ahead, especially given the nature of the threat claimed. Under the circumstances, it is difficult to imagine how no one at a policy making level in the school district knew of what was going on with plaintiff, particularly the day of the supposed threat against the school, not exactly a run of the mill occurrence. If the official or officials who initiated the criminal process against plaintiff violated policy, action against them

surely would have occurred, instead of action against plaintiff. Given the nature of what school officials claimed, and apparently still claim occurred, inferring final policy makers knew and approved of the actions against plaintiff, either while they were happening or shortly thereafter, is entirely reasonable.

Dkt. 38-3, pp. 7-8.

This response does not indicate that the Board of Education or any board member made the decision to call the police, and Plaintiff's speculation that an official with final authority over significant matters in the School District gave the go ahead to do so does not indicate who the supposed official was. Furthermore, Plaintiff cites no state law indicating that any of the individual defendants had this authority, and the Court is not inclined to do Plaintiff's research for her.

**\*22** Citing to *Zahra*'s statement that "a municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials," 48 F.3d at 685, Plaintiff contends that "Superintendent O'Sullivan's public statement the day after plaintiff's arrest suggests the school board did know, and approved of the actions taken, by saying, 'We did a brief investigation, we called the police, sent out an email to all staff ... We thought it warranted the attention of the Norwich Police who followed up with an investigation.' " Dkt. 38-3 at 8 (quoting SAC Ex. H). Plaintiff contends that "[w]hile O'Sullivan did not specify who 'we' was, it is respectfully submitted he was likely not using the term in the ancient regal sense to reference himself, but rather was referencing those with the policymaking authority in the school district to make the decisions to do what was done." *Id.*

Plaintiff's supposition that O'Sullivan was referring to a final policymaker when he stated that "[w]e did a brief investigation, we called the police," without pointing to a specific final policymaker, is insufficient to draw a reasonable inference that some final policymaker was involved in the decision to file the report with the police. Likewise, Plaintiff relies on supposition when she contends that when O'Sullivan said he sent emails to all staff, "it seems unlikely no email or other communication was made to school board members in the same time frame, or that lower ranking officials would be notified, while higher ranking ones would not. It seems

more likely, given the nature of what was alleged to have occurred, that anyone and everyone in authority in the school district was made aware, including school board members." *Id.* Again, Plaintiff's supposition as to what might have occurred is insufficient to raise a reasonable inference that some final policymaker was involved in the decision to file a report with the police.

Next, Plaintiff contends that "the public record shows O'Sullivan reported what occurred at a school board meeting the day after plaintiff's arrest, and since no action was taken by the board against any district employee involved, when they could have done so, they must have approved and/or ratified actions taken against plaintiff." *Id.* pp. 8-9. Plaintiff's argument in this regard is insufficient to show that the Board of Education acquiesced in or ratified the decision to report Plaintiff's purported threat to the police. First, Sullivan was speaking to the Board the day after the complaint was made to the police. Advising the Board of the police report a day after it was made does not present a circumstance from which a reasonable inference could be drawn that the Board acquiesced in or ratified the decision to present the matter to the police. Second, as indicated above, municipal policy claims based on the theories of acquiescence in or ratification of municipal employees' unconstitutional conduct requires widespread or persistent conduct by municipal employees. Here, the alleged unlawful conduct by School District employees was the singular event of presenting Donovan's purported threat to the police. The circumstances do not lend themselves to a reasonable inference that the Board of Education acquiesced in or ratified persistent or widespread unconstitutional conduct by School District employees. For these reasons, the claims brought pursuant to Section 1983 (First Claim, Second Claim, Third Claim, Fourth Claim, Fifth Claim, Sixth Claim, and Seventh Claim) must be dismissed.

### 3. Adding Defendants O'Sullivan, Ryan and Downey

The School District Defendants contend that Plaintiff improperly added Defendants O'Sullivan, Ryan and Downey, and claims against them, to the SAC. Defendants argue that in *sua sponte* granting Plaintiff leave to file the SAC, the Court instructed Plaintiff to file a Second Amended Complaint that complies with Fed. R. Civ. P. 8 and 10, but made no mention of allowing new defendants. Defendants argue that instead of adding a short and plain statement of the claim showing that the pleader is entitled to relief as required by Fed. R. Civ. P. 8, Plaintiff added new claims and new parties which did not

serve to rectify the deficiencies in the prior pleading. Plaintiff has not responded to this argument.

 **\*23** At the time the Court granted leave to file the SAC, there were two defendants - the School District and the City. Defendants are correct that the Court granted leave to file the SAC because the prior pleading failed to comply with Rules 8 and 10 such that the defendants and the Court could decipher the claims Plaintiff intended to bring. However, the Court cannot conclude that the decision granting leave prohibited Plaintiff from adding the individual defendants or bringing claims against him. Indeed, as indicated above it is unclear on the present record whether Plaintiff intends in the SAC to bring claims against the individual defendants in their official capacities only, which would effectively be claims against the municipality, or whether she intends the SAC to serve as claims against the individual defendants both in their official and individual capacities. At this stage of proceedings, and without argument directed specifically to this issue, the Court will deny the School District Defendants' motion to dismiss on this ground.

### 4. Timeliness of State Law Claims

The School District Defendants contend that Plaintiff's state law claims are untimely. As defendants indicate, the events complained of herein occurred in March 2018. The complaint was filed on December 31, 2019, almost twenty months following the first encounter with the Norwich Police Department. Defendants content that the state law claims are untimely because in New York, an action must be commenced against a school district within one year for all claims except tort. N.Y. Ed. L. § 3813(1). Tort claims must be filed within one year and ninety days. *See* N.Y. Ed. L. § 3813(2), N.Y. Gen. Municipal L. 50-I.

Plaintiff attempts to tie the running of the statute of limitations from January 2020 "when school district officials presumably had an opportunity to meet and discuss the [criminal] matter's

status" yet "made no effort to discontinue the criminal action against plaintiff." Dkt. 38-3 at 16. However as discussed above, Plaintiff presents no allegations plausibly indicating that the School District was substantively involved in the criminal prosecution beyond presenting the complaint to the police on March 30, 2018. Accordingly, all state law claims brought by Donovan on her own behalf, whether against the School District or the individual defendants, are barred by the applicable statute of limitations.

Plaintiff argues, however, that her daughter's infancy tolls the running of the statute of limitations for all state law claims brought on her daughter's behalf until A.M.Y. turns 18 years of age. The Court agrees and finds that the statute of limitations on those portions of the state law claims brought on A.M.Y.'s behalf is tolled until A.M.Y. reaches 18 years of age. *See* N.Y. C.P.L.R. § 208(a).

### VI. CONCLUSION

For the reasons set forth above, the City of Norwich's motion to dismiss, Dkt. 29, is **GRANTED**, and all claims against the City of Norwich are **DISMISSED**.

The Norwich City School District, Gerald O'Sullivan, Scott Ryan, and Joseph Downey's motion to dismiss, Dkt. 34, is **GRANTED in part and DENIED in part**. The motion is granted to the extent that all claims brought against the School District under Section 1983 are **DISMISSED**, and all state law claims brought by Donovan on her own behalf, whether against the School District or the individual defendants, are **DISMISSED**. The motion is denied in all other respects.

Plaintiff's motion to amend, Dkt. 38, is **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 623904

### Footnotes

1       Counsel asserts:

2. Adding in school board members, and defendants O'Sullivan, Ryan and Downey in their individual capacity are proposed amendments of form, and in that connection, the names of school board members are added to the caption, and they are referenced in paragraph 5. The words individual capacity are also added anywhere O'Sullivan, Ryan and Downey are referenced in their official capacity in the complaint.

3. For clarity's sake, each reference to final decision makers is changed to "final policymakers".

4. The other proposed amendment adding the following to paragraph 68 "As a result, she was unable to communicate with others in the manner she previously had, as well as prevented from organizing and/ or advocating with other parents as she had planned to do - and had told school officials she would do - due to the time and energy consumed in defending herself, and due to the stigma of being charged as a domestic terrorist". An affidavit from plaintiff justifying the proposed amendment's inclusion accompanies these papers.

5. Arguments and citations of law in support of the cross motion, and opposing defendants' respective motions to dismiss accompany these papers, and for convenience, all proposed amendments are outlined and underlined in red in the annexed proposed third amended complaint, sans exhibits which would remain the same.

Drazen Aff., Dkt. 38-1.

2    The original Complaint was filed on December 31, 2019. Dkt. 1. In February 2020, the School District and City filed motions to dismiss arguing the pleading deficiencies undermined Plaintiff's claims. Dkt. 4, Dkt. 6. Rather than respond to the motions, on March 9, 2020 Plaintiff filed an Amended Complaint as of right, adding allegations in an apparent attempt to avoid the arguments presented in the defendants' motions. In light of the Amended Complaint, the Court denied defendants' initial dismissal motions as moot. *See* Dkt. 15. In March 2020, defendants again filed dismissal motions, this time addressed to the Amended Complaint. *See* Dkt. 11; Dkt. 13. Again, rather than respond to the motions, in April 2020, Plaintiff attempted to submit a Second Amended Complaint without consent of opposing counsel or leave of the Court, and refused to withdraw it even when the City pointed out that she could not do so. Instead, Plaintiff left the Second Amended Complaint on the docket and immediately filed a cross-motion for leave to file the Second Amended Complaint, again without actually responding to the dismissal motions.

The Court issued a decision in February 2021 that struck the Second Amended Complaint filed without consent or Court permission, and denied Plaintiff's cross-motion to file the proposed second amended complaint because (1) Plaintiff failed to comply with N.D.N.Y. L.R. 15.1; and (2) Plaintiff did not address defendants' substantive arguments for dismissal of the claims in the Amended Complaint, identify where in the proposed second amended complaint factual allegations existed to legally support Plaintiff's claims, or present any opposition to the request for an order directing a more definitive statement, leaving "the parties – and the Court – to sort through thirty-one pages of often-repetitive and prolix allegations in an effort to determine what, if anything, Plaintiff had added in the way of facts to address the alleged deficiencies in [their] claims." Dkt. 26 at 4. The Court also found that Plaintiff's manner of pleading failed to comply with Fed. R. Civ. P. 8(a)(2) and thus deprived Defendants of fair notice of what Plaintiffs' claims were and the grounds upon which they rested. *See id.* at 7. Accordingly, the Court denied without prejudice to renewal the defendants' motions to dismiss, and *sua sponte* granted leave "to file a second amended complaint that complies with Fed. R. Civ. P. 8 and 10." *Id.* at 11. Thereafter, Plaintiff filed the SAC, Dkt. 27. This constituted the fifth iteration of the Complaint in fourteen months, and came after the defendants' several motions providing detail as to what the pleading needed to adequately present Plaintiff's claims. Defendants then submitted motions addressed to this fifth pleading (the third Second Amended Complaint). After these motions were submitted, Plaintiff asked for leave to amend yet again, describing (but not providing) a proposed third amended complaint.

3    The letter from Google's Legal Department has no address or telephone number, no personal identification of any legal department representative, no signature or signature line, and contains several typographical errors and odd syntax. The body of the letter provides:

Dear Miss. (sic) Donovan,

As you requested the march (sic) 21, 2018 email you received from a one Mr. Downey has been preserved and validated as authentic. The email has but (sic) put on record in our legal dept (sic) and has been issued a document number 18-ac2972. The file will remain for a period of 2 years or until other wise (sic) told to dispose of. Our office has given you a copy of the complete path in which the email was delivered to our server.

Please feel free to contact us further if you need any further assistance.

Go gle (sic) Legal Dept (sic)

4    The Court draws no conclusion as whether the purported threat met the requirements of a charge under New York Penal Law § 490.20(1), which provides that "[a] person is guilty of making a terroristic threat when with intent to intimidate or coerce a civilian population, influence the policy of a unit of government by intimidation or coercion, or affect the conduct of a unit of government by murder, assassination or kidnapping, he or she threatens to commit or cause to be committed a specified offense and thereby causes a reasonable expectation or fear of the imminent commission of such offense."

5    The newspaper article Donovan cites indicates only that District Superintendent Gerald O'Sullivan provided an update at a Board of Education meeting on the District's efforts to be prepared for any internal or external crisis. It also indicates that the District did a brief investigation about Donovan's threat, called the police, and sent out an email to all staff. According to the article, O'Sullivan indicated "he thought it warranted the attention of the Norwich police who followed up with an investigation." O'Sullivan indicated that the District had not received any recommendations from law enforcement on how to handle Donovan's situation, indicating that the matter would be handled through the legal system, although he indicated that the District would be moving forward "in a more productive manner" including holding a student assembly to remember the Parkland shooting victims, scheduling an active shooter drill, sending students from the middle school and the high school to attend a school safety summit to discuss school safety issues, and hosting a multi-agency meeting with the New York State Police, the Chenango County Sheriff's Office, the Norwich Fire Department, emergency responders, members of the City of Norwich, and Chenango Memorial Hospital. The article indicates that the multi-agency meeting "comes after O'Sullivan met with Norwich Police Department Detective Ruben Roche and Norwich Fire Fighter Jason Gray on March 15," which was before Donovan's arrest on March 20, 2018 so that meeting could not have addressed Donovan's purported threat or police action related thereto.

6    In this regard, Plaintiff argues:

[I]t seems highly likely the Police Chief would be well aware of a nearly three hour ongoing interrogation of someone his officers say made a terroristic threat to the school. It seems also seems [sic] highly likely under such circumstances the Police Chief would be watching the interrogation in real time, or being briefed in near real time, and that during those nearly three hours he would have spoken with the mayor of the city, to keep them up to speed on events, and perhaps seek some guidance.

DKt. 38-4, p. 9.

Plaintiff continues by arguing:

[T]he notion that the city's actions taken against plaintiff March 20, 2018 due to what police believed was a terroristic threat to the school, were based solely on choices of those beneath the final policy making level, seems highly improbable. It also seems highly improbable officials like the Police Chief and mayor would stop being interested in what occurred the day after, and that they would continue closely following events to the later stages, like when plaintiff introduced certified proof that the only witness other than plaintiff to the phone call that precipitated events disavowed their initial statement (par. 56-58; exhibits "c", "d" and "e").

Ample opportunity arose for such final policy making officials to intervene, but they refused. It also seems highly likely that in the course of his contacts with the school about school safety Sgt. Detective Roach would be updating policymakers at the school, as was suggested/implied by the school superintendent's public statements (exhibit "h"), including the decision to bring the felony charge March 23, 2018. That such a decision was made with approval of city policymakers seems much more likely than without approval.

*Id.*

7    In *Zahra*, the Second Circuit stated:

We have previously ruled that a municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials, *Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), and that "municipal inaction such as the persistent failure to discipline subordinates who violate [persons'] civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct," *Batista*, 702 F.2d at 397. *See also* [*Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)] (policy may be inferred from "evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force in violation of the complainants' civil rights"); *Turpin*, 619 F.2d at 201 ("where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts").

48 F.3d at 685.

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   23

2022 WL 16966549
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Simone M. DICKSON, Plaintiff,

v.

SCHENECTADY FAMILY
COURT and Jill S. Polk, Defendants.

No. 1:22-CV-499 (DNH/CFH)
|
Signed October 27, 2022

**Attorneys and Law Firms**

Simone M. Dickson, P.O. Box 177, South Hampton, New York 11946, Plaintiff pro se.

**REPORT-RECOMMENDATION AND ORDER**

Christian F. Hummel, United States Magistrate Judge

### I. In Forma Pauperis

*1 Plaintiff pro se Simone M. Dickson ("plaintiff") purported to commence this action on April 5, 2022, by filing a complaint in the Southern District of New York. See Dkt. No. 2 ("Compl."). In lieu of paying the court's filing fee, she submitted a motion to proceed in forma pauperis ("IFP"). See Dkt. No. 1. The Southern District of New York transferred the case to this Court on May 13, 2022. See Dkt. Nos. 3, 4. The undersigned has reviewed plaintiff's IFP motion and determines that she financially qualifies to proceed IFP for the purpose of filing. [1]

### II. Initial Review

### A. Legal Standard

Section 1915 [2] of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is

immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

Where, as here, the plaintiff proceeds pro se, "the court must construe his [or her] submissions liberally and interpret them to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (citation and internal quotation marks omitted). This does not mean the Court is required to accept unsupported allegations that are devoid of sufficient facts or claims. Although detailed allegations are not required at the pleading stage, the complaint must still include enough facts to provide the defendants with notice of the claims against them and the grounds on which these claims are based. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic v. Twombly, 550 U.S. 544, 555-56 (2007). Pro se litigants are "not exempt ... from compliance with relevant rules of procedural and substantive law[.]" Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (citation omitted). Ultimately, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted).

*2 Pleading guidelines are set forth in the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include "a short and plain statement of the grounds for the court's jurisdiction" and "a demand for the relief sought...." FED. R. CIV. P. 8(a)(1), (3). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d)(1).

Further, Rule 10 provides in pertinent part that:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" *Flores*, 189 F.R.D. at 55 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too [ ] heavy [a] burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). The Second Circuit has held that "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (citation omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* (citation omitted). If dismissal is warranted and the plaintiff is *pro se*, the court generally affords the plaintiff leave to amend the complaint. *See* *Simmons v. Abruzzo*, 49 F.3d 83, 86-87 (2d Cir. 1995).

**B. Plaintiff's Complaint**

Plaintiff's complaint is essentially one paragraph wherein she states that Schenectady County Family Court Judge Jill S. Polk "m[a]nipulated my situation as well as shown misconduct through animosity with my court proceedings because of personal afflictions and personal financial endeavors." Compl. at 5. Plaintiff states that the dates of

occurrence were "2016-2022 present[.]" *Id.* Plaintiff purports to bring this claim under federal question jurisdiction for a violation of "due process"; she claims injuries in the form of "intentional tort, punitive damages, psychological damages to [her] children, and slander"; and she seeks "8.5 Billion" dollars. *Id.* at 2, 6.

**C. Failure to State a Claim Under Federal Rules of Civil Procedure 8 and 10**

Plaintiff's complaint fails to meet the pleading requirements of Rules 8 and 10. See FED. R. CIV. P. 8, 10. Plaintiff's complaint does not present a short and plain statement of the claim showing that she is entitled to relief. See FED. R. CIV. P. 8(a)(2). She also does not present her claims in numbered paragraphs, limited to one "circumstance" per paragraph. FED. R. CIV. P. 10. Rather, her complaint consists of a single paragraph which does not provide any context for Judge Polk's alleged misconduct in handling plaintiff's "court proceedings" with "personal afflictions and personal financial endeavors." Compl. at 5. For example, plaintiff does not provide specific dates or information about the purpose of the court proceedings. See *id.* Plaintiff's single paragraph is woefully deficient and "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." *Gonzales*, 167 F.R.D. at 355; see also *Laspisa v. Citifinancial Does 1 to 20*, 269 F. Supp. 3d 11, 13 (N.D.N.Y. 2017) ("A complaint that fails to comply with these Rules presents too heavy a burden for the defendant in shaping a comprehensive defense, provides no meaningful basis for a court to assess the sufficiency of a plaintiff's claims, and may properly be dismissed by the court."), report and recommendation adopted, 2017 WL 3769570 (N.D.N.Y. Aug. 29, 2017).[3] As such, it is recommended that the complaint be dismissed.

**D. Domestic Relations Exception**

**\*3** "It is well-settled that federal courts generally do not have jurisdiction over domestic relations matters, which include divorce, child custody, child support, and alimony." *Walker v. Fam. Ct. Judge Catherine Cholakis*, No. 1:19-CV-1288 (LEK/CFH), 2020 WL 3503158, at \*4 (N.D.N.Y. June 29, 2020) (citing *Marshall v. Marshall*, 547 U.S. 293, 294-95 (2006)). "This policy exception exists because the states

have developed competence and expertise in adjudicating marital and custody disputes, a skill that the federal courts traditionally lack." Id. "Claims that: (1) attempt to 'rewrit[e] a domestic dispute as a tort claim for monetary damages[ ]'; or (2) allege constitutional violations but whose injuries 'stem directly from the disputed family court decision,' will be barred under the domestic relations exception." Id. (quoting Schottel v. Kutyba, No. 06-1577-CV, 2009 WL 230106, at *6 (2d Cir. Feb. 2, 2009) (summary order); Amato v. McGinty, No. 17-CV-593 (MAD/ATB), 2017 WL 4083575, at *5 (N.D.N.Y. Sep. 15, 2017)).

Plaintiff has not provided any specific information in her complaint about the actions that Judge Polk allegedly took that violated plaintiff's due process rights. See generally Compl. She states that some of her alleged injuries include "psychological damages to [her] children[.]" Id. at 6. To the extent plaintiff's complaint alludes to this Court's review of Judge Polk's Family Court orders concerning plaintiff's children, such a claim for money damages is barred under the domestic relations exception. See Walker, 2020 WL 3503158, at *5 (citing Amato, 2017 WL 4083575, at *5) ("[A]lthough [the] plaintiffs alleged that the 'order and processes' of the family court were unconstitutional, the domestic relations exception applied because plaintiff's injuries 'stem[med] directly' from the disputed family court custody decision."). To the extent plaintiff briefly mentions "intentional tort" "[t]his Court recently clarified that state courts are better suited to adjudicate tort claims that 'begin and end in a domestic dispute.' " Id. (quoting Dodd v. O'Sullivan, 19-CV-560, 2019 WL 2191749, at *4 (N.D.N.Y. May 21, 2019)), report and recommendation adopted, 2020 WL 204253 (N.D.N.Y. Jan. 14, 2020). Thus, it appears that this Court may lack subject matter jurisdiction over plaintiff's complaint. However, plaintiff has not provided sufficient information for the undersigned to confidently conclude whether the Court has subject matter jurisdiction over any purported constitutional claim pursuant to 42 U.S.C. § 1983. As such, the undersigned does not recommend dismissing on subject matter jurisdiction grounds but based on the defendants' immunity from suit.

### E. Sovereign and Judicial Immunities

The complaint must be dismissed because the Schenectady County Family Court and Judge Polk are immune from suit. The Second Circuit has ruled that "the New York State Unified Court System is unquestionably an arm of the State,

and is entitled to Eleventh Amendment sovereign immunity." Gollomp v. Spitzer, 568 F.3d 355, 366 (2d Cir. 2009). This Court has explained that "[t]he Schenectady County Family Court is a part of the New York State Unified Court System and is entitled to sovereign immunity." Vazquez v. New York, No. 1:22-CV-196 (GTS/CFH), 2022 WL 2390248, at *5 (N.D.N.Y. June 30, 2022), report and recommendation adopted sub nom. Vazquez Carbuccia v. New York, 2022 WL 3100553 (N.D.N.Y. Aug. 4, 2022) (citation omitted). Similarly, judges within the New York State Unified Court System are entitled to Eleventh Amendment immunity to the extent they are sued in their official capacity. See Aron v. Becker, 48 F. Supp. 3d 347, 366 (N.D.N.Y. 2014) (dismissing claim against a Delaware County judge on sovereign immunity grounds). As the Schenectady County Family Court and Judge Polk are arms of the State, they are entitled to Eleventh Amendment immunity, and it is recommended that the complaint against them be dismissed with prejudice.

**\*4** The complaint against Judge Polk is also subject to dismissal on judicial immunity grounds. It is well settled that judges have absolutely immunity for their judicial acts performed in their judicial capacities. See Mireles v. Waco, 502 U.S. 9, 11 (1991); Forrester v. White, 484 U.S. 219, 225 (1988); Bliven v. Hunt, 579 F.3d 204, 209 (2d Cir. 2009). "Judicial immunity applies even when the judge is accused of acting maliciously or corruptly." Coon v. Merola, No. 1:19-CV-394 (DNH/ATB), 2019 WL 1981416, at *3 (N.D.N.Y. Apr. 8, 2019) (citing Imbler v. Pachtman, 424 U.S. 409, 419 n.12 (1976))), report and recommendation adopted, 2019 WL 1978595 (N.D.N.Y. May 3, 2019). "The only two circumstances in which judicial immunity does not apply is when he or she takes action 'outside' his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken 'in absence of jurisdiction.' " Id. (quoting Mireles, 502 U.S. at 11-12. Judicial immunity "shields judges from suit to the extent they are sued in their individual capacities[.]" Washington v. Ciccone, No. 3:21-CV-0564 (MAD/ML), 2021 WL 2935950, at *4 (N.D.N.Y. July 13, 2021), report and recommendation adopted, 2021 WL 4859663 (N.D.N.Y. Oct. 19, 2021). "[T]he Eleventh Amendment shields judges from suit to the extent that they are sued in their official capacities." Id.

Plaintiff has not alleged any facts to suggest that Judge Polk was acting outside of her judicial capacity or in the absence

of jurisdiction. See generally Compl. Judge Polk is entitled to absolute judicial immunity from plaintiff's complaint seeking monetary damages. The undersigned, therefore, recommends dismissing the complaint with prejudice because it does not appear from the complaint that sovereign or judicial immunity can be overcome. See Edwardsen v. Aloi, No. 5:17-CV-00202 (LEK/TWD), 2017 WL 1283496, at *3 (N.D.N.Y. Mar. 3, 2017) (recommending dismissal with prejudice on judicial immunity grounds), report and recommendation adopted, 2017 WL 1283763 (N.D.N.Y. Apr. 5, 2017).

### F. Statute of Limitations

It is also possible that plaintiff's complaint is barred by the statute of limitations. "[ ] Section 1983 actions in New York are subject to a three-year statute of limitations, running from the time a plaintiff knows or has reason to know of the injury giving rise to the claim." Milan v. Wertheimer, 808 F.3d 961, 963 (2d Cir. 2015) (internal quotations and citations omitted). To the extent plaintiff states that Judge Polk's conduct began in 2016, plaintiff would have three years from the time she knew or had reason to know of the injury to file her complaint, which would be sometime in 2019. Plaintiff did not bring this action until April 2022. See Compl. As such her claims stemming from Jude Polk's actions in 2016 are likely time-barred.

"The continuing violation doctrine, where applicable, provides an 'exception to the normal knew-or-should-have-known accrual date.' " Gonzalez v. Hasty, 802 F.3d 212, 220 (2d Cir. 2015) (quoting Harris v. City of New York, 186 F.3d 243, 248 (2d Cir. 1999)). "It applies to claims 'composed of a series of separate acts that collectively constitute one unlawful [ ] practice.' " Id. (quoting Washington v. Cnty. of Rockland, 373 F.3d 310, 318 (2d Cir. 2004) (brackets in original) (further internal quotation omitted)). "The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a 'serial violation[ ],' but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." Id. (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111 (2002)). Plaintiff has not alleged sufficient information for the undersigned to determine whether the continuing violations doctrine would apply. See generally Compl. Nevertheless, dismissal is warranted under Rules 8

and 10 of the Federal Rules of Civil Procedure and judicial and Eleventh Amendment immunity.

### III. Opportunity to Amend

**\*5** Generally, a court should not dismiss a complaint without granting leave to amend "at least once" "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Branum v. Clark, 927 F.2d 698, 704-05 (2d Cir. 1991). "[A]n opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile." Trombley v. O'Neill, 929 F. Supp. 2d 81, 106 (N.D.N.Y. 2013).

Often, when a complaint is dismissed for failure to sufficiently plead a claim pursuant to Rules 8 and 10, it is dismissed without prejudice and the plaintiff is afforded an opportunity to amend his or her complaint. See, e.g., Tasciotti v. Haffmans, No. 1:22-CV-00238 (DNH/TWD), 2022 WL 958094, at *3 (N.D.N.Y. Mar. 30, 2022) ("[C]onsidering their pro se status, the Court further recommends [the p]laintiffs be given an opportunity to amend the complaint to comply with the basic pleading requirements set forth above."), report and recommendation adopted, 2022 WL 1203073 (N.D.N.Y. Apr. 22, 2022). Similarly, dismissals for lack of subject matter jurisdiction are dismissed without prejudice. See Katz v. Donna Karan Co., L.L.C., 872 F.3d 114, 116 (2d Cir. 2017) ("[A] complaint must be dismissed without prejudice where the dismissal is due to the court's lack of subject matter jurisdiction[.]"). It is not clear whether the Court has subject matter jurisdiction over plaintiff's purported due process claim because of the lack of context in her complaint; however, because the Schenectady County Family Court and Judge Polk are immune from suit, the undersigned recommends dismissing the complaint with prejudice and without leave to amend. See Johnson v. Bieling, No. 5:20-CV-1124 (GTS/ML), 2021 WL 1841470, at *12 (N.D.N.Y. Jan. 6, 2021) (collecting cases dismissing with prejudice and without leave to amend on judicial immunity grounds), report and recommendation adopted, 2021 WL 1840591 (N.D.N.Y. May 7, 2021); see also Edwardsen, 2017 WL 1283496, at *3. [4]

### IV. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's application to proceed in forma pauperis (Dkt. No. 1) is **GRANTED** for purposes of filing only; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 2) be **DIMISSED WITH PREJUDICE and WITHOUT LEAVE TO AMEND**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).[5]

**All Citations**

Slip Copy, 2022 WL 16966549

## Footnotes

1    Plaintiff is advised that although she has been granted IFP status, she is still required to pay any fees and costs she may incur in this action.

2    The language of 1915 suggests an intent to limit availability of IFP status to prison inmates. See 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. See, e.g., Fridman v. City of N.Y., 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

3    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

4    The undersigned notes that plaintiff has a history of filing pro se complaints in the District of Columbia, Southern District of New York, and Northern District of New York. See Dickson v. Mitta et al., 1:22-CV-437 (DNH/CFH), Dkt. No. 4 at 21, n.9 (collecting cases) (recommending dismissal of plaintiff's complaint for failure to establish subject matter jurisdiction or state a claim for relief, and on statute of limitation and immunity grounds).

5    If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

2021 WL 1841470
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Marsheem JOHNSON, Plaintiff,

v.

D. BIELING, Onondaga County Sheriff's Officer;
S. Mollica, Onondaga County Sheriff's Officer;
J.M. Young, Sgt.; August Nordon, Public Defender;
Burnettii, Onondaga County Supreme Court Judge;
Celie, Onondaga County Drug Court Judge; and
Clifton Cardan, Public Defender, Defendants.

5:20-CV-1124 (GTS/ML)
|
Signed 01/06/2021

**Attorneys and Law Firms**

MARSHEEM JOHNSON, Plaintiff, Pro Se, Collins
Correctional Facility, Post Office Box 340, Collins, New York
14034.

**ORDER and REPORT-RECOMMENDATION**

Miroslav Lovric, U.S. Magistrate Judge

**I. INTRODUCTION**

 **\*1** The Clerk has sent this *pro se* complaint (Dkt. No.
1) together with an amended application to proceed *in
forma pauperis* (Dkt. No. 5) filed by Marsheem Johnson
("Plaintiff") to the Court for review. For the reasons
discussed below, I grant Plaintiff's amended *in forma pauperis*
application (Dkt. No. 5) and recommend that Plaintiff's
Complaint be dismissed in part with leave to amend, and in
part without leave to amend.

**II. BACKGROUND**

On July 2, 2020, Plaintiff commenced a *pro se* habeas corpus
action in the Northern District of New York, No. 9:20-
CV-0836 (MAD) ("*Johnson I*"), which is currently pending.
(*Johsnon I*, Dkt. No. 1.)

On September 17, 2020, Plaintiff commenced this action
(*Johnson II*) by the filing of a verified Complaint. (Dkt. No.
1.) The Complaint asserts that it is "amending [Plaintiff's]
complaint to docket # 9:20-CV-0836." (Dkt. No. 1 at 2.)

However, construed as liberally [1] as possible, the Complaint
alleges that Plaintiff's civil rights were violated by the
following seven Defendants: (1) D. Bieling, Onondaga
County Sheriff's Officer; (2) S. Mollica, Onondaga County
Sheriff's Officer; (3) J.M. Young, Sgt.; (4) August
Nordon, Public Defender; (5) Burnettii, Onondaga County
Supreme Court Judge; [2] (6) Celie, Onondaga County Drug
Court Judge; [3] and (7) Clifton Cardan, Public Defender
(collectively "Defendants"). (*See generally* Dkt. No. 1.)

More specifically, the Complaint alleges that on June 2, 2016,
Plaintiff exited the 7-Eleven on North Salina Street and was
walking down the street, when Defendant Bieling "jumped
out of his patrol car with his taser in hand" and ordered
Plaintiff to get on his knees and put his hands on his head.
(Dkt. No. 1 at 6.) Plaintiff alleges that Defendant Mollica
"flew through the parking lot of N. Salina and Cour[t] St ...
jumped out of his unmarked car and placed" handcuffs on
Plaintiff and did not read Plaintiff any *Miranda* warnings. (*Id.*
at 13.) Plaintiff alleges that he was not provided with a search
warrant for his person but that Defendant Bieling pat searched
him, took everything out of his pockets, and Defendant
Mollica "yanked the back of [Plaintiff's] pants." (*Id.* at
6-7, 13.) Plaintiff alleges that Defendant Bieling "unbuckled
[Plaintiff's] pants in public and (sexually assaulted [Plaintiff])
by grabbing [Plaintiff] by the groin area." (*Id.* at 7.) Plaintiff
alleges that he was then placed in the back of a patrol vehicle
and booked at the Onondaga County Justice Center. (*Id.*)

 **\*2** Plaintiff alleges that Defendant Young "signed off on the
police report without a search warrant." (*Id.* at 7-8.)

Plaintiff alleges that Defendant Nordon was assigned to
represent him with respect to the pending criminal charges.
(*Id.* at 8.) Plaintiff further alleges that Defendant Nordon did
not inform Plaintiff of his options, never explained the weight
of the drugs, the quantity of the drugs, whether the drugs
were real or fake, did not produce a test report on the drugs,
and did not consider Plaintiff's defense that he was illegally
searched. (*Id.*) Plaintiff alleges that Defendant Nordon waived
Plaintiff's right to a preliminary hearing without Plaintiff's
consent, entered a plea agreement on Plaintiff's behalf in drug
court, and Plaintiff "never [saw] or heard from [Defendant
Nordon] again." (*Id.*)

Plaintiff alleges that in July 2016, after being held at the
Onondaga County Jail for fifty-five days, he filed a motion

pursuant to 🚩 N.Y. Crim. Proc. Law § 190.80, before Defendant Burnettii. (*Id.* at 8.) Plaintiff alleges that in July 2016, he was brought before Defendant Burnettii, who informed him that Defendant Nordon had passed away and denied Plaintiff's motion pursuant to 🚩 N.Y. Crim. Proc. Law § 190.80. (*Id.* at 8-9.)

Plaintiff alleges that in September 2016, Defendant Cardan was assigned to represent him with respect to the pending criminal charges. (*Id.* at 9.) Plaintiff alleges that Defendant Cardan "never took the time to look into [Plaintiff's] case," failed to provide Plaintiff with documents establishing the weight, quantity, or quality of the drug he allegedly possessed, and did not pursue Plaintiff's defenses that he was being improperly held without an indictment, was illegally searched, and was sexually assaulted by officers. (*Id.*.) Moreover, Plaintiff alleges that Defendant Cardan failed to advise him of his options and "forced" Plaintiff into signing the drug court agreement. (*Id.*.)

Plaintiff alleges that on September 19, 2017, Defendant Celie sentenced him to a term of three years-incarceration and two years post-release supervision. (*Id.* at 10.) Plaintiff alleges that Defendant Celie knew that the Onondaga County Sheriff's Department officers "grabbed [Plaintiff] by the [ ]groin area[,] ... there was never a [ ]search warrant[ ] produce[d], ... [Plaintiff] was never read [his] [ ]Miranda rights[ ] while being [ ]handcuffed[ ], ... there was no [ ]indictment[ ], ... there was never a [ ]test result[ ] produce[d] [ ]showing or stating[ ] the [ ]weight[ ] ... of the drug [Plaintiff] was allege[d to have] possessed." (*Id.* at 10.)

Based on these factual allegations, Plaintiff asserts the following seven causes of action: (1) a claim that Defendants violated his right to due process pursuant to the Fourteenth Amendment and 🚩 42 U.S.C. § 1983; (2) a claim that Defendants violated his right to equal protection, pursuant to the Fourteenth Amendment and 🚩 42 U.S.C. § 1983; (3) a claim of false arrest, pursuant to the Fourth Amendment and 🚩 42 U.S.C. § 1983; (4) a claim of excessive force, pursuant to the Fourth Amendment and 🚩 42 U.S.C. § 1983; (5) a claim of failure to intervene, pursuant to the Fourth Amendment and 🚩 42 U.S.C. § 1983; (6) a claim that Defendants illegally searched and seized him, in violation of the Fourth Amendment and 🚩 42 U.S.C. § 1983; and

(7) a claim of malicious prosecution, pursuant to the Fourth Amendment and 🚩 42 U.S.C. § 1983. (Dkt. No. 1 at 6.)

**\*3** As relief, Plaintiff seeks $805,000.00 in damages (based on a demand for $115,000.00 in damages per claim). (Dkt. No. 1 at 13.)

## III. PLAINTIFF'S AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"🚩 28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, 09-CV-1922, 2010 WL 5185047, at \*1 (S.D.N.Y. Oct. 26, 2010).[4] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Cash*, 2010 WL 5185047, at \*1 (citing 🚩 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

Upon review, the Court finds that Plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility (Dkt. No. 5), and which demonstrates economic need. *See* 🚩 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization required in the Northern District. (Dkt. No. 6.)

Accordingly, Plaintiff's amended application to proceed with this action IFP is granted. (Dkt. No. 5.)

## IV. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

Having found that Plaintiff meets the financial criteria for commencing this action *in forma pauperis*, and because Plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the Complaint in light of 🚩 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A(a). 🚩 Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that — ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks

monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [5]

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a government entity or officer or employee of a government entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curium) (noting that Section 1915A applies to all actions brought by prisoners against governmental officials even when plaintiff paid the filing fee).

**\*4** Additionally, when reviewing a complaint, a court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the

defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

## V. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

### A. Claims Against Defendants Burnettii and Celie

Plaintiff's Complaint appears to assert claims against Defendants Burnettii and Celie in their individual and official capacities, for actions they allegedly took in their positions as Onondaga County Supreme Court Judge and Onondaga County Drug Court, respectively. (Dkt. No. 1 at 3.)

It is well settled that "officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999); *see also Mireles v. Waco*, 502 U.S. 9, 9-10 (1991) (citations omitted) ("A long line of this Court's precedents acknowledges that, generally, a judge is immune from a suit for money damages. Although unfairness and injustice to a litigant may result on occasion, 'it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.'"); *Mahapatra v. Comstock*, 97-CV-7129, 1998 WL 88054, at \*1 (2d Cir. Feb. 26, 1998) ("[T]he district court properly dismissed the claims for damages based on absolute immunity. Judges are shielded from liability for civil damages for judicial acts performed in their judicial capacities."); *McKnight v. Middleton*, 699 F. Supp. 2d 507, 523 (E.D.N.Y. 2010) ("It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions."). This immunity applies to state court judges who are sued in federal court. *Pizzolato v. Baer*, 551 F. Supp. 355, 356 (S.D.N.Y. 1982), *aff'd sub nom. Pizzolato v. City of New York*, 742 F.2d 1430 (2d Cir. 1983). "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he

has acted in the clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349, 357 (1978).

**\*5** Plaintiff's allegations regarding Defendants Burnettii and Celie appear to relate to actions they took as judges, while presiding over Plaintiff's state criminal proceedings. (*See generally* Dkt. No. 1.) The Complaint is devoid of facts plausibly suggesting that Defendants Burnettii or Celie took any action as an individual, and therefore also fails to allege that either acted in the clear absence of all jurisdiction. As a result, I recommend that the claims against Defendants Burnettii and Celie be dismissed in their entirety based on the doctrine of absolute judicial immunity.

### B. Claims Against Defendants Nordon and Cardan

"To state a claim under § 1983, a plaintiff must allege (1) the deprivation of a right secured by the Constitution or laws of the United States (2) which has taken place under color of state law." *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982)). "However, it is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983." *Rodriguez*, 116 F.3d at 65-66 (citing *Housand v. Heiman*, 594 F.2d 923, 924-25 (2d Cir. 1979) (per curiam); *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981) (public defenders do not act under color of state law)). Moreover, "[p]rivate attorneys are generally not 'state actors' for purposes of § 1983." *O'Donoghue v. United States Soc. Sec. Admin.*, 828 F. App'x 784, 787 (2d Cir. 2020) (citing *Rodriguez*, 116 F.3d at 65-66); *see Szymonik v. Connecticut*, 807 F. App'x 97, 102 (2d Cir. 2020) (holding that the defendant, "as a private attorney, was not a state actor; that he was licensed by the state to practice law does not render him a state actor."); *Caldwell v. Barrier*, 19-CV-1516, 2020 WL 918717, at \*3 (N.D.N.Y. Feb. 26, 2020) (Hummel, M.J.) ("Private attorneys, whether court appointed or privately retained, are not liable under 42 U.S.C. § 1983."), *report and recommendation adopted by* 2020 WL 1904034 (N.D.N.Y. Apr. 17, 2020) (Sannes, J.).

The allegations in the Complaint fail to allege facts plausibly alleging that Defendants Nordon and Cardan were state actors subject to liability pursuant to 42 U.S.C. § 1983.

As a result, I recommend dismissal of the claims against Defendants Nordon [6] and Cardan with prejudice.

### C. Claims Against Defendants Bieling, Mollica, and Young

After carefully considering the matter, I recommend that Plaintiff's claims for violation of his right to due process, violation of the equal protection clause, and malicious prosecution against Defendants Bieling, Mollica, and Young in their individual capacities be dismissed without prejudice as premature pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), because they seek to impugn the validity of his underlying state court criminal proceeding. In addition, I recommend that Plaintiff's claims for false arrest, excessive force, failure to intervene, and unlawful search and seizure against Defendants Bieling, Mollica, and Young in their individual capacities be dismissed because they are untimely. Moreover, I recommend that Plaintiff's claims against Defendants Bieling, Mollica, and Young in their official capacities be dismissed with prejudice.

#### 1. Individual Capacity Claims

**\*6** "A claim for damages [that would necessarily imply the invalidity of a plaintiff's state court] conviction or sentence that has *not* been so invalidated is not cognizable under § 1983." *Heck*, 512 U.S. at 486-87. In *Covington v. City of New York*, the Second Circuit held that "if success on a § 1983 claim would necessarily impugn the validity of a conviction in a pending criminal prosecution, such a claim *does not accrue* so long as the potential for a judgment in the pending criminal prosecution continues to exist." *Covington v. City of New York*, 171 F.3d 117, 124 (2d Cir. 1999).

In contrast, the Supreme Court held in *Wallace v. Kato*, 549 U.S. 384 (2007), that the statute of limitations for a false arrest claim begins to accrue "when legal process was initiated." *Wallace*, 549 U.S. at 390. "Following *Wallace*, several Courts have applied that same analysis for Fourth

Amendment claims based on events occurring 'between an unlawful arrest and the institution of legal process.' " *Nussbaumer v. Nesbitt*, 11-CV-6331, 2011 WL 4828844, at *1 (W.D.N.Y. Oct. 7, 2011) (citing *Mondragon v. Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008); *see Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) ("Fourth Amendment claims for false arrest or unlawful searches accrue at the time of (or termination of) the violation."); *Johnson v. Dossey*, 515 F.3d 778, 781-82 (7th Cir. 2008) (distinguishing between claims that accrue when a litigant first appears before a magistrate, controlled by *Wallace*, and claims that arise during the legal process (controlled by *Heck*)); *Mallard v. Potenza*, 94-CV-0223, 2007 WL 4198246, at *3 (E.D.N.Y. Nov. 21, 2007) (seeing no reason to distinguish between false arrest and search and seizure claims; "*Wallace* applies with equal force to a claim for an illegal search and seizure.")).

### a. *Heck* Delayed Accrual Claims

I recommend that Plaintiff's claims for violation of his right to due process, violation of his right to equal protection, and malicious prosecution be dismissed without prejudice as premature pursuant to *Heck* because they seek to impugn the validity of his underlying state court criminal proceeding. *See McDonough v. Smith*, 139 S. Ct. 2149, 2156-57 (2019) (holding that the plaintiff could not bring a "fabricated-evidence claim under § 1983 prior to favorable termination of his prosecution" because a fabricated-evidence claim is most analogous to the tort of malicious prosecution, which also only accrues after the plaintiff prevailed in the underlying criminal proceeding); *Roberties v. Huff*, 11-CV-0521, 2012 WL 1113479, at *4 (W.D.N.Y. Mar. 30, 2012) (dismissing as premature, pursuant to *Heck*, due process, conspiracy to prosecute, obstruction of justice, fabrication of evidence, and equal protection claims related to the plaintiff's conviction); *Nussbaumer*, 2011 WL 4828844, at *1 (dismissing as premature, pursuant to *Heck*, due process, equal protection, malicious prosecution, and access to the courts claims related to the plaintiff's conviction); *Harris v. Buffardi*, 08-CV-1322, 2011 WL 3794235, at *10 (N.D.N.Y. Aug. 24, 2011) (Sharpe, J.) (where plaintiff's conviction had not been overturned or otherwise invalidated, his claims for "violation of his due process rights, fabrication of evidence, obstruction of justice, bad faith inadequate investigation, and §§ 1983

and 1985 conspiracy—all of which are patent attacks on the validity of his conviction—[were] barred.").

In the alternative, I recommend dismissal of Plaintiff's malicious prosecution claim for failure to state a claim.

**\*7** To state a claim for malicious prosecution pursuant to 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting the following four elements: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as motivation for defendant's actions. *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 604 (E.D.N.Y. 2017) (citing *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010)).

With regard to the second element, "it must be alleged that the prosecution is at an end, either by alleging that defendant was acquitted of the charge, or by alleging facts showing the legal termination of the prosecution complained of, in favor of defendant, prior to the commencement of the action." *Carpenter v. Nutter*, 127 Cal. 61, 63 (1899); *see also Wallace*, 549 U.S. at 392. "Proceedings are 'terminated in favor of the accused' only when their final disposition is such as to indicate the accused is not guilty." *DiBlasio v. City of New York*, 102 F.3d 654, 658 (2d Cir. 1996); *see also Spak v. Phillips*, 857 F.3d 458, 462 (2d Cir. 2017) ("A 'favorable termination' does not occur until the prosecution against the plaintiff has 'conclusively' ended."). A reversal of a criminal conviction and remand for a new trial does not constitute such a termination. *DiBlasio*, 102 F.3d at 658 (citing *Russell v. Smith*, 68 F.3d 33, 36-37 (2d Cir. 1995)); *accord Poventud v. City of New York*, 750 F.3d 121, 130-31 (2d Cir. 2014) (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)) ("[U]nder the common law any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action.").

Plaintiff alleges that on September 19, 2017, Defendant Celie sentenced him to a term of three years incarceration, and two years post-release supervision. (Dkt. No. 1 at 10.)

Thus, Plaintiff has not alleged that the criminal proceeding terminated in his favor. (*Id.*) It is not clear based on the allegations of the Complaint whether Plaintiff sought to appeal his criminal conviction. (Dkt. No. 1 at 9-10 [alleging that Plaintiff was "forced to sign the drug court agreement ... [and] that by signing the agreement ... [he] will not have the [ ]right[ ]s[ ] to appeal."].) However, Plaintiff has not alleged that his conviction has been overturned and finally disposed of, such that the charges cannot be brought against him again. As a result, I recommend that Plaintiff's malicious prosecution claim be dismissed without prejudice.

### b. Untimely Claims

The statute of limitations for a 🚩 § 1983 action accruing in New York is three years. *See Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009).* Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know the injury which is the basis of his action." 🚩 *Covington v. New York, 171 F.3d 117, 121 (2d Cir. 1999)* (quoting 🚩 *Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980)); see Fahs Constr. Grp., Inc. v. Gray, 725 F.3d 289, 292 (2d Cir. 2013)* (per curiam) (citing 🚩 *Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002))* (a claim for equal protection accrues "when the plaintiff knew or should have known of the disparate treatment.").

**\*8** Although the statute of limitations is an affirmative defense, where it is clear from the face of the complaint that a claim is barred by the applicable statute of limitations, the claim is subject to dismissal for failure to state a claim on 🚩 28 U.S.C. § 1915(e)(2)(B) review. *See 🚩 Pino v. Ryan, 49 F.3d 51, 53 (2d Cir. 1995)* (holding that a complaint can be dismissed on initial review based on a defense that appears on the face of the complaint); *Syfert v. City of Rome,* 17-CV-0578, 🚩 *2018 WL 3121611, at \*3-5 (N.D.N.Y. Feb. 12, 2018)* (Dancks, M.J.) (dismissing all claims barred by the statute of limitations on initial review pursuant to 🚩 28 U.S.C. § 1915(e)(2)(B)); *Syfert v. City of Rome,* 17-CV-0578, 🚩 *2017 WL 3405521, at \*8-10 (N.D.N.Y. Aug. 7, 2017)* (Dancks, M.J.) (same); *Syfert v. City of Rome,* 15-CV-1149, 🚩 *2015 WL 6819168, at \*7-8 (N.D.N.Y. 2015)* (Baxter, M.J.) (same).

### i. False Arrest

As set forth above in Part V.C.1. of this Order and Report-Recommendation, the statute of limitations for a false arrest claim begins to accrue "when legal process was initiated." 🚩 *Wallace, 549 U.S. at 390.* According to the Complaint, legal process was initiated against Plaintiff in June 2016. (Dkt. No. 1 at 7-8.) Thus, the statute of limitations for Plaintiff's false arrest claim expired three years later, in June 2019. Plaintiff commenced this action more than one year later, on August 28, 2020. [7] As a result, I recommend that Plaintiff's false arrest claims against Defendants Bieling, Mollica, and Young in their individual capacities be dismissed as time-barred. [8]

In the alternative, I recommend dismissal of Plaintiff's false arrest claims against Defendants Bieling, Mollica, and Young in their individual capacities for failure to state a claim.

"A 🚩 § 1983 claim for false arrest, which derives from an individual's right under the Fourth Amendment to be free from unreasonable seizures, including arrest without probable cause, *see, e.g.,* 🚩 *Lennon v. Miller, 66 F.3d 416, 423 (2d Cir. 1995),* is substantially the same as a claim for false arrest under New York law." *Kates v. Greece Police Dep't,* 16-CV-6554, 🚩 2017 WL 11548970, at \*3 (W.D.N.Y. Feb. 21, 2017) (citing 🚩 *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996);* 🚩 *Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991)).* "Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Hernandez v. United States, 939 F.3d 191, 199 (2d Cir. 2019)* (quoting 🚩 *McGowan v. United States, 825 F.3d 118, 126 (2d Cir. 2016)* (per curium)).

"Probable cause 'is a complete defense to an action for false arrest' brought under New York law or 🚩 § 1983." *Kates, 2017 WL 11548970, at \*3* (citing 🚩 *Weyant, 101 F.3d at 852*).

**\*9** "For purposes of the privilege element of a false arrest and imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause."

*De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 759 (N.Y. 2016); *accord* *Marshall v. Sullivan*, 105 F.3d 47, 50 (2d Cir. 1996). "A person who has been convicted of the crime for which he was arrested cannot state a claim for false arrest because his conviction establishes that his confinement was grounded on probable cause; therefore, it was privileged." *Johnson v. Pugh*, 11-CV-0385, 2013 WL 3013661, at *2 (E.D.N.Y. June 18, 2013); *see also* *Marcavage v. City of New York*, 689 F.3d 98, 109-10 (2d Cir. 2012) ("Defendants prevail if there was probable cause to arrest Plaintiff[ ] for any single offense."); *Phelan v. Sullivan*, 541 F. App'x 21, 23-24 (2d Cir. 2013) ("A false arrest claim is defeated by the plaintiff's conviction for the offense for which he was arrested.").

The Complaint alleges that Plaintiff's was convicted and sentenced for his underlying criminal charges. (Dkt. No. 1 at 10.) Thus, his arrest was grounded on probable cause and was privileged. As a result, I recommend that Plaintiff's false arrest claims against Defendants Bieling, Mollica, and Young in their individual capacities be dismissed for failure to state a claim.

### ii. Excessive Force

"The statute of limitations applicable to federal claims of ... excessive force ... is three years." *B. v. City of New York*, 14-CV-1021, 14-CV-1924, 15-CV-0462, 15-CV-0463, 15-CV-0876, 15-CV-1146, 2016 WL 4530455, at *6 (E.D.N.Y. Aug. 29, 2016) (citing *Gilmore v. Goord*, 360 F. Supp. 2d 528, 530 (W.D.N.Y. 2005); *Shomo*, 579 F.3d at 181). "A claim for excessive force accrues when the use of force occurred." *Mitchell v. Kugler*, 07-CV-1801, 2009 WL 160798, at *6 (E.D.N.Y. Jan. 23, 2009).

Construing the Complaint liberally, as the Court must at this juncture, it alleges that Defendants Bieling and Mollica used excessive force while arresting Plaintiff on June 6, 2016. (Dkt. No. 1 at 6-7, 13; Dkt. No. 1, Attach. 1 at 1.) Thus, the statute of limitations for Plaintiff's excessive force claim expired on June 6, 2019. Plaintiff did not commence this action until August 28, 2020.[9] As a result, I recommend dismissal of Plaintiff's excessive force claims against Defendants Bieling, Mollica, and Young[10] in their individual capacities because those claims are untimely.

### iii. Failure to Intervene

"It is widely recognized that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "The statute of limitations for a claim based on failure to intervene accrues when the failure to intervene occurs." *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 303 (N.D.N.Y. 2018) (Suddaby, C.J.) (citing *Roundtree v. City of New York*, 15-CV-6582, 2018 WL 443751, at *3 (S.D.N.Y. Jan. 16, 2018)); *accord Mercano v. City of New York*, 15-CV-3544, 2017 WL 1969676, at *3 (S.D.N.Y. May 12, 2017).

**\*10** Construing the Complaint liberally, as the Court must at this juncture, it alleges that, in the alternative to Plaintiff's excessive force claims against Defendants Bieling and Mollica, they failed to intervene to protect him on June 6, 2016. (Dkt. No. 1 at 6-7, 13; Dkt. No. 1, Attach. 1 at 1.) Thus, the statute of limitations for Plaintiff's failure to intervene claim expired on June 6, 2019. Plaintiff did not initiate this lawsuit until August 28, 2020.[11] As a result, I recommend dismissal of Plaintiff's failure to intervene claims against Defendants Bieling, Mollica, and Young[12] in their individual capacities because they are untimely.

### iv. Unlawful Search and Seizure

The statute of limitations for an unlawful search and seizure claim begins to run when the plaintiff is detained pursuant to legal process. *Hagans v. Nassau Cnty. Police Dep't*, 18-CV-1918, 2020 WL 1289529, at *5 (E.D.N.Y. Mar. 18, 2020) (citing *Mallard v. Potenza*, 94-CV-0223, 2007 WL 4198246, at *5 (E.D.N.Y. Nov. 21, 2007)).

Construing the Complaint liberally, as the Court must at this juncture, it alleges that Defendants Bieling and Mollica unlawfully seized and searched Plaintiff on June 6, 2016. (Dkt. No. 1 at 6-7, 13; Dkt. No. 1, Attach. 1 at 1.) Thus, the statute of limitations for Plaintiff's unlawful search and seizure claim expired on June 6, 2019. Plaintiff did not initiate this lawsuit until August 28, 2020.[13] As a result, I recommend dismissal of Plaintiff's excessive force claims

against Defendants Bieling, Mollica, and Young [14] in their individual capacities because they are untimely.

### 2. Official Capacity Claims

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "New York State has not consented to suit in federal court." *Abrahams v. Appellate Div. of Supreme Court*, 473 F. Supp. 2d 550, 556 (S.D.N.Y. 2007) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977)).

**\*11** Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979). "[C]laims against a government employee in his official capacity are treated as a claim against the municipality," and, thus, cannot stand under the Eleventh Amendment. *Hines v. City of Albany*, 542 F. Supp. 2d 218, 227 (N.D.N.Y. 2008).

As a result, I recommend that all claims against Defendants Bieling, Mollica, and Young in their official capacities be dismissed with prejudice and without leave to amend. *Jackson v. Gunsalus*, 16-CV-0647, 2016 WL 4004612, at \*2 (N.D.N.Y. June 24, 2016) (Dancks, M.J.), *report and recommendation adopted*, 2016 WL 3983635 (July 25, 2016) (Sharpe, J.).

### VI. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with

[the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [15]

For the reasons stated in Section V.C.1.a., I recommend that Plaintiff's claims regarding due process, equal protection, and malicious prosecution "be dismissed without prejudice until and if the conviction is later overturned or vacated." *Kates v. Greece Police Dep't*, 16-CV-6544, 2017 WL 11548969, at \*3 (W.D.N.Y. Nov. 13, 2017).

For the reasons stated in Section V.C.1.b., all of Plaintiff's claims that accrued before August 28, 2017, are barred by the statute of limitations. Nonetheless, a district court typically should not dismiss claims as time-barred without providing a *pro se* plaintiff with "notice and opportunity to be heard" as to whether there might be a meritorious tolling argument or other reason why the complaint might be considered. *See Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007). Therefore, it is recommended that Plaintiff's time-barred claims be dismissed with leave to amend. This by no means suggests that Plaintiff's time-barred claims are meritorious, as it appears very unlikely that Plaintiff can state federal constitutional claims based upon any of the time-barred claims in his complaint.

**\*12** However, I recommend that Plaintiff's claims against Defendants Burnetti and Celie be dismissed with prejudice based on the doctrine of judicial immunity. *See Olszyk v. Thorne*, 20-CV-0445, 2020 WL 5634328, at \*9 (N.D.N.Y. June 17, 2020) (Lovric, M.J.) (recommending dismissal with prejudice, claims against a judge overseeing the plaintiff's parole violation based on the doctrine of judicial immunity), *report and recommendation adopted by* 2020 WL 5633791 (N.D.N.Y. Sept. 21, 2020) (McAvoy, J.); *Wellington v. Foland*, 19-CV-0615, 2019 WL 3315181, at \*11 (N.D.N.Y. July 24, 2019) (Lovric, M.J.) (recommending dismissal with prejudice and without leave to amend, claims against a village court judge based on the doctrine of absolute immunity),

*report and recommendation adopted by,* 2019 WL 6485157 (N.D.N.Y. Dec. 3, 2019) (Suddaby, C.J.); *Brooks v. Ukieley,* 14-CV-6662, 2015 WL 235406, at \*4 (E.D.N.Y. Jan. 16, 2015) (dismissing the plaintiff's claims in their entirety with prejudice against Judges Ukieley and Toomey based on the doctrine of judicial immunity); *Gonzalez v. Sharpe,* 06-CV-1023, 2006 WL 2591065, at \*3 (N.D.N.Y. Sept. 8, 2006) (Scullin, J.) (dismissing without leave to amend, the plaintiff's claims against U.S. District Court Judge Gary L. Sharpe based on the doctrine of judicial immunity).

Moreover, I recommend that Plaintiff's claims against Defendants Nordon and Carden be dismissed with prejudice. *See Giles v. Fitzgerald,* 20-CV-0980, 2020 WL 6287459, at \*10 (N.D.N.Y. Oct. 27, 2020) (Lovric, M.J.) (recommending dismissal with prejudice, claims pursuant to 42 U.S.C. § 1983, against the plaintiff's attorneys in his underlying criminal action); *Caldwell v. Barrier,* 19-CV-1516, 2020 WL 918717, at \*3 (N.D.N.Y. Feb. 26, 2020) (Hummel, M.J.) (dismissing with prejudice, claims against the defendant private attorney, who represented the plaintiff in different case because the defendant was not liable under § 1983), *report and recommendation adopted by* 2020 WL 1904034 (N.D.N.Y. Apr. 17, 2020) (Sannes, J.).

In addition, I recommend that any claims against Defendants Bieling, Mollica, and Young in their official capacities be dismissed with prejudice. *See Giles,* 2020 WL 6287459, at \*11 (recommending dismissal with prejudice, claims for monetary damages against the defendant police officers in their official capacities based on Eleventh Amendment immunity); *Wrobleski v. Miller,* 19-CV-0876, 2019 WL 6496723, at \*9 (N.D.N.Y. Dec. 2, 2019) (Lovric, M.J.) (recommending dismissal with prejudice and without leave to amend, claims against officers in their official capacities pursuant to the doctrine of immunity pursuant to the Eleventh Amendment), *report and recommendation adopted in part and rejected in part on other grounds,* 2020 WL 219221 (N.D.N.Y. Jan. 15, 2020) (Sharpe, J.); *Jackson v. Gunsalus,* 16-CV-0647, 2016 WL 4004612, at \*2 (N.D.N.Y. June 24, 2016) (Dancks, M.J.) (dismissing with prejudice and without leave to amend, claims against police officers in their official capacities based on the doctrine of immunity pursuant to the Eleventh Amendment) *report and recommendation adopted by,* 2016 WL 3983635 (July 25, 2016) (Sharpe, J.).

If Plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides

that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd,* 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry,* 94-CV-1594, 1995 WL 316935, at \*7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**\*13  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's amended IFP application (Dkt. No. 5) is **GRANTED**; and it is further

**ORDERED** that the Clerk of the Court (1) provide the Superintendent of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 6) and notify that official that Plaintiff has filed this action and is required to pay the Northern District of New York the entire statutory filing fee of $350.00 in installments, over time, pursuant to 28 U.S.C. § 1915; and (2) provide a copy of Plaintiff's inmate authorization form (Dkt. No. 6) to the Financial Deputy of the Clerk's Office; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it alleges claims for violation of his right to due process, violation of the equal protection clause, false arrest, excessive force, failure to intervene, unlawful search and seizure, and malicious prosecution against Defendants

Bieling, Mollica, and Young in their individual capacities, pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(a) for failure to state a claim upon which relief may be granted; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it alleges claims against (1) Defendant Burnettii, (2) Defendant Celie, (3) Defendant Nordon, (4) Defendant Carden, and (5) Defendants Bieling, Mollica, and Young in their official capacities, pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim and because those claims seek relief from defendants who are immune from such relief; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [16] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roland v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Slip Copy, 2021 WL 1841470

---

## Footnotes

1   The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994)).

2   The Court notes that Plaintiff likely intended to assert claims against retired New York State Supreme Court Justice Brunetti. However, based on the recommendation *infra* and at this juncture, without additional information from Plaintiff, the Court declines to *sua sponte* amend the caption and will refer to Defendant Burnettii, as alleged by Plaintiff.

3   The Court notes that Plaintiff likely intended to assert claims against Syracuse City Court Judge Cecile. However, based on the recommendation *infra* and at this juncture, without additional information from Plaintiff, the Court declines to *sua sponte* amend the caption and will refer to Defendant Celie, as alleged by Plaintiff.

4   Section § 1915(g) prohibits a prisoner from proceeding *in forma pauperis* where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed Plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. *See* http://pacer.uspci.uscourts.gov. It does not appear from that review that Plaintiff had accumulated three strikes for purposes of 28 U.S.C. § 1915(g) as of the date this action was commenced.

5   To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis in either law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).

6    The Complaint alleges that Defendant Nordon died during his representation of Plaintiff sometime on or before July 2016. (Dkt. No. 1 at 8-9.) To the extent that Plaintiff has any viable claims pursuant to 42 U.S.C. § 1983 against Defendant Nordon, those claims would likely survive Defendant Nordon's death. *See Graham v. Henderson*, 224 F.R.D. 59, 62-63 (2004) (holding that "[b]ecause no court has held that § 1983 retaliation claims do not survive the death of the defendant in New York and further, because no court held that only § 1983 'personal injury' claims survive the death of the defendant, plaintiff's § 1983 retaliation claim survives the death of defendants."). However, a motion pursuant to Fed. R. Civ. P. 25(a) must be filed to substitute the proper party on behalf of Defendant Nordon's estate.

7    Plaintiff's Complaint was filed with the Clerk of the Court on September 17, 2020. (Dkt. No. 1.) However, pursuant to the prison mailbox rule, the Complaint is deemed to have been filed on the date that the Complaint was signed, which was August 28, 2020. *Mayandeunas v. Bigelow*, 18-CV-1161, 2019 WL 3955484, at *4 (N.D.N.Y. Aug. 22, 2019) (Suddaby, C.J.) (holding that "the prisoner's federal court complaint was signed (which, pursuant to the Prison Mailbox Rule, is the date of the filing of the prisoner's court action).").

8    After carefully reviewing the Complaint, the Court discerns no basis to invoke equitable tolling or equitable estoppel in order to salvage what are otherwise untimely claims.

9    *See, supra*, note 7.

10   The Complaint does not contain any facts plausibly alleging that Defendant Young was involved in the use of force on June 6, 2016. (*See generally* Dkt. No. 1.) Instead, the Complaint alleges only that on June 2, 2016, Defendant Young "signed off on the police report without a search warrant produce[d] or without [Plaintiff] being read [his] Miranda rights or that [he] was under arrest until [he] arrived at the county jail." (Dkt. No. 1 at 7-8.) These allegations are insufficient to state a claim for excessive force against Defendant Young. As a result, in the alternative, to the extent that Plaintiff attempts to assert a use of force claim against Defendant Young, I recommend that such claim be dismissed for failure to state a claim.

11   *See, supra*, note 7.

12   To establish a claim of failure to intervene, a plaintiff must prove the following four elements: (1) that a constitutional violation was being committed against the plaintiff; (2) that the officer knew, or deliberately ignored, the fact that the constitutional violation was going to be, or was being, committed; (3) that the defendant had a reasonable opportunity to intervene and prevent the harm; and (4) that the defendant did not take reasonable steps to intervene. *Curley v. Vil. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988); *Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.). As set forth in note 10 *supra*, the Complaint does not allege that Defendant Young was even present for the use of force on June 6, 2016. Thus, the Complaint does not contain facts plausibly alleging that Defendant Young had a reasonable opportunity to intervene during the use of force on June 6, 2016. As a result, in the alternative, to the extent that Plaintiff attempts to assert a failure to intervene claim against Defendant Young, I recommend that such claim be dismissed for failure to state a claim.

13   *See, supra*, note 7.

14   Plaintiff appears to allege that Defendant Young was aware of the unlawful search and seizure when he signed off on the police report. (Dkt. No. 1 at 7-8.) However, it is unclear what police report Defendant Young would have been reviewing on June 2, 2016, which was four days before the alleged incident on June 6,

2016. (*See generally* Dkt. No. 1.) As a result, in the alternative, to the extent that Plaintiff attempts to assert an unlawful search and seizure claim against Defendant Young, I recommend that such claim be dismissed for failure to state a claim.

15    *See also* Carris v. First Student, Inc., 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

16    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1283496
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Evan McCallum EDWARDSEN, Plaintiff,

v.

Judge ALOI, Defendant.

5:17-CV-00202 (LEK/TWD)

|

Signed 03/03/2017

**Attorneys and Law Firms**

EVAN McCALLUM EDWARDSEN, 537 Hickok Avenue,
Syracuse, New York 13206, pro se.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** The Clerk has sent to the Court for initial review the
complaint in this pro se 42 U.S.C. § 1983 civil rights action
brought by Plaintiff Evan McCallum Edwardsen against
Defendant Judge Aloi. (Dkt. No. 1.) Also before the Court is
Plaintiff's application for leave to proceed *in forma pauperis*
("IFP Application") (Dkt. No. 2.)

**I. IFP APPLICATION**

A court may grant *in forma pauperis* status if a party "is
unable to pay" the standard fee for commencing an action.
28 U.S.C. § 1915(a)(1) (2006). After reviewing Plaintiff's
IFP Application (Dkt. No. 2), the Court finds that he meets
the standard and his IPF Application is granted.

**II. LEGAL STANDARDS FOR INITIAL REVIEW**

Even when a plaintiff meets the financial criteria for *in forma
pauperis*, 28 U.S.C. § 1915(e) directs that when a plaintiff
proceeds *in forma pauperis*, "the court shall dismiss the case
at any time if the court determines that ... the action ... (I)
is frivolous or malicious; (ii) fails to state a claim on which
relief may be granted; or (iii) seeks monetary relief against a
defendant who is immune from such relief." 28 U.S.C. §
1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must
look to see whether the complaint lacks an arguable basis
either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319,
325 (1989). "An action is frivolous when either: (1) the factual
contentions are clearly baseless such as when the claims are
the product of delusion or fantasy; or (2) the claim is based
on an indisputably meritless legal theory." *Livingston v.
Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)
(citations and internal quotation marks omitted). Although
extreme caution should be exercised in ordering *sua sponte*
dismissal of a pro se complaint before the adverse party
has been served and the parties have had an opportunity to
respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir.
1983), the court still has a responsibility to determine that a
claim is not frivolous before permitting a plaintiff to proceed.
*See, e.g., Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991)
(per curiam) (holding that a district court has the power to
dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint
must plead enough facts to state a claim that is "plausible
on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 570 (2007). "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable
for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.
662, 678 (2009). While Rule 8(a) of the Federal Rules
of Civil Procedure, which sets forth the general rules of
pleading, "does not require detailed factual allegations, ... it
demands more than an unadorned, the-defendant-harmed-me
accusation." *Id.* In determining whether a complaint states
a claim upon which relief may be granted, "the court must
accept the material facts alleged in the complaint as true and
construe all reasonable inferences in the plaintiff's favor."
*Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994)
(citation omitted). "[T]he tenet that a court must accept as true
all of the allegations contained in a complaint is inapplicable
to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare
recitals of the elements of a cause of action, supported by mere
conclusory statements, do not suffice." *Id.*

**\*2** Where a plaintiff proceeds pro se, the pleadings must be
read liberally and construed to raise the strongest arguments
they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537
F.3d 185, 191 (2d Cir. 2008) (citation omitted). A pro se

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 128 of 185

Edwardsen v. Aloi, Not Reported in Fed. Supp. (2017)

complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III. PLAINTIFF'S COMPLAINT

Plaintiff claims that he was convicted without the right to trial and therefore denied his right to face his accusers. (Dkt. No. 1 at 2, 5.) Plaintiff has alleged that he was injured by retired Judge Aloi's personal bias against him. [1] *Id.* at 5. According to Plaintiff, throughout the proceedings, Judge Aloi trusted the inaccurate information given him by abusive groups and considered what they said to be true. *Id.* Plaintiff knew he had no chance of an impartial judge and would lose his case because of that. *Id.* Plaintiff has alleged that through his lawyer, Judge Aloi stated that if Plaintiff took back his plea of insanity, he would have to plead guilty. *Id.* Plaintiff agreed and signed a no appeal paper at Judge Aloi's request. *Id.* According to Plaintiff, he even stated "he did not throw the fake grenade out the window but dropped it after being told to throw it." *Id.* Plaintiff contends that Judge Aloi trusted the evidence from abusive groups without a trial whereas without a trial Plaintiff's information was considered false." *Id.* Plaintiff is seeking compensatory damages in the amount of $1,000.

## IV. ANALYSIS

Plaintiff has not included identifying information on Judge Aloi in his complaint. However, based upon the information provided in the DOCCS inmate lookup site, *see* footnote 1, *supra.*, which reveals that Plaintiff was convicted in Onondaga County in 2012 of placing a false bomb, and the references in Plaintiff's complaint to a fake hand grenade and to Judge Aloi being retired (Dkt. No. 1 at 1, 5), the Court takes judicial notice that Plaintiff intends to bring this action against recently retired Onondaga County Court Judge, the Hon. Anthony F. Aloi.

Under well-settled precedent, Judges have absolute immunity for their judicial acts performed in their judicial capacities.

*Mireles v. Waco*, 502 U.S. 9, 11 (1991); *Forrester v. White*, 484 U.S. 219, 225 (1988); *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009). This absolute "judicial immunity is not overcome by allegations of bad faith or malice," nor can a judge "be deprived of immunity because the action he took was in error ... or was in excess of his authority." *Mireles*, 502 U.S. at 11 (internal quotation marks omitted). The immunity may be overcome only if the court is alleged to have taken nonjudicial actions or if the judicial actions taken were "in the complete absence of jurisdiction." *Id.* at 111-12.

**\*3** The Court finds that Judge Aloi is entitled to absolute judicial immunity with regard to the claims in Plaintiff's complaint. Accordingly, the Court recommends that Plaintiff's complaint be dismissed upon initial review. Inasmuch as it appears from the allegations in the complaint that judicial immunity cannot be overcome by a better pleading, the Court further recommends that the dismissal of Plaintiff's complaint be with prejudice. *See Cuoco*, 222 F.3d at 112.

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**; and it is

**RECOMMENDED** that the complaint (Dkt. No. 1) be **DISMISSED WITH PREJUDICE ON ABSOLUTE JUDICIAL IMMUNITY GROUNDS**.

Pursuant to *28 U.S.C. § 636(b)(1)*, the parties have fourteen days within which to file written objections to the foregoing report. [2] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); *28 U.S.C. § 636(b)(1)*; Fed. R. Civ. P. 72.

## All Citations

Not Reported in Fed. Supp., 2017 WL 1283496

Edwardsen v. Aloi, Not Reported in Fed. Supp. (2017)

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 129 of 185

## Footnotes

1    Plaintiff has not alleged the dates upon which the acts alleged in the complaint occurred. According to the Department of Corrections and Community Supervision ("DOCCS") inmate lookup, Plaintiff was convicted of placing a false bomb, a class E felony and received into the DOCCS system on August 31, 2012. Plaintiff is listed as having been conditionally released to parole on January 15, 2015, and subject to post release supervision until January 15, 2018. *See* http://nysdoccslookup.doccs.ny.gov/ GCA00P00/ WIQ3/WINQ130 (last visited on March 3, 2017).

2    If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1283496
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Evan McCallum EDWARDSEN, Plaintiff,

v.

Judge ALOI, Defendant.

5:17-CV-00202 (LEK/TWD)

|

Signed 03/03/2017

**Attorneys and Law Firms**

EVAN McCALLUM EDWARDSEN, 537 Hickok Avenue, Syracuse, New York 13206, pro se.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** The Clerk has sent to the Court for initial review the complaint in this pro se 42 U.S.C. § 1983 civil rights action brought by Plaintiff Evan McCallum Edwardsen against Defendant Judge Aloi. (Dkt. No. 1.) Also before the Court is Plaintiff's application for leave to proceed *in forma pauperis* ("IFP Application") (Dkt. No. 2.)

**I. IFP APPLICATION**

A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1) (2006). After reviewing Plaintiff's IFP Application (Dkt. No. 2), the Court finds that he meets the standard and his IPF Application is granted.

**II. LEGAL STANDARDS FOR INITIAL REVIEW**

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that ... the action ... (I) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted). Although extreme caution should be exercised in ordering *sua sponte* dismissal of a pro se complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g., Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Id.* In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**\*2** Where a plaintiff proceeds pro se, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted). A pro se

Edwardsen v. Aloi, Not Reported in Fed. Supp. (2017)

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 131 of 185

complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III. PLAINTIFF'S COMPLAINT

Plaintiff claims that he was convicted without the right to trial and therefore denied his right to face his accusers. (Dkt. No. 1 at 2, 5.) Plaintiff has alleged that he was injured by retired Judge Aloi's personal bias against him.[1] *Id.* at 5. According to Plaintiff, throughout the proceedings, Judge Aloi trusted the inaccurate information given him by abusive groups and considered what they said to be true. *Id.* Plaintiff knew he had no chance of an impartial judge and would lose his case because of that. *Id.* Plaintiff has alleged that through his lawyer, Judge Aloi stated that if Plaintiff took back his plea of insanity, he would have to plead guilty. *Id.* Plaintiff agreed and signed a no appeal paper at Judge Aloi's request. *Id.* According to Plaintiff, he even stated "he did not throw the fake grenade out the window but dropped it after being told to throw it." *Id.* Plaintiff contends that Judge Aloi trusted the evidence from abusive groups without a trial whereas without a trial Plaintiff's information was considered false." *Id.* Plaintiff is seeking compensatory damages in the amount of $1,000.

## IV. ANALYSIS

Plaintiff has not included identifying information on Judge Aloi in his complaint. However, based upon the information provided in the DOCCS inmate lookup site, *see* footnote 1, *supra*, which reveals that Plaintiff was convicted in Onondaga County in 2012 of placing a false bomb, and the references in Plaintiff's complaint to a fake hand grenade and to Judge Aloi being retired (Dkt. No. 1 at 1, 5), the Court takes judicial notice that Plaintiff intends to bring this action against recently retired Onondaga County Court Judge, the Hon. Anthony F. Aloi.

Under well-settled precedent, Judges have absolute immunity for their judicial acts performed in their judicial capacities.

*Mireles v. Waco*, 502 U.S. 9, 11 (1991); *Forrester v. White*, 484 U.S. 219, 225 (1988); *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009). This absolute "judicial immunity is not overcome by allegations of bad faith or malice," nor can a judge "be deprived of immunity because the action he took was in error ... or was in excess of his authority." *Mireles*, 502 U.S. at 11 (internal quotation marks omitted). The immunity may be overcome only if the court is alleged to have taken nonjudicial actions or if the judicial actions taken were "in the complete absence of jurisdiction." *Id.* at 111-12.

**\*3** The Court finds that Judge Aloi is entitled to absolute judicial immunity with regard to the claims in Plaintiff's complaint. Accordingly, the Court recommends that Plaintiff's complaint be dismissed upon initial review. Inasmuch as it appears from the allegations in the complaint that judicial immunity cannot be overcome by a better pleading, the Court further recommends that the dismissal of Plaintiff's complaint be with prejudice. *See Cuoco*, 222 F.3d at 112.

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**; and it is

**RECOMMENDED** that the complaint (Dkt. No. 1) be **DISMISSED WITH PREJUDICE ON ABSOLUTE JUDICIAL IMMUNITY GROUNDS**.

Pursuant to *28 U.S.C. § 636(b)(1)*, the parties have fourteen days within which to file written objections to the foregoing report.[2] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); *28 U.S.C. § 636(b)(1)*; Fed. R. Civ. P. 72.

## All Citations

Not Reported in Fed. Supp., 2017 WL 1283496

Edwardsen v. Aloi, Not Reported in Fed. Supp. (2017)

Case 1:22-cv-00983-GTS-ML     Document 6     Filed 02/07/23     Page 132 of 185

## Footnotes

1       Plaintiff has not alleged the dates upon which the acts alleged in the complaint occurred. According to the
        Department of Corrections and Community Supervision ("DOCCS") inmate lookup, Plaintiff was convicted of
        placing a false bomb, a class E felony and received into the DOCCS system on August 31, 2012. Plaintiff
        is listed as having been conditionally released to parole on January 15, 2015, and subject to post release
        supervision until January 15, 2018. *See* http://nysdoccslookup.doccs.ny.gov/ GCA00P00/ WIQ3/WINQ130
        (last visited on March 3, 2017).

2       If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three
        additional days will be added to the fourteen-day period, meaning that you have seventeen days from the
        date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P.
        6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is
        extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 16961389
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Simone M. DICKSON, Plaintiff,

v.

SCHENECTADY FAMILY
COURT and Jill S. Polk, Defendants.

1:22-CV-499
|
Signed November 16, 2022

**Attorneys and Law Firms**

SIMONE M. DICKSON, Plaintiff, Pro Se, P.O. Box 177,
South Hampton, NY 11946.

## ORDER ON REPORT & RECOMMENDATION

DAVID N. HURD, United States District Judge

 **\*1**  On April 5, 2022, *pro se* plaintiff Simone M. Dickson
("plaintiff") filed this civil rights action in the U.S. District
Court for the Southern District of New York alleging
defendants violated "m[a]nipulated [her] situation as well
as shown misconduct through animosity with [her] court
proceedings because of personal afflictions and personal
financial endeavors." Dkt. No. 2. Along with her complaint,
plaintiff sought leave to proceed *in forma pauperis* ("IFP
Application"). Dkt. No. 1.

On May 6, 2022, Chief U.S. District Judge Laura Taylor
Swain ordered plaintiff's complaint transferred to the
Northern District of New York. Dkt. No. 3. As Chief Judge
Swain explained, plaintiff resides in the Northern District of
New York and all of the events giving rise to her claims
took place there. *Id.* Accordingly, the Clerk of Court for the
Southern District of New York transferred the matter to this
judicial district. Dkt. No. 4.

On October 27, 2022, U.S. Magistrate Judge Christian F.
Hummel granted plaintiff's IFP Application for the limited
purpose of filing and advised by Report & Recommendation
("R&R") that plaintiff's complaint be dismissed with
prejudice and without leave to amend. Dkt. No. 6.

As Judge Hummel explained, even broadly construed the
complaint was "woefully deficient" and totally devoid of
"specific dates or information about the purpose of the court
proceedings" she sought to challenge. Dkt. No. 6.

Even assuming otherwise, Judge Hummel observed that any
cognizable claims based on plaintiff's factual allegations—
which involve a state family court dispute—would be barred,
either by the domestic relations exception or by sovereign
and judicial immunity. Dkt. No. 6. In the alternative, Judge
Hummel noted that plaintiff's claims would also be barred by
the statute of limitations applicable to civil rights actions in
federal court. *Id.*

Plaintiff has not filed objections, and the time period in which
to do so has expired. *See* Dkt. No. 6. Upon review for clear
error, the R&R will be accepted and adopted in all respects.
*See* FED. R. CIV. P. 72(b).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED; and

2. Plaintiff's complaint is DISMISSED with prejudice and
without leave to amend.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 16961389

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4489284
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Temmi KRAMER, et al., Plaintiffs,

v.

Edmund DANE, et al., Defendants.

17-CV-5253 (JFB) (SIL)
|
Signed 09/19/2018

**Attorneys and Law Firms**

Temmi Kramer, Far Rockaway, NY, pro se.

Daniel Scott Hallak, Lori L. Pack, Office of the New York State Attorney General, Hauppauge, NY, Brian J. Davis, Law Office of Brian J. Davis, Nicole Feder, L'Abbate Balkan Colavita & Contini LLP, Garden City, NY, Nancy Tova Sherman, Great Neck, NY, John Mark Zenir, Westbury, NY, for Defendants.

ORDER

Joseph F. Bianco, United States District Judge

**\*1** *Pro se* plaintiffs Temmi Kramer and her son Zachary Kramer [1] bring this action for violations of (1) the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983; (2) 42 U.S.C. § 1985; (3) 42 U.S.C. § 1986; (4) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; and (5) various New York state laws. Plaintiffs' claims arise from a state court divorce proceeding between plaintiff Temmi Kramer and her now ex-husband, David Kramer. In particular, the claims involve a July 2015 Order that awarded custody of Temmi and David Kramer's daughter, R.K., to David Kramer; an October 2015 Order that appointed a receiver to sell marital property; and a June 2017 Order that enjoined Temmi Kramer from interacting with R.K. and suspended child support payments for one of Temmi and David Kramer's sons, J.K.

Most defendants are individuals who were involved in the divorce proceeding, including David Kramer's divorce counsel, the court-appointed receiver, state court justices,

a state court law clerk, and a court-appointed guardian. Plaintiffs also name Governor Andrew Cuomo and the State of New York as defendants. In sum and substance, plaintiffs allege that these individuals participated in a conspiracy to unconstitutionally "strip[ ] Plaintiffs of their property and Child support" and to "illegally restrain ... Temmi Kramer from her daughter." (Am. Compl. ¶ 3; *see also, e.g., id.* ¶¶ 4, 6,24, 53.)

Several defendants have moved to dismiss the Amended Complaint. [2] (ECF Nos. 39, 49-51.) On April 25, 2018, the Court referred the motions to dismiss to Magistrate Judge Locke for a report and recommendation. (ECF No. 65.)

Presently before the Court is a Report and Recommendation ("R&R") from Magistrate Judge Locke advising the Court to dismiss the complaint in its entirety without leave to amend. (ECF No. 91.) More specifically, the R&R recommends that the Amended Complaint should be dismissed for lack of subject matter jurisdiction. The R&R alternatively recommends that the federal claims should be dismissed for failure to state a claim and that the Court should decline to exercise supplemental jurisdiction over the state law claims. For the reasons explained below, after a *de novo* review, the Court adopts the thorough and well-reasoned R&R in its entirety.

**I. Standard of Review**

**\*2** A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge. *E.g.,* Kleinberg v. Radian Grp., Inc., 240 F. Supp. 2d 260, 262 (S.D.N.Y. 2002); DeLuca v. Lord, 858 F. Supp. 1330, 1345 (S.D.N.Y. 1994). As to those portions of a report to which no "specific written objections" are made, the Court may accept the findings contained therein, as long as the factual and legal bases supporting the findings are not clearly erroneous. *See* Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 149 (1985); Greene v. WCI Holdings Corp., 956 F. Supp. 509, 513 (S.D.N.Y. 1997). When "a party submits a timely objection to a report and recommendation, the district judge will review the parts of the report and recommendation to which the party objected under a *de novo* standard of review." Dafeng Hengwei Textile Co. v. Aceco Indus. & Commercial Corp., 54 F. Supp. 3d 287, 291 (E.D.N.Y. 2014) (citing 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a *de novo* determination of those portions of the

report or specified proposed findings or recommendations to which objection is made.") ); Fed. R. Civ. P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.").

## II. Analysis

Having reviewed the full record and the applicable law, and having reviewed the R&R *de novo*, the Court adopts the thorough and well-reasoned R&R in its entirety.

As an initial matter, the R&R recommends dismissal of any claims that plaintiff Temmi Kramer asserts on behalf of her children because a *pro se* litigant may not represent others. (R&R 19.) The Court agrees that plaintiff Temmi Kramer may not represent her children in this action, and dismisses any claims brought on their behalf.

### A. Subject Matter Jurisdiction

Magistrate Judge Locke concluded that the Amended Complaint should be dismissed for lack of subject matter jurisdiction under both the *Rooker-Feldman* doctrine and the domestic relations exception to federal jurisdiction. (R&R 11-14.) In their objections, plaintiffs argue that neither doctrine applies to bar the instant claims. For the reasons discussed below, the Court disagrees with plaintiffs, and dismisses the Amended Complaint for lack of subject matter jurisdiction.

#### 1. The *Rooker-Feldman* Doctrine

Plaintiffs argue that the *Rooker-Feldman* doctrine, which precludes lower federal courts from exercising jurisdiction over claims that seek to collaterally attack state court judgments, does not apply to bar the instant claims. (Pls. Objs. 11-12.) They assert that they did not lose in state court, and that "[n]o judgement has been rendered in State Court and, without authority or jurisdiction, Plaintiffs are still being stripped of their due process rights and Constitutional rights to date without due process." (*Id.*) These objections lack merit.

Plaintiffs repeatedly allege that various state court decisions and judgments deprived them of custody of R.K., child support payments, and marital property. (*E.g.*, Am. Compl. ¶¶ 3, 4, 7, 16, 26-27, 53.) Plaintiffs are accordingly "state

court losers" for purposes of the *Rooker-Feldman* doctrine. *See, e.g.*, *Davis v. Baldwin*, No. 12-CV-6422 ER, 2013 WL 6877560, at *3 (S.D.N.Y. Dec. 31, 2013) ("Plaintiff 'lost' in state court when the Family Court issued the Order of Removal placing Aaliyah in the custody of ACS and the Orders of Protection precluding Plaintiff from interfering with the care and custody of his children."), *aff'd*, 594 F. App'x 49 (2d Cir. 2015); *Cogswell v. Rodriguez*, 304 F. Supp. 2d 350, 355 (E.D.N.Y. 2004) (claims that state court determinations regarding child support denied plaintiff due process and equal protection were barred by *Rooker-Feldman* ).

Those same allegations, and other allegations in the Amended Complaint, contradict plaintiffs' assertion that no judgment has been rendered. Specifically, in addition to the allegations above, plaintiffs allege that the divorce proceeding was "closed by STEINMAN in April 2017" [3] (*id.* ¶ 59); that Justice Steinman "reopened" the matter to issue the June 16, 2017 order (*id.* ¶¶ 4(e), 75); and that the New York State Supreme Court Appellate Division, Second Department denied leave to appeal that order (*id.* ¶ 2). Thus, plaintiffs' assertions that no judgment has been rendered are meritless.

**\*3** To the extent plaintiffs argue that no *valid* state court judgment has been rendered because defendants allegedly acted without jurisdiction and in violation of plaintiffs' constitutional rights (*see* Pls. Objs. 2), that argument is unavailing. *See, e.g.*, *Remy v. NYS Dep't of Taxation & Fin.*, No. 09 CV 4444, 2010 WL 3926919, at *3 (E.D.N.Y. Sept. 29, 2010) (rejecting argument that *Rooker-Feldman* did not apply because plaintiff alleged state court judgment was rendered unconstitutionally and without jurisdiction), *aff'd*, 507 F. App'x 16 (2d Cir. 2013).

Finally, the fact that plaintiffs assert that their constitutional rights were violated during the state court proceedings does not except their claims from the *Rooker-Feldman* doctrine. *E.g.*, *Edem v. Spitzer*, No. 05-CV-3504 (RJD), 2005 WL 1971024, at *1 (E.D.N.Y. Aug. 15, 2005), *aff'd*, 204 F. App'x 95 (2d Cir. 2006). Accordingly, the Court adopts Magistrate Judge Locke's recommendation that the Court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine, and dismisses the Amended Complaint on that ground.

#### 2. The Domestic Relations Exception

Magistrate Judge Locke alternatively determined that the Court lacks subject matter jurisdiction under the domestic

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 136 of 185

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

relations exception to federal jurisdiction. (R&R 14-15.) Plaintiffs argue that "[t]he divorce proceedings terminated and the lawsuit is not about custody, alimony, or divorce proceedings" but is instead about the deprivation of plaintiffs' constitutional rights. (Pls. Objs. 4.) However, plaintiffs cannot avoid the domestic relations exception by recasting a domestic dispute as a tort, civil RICO claim, or constitutional violation. *See, e.g., Sobel v. Prudenti*, 25 F. Supp. 3d 340, 354 (E.D.N.Y. 2014) (collecting cases). Here, as thoroughly explained in the R&R, plaintiffs' Amended Complaint is, in effect, directed at challenging the results of Temmi Kramer's divorce proceedings. Accordingly, the Court adopts Magistrate Judge Locke's recommendation that the Court lacks subject matter jurisdiction under the domestic relations exception, and alternatively dismisses the Amended Complaint on that ground. [4]

## B. Immunity

Magistrate Judge Locke further concluded that, even if the Court had subject matter jurisdiction over the Amended Complaint, several defendants are entitled to immunity. Specifically, the R&R recommends that the claims against the State of New York are barred by the Eleventh Amendment, and that the claims against Justice Dane, Justice Steinman, Justice Marks, Linda Mejias (Justice Dane's law clerk at all relevant times), John Zenir (the court-appointed guardian), Brian Davis (the court-appointed receiver), and Lori Schlesinger (a court-appointed real-estate broker) are barred by the doctrines of judicial and quasi-judicial immunity. (R&R 15-19.)

With respect to the Eleventh Amendment, plaintiffs argue only that the R&R "incorrectly recommends dismissal upon the Eleventh Amendment." (Pls. Objs. 11.) After a *de novo* review, the Court agrees with Magistrate Judge Locke's determination that the Eleventh Amendment bars the claims against the State of New York.

**\*4** As to judicial and quasi-judicial immunity, plaintiffs argue that those doctrines do not apply because the relevant defendants "act[ed] entirely without jurisdiction." (Pls. Objs. 3.) However, the Amended Complaint fails to allege any facts supporting this conclusory assertion. *See, e.g., Jackson v. Cty. of Nassau*, No. 15-CV-7218(SJF)(AKT), 2016 WL 1452394, at \*6 (E.D.N.Y. Apr. 13, 2016) (collecting cases where conclusory assertions that judge acted without jurisdiction were insufficient to defeat immunity). Indeed, to the contrary, the factual allegations in the Amended Complaint make clear

that these defendants were acting within the scope of their jurisdiction at all relevant times.

Finally, plaintiffs argue that Schlesinger is not entitled to quasi-judicial immunity because she is a real estate agent. (Pls. Objs. 4.) A private actor is protected by quasi-judicial immunity if her "acts are integrally related to an ongoing judicial proceeding." *El-Shabazz v. Henry*, No. 12 CIV. 5044 BMC, 2012 WL 5347824, at \*5 (E.D.N.Y. Oct. 29, 2012) (quoting *Mitchell v. Fishbein*, 377 F.3d 157, 172 (2d Cir. 2004) ). In other words, quasi-judicial immunity attaches to individuals who are acting "as an arm of the court." *Dowlah v. Dowlah*, No. 09-CV-2020 SLT/LB, 2010 WL 889292, at \*6 (E.D.N.Y. Mar. 10, 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 111 (2d Cir. 1998) ). Although plaintiffs are correct that Schlesinger is a real estate broker, they ignore that she is a defendant in this case solely because she was appointed by Justice Steinman to assist with the sale of marital property pursuant to a court order issued in Temmi Kramer's divorce proceeding. (*See, e.g.*, Am. Compl. ¶¶ 4(j), 25.) Thus, the Court agrees with Magistrate Judge Locke that Schlesinger is entitled to quasi-judicial immunity.

## C. Failure to State a Claim

As noted above, Magistrate Judge Locke further concluded that, even if the Court had subject matter jurisdiction, the federal causes of action should nevertheless be dismissed for failure to state a claim. (R&R 19-25.) After a *de novo* review, the Court agrees that the Amended Complaint fails to state a federal claim for relief.

Plaintiffs objects to the R&R's recommendation that the civil RICO claim should be dismissed because the Amended Complaint fails to allege that defendants' engaged in racketeering acts. (R&R 24-25.) In particular, plaintiffs point to a chart attached to the Amended Complaint, which, they contend, adequately alleges defendants' racketeering activity. (Pls. Objs. 10.) However, the "racketeering acts" described in the chart are devoid of any factual information. Instead, they allege only that defendants "participated in scheme to defraud," "conspired through wire & mail," and "obstruct[ed] justice." (*See generally* ECF No. 23-1 at 83-95.) In other words, the racketeering acts that plaintiffs allege amount to nothing more than legal conclusions, which are insufficient to state a plausible RICO claim.

Plaintiff asserts other scattershot objections to Magistrate Judge Locke's determination that the Amended Complaint

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 137 of 185

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

fails to state a federal claim for relief. The Court has reviewed plaintiffs' arguments *de novo*, and finds them to be without merit. Accordingly, the Court adopts Magistrate Judge Locke's recommendation that the Amended Complaint fails to state a federal claim for relief, and dismisses those claims.

**D. Supplemental Jurisdiction**

Plaintiffs also object to Magistrate Judge Locke's recommendation that the Court should decline to exercise supplemental jurisdiction over the state law claims. (R&R 25-26.) Having determined that plaintiffs' federal claims do not survive defendants' motions to dismiss, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. *See* 28 U.S.C. § 1367(c)(3). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' " *Birch v. Pioneer Credit Recovery, Inc.,* No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir. 1986) ). Therefore, in the instant case, the Court, in its discretion, " 'decline[s] to exercise supplemental jurisdiction' " over plaintiffs' state law claims because "it 'has dismissed all claims over which it has original jurisdiction.' " *Kolari v. N.Y-Presbyterian Hosp,* 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3) ); *see also Cave v. E. Meadow Union Free Sch. Dist.,* 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction.").

**E. Leave to Amend**

**\*5** Federal Rule of Civil Procedure 15(a) provides that a party shall be given leave to amend "when justice so requires." Fed. R. Civ. P. 15(a). "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." *Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 101 (2d Cir. 2002). The Second Circuit has held that "a *pro se* litigant in particular 'should be afforded every reasonable opportunity to demonstrate that he has a valid claim.' " *Dluhos v. Floating*

*& Abandoned Vessel, Known as New York,* 162 F.3d 63, 69 (2d Cir. 1998) (quoting *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir. 1984) ). Nevertheless, even in the case of a *pro se* plaintiff, "[i]t is axiomatic that leave to amend need not be granted if to do so would be futile." *Cruz v. Garden of Eden Wholesale, Inc.,* 12 CIV. 5188 BMC MDG, 2012 WL 5386046, at *2 (E.D.N.Y. Oct. 26, 2012). As to futility, "leave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, *i.e.,* if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." *Milanese v. Rust-Oleum Corp.,* 244 F.3d 104, 110 (2d Cir. 2001) (citing *Ricciuti v. N. Y. C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir. 1991) ).

Here, the defects in the Amended Complaint are jurisdictional and substantive and cannot be cured through better pleading. Accordingly, the Court denies plaintiffs leave to amend and dismisses the Amended Complaint without prejudice. *See Vandor, Inc. v. Militello,* 301 F.3d 37, 38-39 (2d Cir. 2002) (per curiam) ("[A]bsent jurisdiction 'federal courts do not have the power to dismiss *with prejudice.*' " (quoting *Hernandez v. Conriv Realty Assocs.,* 182 F.3d 121, 122 (2d Cir. 1999) ) ).

**III. Conclusion**

For the foregoing reasons, IT IS HEREBY ORDERED that, after a *de novo* review, the Court adopts the R&R in its entirety. Accordingly, defendants' motions to dismiss are granted, and plaintiffs' federal claims are dismissed without prejudice. The Court declines to exercise supplemental jurisdiction over any remaining state law claims and dismisses those claims without prejudice. The Clerk of Court shall enter judgment accordingly and close the case.

IT IS FURTHER ORDERED that the moving defendants shall serve a copy of this Order on plaintiffs, and file proof of service with the Court.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that, should plaintiff seek leave to appeal *in forma pauperis,* any appeal from this Order would not be taken in good faith, and *in forma pauperis* status is therefore denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 138 of 185

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4489284

## Footnotes

1    The Amended Complaint is verified by both Temmi Kramer and Zachary Kramer, who is over eighteen. Temmi Kramer also purports to assert the claims on behalf of her other children, Kevin Kramer, J.K., and R.K.

2    Plaintiffs also name Leagle, Inc., which owns Leagle.com, a website that publishes judicial opinions. Plaintiff asserts state law claims against Leagle, Inc. for publishing the state court's July 2015 custody decision. On May 17, 2018, the Clerk of the Court entered a certificate of default against Leagle, Inc., finding that it had failed to appear or otherwise defend this action. (ECF No. 81.) On June 1, 2018, plaintiffs moved for default judgment against Leagle, Inc. (ECF No. 88.) On July 13, 2018, the Chief Operating Officer of Leagle, Inc. submitted a letter to the Court stating that the Court lacked personal jurisdiction over Leagle, Inc. it had not been properly served. (ECF No. 89.) In light of the Court's adoption of the R&R, and dismissal of the Amended Complaint for lack of subject matter jurisdiction, the motion for default judgment against Leagle, Inc. is denied as moot.

3    In their objections, plaintiffs state that a Judgment of Divorce was entered on June 2, 2016. (Pl. Objs. 5.)

4    As noted above, plaintiffs bring state law claims against Leagle, Inc. for publishing the state court's July 2015 custody decision. Although those claims are likely not barred by the *Rooker-Feidman* doctrine or the domestic relations exception, the Court declines to exercise supplemental jurisdiction over the state law claims and accordingly dismisses them without prejudice.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    5

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 139 of 185

1995 WL 316935
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mina POURZANDVAKIL, Plaintiff,

v.

Hubert HUMPHRY, Judisicial Systeam of The State of
Minnesota and Olmested County Court Systeam, and
State of Minnesota, Saint Peter State Hospital, Doctor
Gammel Stephelton, et el Erickson, North West Bank
and Trust, Olmested County Social Service, J.C. Penny
Insurnce, Metmore Finicial, Traveler Insurnce, Comecial
Union Insurnce, Hirman Insurnce, Amrican State
Insurnce, Farmers Insurnce, C. O Brown Insurnce, Msi
Insurnce, Steven Youngquist, Kent Chirstain, Micheal
Benson, United Airline, Kowate Airline, Fordmotor
Cridite, First Bank Rochester, George Restwich,
British Airways, Western Union, Prudenial Insurnce,
T.C.F. Bank, Judge Sandy Kieth, Judge Niergari,
Olmestead County Judgering, Judge Mores, Judge
Jacobson, Judge Challien, Judge Collin, Judge Thomase,
Judge Buttler, Judge Morke, Judge Moweer, Sera
Clayton, Susan Mudhaul, Ray Schmite, Defendants. [1]

Civ. A. No. 94-CV-1594.
|
May 23, 1995.

**Attorneys and Law Firms**

Hubert H. Humphrey, III, Atty. Gen. of the State of Minn.,
St. Paul, MN, Jerome L. Getz, Asst. Atty. Gen., of counsel,
for Hubert H. Humphry, III, Judicial System of the State
of Minnesota, St. Peter Regional Treatment Center, Gerald
Gammell, MD, William Erickson, MD, Thomas Stapleton,
MD, the Honorable James L. Mork, Chief Judge Anne
Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge
Dennis Challeen, and Judge Lawrence Collins.

Condon & Forsyth, P.C., New York City, Stephen J. Fearon,
Michael J. Holland, of counsel, for British Airways, P.L.C.
and Kuwait Airways Corp.

Dunlap & Seeger, P.C., Rochester, MN, Gregory J. Griffiths,
of counsel, for Olmsted County, Raymond Schmitz, Susan
Mundahl, Norwest Bank Minnesota, N.A. (the Northwest
Bank & Trust), C.O. Brown Agency, Inc.

Arthur, Chapman, McDonough, Kettering & Smetak, P.A.,
Minneapolis, MN, Eugene C. Shermoen, Jr., of counsel, for
J.C. Penney Ins. Co. and Metropolitan Ins. Co.

Shapiro & Kreisman, Rochester, NY, John A. DiCaro, of
counsel, for Metmor Financial, Inc.

Costello, Cooney & Fearon, Syracuse, Paul G. Ferrara, Robert
J. Smith, of counsel, for Travelers Ins. Companies; Hirman
Ins.; Commercial Union Ins. Companies.

Smith, Sovik, Kendrick & Sugnet, P.C., Syracuse, Thomas
N. Kaufmann, of counsel, for American States Ins. Co. and
Prudential Ins. Co.

Steven C. Youngquist, Rochester, MN, pro se.

Thomas J. Maroney, U. S. Atty., Syracuse, NY, William F.
Larkin, Asst. U. S. Atty., of counsel, for Michael Benson,
Postmaster N. D. of New York.

George F. Restovich & Associates, Rochester, MN, George F.
Restovich, of counsel, for George F. Restovich.

Conboy, McKay, Bachman & Kendall, L.L.P, Watertown, NY,
George K. Myrus, of counsel, for Western Union.

Richard Maki, Rochester, MN, pro se.


MEMORANDUM-DECISION AND ORDER

POOLER, District Judge.


INTRODUCTION

**\*1** In the four and one-half months since she filed this
action, plaintiff Mina Pourzandvakil has filed three amended
complaints and ten motions. She also has sought and received
entry of default against ten defendants, none of whom she
properly served. She twice has sought and been denied
temporary restraining orders. She has included in her action
defendants with no apparent connection to this forum, that
were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of
defendants have filed a total of twelve motions, some seeking
vacation of the defaults entered against them, some seeking
dismissal and others seeking both. We grant defendants'
motions insofar as they seek vacation of the clerk's entries of
default and dismissal of the complaint. We vacate *sua sponte*

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 140 of 185

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.

## BACKGROUND

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy easy summarization and will be addressed only insofar as they are relevant to the various motions.

**\*2** The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (*sic*)[2] ("J.C. Penney"), British Airways, Kowate (*sic*) Airline ("Kuwait"), MSi Insurnce (*sic*) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (*sic*) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default, it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper[3] (answer to amended complaint filed March 24, 1995; and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

Case 1:22-cv-00983-GTS-ML   Document 6   Filed 02/07/23   Page 141 of 185

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or Rule 12 of the Federal Rules of Civil Procedure. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to Fed. R. Civ. P. 12(b) or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

**\*3** Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against

them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against it. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

ANALYSIS

The Defaults

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. Fed. R. Civ. P. 4(e)(2). Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. Fed. R. Civ. P. 4(e)(1). Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. Fed. R. Civ. P. 4(h)(1) and 4(e)(1). Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See* N.Y. Civ. Prac. L. & R. §§ 308, 311 (McKinney Supp. 1995); 🔖 N.Y. Bus. Corp. Law § 306 (McKinney Supp. 1995); Minn. Stat. § 543.08 (1995); Minn. R. 4.03 (1995). Finally, service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. Fed. R. Civ. P. 4(j)(2). Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank

Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

## II. The Jurisdictional Arguments

**\*4** In addition to raising various other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

### A. Personal Jurisdiction

Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Youngquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to Rule 14 or Rule 19 of the Federal Rules of Civil Procedure and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. Fed. R. Civ. P. 4(k). Defendants

are not subject to federal interpleader jurisdiction and they were not joined pursuant to Rule 14 or Rule 19. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to Rule 4(k). *See* N.Y. Civ. Prac. L. & R. § 302 (McKinney Supp. 1995). This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id.* §302(a). The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of Section 302(a). Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

### B. Subject Matter Jurisdiction

Pourzandvakil's complaint does not contain the jurisdictional allegations required by Fed. R. Civ. P. 8(a)(1). Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff was a party.

⚑ *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 482 (1983). These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

**\*5** The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 143 of 185

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. 🚩 28 U.S.C. § 1332. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under 🚩 28 U.S.C. § 1367(a).

🚩 Section 1367(a) requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id.* Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id.* Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

### C. Venue

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. The general venue statute provides that a diversity action, except as otherwise provided by law, may be brought only in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

*6 🚩 28 U.S.C. § 1391(a). 🚩 Section 1391(b) provides that federal question actions, except as otherwise provided by law, may be brought only in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

🚩 *Id.* § 1391(b). The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id.* § 1406(a). Because, as we will explain below, Pourzandvakil's complaint not only fails to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to

transfer this case to another district. The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner,* 997 F.2d 1023, 1027 (2d Cir. 1993) (holding that it was an improper exercise of discretion to dismiss rather than transfer when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ. No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). [7] We already have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the Rule 12(b)(6) issue only on ASI's motion. *See* Bell v. Hood, 327 U.S. 678, 682-83 (1946) (subject matter jurisdiction); Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963) (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

**\*7** Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987). A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Estelle v. Gamble, 429 U.S. 97, 106 (1976) (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". Barr, 810 F. 2d at 363.

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] Civ. No. 94-C944 (D.D.C. 1994), *Pourzandvakil*

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 145 of 185

Pourzandvakil v. Humphry, Not Reported in F.Supp. (1995)

*v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to amend her pleading and plaintiff still was not able to offer specifics. [9] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White,* 886 F. 2d 721, 724 (4th Cir. 1989)). We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

**\*8** We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under 28 U.S.C. §1915(d), holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. The Supreme Court explicitly has acknowledged a district court's power under Section 1915(d) to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id.* at 329 n.8. The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter,* 151 F.R.D. 537, 540 (S.D.N.Y. 1993), *aff'd* 41 F.3d 1500 (2d Cir. 1994); *cf. Pillay v. I.N.S.,* 45 F.3d 14, 17 (2d Cir. 1995) (per curiam) (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts and found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler,* 151 F.R.D. at 540.

IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture,* 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991). Moreover, her litigiousness has not yet reached the point at which courts in this circuit have justified injunctive relief. *See id.* at 694 (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief, however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id.* at 695.

CONCLUSION

**\*9** All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry,* 799 F.2d 183, 188-9 (5th Cir. 1986) (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y v. National Broadcasting Co.,* 377 F.2d 194, 199 n.3 (2d Cir. 1967) (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp.,* 139 F.2d 871, 875 (3d Cir.) *cert. denied,* 322 U.S. 740(1944) (dismissal for lack of personal jurisdiction is not a dismissal on the merits). The dismissals against the remaining defendants are with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied.

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 146 of 185

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 316935

## Footnotes

1    Names in the caption are spelled to reflect plaintiff's complaint.

2    Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

3    Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

4    The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against non-moving defendants for failure to state a claim on which relief can be granted.

5    The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

6    We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. 28 U.S.C. § 1332(a). However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id.* § 1332(a)(2). Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of 28 U.S.C. § 1603. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See* 28 U.S.C. § 1330. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under Section 1332. *Cf. Hiram Walker & Sons, Inc. v. Kirk Line,* 877 F.2d 1508, 1511-1512 (11th Cir. 1989), *cert. denied,* 115 S.Ct. 1362 (1995) (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 147 of 185

**Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)**

affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under 🚩28 U.S.C. § 1332.

7    J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

8    Former Supreme Court Justice Harry A. Blackmun.

9    We note also that plaintiff has not requested leave to amend in this action.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Dukes v. New York City Employees' Retirement System,
S.D.N.Y.,   February 25, 2019

360 Fed.Appx. 177
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Maureen MCNAMARA, Plaintiff-Appellant,

v.

Chief Judge Judith S. KAYE, New York Court
of Appeals, Presiding Justice A. Gail Prudenti,
Supreme Court of the State of New York, Appellate
Division, Second Judicial Department, Grievance
Committee, Ninth Judicial District, Gloria Bunze,
Gary L. Casella, its attorneys, "John Doe," "Jane Roe,"

individually, State of New York, Defendants-Appellees. *

No. 08-4561-cv.
|
Oct. 20, 2009.

Appeal from a judgment of the United States District Court
for the Eastern District of New York (Irizarry, J.).
**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED.**

**Attorneys and Law Firms**

Michael D. Diederich, Jr., Stony Point, NY, for Appellant.

Andrew M. Cuomo, Attorney General of the State of New
York. Barbara D. Underwood, Solicitor General, Michelle
Aronowitz, Deputy Solicitor General, Richard O. Jackson,
Assistant Solicitor General, Of Counsel, for Appellees.

PRESENT: DENNIS JACOBS, Chief Judge, ROBERT D.
SACK and GERARD E. LYNCH, Circuit Judges.

*SUMMARY ORDER*

**\*1** Plaintiff, Maureen McNamara, appeals from a judgment
entered August 18, 2008 in the United States District Court for
the Eastern District of New York (Irizarry, *J.*). On defendant's
motion, the district court dismissed McNamara's claims for
lack of subject-matter jurisdiction and for failure to state
a cause of action. We assume the parties' familiarity with
the underlying facts, the procedural history, and the issues
presented for review.

We have considered McNamara's arguments, and they are
without merit. The majority of her claims fail on one or
more of the doctrines of sovereign immunity, official judicial
immunity, and standing. Arguably, claims under the ADA;
the First Amendment; and the Due Process, Equal Protection,
and Guarantee clauses survive; however, to the extent that
they do, McNamara has not plausibly pleaded sufficient
facts to survive a motion to dismiss. Her CPLR Article
78 claim fails for lack of subject-matter jurisdiction. *See
Morningside Supermarket Corp. v. N.Y. State Dep't of Health,*
432 F.Supp.2d 334, 346 (S.D.N.Y.2006); *Cartagena v.
City of N.Y.,* 257 F.Supp.2d 708, 710 (S.D.N.Y.2003).

We note finally, in dicta, that we do not rely upon the
district court's application of the *Rooker-Feldman* doctrine in
affirming. *Rooker-Feldman* only applies when the requested
federal court remedy of an alleged injury caused by a state
court judgment would require overturning or modifying that
state court judgment. *See Hoblock v. Albany County Bd.
of Elections,* 422 F.3d 77, 85 (2d Cir.2005). Inasmuch as
McNamara's claims challenge the procedures applied in all
attorney disciplinary proceedings and seek damages and
prospective relief rather than a modification of her suspension
or reinstatement orders, her claims would not appear to be
barred by *Rooker-Feldman.* Nevertheless, her claims were
properly dismissed for the reasons noted above.

For the foregoing reasons, the judgment of the district court
is hereby **AFFIRMED.**

**All Citations**

360 Fed.Appx. 177, 2009 WL 3377914

## Footnotes

*        We direct the Clerk of the Court to amend the official caption as noted.

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 150 of 185

2018 WL 5077164
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Temmi **KRAMER**, (Individually), Temmi **Kramer** as
Custodial Parent and Natural Guardian of J. **Kramer**,
Zachary **Kramer**, Kevin **Kramer**, R.K. – as an Illegally
Restrained Minor Requesting Representation, Plaintiff,
v.
Edmund **DANE**, Linda Mejias, Leonard Steinman,
Lawrence Marks, Governor Andrew Cuomo,
(All Individually), the State of New York,
Brian Davis, Esq., Nancy Sherman, Esq., John
Zenir, Esq. Leagle, Inc. (Leagle.com), Lori
Schlesinger, and John Doe "A", Defendants.



17
-
CV
-
5253
(JFB)(SIL)
|
Signed 07/26/**2018**

**Attorneys and Law Firms**

Temmi **Kramer**, Far Rockaway, NY, pro se.

Daniel Scott Hallak, Lori L. Pack, Office of the New York
State Attorney General, Hauppauge, NY, Brian J. Davis, Law
Office of Brian J. Davis, Nicole Feder, L'Abbate Balkan
Colavita & Contini LLP, Garden City, NY, Nancy Tova
Sherman, Great Neck, NY, John Mark Zenir, Westbury, NY,
for Defendants.

**REPORT AND RECOMMENDATION**

STEVEN I. LOCKE, United States Magistrate Judge

**\*1** Presently before the Court, on referral from the
Honorable Joseph F. Bianco for Report and Recommendation
in this civil rights action, are several motions to dismiss. *See*
motion to dismiss ("State Motion"), Docket Entry ("DE")
[16]; motion to dismiss ("Davis Motion"), DE [39]; motion to
dismiss ("Second State Motion"), DE [49]; motion to dismiss
("Zenir Motion"), DE [50]; motion to dismiss ("Sherman
Motion"), DE [51]. *Pro se* Plaintiff Temmi **Kramer**, on behalf

of her children Kevin **Kramer** and infants J.K. and R.K.,
as well as *pro se* Plaintiff Zachary **Kramer** (collectively
"Plaintiffs") commenced this civil rights action seeking relief
from purported unlawful conduct in an underlying state court
proceeding. [1] *See* Amended Complaint ("Am. Compl."), DE
[21]. Plaintiffs seeks money damages for violations of: (1) the
First, Fourth, Fifth and Fourteenth Amendments of the U.S.
Constitution under 42 U.S.C. § 1983; (2) 42 U.S.C.
§ 1985; (3) 42 U.S.C. § 1986; (4) the Racketeer Influenced
Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961
*et seq.*; and (5) various state laws. *See id.* Judge Bianco
referred the above-mentioned motions to this Court for a
Report and Recommendation as to whether they should be
granted. *See* DE [65]. For the reasons set forth herein, the
Court respectfully recommends that the motions be granted in
their entirety and that the Amended Complaint be dismissed
without prejudice.

Initially, the Court recommends dismissal for lack of subject
matter jurisdiction under the *Rooker-Feldman* and domestic
relations exception doctrines. The Court also recommends
dismissal of the claims against certain individual Defendants
for lack of subject matter jurisdiction based on the judicial
and quasi-judicial immunity doctrines. Similarly, the causes
of action against New York State should be dismissed
because they are barred by the Eleventh Amendment. The
Court alternatively recommends dismissal of the majority
of Plaintiffs' 42 U.S.C. §§ 1983, 1985 and 1986 and
RICO causes of action on their merits for failure to state
a claim. Finally, the Court recommends that supplemental
jurisdiction over Plaintiffs' remaining state law causes of
action be declined.

**I. BACKGROUND**
The following facts, set forth in the Complaint and
the attached exhibits, are presumed true for purposes of
Defendants' motions.

This action stems from Plaintiff Temmi **Kramer's** New
York state court divorce proceedings presided over at
various times by Defendants Justice Edmund M. **Dane**
("Justice **Dane**") and Justice Leonard D. Steinman ("Justice
Steinman"). *See generally* Am. Compl. Plaintiffs allege
a wide-ranging conspiracy centered on a purported mail
fraud and racketeering enterprise within the New York State
court system designed to strip litigants of marital property
and child support. *See id.* Defendant John Zenir ("Zenir")

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 151 of 185

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

was appointed as law guardian for Plaintiffs' children and Defendant Nancy Sherman ("Sherman") acted as Temmi **Kramer's** ex-husband's attorney during the underlying state court action. *See id.* ¶¶ 4, 6, 16-17. Defendants Brian J. Davis ("Davis") and Lori Schlesinger ("Schlesinger") were appointed as temporary receivers tasked with liquidating the marital property. *See id.* ¶¶ 4, 26-27. Plaintiffs also allege that Defendants Chief Administrative Judge Lawrence Marks ("Judge Marks") and Governor Andrew Cuomo ("Governor Cuomo") were aware of the purported racketeering scheme. *See id.* ¶ 4.

**\*2** Over the course of her divorce proceedings Temmi **Kramer**: (1) lost custody of the couple's youngest child, R.K., to her ex-husband; (2) was denied child support; and (3) received a temporary restraining order enjoining her from: (a) interacting with R.K.; and (b) publicizing the divorce proceedings. *See id.* ¶¶ 2, 4. **Kramer** alleges that the temporary restraining order's bar on publicity was a retaliatory measure motivated by **Kramer's** previous efforts in speaking out against Defendants' purportedly unlawful RICO scheme. *See id.* ¶ 49. After the proceedings, Defendant Leagle.com ("Leagle") published the custody decision on the internet. *See id.* ¶ 4. Temmi **Kramer** then sought to stay enforcement of the temporary restraining order, but her request was denied by the Appellate Division, Second Department. *See id.* ¶ 49; *see also* Decision & Order on Motion, Appellate Division, Second Department, DE [51-6].

Based on the above, Plaintiffs commenced the instant action by Complaint filed on April 6, 2016 and amended on December 14, 2017. *See* Complaint, DE [1]; *see also* Am. Compl. As set forth above, the Amended Complaint, which is verified by Temmi **Kramer** and Zachary **Kramer**, seeks money damages for violations of:

(1) the First and Fourteenth Amendments of the U.S. Constitution for an abridgment of Temmi **Kramer's** free speech, equal protection and procedural and substantive due process rights under ⚐ 42 U.S.C. § 1983 against all Defendants except Leagle;

(2) ⚐ 42 U.S.C. § 1985 for conspiracy as to: (a) Justice Steinman; (b) Justice **Dane**; (c) Justice Steinman's then-law clerk Defendant Judge Linda Mejias ("Judge Mejias"); (d) Judge Marks; (e) Governor Cuomo; (f) Zenir; (g) Davis; (h) Sherman; and (i) Defendant State of New York ("New York State");

(3) 42 U.S.C. § 1986 against all Defendants;

(4) RICO against: (a) Justice Steinman; (b) Justice **Dane**; (c) Judge Mejias; (d) Judge Marks; (e) Governor Cuomo; (f) Zenir; and (g) Sherman; and

(5) Various state laws.

*See generally* Am. Compl.

The Amended Complaint also seeks relief against New York State based on a municipal liability theory for its purported adoption of "a policy, pattern and practice [...] of permitting illegal and unconstitutional *sua sponta* [*sic*] [...] [r]ecievership appointments against vulnerable custodial mothers...." *See* Am. Compl. ¶¶ 102-105. In the Amended Complaint's current form, the Court is unable to discern Plaintiffs' claims or identify the basis for relief purportedly arising of the Fourth or Fifth Amendments to the U.S. Constitution.

In lieu of an answer, Justice **Dane**, Judge Mejias and New York State first moved to dismiss under the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 12(b)(1) and 12(b)(6) for lack of subject matter and for failure to state a claim. *See* DE [16]. Davis's and Schlesinger's motion to dismiss seeking relief on similar grounds soon followed. *See* DE [39]. Justice **Dane**, Judge Mejias and New York State, now joined by Governor Cuomo, Judge Marks and Justice Steinman, moved once again seeking to dismiss Temmi **Kramer's** claims made on behalf of her infant children due to her inability to represent them as a *pro se* litigant. *See* DE [49]. Zenir and Sherman, respectively, moved shortly after for dismissal for lack of subject matter and failure to state a claim. *See* DE [50], [51]. Leagle has failed to answer, move or otherwise respond to the Amended Complaint and is currently in default. *See* Certificate of Default, DE [81]. Judge Bianco referred all of the motions to this Court for Report and Recommendation. *See* DE [65].

## II. LEGAL STANDARDS

### A. Fed. R. Civ. P. 12(b)(1)

"It is axiomatic that federal courts are courts of limited jurisdiction and may not decide cases over which they lack subject matter jurisdiction." ⚐ *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir. 2000). To that end, "[d]etermining the existence of subject matter jurisdiction is

Case 1:22-cv-00983-GTS-ML   Document 6   Filed 02/07/23   Page 152 of 185

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008). In deciding a motion to dismiss for lack of subject matter jurisdiction, "a court must accept as true all material factual allegations in the complaint and refrain from drawing inferences in favor of the party contesting jurisdiction." *U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 449 (S.D.N.Y. 2001).

**\*3** Lower federal courts lack subject matter jurisdiction over direct appeals of state court judgments under the *Rooker-Feldman* doctrine. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149 (1923) (holding that only the Supreme Court can entertain a direct appeal from a state court judgment); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 483, n.3, 103 S.Ct. 1303, 1308 (1983) (finding that federal courts lack jurisdiction over claims which are "inextricably intertwined" with prior state court determinations). Federal courts also lack subject matter jurisdiction over claims against judges relating to the exercise of their judicial functions on immunity grounds. *Mireless v. Waco*, 502 U.S. 9, 11-12, 112 S. Ct. 286, 288 (1991). In addition, the Supreme Court has articulated a domestic relations exception to subject matter jurisdiction that divests the federal courts of the power to issue "divorce, alimony, and child custody decrees." *Marshall v. Marshall*, 547 U.S. 293, 308, 126 S. Ct. 1735, 1746 (2006).

The Eleventh Amendment provides for state immunity: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., amend. XI. Further, a non-consenting state is immune from suits brought by its own citizens in federal court." *Clissuras v. City Univ. of New York*, 359 F.3d 79, 81 (2d Cir. 2004) (internal citations omitted). This immunity extends not only to the state itself, but also to entities considered "arms of the state," *id.* (quoting *McGinty v. New York*, 251 F.3d 84, 95 (2d Cir. 2001) ), and "applies regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908 (1984).

## **B. Fed. R. Civ. P. 12(b)(6)**

To survive a motion to dismiss under Federal Civil Rule 12(b)(6), a complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). But a pleading "that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966).

In reviewing a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See LaFaro v. New York Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). Where the complaint is filed by a *pro se* litigant, the Court must also be careful to "interpret the complaint liberally to raise the strongest claims that the allegations suggest." *Rosen v. N. Shore Tower Apartments, Inc.*, 11-CV-00752, 2011 WL 2550733, at \*2 (E.D.N.Y. June 27, 2011) (citing *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) ). Even so, "threadbare recitals of the elements of a cause of action" that are supported by "conclusory" statements and mere speculation are inadequate and subject to dismissal. *See Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation and citation omitted).

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court may consider:

> **\*4** (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated ... by reference; (3) matters of which judicial notice may be taken; and (4) documents upon whose terms and effect the complaint

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 153 of 185

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

relies heavily, *i.e.,* documents that are "integral" to the complaint.

*Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003) (internal citation omitted); *see also Miotto v. Yonkers Pub. Sch.*, 534 F. Supp. 2d 422, 425 (S.D.N.Y. 2008) ("[I]n assessing the legal sufficiency of a claim, the court may consider only the facts alleged in the complaint, and any document attached as an exhibit to the complaint or incorporated in it by reference."). The Court may also "take judicial notice of documents in the public record." 🚩 *Vale v. Great Neck Water Pollution Control Dist.*, 80 F.Supp.3d 426, 433 (E.D.N.Y. 2015) (quoting *Volpe v. Nassau County*, 915 F.Supp.2d 284, 291 (E.D.N.Y. 2013) ).

*Rule 12(g)(2)* states that "[e]xcept as provided in *Rule 12(h) (2) or (3)*, a party that makes a motion under [*Rule 12*] must not make another motion under [*Rule 12*] raising a defense or objection that was available to the party but omitted from its earlier motion." *Fed. R. Civ. P. 12(g)(2)*. Under *Fed. R. Civ. P. 12(h)(2)*, a party may raise a 12(b)(6) failure to state a claim defense that it omitted from an earlier motion: (1) in any pleading allowed or ordered under Rule 7(a); (2) by a motion under *Rule 12(c)*; or (3) at trial. To that end, the Court concludes that the Second State Motion's arguments for dismissal based on a failure to state a claim are properly considered under *Rule 12(c)*. In any event, as both 12(b)(6) and 12(c) apply the same standard, this is a distinction without difference. *See* 🚩 *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 521 (2d Cir. 2006) ("The standard for addressing a *Rule 12(c)* motion for judgment on the pleadings is the same as that for a *Rule 12(b)(6)* motion to dismiss for failure to state a claim.").

## III. DISCUSSION

Applying the standards outlined above, and for the reasons below, the Court respectfully recommends that Defendants' respective motions to dismiss the Amended Complaint be granted in their entirety. The Court initially recommends dismissal for a lack of subject matter jurisdiction under the *Rooker-Feldman* and domestic relations exception doctrines. The Court also recommends dismissal of the claims against Defendants Justice **Dane**, Justice Steinman, Judge Mejias, Judge Marks, Zenir, Davis and Schlesinger for lack of subject matter jurisdiction based on the judicial and quasi-judicial immunity doctrines. Similarly, the causes of action against

New York State should be dismissed because they are barred by the Eleventh Amendment.

The Court also recommends dismissal of the majority of Plaintiffs' 🚩 42 U.S.C. §§ 1983, 🚩 1985 and 1986 and RICO causes of action on their merits for failure to state a claim. But because the Court lacks subject matter jurisdiction, as set forth above, the Court does not address the viability of each cause of action. Instead, the Court first considers subject matter jurisdiction and subsequently addresses each claim as appropriate. Finally, the Court recommends that supplemental jurisdiction over Plaintiffs' remaining state law causes of action be declined.

As a preliminary matter, the Court recommends dismissal of claims made on behalf of Temmi **Kramer's** children because both Temmi **Kramer** and Zachary **Kramer** are *pro se* litigants and cannot represent any third-party interests. A lay person cannot represent another individual—not even his or her own child. 🚩 *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990) ("[A] nonattorney parent must be represented by counsel in bringing an action on behalf of his or her child."); *see* 🚩 *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998) ("[B]ecause *pro se* means to appear for one's self, a lay person may not represent a corporation or a partnership or appear on behalf of his or her own child."). When it is apparent to the court that a *pro se* plaintiff is suing on behalf of a minor, the Court has a duty to protect the child by enforcing this prohibition against unauthorized representation. 🚩 *Wenger v. Canastota Cent. Sch. Dist.*, 146 F.3d 123, 125 (2d Cir. 1998). Here, R.K. and J.K., named Plaintiffs in this action, appear to be minors. *See* Am. Compl. ¶ 23. Because Plaintiffs are not represented by counsel and neither Temmi **Kramer** nor Zachary **Kramer** are attorneys themselves, they cannot sue on behalf of Kevin **Kramer** or J.K. and R.K. Therefore, on this basis, the Court recommends dismissal without prejudice of all claims filed on behalf of Kevin **Kramer**, J.K. and R.K.

### A. Subject Matter Jurisdiction

**\*5** The Court recommends that the entire Amended Complaint be dismissed in its entirety for lack of subject matter jurisdiction based on the *Rooker-Feldman* doctrine and the domestic relations exception. The Court also recommends dismissal of the claims against the State of New York on sovereign immunity grounds. Further, the Court concludes that judicial and quasi-judicial immunity bars the claims

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 154 of 185

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

against Justices **Dane** and Steinman, as well as Judge Marks, Davis and Schlesinger and recommends dismissal as to them on this alternate basis.

### i. The Rooker-Feldman Doctrine

At the outset, the Court recommends dismissal for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine. The *Rooker-Feldman* doctrine "recognizes that 'federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments.' " *Alston v. Sebelius*, No. 13-cv-4537, 2014 U.S. Dist. LEXIS 123613, at *23-*24 (E.D.N.Y. July 31, 2014) *Report and Recommendation adopted by* 2014 U.S. Dist. LEXIS 122970 (E.D.N.Y. Sept. 2, 2014) (quoting *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005) ). "Underlying the *Rooker-Feldman* doctrine is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-court decisions." *Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009) (quoting *Hoblock*, 422 F.3d at 85) (internal citations omitted).

The Second Circuit has identified four requirements that must be met before the doctrine applies:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must 'complain [ ] of injuries caused by [a] state-court judgment[.]' Third, the plaintiff must 'invite district court review and rejection of [that] judgment [ ].' Fourth, the state-court judgment must have been 'rendered before the district court proceedings commenced'—*i.e., Rooker-Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

*Hoblock*, 422 F.3d at 85 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 282, 125 S. Ct. 1517, 1521-22 (2005) ). This doctrine also prohibits a district court review of state court judgments to claims that are "inextricably intertwined" with the state court's determinations. *Kropelnicki v. Siegel*, 290 F.3d 118, 128 (2d Cir. 2002). A claim is inextricably intertwined with the state court judgment if "the federal claim succeeds only to the extent that the state court wrongly decided the issues before it."

*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14, 25, 107 S. Ct. 1519, 1533 (1987).

In addition, a plaintiff cannot circumvent *Rooker-Feldman* by recasting her claims as federal civil rights violations. *See Davidson v. Garry*, 956 F. Supp. 265, 268–69 (E.D.N.Y. 1996). "The fact that [a] plaintiff alleges that the state court judgment was procured by fraud does not remove h[er] claims from the ambit of *Rooker-Feldman*." *Huszar v. Zeleny*, 269 F. Supp. 2d 98, 103 (E.D.N.Y. 2003) (internal citation omitted). "Indeed, even if the order by the state court was wrongfully procured[,] the order remains in full force and effect until it is reversed or modified by an appropriate state court." *Id.*

The Court concludes that all four factors of the *Rooker-Feldman* doctrine are present here. Temmi **Kramer's** divorce proceedings were fully and fairly litigated in state court and she lost. Plaintiffs' allegations, construed liberally in their favor, essentially challenge the validity of her divorce and post-divorce proceedings. In broad terms, Plaintiffs allege that an overarching racketeering enterprise tainted the state court action, and those involved conspired to, among other things, unlawfully seize her marital property and deny her custody of her children. *See, e.g.*, Am. Compl. ¶¶ 26-17. Plaintiffs' claims thus hinge on the allegation of unlawful conduct in her underlying state court action, and they invite this Court to review the merits of that judgment. Finally, it is undisputed that the divorce proceedings concluded, and the judgment was rendered before this federal action was commenced. As a result, Plaintiffs' claims are precluded by the *Rooker-Feldman* doctrine and this Court lacks subject matter jurisdiction over them. The Court therefore recommends that Plaintiffs' claims be dismissed on this basis.

### ii. The Domestic Relations Exception

**\*6** Next, Defendants argue that the Court lacks subject matter jurisdiction over Plaintiffs' claims based on the domestic relations exception. The Supreme Court has recognized a domestic relations exception to subject matter jurisdiction that divests the federal courts of the power to issue "divorce, alimony, and child custody decrees." *Marshall*, 547 U.S. at 308, 126 S. Ct. at 1746 (internal quotation marks and citation omitted); *Rabinowitz v. New York*, 329 F. Supp. 2d 373, 376 (E.D.N.Y. 2004) (dismissing *pro se* complaint seeking to challenge state court child custody order because federal court review was barred by the domestic relations

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

exception). This exception is based on a "policy consideration that the states have traditionally adjudicated marital and child custody disputes and therefore have developed competence and expertise in adjudicating such matters, which the federal courts lack." *Thomas v. New York City*, 814 F. Supp. 1139, 1146 (E.D.N.Y. 1993).

While this exception is narrow, "a plaintiff cannot obtain federal jurisdiction merely by rewriting a domestic dispute as a tort claim for monetary damages." *Schottel v. Kutyba*, No. 06-cv-1577, 2009 WL 230106, at *1 (2d Cir. Feb. 2, 2009). As a result, federal courts will dismiss civil rights actions aimed at changing the results of domestic proceedings, including orders of child custody. *See Mitchell-Angel v. Cronin*, 101 F.3d 108 (2d Cir. 1996). Further, federal courts may abstain from exercising jurisdiction over issues "on the verge of being matrimonial in nature" if full and fair adjudication is available in state courts. *Id.* (internal citations omitted).

Applying these standards, Plaintiffs' claims should again be dismissed. Although Plaintiffs style their claims as raising constitutional and statutory issues, the allegations stem directly from the underlying state domestic relations matter and are thus outside this Court's jurisdiction. In large measure, Plaintiffs seek relief for the loss of marital property and custody over R.K., which would require the Court to improperly "re-examine and re-interpret all the evidence brought before the state court" in the underlying divorce proceedings. *McArthur v. Bell*, 788 F. Supp. 706, 709 (E.D.N.Y. 1992). Simply, any review of Plaintiffs' claims would require analysis of: (1) the basis for R.K.'s custody determination; (2) the propriety of liquidating the marital property; or (3) calculations of owed child support. *See Neustein v. Orbach*, 732 F. Supp. 333, 339 (E.D.N.Y. 1990) (barring claims under the domestic relations exception when it requires a reexamination of the evidence in the underlying state court action). Accordingly, this action is barred by the domestic relations exception and the Court recommends dismissal on this alternate basis.

### iii. Eleventh Amendment Immunity

The Court also concludes that Plaintiffs' claims against New York State are barred by the Eleventh Amendment. As set forth above, the Eleventh Amendment bars suits in federal court by private parties against a state absent consent to suit or an express statutory waiver of the state's otherwise presumed sovereign immunity. *Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 362, 121 S. Ct. 955, 962 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."). Thus, a claim that is barred by a state's sovereign immunity is properly dismissed under the Eleventh Amendment for a lack of subject matter jurisdiction. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 116 S. Ct. 1114, 1121 (1996) ("For over a century [the Supreme Court has] reaffirmed that federal jurisdiction over suits against non-consenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.' "); *see also Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (citing *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 252, 131 S. Ct. 1632, 1637 (2011) (noting that "the Eleventh Amendment ... confirm[s] the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant") ).[2]

**\*7** Neither RICO nor 42 U.S.C. §§ 1983, 1985 or 1986 operate as a waiver of New York's Eleventh Amendment immunity and New York has not consented to such suits in federal court. *Murawski v. New York State Bd. of Elections*, 285 F. Supp. 3d 691, 694 (S.D.N.Y. 2018); *see also Molina v. State of N.Y.*, 956 F. Supp. 257, 260 (E.D.N.Y. 1995). Accordingly, the Court recommends that Plaintiffs' claims against New York State also be dismissed for lack of subject matter jurisdiction on Eleventh Amendment grounds.

### iv. Judicial and Quasi-Judicial Immunity

The Court further recommends that Plaintiffs' claims against Justice **Dane**, Justice Steinman, Judge Marks, Davis and Schlesinger be dismissed as they are barred by the doctrines of absolute judicial and quasi-judicial immunity. Judges are immune from liability for damages for acts committed within the scope of their jurisdiction. *See Mireles*, 502 U.S. at 11-12, 112 S. Ct. at 288 (finding that judges have absolute immunity from suits for damages arising out of judicial acts performed in their judicial capacities); *see also Stump v. Sparkman*, 435 U.S. 349, 359, 98 S. Ct. 1099, 1106 (1978); *Fields v. Soloff*, 920 F.2d 1114, 1119 (2d Cir. 1990). Law clerks similarly enjoy absolute immunity. *Oliva v. Heller*,

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 156 of 185

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

839 F.2d 37, 40 (2d Cir. 1988) ("As law clerks are simply extensions of the judges at whose pleasure they serve[,] ... for purposes of absolute judicial immunity, judges and their law clerks are considered as one.").

A judge will not be deprived of this immunity even when the action was taken in error, done maliciously or exceeded his authority. *See* 🚩 *Stump*, 435 U.S. at 356-58, 98 S. Ct. at 1104. This absolute immunity is necessary to permit judges to act independently and without fear of consequences to themselves. 🚩 *Stump*, 435 U.S. at 355, 98 S. Ct. at 1104. To that end, "judicial immunity is not overcome by allegations of bad faith or malice." 🚩 *Mireles v. Waco*, 502 U.S. at 11, 112 S. Ct. at 288.

Yet immunity from money damages will be denied where a judge: (i) acts in the clear absence of all jurisdiction and (ii) knew or must have known that he was acting in such a manner. *Tucker v. Outwater*, 118 F.3d 930, 936 (2d Cir. 1997). The first element is an objective inquiry: "that no reasonable judge would have thought jurisdiction proper." 🚩 *Maestri v. Jutkofsky*, 860 F.2d 50, 53 (2d Cir. 1988). The second element is a subjective inquiry about whether "the judge whose actions are questioned actually knew or must have known" of the jurisdictional defect. *Id.*

A private actor may also be afforded the immunity ordinarily accorded judges if his role is functionally comparable to that of a judge or if his actions are integrally related to an ongoing judicial proceeding. 🚩 *Mitchell v. Fishbein*, 377 F.3d 157, 172–73 (2d Cir. 2004) (internal citations and quotation marks omitted). This quasi-judicial immunity applies to federal claims in federal court. *See* 🚩 *Gross v. Rell*, 585 F.3d 72, 81 (2d Cir. 2009). In the category of private actor's acts integrally related to ongoing judicial proceedings, absolute immunity may attach to non-judicial officers and employees where the individual serves as an "arm of the court," 🚩 *Scotto v. Almenas*, 143 F.3d 105, 111 (2d Cir. 1998) (quoting 🚩 *Dorman v. Higgins*, 821 F.2d 133, 137 (2d Cir. 1987) ), or where the individual conducts "activities that are inexorably connected with the execution of [court] procedures and are analogous to judicial action," *id.* (internal citations omitted). To that end, law guardians and court-appointed receivers are entitled to quasi-judicial immunity for actions related to their representation of a child in family court. *See Yapi v. Kondratyeva*, 340 Fed. App'x.

683, 685 (2d Cir. 2009) (citations omitted); *Lewittes v. Lobis*, No. 04-cv-0155, 2004 **WL** 1854082, *11 (S.D.N.Y. Aug. 19, 2004). Accordingly, court-appointed receivers or law guardians acting in accordance with a judicial mandate are immune from suit. *MacKay v. Crews*, No. 09-cv-2218, 2009 **WL** 5062119, at *12 (E.D.N.Y. Dec. 16, 2009).

**\*8** Applying the standards above, Plaintiffs' claims against Justice **Dane**, Judge Mejias, Justice Steinman, Davis and Schlesinger are precluded. Here, the state courts at issue are vested with subject matter jurisdiction over Plaintiffs' divorce proceedings and Plaintiffs have failed to plausibly allege that the rulings made during the matrimonial dispute were outside their jurisdiction. The Amended Complaint similarly fails to plausibly set forth any allegations that Davis and Schlesinger, as appointed temporary receivers, acted outside their judicial mandate. As a result, the claims against these Defendants are barred under the judicial and quasi-judicial immunity doctrines and the Court recommends dismissal of Plaintiffs' claims against them on jurisdictional grounds.

**B. Failure to State a Claim**

Turning to the merits, the Court also concludes that various causes of action set forth in the Amended Complaint fail to state a claim under Fed. R. Civ. P. 12(b)(6). The Court addresses these in turn.

*i.* 🚩 *42 U.S.C. § 1983*

The majority of Plaintiffs' Section 1983 claims fail as a matter of law. 🚩 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

🚩 42 U.S.C. § 1983. Although 🚩 section 1983 itself does not create substantive rights, it does provide "a procedure for

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 157 of 185

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

redress for the deprivation of rights established elsewhere."
*Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). To prevail
on a claim arising under 42 U.S.C. § 1983, a plaintiff
must establish: "(1) the deprivation of any rights, privileges,
or immunities secured by the Constitution and its laws; (2)
by a person acting under the color of state[-]law." *Hawkins
v. Nassau Cty. Corr. Facility*, 781 F. Supp. 2d 107, 111
(E.D.N.Y. 2011) (citing 42 U.S.C. § 1983).

### 1. Color of State Law

Beginning the merits analysis with Zenir and Sherman,
the Court concludes that the Amended Complaint fails to
plausibly allege they acted under the color of state law as
required to set forth a viable 42 U.S.C. § 1983. Section
1983 liability may be imposed only upon wrongdoers "who
carry a badge of authority of a State and represent it in some
capacity, whether they act in accordance with their authority
or misuse it." *National Collegiate Athletic Association
v. Tarkanian*, 488 U.S. 179, 191, 109 S.Ct. 454, 461(1988)
(internal quotations and citation omitted).

Here, Plaintiffs essentially allege that Sherman and Zenir,
solely through their positions, as a private attorney licensed
in New York and as a court-appointed law guardian,
respectively, were acting under the color of state law. Yet it has
been repeatedly held that law guardians, although appointed
by the court, exercise independent professional judgment in
the interests of the clients they represent and are therefore not
state actors for purposes of Section 1983. *See Arena v.
Dep't of Soc. Servs. of Nassau Cty.*, 216 F. Supp. 2d 146, 155
(E.D.N.Y. 2002) (citing *Storck v. Suffolk Cty. Dep't of Soc.
Servs.*, 62 F. Supp. 2d 927, 941 (E.D.N.Y. 1999) ). And private
attorneys are not state actors simply by their state-issued
licenses to practice law. *See Polk County v. Dodson*, 454
U.S. 312, 319, 102 S.Ct. 445, 450 (1981). As a result, without
more, the Amended Complaint fails to allege that Zenir and
Sherman acted under the color of state law sufficient to
establish claims against them pursuant to Section 1983.
Accordingly, the Court recommends dismissal of Plaintiffs'
42 U.S.C. § 1983 causes of action against Zenir and
Sherman on this basis.

### 2. Equal Protection

Plaintiffs' equal protection cause of action also fails as
a matter of law. A plaintiff asserting a class-based equal
protection claim under Section 1983 must allege that
the discriminatory actions were intentional and based on
her membership in a protected class. *See Brown v. City
of Oneonta*, 221 F.3d 329 (2d Cir. 2000). Alternatively, a
plaintiff may pursue an equal protection claim under a "class
of one" theory. *See Vassallo v. Lando*, 591 F. Supp. 2d
172, 183 (E.D.N.Y. 2008). A class-of-one equal protection
claim arises when an individual is "intentionally treated
differently from others similarly situated and ... there is no
rational basis for the difference in treatment." *Fortress
Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012)
(quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564,
120 S.Ct. 1073, 1074 (2000) ). Here, Plaintiffs fail to identify
or allege the existence of any similarly situated comparator,
whether distinguished by membership in a protected class or
otherwise. Accordingly, the Court recommends dismissal of
Plaintiffs' equal protection claim for failure to state a cause
of action.

### 3. Substantive Due Process

**\*9** Plaintiffs' substantive due process cause of action is
likewise untenable. Substantive due process "is the right
to be free of arbitrary government action that infringes a
protected right." *O'Connor v. Pierson*, 426 F.3d 187, 200
n.6 (2d Cir. 2005). To prevail on a substantive due process
claim, a plaintiff must establish that the defendant infringed
on a protected liberty or property interest in an arbitrary or
irrational manner that shocks the conscience. *See Pena
v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005). To establish a
violation of substantive due process for the right to custody,
a plaintiff must demonstrate that the state action was "so
shocking, arbitrary, and egregious that the Due Process Clause
would not countenance it even were it accompanied by full
procedural protection." *Tenenbaum v. Williams*, 193 F.3d
581, 600 (2d Cir. 1999). It is not enough that the government
act be "incorrect or ill-advised"; it must be "conscience-
shocking." *Kaluczky v. City of White Plains*, 57 F.3d 202,
211 (2d Cir. 1995). "Only the most egregious official conduct

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 158 of 185

can be said to be arbitrary in the constitutional sense and therefore unconstitutional." 🚩 *Tenenbaum*, 193 F.3d at 600 (internal quotation marks omitted).

Even construing the Amended Complaint's allegations in a light most favorable to Plaintiffs, they fail to set forth a substantive due process violation. A divorce proceeding granting custody to one parent over the other, modifying child support and liquidating marital property can hardly be said to shock the conscience. At best, the Amended Complaint alleges "incorrect" or "ill-advised" government decision-making, which is insufficient to sustain a viable substantive due process violation. As a result, Court recommends dismissal of Plaintiffs' substantive due process cause of action.

### 4. Procedural Due Process

The Court also concludes that the Amended Complaint fails to set forth a viable procedural due process claim. To establish a procedural due process violation, a plaintiff must prove that she was deprived of "an opportunity granted at a meaningful time and in a meaningful manner for a hearing appropriate to the nature of the case." 🚩 *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988) (internal quotation omitted). Plaintiff, however, does not allege that she was denied the opportunity to be heard. Instead, she concedes that she was afforded a state court hearing and even chose to appeal the adverse decision rendered in that proceeding. "[T]he availability of such recourse [within the state judicial system], as a matter of law, precludes finding that the defendants' conduct violated" Plaintiffs' rights to procedural due process under the Fourteenth Amendment. 🚩 *T.S. Haulers, Inc. v. Town of Riverhead*, 190 F.Supp.2d 455, 465 (E.D.N.Y. 2002). Accordingly, the Court recommends dismissal of Plaintiffs' procedural due process cause of action on its merits.

### ii. 🚩 *42 U.S.C. § 1985*

Plaintiffs' conspiracy cause of action under 🚩 42 U.S.C. § 1985 is also without merit. To state a claim for conspiracy under 🚩 Section 1985(3), a plaintiff must allege:

(1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen.

🚩 *Turkmen v. Hasty*, 789 F.3d 218, 262 (2d Cir. 2015). To prevail on a claim under 🚩 42 U.S.C. § 1985(3), "the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." 🚩 *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (quoting 🚩 *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) ). Plaintiffs, however, fail to allege that Defendants acted with any racial, class-based, or otherwise discriminatory animus. Accordingly, the Court recommends that Plaintiffs' 🚩 Section 1985 cause of action be dismissed for failure to state a cause of action.

### iii. 🚩 *42 U.S.C. § 1986*

**\*10** As Plaintiffs fail to plead a viable 🚩 Section 1985 cause of action, their Section 1986 claim is similarly invalid. 42 U.S.C. § 1986 imposes liability on an individual who has knowledge of discrimination prohibited under 🚩 42 U.S.C. § 1985. 🚩 *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996). Accordingly, Section 1986 claim depends on a tenable 🚩 Section 1985 claim. *See* 🚩 *Mian*, 7 F.3d at 1088 (finding that Section 1986 claims depend on a valid 🚩 section 1985 claim). As a result, having concluded that Plaintiffs fail to state a claim under 🚩 Section 1985, the Court also recommends dismissal of Plaintiffs' Section 1986 cause of action.

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 159 of 185

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

### iv. RICO

Finally, the Court concludes that Plaintiffs' RICO cause of action fails as a matter of law. To bring a RICO claim, a plaintiff must allege (1) that the defendants (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly to conduct or participate in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *See* *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). "Racketeering activity" is defined as comprising specific enumerated crimes, including mail fraud as alleged in the Amended Complaint. 18 U.S.C. § 1961(1). Here, Plaintiffs summarily allege that Defendants were engaged in mail fraud so as to constitute "racketeering activity," but fail to set forth any facts or details as to how Defendants carried out such fraudulent activity. Nor does the Amended Complaint explain how Defendants participated in an "enterprise" and there are no allegations how the underlying marital proceedings affected interstate or foreign commerce. Such naked assertions devoid of factual enhancement are insufficient as a matter of law and the Court accordingly recommends that Plaintiffs' RICO claim be dismissed on its merits.

### C. Supplemental Jurisdiction Over State-Law Claims

Having recommended that each of Plaintiffs' federal causes be dismissed, the Court also recommends that the Court decline to exercise supplemental jurisdiction over any remaining state law causes of action. *See* *Quiroz v. U.S. Bank Nat'l Ass'n*, No. 10-CV-2485, 2011 **WL** 2471733, at *8 (E.D.N.Y. May 16, 2011) (recommending that the district court decline to exercise supplemental jurisdiction) (Report and Recommendation), *adopted by*, 2011 **WL** 3471497 (E.D.N.Y. Aug. 5, 2011). Supplemental jurisdiction over Plaintiffs' state-law claims is governed by 28 U.S.C. § 1367, which provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy ..." 28 U.S.C. § 1367(a).

Where a district court dismisses for lack of subject matter jurisdiction, the district court may not exercise its discretion to retain supplemental jurisdiction over related state-law claims, which is the case here. *See* *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 399 (2d Cir. 2017). Accordingly, the Court recommends that supplemental jurisdiction over Plaintiffs' state-law causes of action be declined.

### D. Leave to File an Amended Complaint

While leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Yet the court must be mindful of the unique context of a *pro se* complaint and "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Aquino v. Prudential Life & Cas. Ins. Co.*, 419 F. Supp. 2d 259, 278 (E.D.N.Y. 2005); *see also* *Thompson v. Carter*, 284 F.3d 411, 419 (2d Cir. 2002) ("The liberal pleading standards applicable to *pro se* civil rights complaints in this circuit require that the district court give [plaintiff] an opportunity to flesh out his somewhat skeletal complaints before dismissing them"). That said, "a district court may deny leave to amend when, as here, amendment would be futile because the problem with the claim 'is substantive ... [and] better pleading will not cure it.'" *Reynolds v. City of Mount Vernon*, 14-CV-1481, 2015 **WL** 1514894, at *5 (S.D.N.Y. Apr. 1, 2015) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

**\*11** Despite the leniency afforded Plaintiffs considering their *pro se* status, the Court finds that the deficiencies in their pleadings are substantive, and because of the untenable nature of their claims, any further amendments would be futile. Additionally, in their opposition Plaintiffs have not requested permission to file a second amended complaint, nor have they "given any indication that [they are] in possession of facts that would cure the problems identified in this opinion." *Clark v. Kitt*, 12-CV-8061, 2014 **WL** 4054284, at *15 (S.D.N.Y. Aug. 15, 2014). Accordingly, as the facts present in the pleadings "give[ ] no indication that a valid claim may be stated," the Court respectfully recommends that Plaintiffs be denied leave to amend. *See* *Flaherty v. All Hampton Limousine, Inc.*, 02-CV-4801, 2008 **WL** 2788171, at *8 (E.D.N.Y. July 16, 2008).

### IV. CONCLUSION

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 160 of 185

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

For the reasons set forth above, the Court respectfully recommends that the motions to dismiss be granted in their entirety and that the Amended Complaint be dismissed without prejudice.[3] The Court recommends dismissal for lack of subject matter jurisdiction under the *Rooker-Feldman* and domestic relations exception doctrines. The Court also recommends dismissal of the claims against Defendants Justice Dane, Justice Steinman, Judge Mejias, Marks, Zenir, Davis and Schlesinger for lack of subject matter jurisdiction based on the judicial and quasi-judicial immunity doctrines. Similarly, the causes of action against New York State should be dismissed because they are barred by the Eleventh Amendment.

The Court also recommends dismissal of the majority of Plaintiffs' 42 U.S.C. §§ 1983, 1985 and 1986 and RICO causes of action on their merits for failure to state a claim. Finally, the Court recommends that supplemental jurisdiction over Plaintiffs' remaining state law causes of action be declined and that leave to amend be denied.

## V. OBJECTIONS

A copy of this Report and Recommendation is being served on Defendants by electronic filing on the date below. Defendants are directed to serve a copy of this Report and Recommendation on Plaintiffs and promptly file proof of service by ECF. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 5077164

## Footnotes

1      While the caption indicates that Temmi Kramer seeks to represent the interests of her children, the Court notes that the Amended Complaint is verified by both Temmi Kramer and Zachary Kramer. As a result, the Court construes the Amended Complaint as Temmi and Zachary Kramer bringing claims in their respective individual capacities in addition to Temmi Kramer's attempt to represent the interests of her children, Kevin Kramer and infants J.K. and R.K.

2      The Court is mindful that "whether the claim of sovereign immunity [under the Eleventh Amendment] constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense" has not been definitively answered by the Supreme Court or the Second Circuit. *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) (citing *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 391, 118 S. Ct. 2047, 2053 (1998) (leaving open whether "Eleventh Amendment immunity is a matter of subject-matter jurisdiction"); *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237-39 (2d Cir. 2006) (holding that the burden of proof for sovereign immunity rests on the party asserting it as is true of affirmative defenses generally) ). But the Supreme Court discussed the Eleventh Amendment as a jurisdictional bar and has confirmed that a state's sovereign immunity conferred by it can be raised for the first time on appeal. *See Woods*, 466 F.3d at 237-38 (collecting cases). Both holdings accord with the issue being essentially jurisdictional. *See id.* As the exact characterization of Eleventh Amendment immunity does not substantively impact this Court's Report and Recommendation that the Amended Complaint be dismissed, the Court assumes it to be jurisdictional and does not analyze the issue further.

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 161 of 185

Kramer v. Dane, Not Reported in Fed. Supp. (2018)

3     Second Circuit precedent instructs that when a court dismisses for lack of subject-matter jurisdiction, that dismissal must be without prejudice. *See Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d Cir. 1999) ("[W]here a court lacks subject matter jurisdiction, it also lacks the power to dismiss with prejudice.").

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 162 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

2019 WL 7067043
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Joseph WATLEY and Karin Hasemann, Plaintiffs,
v.
DEPARTMENT OF CHILDREN & FAMILIES,
Joette Katz, and Vannessa Dorantes, Defendants.

CASE NO. 3:13-cv-1858(RNC)
|
Signed 12/23/2019

**Attorneys and Law Firms**

Andrew D. O'Toole, O'Toole + O'Toole LLC, Dan Barrett, Elana Spungen Bildner, ACLU Foundation of Connecticut, Hartford, CT, for Plaintiffs.

Alayna Michelle Stone, Jane R. Rosenberg, Attorney General's Office Administration, Hartford, CT, for Defendants.

RULING AND ORDER

Robert N. Chatigny, United States District Judge

 **\*1**  Plaintiffs Joseph Watley and Karin Hasemann bring this action against the Connecticut Department of Children & Families ("DCF"), former DCF Commissioner Joette Katz, and current Commissioner Vanessa Dorantes, claiming that DCF took custody of their children, and ultimately obtained a final court order terminating their parental rights, in violation of federal laws protecting persons with disabilities. The action has been remanded following sua sponte dismissal of the original complaint, which was filed pro se. See ECF Nos. 9 (dismissing case), 22 (order of Second Circuit vacating and remanding). The amended complaint, prepared by counsel, alleges violations of the plaintiffs' rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12134; the Rehabilitation Act ("RA"), 29 U.S.C. § 794; and the Due Process Clause of the Fourteenth Amendment, made enforceable under 42 U.S.C. § 1983. Plaintiffs seek money damages to redress DCF's alleged intentional discrimination and failure to provide reasonable accommodations. In addition, they seek injunctive relief requiring DCF to adopt certain institutional reforms. [1]

Plaintiffs commenced this action in federal district court after more than a decade of litigation in the trial and appellate courts of Connecticut, including five neglect trials, four termination of parental rights ("TPR") trials, and three appeals. Published decisions of state trial and appellate courts in the underlying proceedings frame the present action. See In re Joseph W., Jr., 53 Conn. Supp. 1, 79 A.3d 155 (2013)(describing procedural history in detail). [2] The decisions show the following:

 **\*2**  - DCF obtained orders of temporary custody with regard to plaintiffs' children soon after each was born on the ground that the children would be in immediate physical danger if they were left in plaintiffs' care;

- DCF's subsequent actions affecting plaintiffs' parental rights were undertaken in conjunction with court orders requiring plaintiffs to take certain specific steps to regain custody;

- the court-ordered steps and their implementation took account of the requirement in the applicable state statute that DCF make "reasonable efforts" to reunite a parent and child, Conn. Gen. Stat. § 17a-112(j);

- the reasonable efforts requirement in state law aligns with federal law, which prohibits a state from seeking to terminate parental rights without first making reasonable efforts to preserve the family, as required by the Adoption Assistance and Child Welfare Act, 42 U.S.C. § 1305 (1980), and the Adoption and Safe Families Act, 42 U.S.C. § 1305 (1997);

- the reasonable efforts requirement under state law requires DCF to consider a parent's disabilities, including mental disabilities;

- in the course of the proceedings leading to termination of plaintiffs' parental rights ("TPR proceedings"), both plaintiffs denied having any disability and resisted having to cooperate with DCF and comply with court-ordered specific steps;

- plaintiffs asserted that the removal of the children from their custody constituted discrimination based on their perceived disabilities in violation of the ADA, that their lawyers were ineffective in failing to adequately present defenses under the ADA, and that an "ADA coordinator" should be present throughout court proceedings;

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 163 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

- plaintiffs were not given an ADA coordinator but they were given additional time and other assistance to meet the court-ordered steps and, on this basis, DCF was found to have met the reasonable efforts requirement before plaintiffs' parental rights were terminated.

Pending for decision is defendants' motion to dismiss all the claims in the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). Defendants contend that the claims for damages are barred by the Rooker-Feldman doctrine, [3] collateral estoppel, the statute of limitations, sovereign immunity and qualified immunity. They further contend that plaintiffs lack standing to seek injunctive relief. Discovery has been stayed at the request of the defendants over plaintiffs' objection pending a determination of whether plaintiffs have any legal basis on which they can proceed.

In opposing dismissal of the amended complaint, plaintiffs emphasize that before their parental rights were terminated, they were denied the assistance of an ADA coordinator. They contend that the denial violated Title II of the ADA, which provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation or denied the benefits of the services, programs or activities of a public entity." 42 U.S.C. § 12132. When plaintiffs requested an ADA coordinator, DCF took the position that Title II of the ADA did not apply in child protection proceedings, which was a common view, if not the prevailing view, at the time. See Michael Lanci, Note, In the Child's Best Interests? Rethinking Consideration of Physical Disability in Child Custody Disputes, 118 Colum. L. Rev. 875, 883 n.51 (2018) (citing In re Adoption of Gregory, 434 Mass. 117, 747 N.E.2d 120, 124 (Mass. 2001); In re Doe, 60 P.3d 285, 290-91 (Haw. 2002)). [4] The state trial court agreed with DCF that the ADA did not "create[ ] special obligations in a child protection proceeding." In re Joseph W., 2011 WL 5842570, at *5. Plaintiffs sought appellate review of this issue without success. In re Joseph W., 305 Conn. at 653, 46 A.3d 59 ("[W]e reject the ADA claim of the father...."); In re Joseph W., 146 Conn. App. at 476, 78 A.3d 276 (rejecting the ADA claim of the mother).

*3 In the amended complaint, plaintiffs allege that during the period 2002 to 2013, DCF violated the antidiscrimination provision of the ADA by removing their children, and later seeking termination of their parental rights, based on discredited stereotypes about the parenting ability of persons with mental disabilities. They also contend that DCF violated the ADA by failing to provide them with reasonable accommodations enabling them to regain custody. Because no state court squarely addressed these claims in the underlying proceedings, plaintiffs submit that they should be able to litigate them here.

Defendants argue that plaintiffs cannot obtain relief on the claims in the amended complaint without asking this court to review and reject decisions made by the state courts. Defendants' assessment is accurate. A final termination of parental rights cannot occur unless a state court makes certain findings, including the crucial finding that "reasonable efforts" to achieve reunification have been made by the state with due regard for the parent's disabilities. A claim in federal court that parental rights have been unlawfully terminated due to discrimination on the basis of disability necessarily asks the federal court to review the state court's decision and either vacate it or award damages or both. But few principles are as firmly established as the rule that prohibits federal district courts from reviewing decisions of state courts. In our system of state and federal courts, the only federal court empowered to review state court decisions is the United States Supreme Court. This rule applies even when the state court has incorrectly decided an issue of federal law.

I recognize the profoundly serious nature of the harm for which plaintiffs seek redress. I also appreciate the role and responsibility of the federal district court in ensuring access to a federal trial proceeding for persons whose federal rights have been violated by state officials. Nevertheless, I conclude that the amended complaint must be dismissed.

The primary obstacle to adjudication of the claims in the amended complaint is the Rooker-Feldman doctrine, which provides that federal district courts lack subject matter jurisdiction to review state court judgments. Plaintiffs have the burden of demonstrating that subject matter jurisdiction exists, notwithstanding Rooker-Feldman. To meet this burden, it must be shown that they can obtain relief on the claims in the amended complaint without this court effectively reviewing and rejecting a state court decision. Unquestionably, had the state courts squarely confronted the claims in the amended complaint and rejected them on the merits, this court would lack jurisdiction to review those decisions. It is no different when, as here, the state courts rejected the ADA claims in substance.

Not all of DCF's actions were undertaken pursuant to a court order, so Rooker-Feldman is not a complete bar to the claims in the amended complaint. But other obstacles prevent plaintiffs from proceeding on these claims: collateral estoppel bars relitigation of issues decided in state court; most of the actions complained of fall well outside the three-year statute of limitations; plaintiffs' claim for damages under 📄 § 1983 is unsupported by allegations necessary to state a claim for relief against former Commissioner Katz and cannot be maintained in any event because of qualified immunity; and plaintiffs lack standing to pursue injunctive relief. Accordingly, the amended complaint will be dismissed.

I. Background

Plaintiffs are the biological parents of two sons, Joseph Jr. and Daniel. Ms. Hasemann is also the biological mother of a daughter, Kristina. DCF is the state agency responsible for responding to reports of child abuse and neglect, providing substitute care, and making efforts to reunite families before resorting to termination proceedings. Defendant Katz served as Commissioner of DCF from February 2011 to January 2019. Defendant Dorantes has been Commissioner of DCF since February 2019. [5]

**\*4** Between 2002 and 2013, DCF pursued neglect and termination proceedings against the plaintiffs, ultimately resulting in the termination of Ms. Hasemann's parental rights with respect to all three children and Mr. Watley's parental rights with respect to Joseph Jr. and Daniel. All three children have been adopted and are reportedly doing well and plaintiffs do not seek an order overturning the termination of their parental rights. Rather, they seek damages for emotional distress and injunctive relief in the nature of systemic reforms to ensure DCF's future compliance with the ADA in connection with neglect and TPR proceedings.

Ms. Hasemann's interaction with DCF began in October 2002, when she gave birth to Kristina. Kristina was born prematurely at 34 weeks and required complex medical care. The hospital contacted DCF due to Ms. Hasemann's response to Kristina's birth. She "insisted the girl was a boy, [that the baby had] had a heart attack, and [that she] should be fed in an unusual and inappropriate pattern even though the food intake for this premature baby was crucial." In re Kristina H, No. L15CP02007724A, 2004 WL 886937, at *1 (Conn. Super.

Ct. Apr. 2, 2004). She also informed the hospital she suffered from narcolepsy. [6]

On the basis of the hospital's report, DCF invoked a 96-hour hold under Connecticut law, which authorizes DCF to remove a child without parental consent for up to 96 hours if it has probable cause to believe the child is in imminent risk of physical harm and immediate removal is necessary to ensure the child's safety. Conn. Gen. Stat. § 17a-101g(e) and (f). DCF simultaneously went to court and sought an Order of Temporary Custody ("OTC"), which was granted on the ground that Kristina would be in immediate physical danger if she remained under the care of her mother.

The court issued preliminary "specific steps," which Ms. Hasemann was required to follow in order to regain custody. In re Kristina H., No. L15CP02007724A, 2007 WL 241218, at *1, *3, *7 (Conn. Super. Ct. Jan. 17, 2007) (citing 📄 Conn. Gen. Stat. § 46b-129). In 2004, "the court adjudicated Kristina neglected," and committed her "to the care, custody and guardianship of DCF." Id. at *1. DCF later filed a termination of parental rights petition. After a trial in 2007, Ms. Hasemann's parental rights were terminated. Id. at *1, *27.

Joseph Jr. and Daniel were born in July 2005 and July 2006, respectively. Soon after each was born, the state court issued an OTC. [7] In both cases, the court issued specific steps for both plaintiffs. In re Joseph W., Jr., 53 Conn. Supp. at 2, 5-6, 79 A.3d 155. DCF's neglect petitions alleged "predictive neglect," which requires a showing that under the parents' care, it is "more likely than not" that the child would be "denied proper care and attention physically, educationally, emotionally or morally." Id. at 5, 79 A.3d 155 (citing In re Joseph W., 305 Conn. 633, 648-49, 46 A.3d 59 (2012)). [8]

**\*5** In December 2007, soon after Ms. Hasemann's parental rights were terminated with regard to Kristina, DCF filed termination of parental rights petitions with regard to Joseph Jr. and Daniel. Id. at 7, 79 A.3d 155. After a trial in October 2008, the court terminated plaintiffs' parental rights with respect to both children. Id. The Appellate Court reversed the judgment of the trial court on the ground that Mr. Watley had not been given an adequate opportunity to contest a finding of neglect. Id. at 8, 79 A.3d 155 (citing 📄 In re Joseph W., Jr., 301 Conn. 245, 21 A.3d 723 (2011)). In 2011, the Connecticut Supreme Court agreed with the decision of the Appellate

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 165 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

Court and remanded the case for a new trial. In re Joseph W., Jr., 301 Conn. at 248, 21 A.3d 723.

Following another trial in April 2012, the trial court again terminated plaintiffs' parental rights. See In re Joseph W., Jr., 53 Conn. Supp. at 9, 79 A.3d 155. This judgment also was reversed on appeal. The Connecticut Supreme Court held that a third trial was necessary because the trial court had applied the wrong standard of proof for determining "predictive neglect." In re Joseph W., 305 Conn. at 645, 648, 46 A.3d 59.

After a third trial in December 2012, the trial court terminated plaintiffs' parental rights, the Appellate Court affirmed, and the Connecticut Supreme Court denied certiorari. See In re Joseph W., Jr., 53 Conn. Supp. 1, 192, 79 A.3d 155, aff'd, 146 Conn. App. at 477, 78 A.3d 276, cert. denied, 310 Conn. at 950.

In the course of the underlying proceedings, plaintiffs were evaluated by a number of professionals, sometimes at the direction of DCF and sometimes by court order. See, e.g., id. at 17, 21-23, 29, 42-43, 146, 79 A.3d 155. Ms. Hasemann was found to have severe narcolepsy, schizotypal personality disorder, attention-deficit/hyperactivity disorder, chronic functional impairments, cognitive disorder not otherwise specified, cognitive deficits, antisocial personality disorder, and major depression. She also may suffer from the residual effects of a frontal lobe brain tumor removal that occurred when she was sixteen. Mr. Watley has been found to have "a personality disorder not otherwise specified." He receives Social Security Disability Insurance benefits because of a spinal injury resulting from a car accident.

## II. Legal Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011) (quotation marks and citation omitted), aff'd, 568 U.S. 85, 133 S.Ct. 721, 184 L.Ed.2d 553 (2013). The party asserting subject matter jurisdiction has the burden of proving its existence by a preponderance of the evidence. Luckett v. Bure, 290 F.3d 493, 497 (2d Cir. 2002).

To survive a motion to dismiss for failure to state a claim on which relief may be granted under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim satisfies the plausibility standard if it is supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

## III. Discussion

In the following sections, I first address the issue of sovereign immunity and conclude that the state has waived its Eleventh Amendment immunity under the RA, which makes it unnecessary to decide whether the ADA abrogates a state's sovereign immunity. I then address the claims for money damages, first under the ADA and RA, then under § 1983. I conclude that the claims under the ADA and RA are barred by Rooker-Feldman, collateral estoppel and the statute of limitations, and that the claim under § 1983 is similarly barred. I also conclude that plaintiffs cannot recover damages under § 1983 because they do not plausibly allege that former Commissioner Katz was personally involved in the alleged deprivation of federal rights. I further conclude that even if plaintiffs could plausibly state such a claim, it would have to be dismissed based on qualified immunity. Finally, I address the issue of plaintiffs' standing to seek injunctive relief and conclude that their allegations are insufficient to support standing under Article III to seek the injunctive relief set forth in the amended complaint.

### A. Sovereign Immunity

**\*6** The Eleventh Amendment to the United States Constitution "generally bars suits in federal court by private individuals against non-consenting states." Leitner v. Westchester Cmm'ty Coll., 779 F.3d 130, 134 (2d Cir. 2015) (citing Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990)). Eleventh Amendment immunity "encompasses not just actions in which the state is actually named as a defendant, but also certain actions against state agents and instrumentalities, including actions for the recovery of money from the state."

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 166 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

Id. (quoting Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997)). Eleventh Amendment immunity is subject to the exception articulated in Ex parte Young, 209 U.S. 23 (1908), which allows for injunctive relief. See Milliken v. Bradley, 433 U.S. 267, 289, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (noting that the Ex parte Young exception "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law"). [9]

DCF (and Commissioner Dorantes in her official capacity) may invoke Eleventh Amendment immunity. Bhatia v. Conn. Dep't of Children & Families (DCF), 317 Fed. App'x 51, 52 (2d Cir. 2009). Therefore, plaintiffs cannot obtain money damages under the ADA and RA unless the state has consented to suit or Congress has validly abrogated the state's immunity. NAACP v. Merrill, 939 F.3d 470, 475 (2d Cir. 2019). Congress may override the Eleventh Amendment when it legislates pursuant to § 5 of the Fourteenth Amendment. Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The ADA contains a purported abrogation of Eleventh Amendment immunity, and the RA contains a purported waiver clause for state agencies that accept federal funding. See Garcia v. S.U.N.Y. Health Sci. Cent. of Brooklyn, 280 F.3d 98 (2d Cir. 2001). [10]

In Garcia, the Court of Appeals examined the ADA and RA to assess their impact on a state's sovereign immunity. The Court concluded that the ADA's abrogation is valid as to conduct motivated by "discriminatory animus or ill will due to disability." See 280 F.3d at 112. The Court also stated that the RA expresses Congress's clear "intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity." Id. at 113.

*7 The Garcia court concluded that, under the circumstances presented there, the defendant could have believed it had already lost its immunity under the ADA's abrogation, so its acceptance of federal funds was not a knowing waiver of immunity under the RA; the state agency could not have knowingly waived a right it did not believe it possessed. See id. at 113-15.

After Garcia, a state accepting federal funds would know that the validity of the ADA's abrogation was "far from clear." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 495-96 (4th Cir. 2005). DCF accepted federal funding in that context, thereby waiving its immunity under the RA. Accordingly, the Eleventh Amendment does not bar plaintiffs' suit. See Garcia, 280 F.3d at 113-14; Ross, 211 F. Supp. 3d at 528. [11]

B. Claims for Damages

1. Count One: Intentional Discrimination Under the ADA/RA

In count one, plaintiffs allege that they are each disabled, or regarded by defendants as disabled, and that DCF intentionally discriminated against them by

> (1) placing Joe Jr. and Daniel into foster care based on stereotypes and assumptions based on Plaintiffs' disabilities, (2) failing to provide Plaintiffs with family supports even though Mr. Watley and Ms. Hasemann had good family supports, (3) denying Plaintiffs equal opportunities to participate in and benefit from its services, programs, and activities; (4) utilizing criteria and methods of administration having the effect of discriminating against Plaintiffs on the basis of disability and defeating or substantially impairing accomplishment of the objectives of its rehabilitation and/or reunification program with respect to Plaintiffs; and (5) failing to reasonably modify its policies, practices, and procedures where necessary to avoid discriminating against Plaintiffs on the basis of their disability.

Am. Compl. ¶ 95 (citations omitted). They further allege that DCF "failed to (1) implement appropriate reunification services ... (2) identify appropriate tasks; [and] (3) assist Plaintiffs in meeting tasks to achieve rehabilitation

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 167 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

reunification," as well as failing to impose "only necessary and legitimate safety requirements." Id. ¶ 97. They also claim DCF acted with deliberate indifference. Id. ¶ 100.

a. Legal Standards

To establish a violation under the ADA or RA, "plaintiffs must demonstrate that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities." Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003). [12]

*8 To establish that discrimination occurred "by reason of" their disabilities, plaintiffs must demonstrate that disability discrimination was a "but-for cause of any adverse" action. Natofsky v. City of New York, 921 F.3d 337, 348 (2d Cir. 2019); see also id. at 349 ("We conclude that 'on the basis of' in the ADA requires a but-for causation standard."). [13] Using this but-for standard, plaintiffs can pursue three theories of discrimination: disparate impact, disparate treatment, and failure to make reasonable accommodations.

See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48 (2d Cir. 2002) (recognizing availability of all three theories under ADA, RA, and Fair Housing Act), superseded by statute on other grounds. "Regardless of a plaintiff's theory of liability," they must show but-for causation. H.P. ex rel. W.P. v. Naperville Cmty. Unit Sch. Dist. #203, 910 F.3d 957, 960 (7th Cir. 2018).

b. Analysis

I conclude that the claims of direct discrimination in count one are precluded by the Rooker-Feldman doctrine, collateral estoppel and the statute of limitations.

i. Rooker-Feldman

The Rooker-Feldman doctrine prevents a party who has lost in state court from obtaining review of the state court judgment by a federal district court. See Lance v. Dennis, 546 U.S. 459, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006); Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). The doctrine applies if

four requirements are met: (1) the plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by the state court judgment; (3) the plaintiff must ask the district court to review and reject that judgment; and (4) the state court judgment must have been rendered before the district court proceedings commenced. Green v. Mattingly, 585 F.3d 97, 101 (2d Cir. 2009) (citing Hoblock v. Albany Cty. Bd. of Elections, 422 F.3d 77, 85 (2d Cir. 2005)).

Rooker-Feldman applies broadly to any suit that, in effect, seeks review of or damages based on a state court judgment. It precludes, for example, any claim "seek[ing] vacatur or rejection of [an] order terminating [plaintiffs'] parental rights." Voltaire v. Westchester Cty. Dep't of Soc. Servs., No. 11-cv-8876 (CS), 2016 WL 4540837, at *9 (S.D.N.Y. Aug. 29, 2016). But it also precludes an award of damages stemming from an injury sustained as a result of a state court determination. See id. at *11, 79 A.3d 155 (citing Lomnicki v. Cardinal McCloskey Servs., No. 04-cv-4548, 2007 WL 2176059, at *5 (S.D.N.Y. July 26, 2007) and McClean v. City of N.Y., No. 04-cv-8353, 2007 WL 415138, at *4 (S.D.N.Y. Feb. 6, 2007)); Sample v. Monterey Cty. Family & Children Servs., No. C09-01005 HRL, 2009 WL 2485748, at *3 (N.D. Cal. Aug. 7, 2009) ("Although [plaintiff] asks for monetary damages, she would only receive a damage award if this court determined that the Dependency Court's decisions pertaining to the custody of her children — including any review or authorization of defendants' actions — were in error."); Lomnicki v. Cardinal McCloskey Servs., No. 04-CV-4548 (KMK), 2007 WL 2176059, at *5 (S.D.N.Y. July 26, 2007) ("Plaintiff does not avoid Rooker-Feldman by seeking damages instead of injunctive relief. In order to award damages to Plaintiff, the Court would have to review the decision of the Family Court.").

*9 Rooker-Feldman can apply even if the claim presented in federal court was not presented in state court. The doctrine bars "not only claims that involve direct review of a state court decision, but also claims that are 'inextricably intertwined' with a state court decision." See Swiatkowski v. Bank of Am., NT & SA, 103 F. App'x 431, 432 (2d Cir. 2004). When a federal plaintiff relies on a legal theory not raised in state court, Rooker-Feldman will apply if the federal suit "complains of injury from a state-court judgment and seeks to have that state-court judgment reversed." Hoblock, 422 F.3d at 86.

In Hoblock, the Court of Appeals stated that a father whose parental rights have been terminated in state court "may not" sue in federal court on the theory that the judgment violates his substantive due process rights "regardless of whether he raised any constitutional claims in state court." Id. at 87. That observation is consistent with decisions of the Second Circuit concerning the impact of Rooker-Feldman in cases brought to federal court following child custody proceedings in state court. [14] District courts in this Circuit have likewise applied Rooker-Feldman to ADA claims that required review of state court decisions concerning child custody. [15]

The issue, then, is whether plaintiffs complain of injuries sustained as a result of decisions of state courts. Plaintiffs contend their injuries were caused by DCF rather than any judicial decision. [16] Defendants disagree. They contend that plaintiffs complain of injuries from state court decisions.

"[A] federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." Cho v. City of New York, 910 F.3d 639, 646 (2d Cir. 2018) (quoting Hoblock, 422 F.3d at 88). See also GASH Assocs. v. Village of Rosemont, 995 F.2d 726, 729 (7th Cir. 1993)(relevant question under Rooker-Feldman is whether "the injury of which [plaintiff] complains ... [was] caused by the judgment," or did the plaintiff merely "suffer an injury out of court and then fail to get relief from state court?").

**\*10** I agree with defendants that plaintiffs are seeking relief for injuries caused by state court decisions, which this court lacks jurisdiction to review under Rooker-Feldman. [17] The removal and placement of plaintiffs' children in foster care, provision of specific steps, determination of their visitation schedule, and termination of their parental rights took place pursuant to state court orders. See In re Joseph W., Jr., 53 Conn. Supp. at 5-6, 36, 49, 61-62, 69-77, 79 A.3d 155. In addition, the state courts rejected plaintiffs' requests for an ADA coordinator to be present during court proceedings; ruled that they had substantially failed to comply with the specific steps the courts had identified; determined that placement with plaintiffs' family members was not appropriate; and, in most instances, dictated the providers

from whom plaintiffs could receive treatment. See id. at 10-11, 21, 48, 61-62, 74-75, 98-99, 104, 117-20, 142-45, 156-57, 169-75, 79 A.3d 155; see also Bristol, 685 Fed. App'x at 28 (confirming that district court could judicially notice state court decisions that "bore directly on the question of issue preclusion"). To recover damages based on any of these matters, plaintiffs must demonstrate that the state courts erred. Rooker-Feldman dictates that this court abstain from engaging in substantive review of the state courts' decisions.

### ii. Collateral Estoppel

In addition to the jurisdictional bar posed by Rooker-Feldman, collateral estoppel – or issue preclusion – bars relitigation of issues decided by the state courts in the underlying proceedings. See Hoblock, 422 F.3d at 87-88, n.6. "In Connecticut, to be subject to collateral estoppel, an issue must have been (1) fully and fairly litigated, (2) actually decided, (3) necessary to the judgment in the first action, and (4) identical to the issue to be decided in the second action." Wanamaker v. Town of Westport Bd. of Educ., 11 F. Supp. 3d 51, 66 (D. Conn. 2014). Preclusive effect will be given to the final judgment of a trial court, so long as it has not been set aside, as well as to the final judgment of an appellate court. See Restatement (Second) of Judgments §§ 13, 27 & cmt. o (1982); Stone v. Williams, 970 F.2d 1043, 1054 (2d Cir. 1992) (noting that issue preclusion "prevent[s] relitigation of an issue of fact or law that has already been necessarily decided as part of a valid, final judgment").

Collateral estoppel precludes relitigation of the issue at the heart of plaintiffs' complaint – the propriety of DCF's decision to seek termination of their parental rights based on a finding of "predictive neglect." [18] Plaintiffs claim that this decision was based on unlawful stereotyping and discrimination. Am. Compl. ¶¶ 29, 52, 69. Defendants answer that DCF's decision was based on the need to protect the children from harm, as authorized by the "direct threat" exception under the ADA and RA. 28 C.F.R. § 35.139(a). They argue that collateral estoppel applies because plaintiffs cannot successfully challenge DCF's decision to seek termination of their parental rights without having this court review and reject the state courts' resolution of issues regarding the applicability of the direct threat exception. I agree. [19]

**\*11**  ADA-covered entities are not required "to permit an individual to participate in or benefit from" their programs or services if doing so would be a "direct threat to the health or safety of others." 28 C.F.R. § 35.139(a); see also 🚩 Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 219-21 (2d Cir. 2001); 🚩 Doe v. Deer Mountain Day Camp, Inc., 682 F. Supp. 2d 324, 345-50 (S.D.N.Y. 2010). [20] The ADA defines "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." 42 U.S.C. § 12182(b)(3). To determine whether an individual poses a significant risk to health or safety under the ADA, "a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk." 28 C.F.R. § 35.139(b).

Under Connecticut law, a court may terminate an individual's parental rights only if it finds that: (1) DCF has made "reasonable efforts" to reunify the parent and child, (2) termination is in the best interest of the child, and (3) one of several statutory grounds for termination is present, including, as relevant here, that the child is neglected and the parent has failed to achieve reunification. See In re Joseph W., 53 Conn. Supp. at 2-3, 141-43, 79 A.3d 155 (citing Conn. Gen. Stat. § 17a-112(j)). To establish predictive neglect (so as to satisfy the final prong), the state must show "on the basis of evidence of events preceding the filing of the neglect petition" that "it was more likely than not" that if the child had remained with the parent or parents, "the child would have been" neglected. In re Joseph W., Jr., 53 Conn. Supp. at 127, 79 A.3d 155 (brackets omitted) (quoting In re Joseph W., 305 Conn. at 648-49, 46 A.3d 59). Specifically, the state must show "that if the child were to remain in [the] parent's independent care, the child would be 'denied proper care and attention, physically, educationally, emotionally or morally ... or would [be] permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth.' " Id. (quoting In re Joseph W., 305 Conn. at 649, 46 A.3d 59).

In the underlying proceedings, the state courts decided that the predictive neglect doctrine was "correctly invoked." Id. at 128, 79 A.3d 155. In doing so, they necessarily determined

that leaving the children in the care of the plaintiffs would be "injurious" to the "well-being" of the children. See id. at 127, 79 A.3d 155. And for the state courts to terminate plaintiffs' parental rights, they had to find that DCF made "reasonable efforts" at reunification. Id. at 2-3, 141-43, 79 A.3d 155. In substance, then, the state courts determined that reunification would pose a significant risk to the health or safety of the children and that the risk could not be eliminated by a reasonable modification.

The final trial court's findings concerning the risk to the children and DCF's reasonable efforts at reunification were necessary to the judgment. A finding of probable harm was necessary to the neglect ruling, a finding that DCF had made reasonable efforts at reunification was also necessary to the neglect ruling, and the neglect ruling was necessary to the termination of plaintiffs' parental rights. See In re Joseph W., Jr., 53 Conn. Supp. at 2-3, 141-42, 79 A.3d 155; 150-151; 178-79; 182; 188-89.

**\*12**  To reject the direct threat defense in this case, it would be necessary to reject findings of fact made by the final trial court in its decision terminating plaintiffs' parental rights, which was affirmed on appellate review. The court found that "mother, aided by father, continued to engage in a cyclical pattern of conceiving children, whose custody, of necessity, had to be assumed by the state at birth in order to protect them from the real risk of imminent and serious harm that every professional who has ever evaluated and observed mother try to care for her children has noted as a serious concern." In re Joseph W., Jr., 53 Conn. Supp. at 136, 79 A.3d 155. The court also found that, "[l]ike mother, father showed an inability to safely supervise his children." Id. at 160, 79 A.3d 155. These factual findings – that the children were likely to be harmed if left in plaintiffs' care - are identical to the factual issues pertinent to the direct threat defense. Cf. 🚩 Jensen v. Foley, 295 F.3d 745, 747-48 (7th Cir. 2002) (state court's finding "that probable cause exists to believe that the child is neglected" under state law precludes Fourth Amendment claim because state law issue is identical to whether "taking is supported by probable cause to believe that the child would be subject to the danger of abuse if not removed," and therefore the federal court was "barred by the doctrine of issue preclusion from reconsidering the issue").

Plaintiffs argue that because DCF and the state courts failed to appreciate the applicability of the ADA, their ADA and RA claims were not fully and fairly litigated or necessary to the judgment. Plf. Mem. at 20. But the issues fully and fairly

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 170 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

litigated, actually decided, and necessary to the final state court judgment are inextricably intertwined with the ADA and RA claims presented here. The state court's findings and conclusions regarding those issues – e.g., that reunification would pose a danger to the children – operate to preclude the plaintiffs from stating an ADA/RA claim by conclusively establishing the direct threat defense as a matter of law at the motion-to-dismiss stage. See Matusick v. Erie Cty. Water Auth., 757 F.3d 31, 49 (2d Cir. 2014) (holding that even if the legal frameworks and standards applicable in two proceedings are not identical, the factual findings supporting the first judgment are given preclusive effect).

Plaintiffs further contend that it was never conclusively established in the underlying proceedings that DCF's actions were reasonable under the ADA. However, the state courts recognized that the reasonable efforts required of DCF to achieve reunification of a parent and child include "taking the parent's mental condition into consideration" and "failure to provide adequate services because of the parent's mental condition would violate not only [Connecticut law], but the ADA." In re Antony B., 54 Conn. App. 463, 473 n.9, 735 A.2d 893 (Conn. App. Ct. 1999); see also id. ("[W]e do not suggest that the ADA does not apply to the reunification services and programs that the department must make to meet the parents' specialized needs."). On the second appeal in the underlying proceedings, the Connecticut Supreme Court confirmed that In re Antony B.'s discussion of the ADA applies to neglect proceedings, and affirmed the trial court's rejection of plaintiffs' ADA claims. In re Joseph W., 305 Conn. at 650, 46 A.3d 59. On remand, the trial court stated: "Based on the law and the facts ... the ADA has not been violated in this case.... Under the particular circumstances of this case, the department made reasonable efforts even considering any ADA related issues. The respondents were not discriminated against under the ADA." In re Joseph W., 2012 WL 1759377, at *42–43. Because the requirements of state and federal antidiscrimination law are substantially the same in this respect, a federal plaintiff's ADA claims will generally be precluded when, as here, the state court has determined that DCF made reasonable efforts at reunification. Cf. In re Hicks/Brown, 893 N.W.2d at 639-40 (holding that, under Michigan law, the requirement that the state make "reasonable efforts to reunify a family before seeking termination of parental rights" entailed making "reasonable modifications" under the ADA).

Even if it were possible for DCF to comply with state law and nonetheless violate the ADA, collateral estoppel would still apply in this case. See Miller v. Nichols, 586 F.3d 53, 61 (1st Cir. 2009) (dismissing claims under the ADA and RA that the state "fail[ed] to accommodate the parents' needs in the context of the reunification obligation" because the underlying facts were litigated in state court), cert. denied, 559 U.S. 1008, 130 S.Ct. 1911, 176 L.Ed.2d 367 (2010). The final trial court found that DCF made reasonable (indeed "extraordinary") efforts at reunification and plaintiffs failed to rehabilitate. In re Joseph W., Jr., 53 Conn. Supp. at 145, 79 A.3d 155; see id. at 143-182, 79 A.3d 155. These findings preclude plaintiffs from seeking to prove they were denied reasonable accommodations that would have enabled them to avoid termination of their parental rights.

**\*13** That collateral estoppel bars the reasonable accommodations claim is confirmed by examining in detail each of plaintiff's allegations in light of the findings of the state courts. Plaintiffs allege that DCF failed to provide reasonable accommodations by: (a) failing to identify appropriate tasks and assist plaintiffs in meeting those tasks; (b) failing to provide meaningful visitation opportunities; (c) refusing to allow Ms. Hasemann to treat with her preferred provider, Sally Guest; (d) refusing to allow plaintiffs to treat with providers near their homes; (e) refusing to consider placement with their family members and failing to provide "family supports"; and (f) refusing to provide an ADA coordinator. See Am. Compl. ¶¶ 43, 70, 72, 76, 79, 95, 97.

With the exception of the last allegation (discussed below), all these allegations are in direct conflict with the findings of the final trial court. Taking each allegation in turn, the state court found the following: (a) "the parents were provided with specific steps to take to facilitate the return of Joseph and Daniel," In re Joseph W., Jr., 53 Conn. Supp. at 153, 79 A.3d 155, and largely failed to comply with those steps, see id. at 153-78, 79 A.3d 155; (b) DCF "complied with court orders that the parents be given more liberal visitation than is usually offered upon removal, particularly to parents who fail to comply with services necessary to address their parental and mental health deficiencies," id. at 169, 79 A.3d 155; (c) DCF "attempted to work with mother's self-referred counselor, Sally Guest, but was met with a lack of cooperation from Guest," id. at 145, 79 A.3d 155; (d) both parents repeatedly refused to engage with medical providers and stopped treating with any providers after 2007 (in the case of Ms. Hasemann) and 2008 (in the case of Mr. Watley), see id. at 75-77, 104, 116-17, 121, 79 A.3d 155; and (e) there was

no evidence plaintiffs in fact requested placement with their family members; Ms. Hasemann's parents' home would, in any event, not have been "a safe or suitable choice for the children"; and placement with Mr. Watley's family "was never credible," id. at 159, 165, 170, 79 A.3d 155.

Based on the foregoing analysis, I conclude that plaintiffs are precluded from proceeding on the claim for direct discrimination under count one. The state courts addressed the acts and omissions alleged here. Factual issues bearing on the plaintiffs' claim were fully and fairly litigated and necessary to the reasonable efforts determination, which was necessary to the final judgment finding the children neglected and terminating plaintiffs' parental rights. See In re Joseph W., Jr., 53 Conn. Supp. at 182, 79 A.3d 155.

The only potential exception is the plaintiffs' allegation that they should have been given an ADA coordinator. The state courts conclusively determined that plaintiffs were not entitled to an ADA coordinator in connection with the court proceedings. See In re Joseph W., 305 Conn. at 640, 652, 46 A.3d 59; In re Joseph W., Jr., 146 Conn. App. at 475–76, 78 A.3d 276. But they did not explicitly consider whether the ADA imposed an obligation to appoint an ADA coordinator during reunification efforts prior to the commencement of the trial proceedings. Moreover, the final appellate court noted that plaintiffs' request for an ADA coordinator "was directed only to the trial proceeding." Id. at 475, 78 A.3d 276 n.5.

Nevertheless, plaintiffs are barred from trying to establish that appointment of an ADA coordinator during reunification efforts would have enabled them to regain custody. The final trial court found that "[w]ithout success, [DCF] did everything possible to properly assess the parents' deficiencies and address them." In re Joseph W., Jr., 53 Conn. Supp. at 185, 79 A.3d 155 (emphasis added). In other words, the court found that, as a factual matter, plaintiffs could not have benefitted from additional supports. [21]

**\*14** Plaintiffs' counsel suggested at oral argument that discovery might enable them to surmount the obstacles to litigation of their claims posed by Rooker-Feldman and collateral estoppel. In ruling on the motion to dismiss, however, the court must assess the plausibility of the claims based on the amended complaint without speculating about discovery. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937; Twombly, 550 U.S. at 570, 127 S.Ct. 1955. "Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Twombly, 550 U.S. at 570, 127 S.Ct. 1955.

iii. Statute of Limitations

Plaintiffs seek to recover damages under the ADA/RA on the ground that DCF's decision to invoke a 96-hour hold (as happened with Kristina and Daniel) was motivated by impermissible discrimination on the basis of disability. [22] This claim may not be precluded by Rooker-Feldman or collateral estoppel. E.g., Schweitzer v. Crofton, 935 F. Supp. 2d 527, 540-45 (E.D.N.Y. 2013), aff'd, 560 F. App'x 6 (2d Cir. 2014); Phifer, 289 F.3d at 59. However, it is barred by the three-year statute of limitations.

The parties agree that the relevant statute of limitations is three years, pursuant to Conn. Gen. Stat. § 52-577. See Kloth-Zanard v. Malloy, No. 3:15-CV-00124 (MPS), 2016 WL 5661977, at *7 n.5 (D. Conn. Sept. 29, 2016). Plaintiffs do not dispute that "[f]ederal law governs the question of when a federal claim accrues." Morse v. Univ. of Vt., 973 F.2d 122, 125 (2d Cir. 1992). Under federal law, limitation periods start to run when the allegedly discriminatory act occurs, not when its effects are felt. Chardon v. Fernandez, 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981). Because plaintiffs filed their original complaint on December 13, 2013, the statute of limitations bars any claims related to discriminatory acts occurring before December 13, 2010.

Plaintiffs argue that equitable tolling should apply. But that possibility "is foreclosed by Connecticut precedent, which establishes Conn. Gen. Stat. § 52–577 as a statute of repose not susceptible to equitable tolling." Gerena v. Korb, 617 F.3d 197, 206 (2d Cir. 2010).

The applicability of Connecticut's continuing course of conduct doctrine requires more comment. This doctrine is "understood to be a tolling mechanism." Lee v. Dep't of Children & Families, 939 F. Supp. 2d 160, 171 (D. Conn. 2013). [23] "[T]o support a finding of a continuing course of conduct that may toll the statute of limitations, there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong."

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 172 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

Id. at 171-72 (emphasis omitted) (quoting Neuhaus v. DeCholonky, 280 Conn. 190, 201-02, 905 A.2d 1135 (2006)). This presents a problem for plaintiffs because their parental rights were originally terminated in a court order of October 2008.

Plaintiffs contend that any statute-of-limitations argument is procedurally defective because it depends on facts neither alleged in the complaint nor incorporated by reference. But the complaint explicitly refers to the order of October 2008. Am. Compl. ¶ 77. "Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss." Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir. 1989). And judicial notice may be taken of the fact of a prior court order. E.g., Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425-26 (2d Cir. 2008).

**\*15** The October 2008 order was not overturned until June 2010. In re Joseph W., Jr., 121 Conn. App. 605, 997 A.2d 512 (2010). DCF had a duty not to discriminate against plaintiffs regarding Daniel and Joseph Jr. until October 2008, when their parental rights were terminated. But DCF cannot have owed a duty to plaintiffs while the state court's initial termination of their parental rights applied from 2008 until at least June 2010. [24] At best, therefore, any continuing course of conduct began no earlier than June 2010.

### 2. Count Two: Associational Discrimination Under The ADA/RA

In count two, plaintiffs allege that Mr. Watley was discriminated against based on his association with Ms. Hasemann, who was disabled or perceived to be disabled by DCF, when DCF (1) removed his sons and (2) disregarded the recommendation of a psychologist who found that he was not a risk to his sons and recommended overnight visitation be started. Am. Compl. ¶¶ 112–16.

#### i. Legal Standard

The Second Circuit has recognized that the RA provides a cause of action for "associational discrimination" against a non-disabled person on the basis of their association with a disabled person. "[N]on-disabled parties bringing associational discrimination claims need only prove an independent injury causally related to the denial of federally required services to the disabled persons with whom

the non-disabled plaintiffs are associated." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 279 (2d Cir. 2009) (Wesley, J., concurring for majority). See also Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 432 (2d Cir. 2016) (recognizing associational discrimination claim under ADA in employment context). There are subtle but important differences between the tests announced in Loeffler and Graziadio. The Loeffler formulation recognizes liability for injuries caused to a non-disabled party based on discrimination against a disabled party. [25] The Graziadio standard recognizes a claim under the ADA for discrimination against a non-disabled party based on their relationship with a disabled party. See id. (requiring that plaintiff have suffered an "adverse employment action ... under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.").

**\*16** The amended complaint relies on the Graziadio formulation. See Am. Compl. ¶ 109 (labelling count two as "Intentional Discrimination based on Relationship/ Association With an Individual With a Disability"), ¶ 110 ("Mr. Watley was discriminated against based upon his association and/or relationship with Ms. Hasemann."), ¶ 112 ("DCF discriminated against Mr. Watley based on his association and/or relationship with Ms. Hasemann."). I assume for present purposes that this formulation supports a claim under the RA.

Because Graziadio was an employment discrimination case, it provides little guidance as to the requirements for an associational discrimination claim in other contexts. In keeping with Natofsky and Middletown, I conclude that a plaintiff presenting an associational discrimination claim must show that he or she was discriminated against (through disparate impact, disparate treatment, and/or failure to make reasonable accommodations), and that his or her association with a person who is disabled or perceived to be disabled was a but-for cause of the discrimination. [26]

#### ii. Analysis

Like the claims discussed above, Mr. Watley's claim based on the removal of his sons is precluded by Rooker-Feldman and collateral estoppel. Because the same analysis applies, it will not be repeated here. To the extent the claim is based on the initial 96-hour hold with regard to Daniel, it is barred by

the statute of limitations, again for reasons explained earlier. Finally, to the extent the claim seeks to contest termination of Mr. Watley's parental rights, it is precluded by the state courts' findings in connection with the final order of termination, as also explained above.

Mr. Watley's claim based on the recommendations of his psychologist is barred by collateral estoppel because of findings made by the final trial court. The court found that both psychologists who diagnosed and treated Mr. Watley "did not ever recommend the children could be returned immediately to father's care." In re Joseph W., Jr., 53 Conn. Supp. at 116, 79 A.3d 155. The issue was actually litigated and necessary to the judgment terminating his parental rights.

### 3. Count Three: Retaliation under ADA/RA

Plaintiffs' third count alleges in conclusory terms that the defendants "intimidated, threatened, coerced, and/or engaged in discriminatory conduct against Mr. Watley and Ms. Hasemann after they asserted their rights or requested reasonable modifications or otherwise engaged in protected activity to secure their rights" under the ADA and RA. Am. Compl. ¶ 121. Somewhat more specifically, the amended complaint alleges that plaintiffs engaged in good faith protected activity by requesting modifications and supports, in particular, an ADA coordinator. Id. ¶ 119. In response, the amended complaint alleges, defendants "[(1)] cancelled Plaintiffs' visitation with their sons and [(2)] denied their requests for modifications and additional supports, including [(3)] the ability to seek or continue to seek treatment from certain providers." Id. ¶ 122.

#### i. Legal Standard

"The elements of a retaliation claim under either the Rehabilitation Act or the ADA are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." Natofsky, 921 F.3d at 353 (internal alterations omitted) (quoting Weixel v. Bd. Of Educ. Of City of New York, 287 F.3d 138, 148 (2d Cir. 2002)). The fourth element may be demonstrated "either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of [others] who engaged in similar conduct; or (2) directly,

through evidence of retaliatory animus directed against the plaintiff by the defendant.' " Id. (quoting Littlejohn v. City of New York, 795 F.3d 297, 319 (2d Cir. 2015)).

#### ii. Analysis

**\*17** Plaintiffs' retaliation claim cannot survive application of Rooker-Feldman and collateral estoppel. In addition, the allegations in the amended complaint fail to state a plausible retaliation claim.

##### a. Visitation

Visitation between plaintiffs and their children was governed by court orders. The state courts denied motions for visitation filed by plaintiffs on May 16, 2008; January 7, 2009; September 28, 2011; October 23, 2011, and March 11, 2013. In re Joseph W., Jr., 53 Conn. Supp. at 5, 9, 72, 73, 74, 79 A.3d 155. Mr. Watley withdrew one motion for visitation. Id. at 70, 79 A.3d 155. Ms. Hasemann's visitation rights were suspended following an incident with a DCF employee resulting in her arrest, and were later partially reinstated by court order. Id. at 71–72, 79 A.3d 155. At one point, both plaintiffs failed to appeal orders denying motions for visitation while at the same time appealing other orders. See id. at 74, 119, 79 A.3d 155. As explained above, state courts - not DCF - granted OTCs, set the visitation schedule, approved of various reunification plans, refused to appoint an ADA coordinator in connection with the court proceedings, and ultimately terminated plaintiffs' parental rights. Under Rooker-Feldman, this court does not have jurisdiction to review those decisions.

Plaintiffs' retaliation claim based on denial of visitation is also precluded by collateral estoppel. The appropriateness of visitation is based on the best interests of the child, and DCF's visitation determinations are subject to modification by the trial court. See Conn. Gen. Stat. § 17a–10a. The trial courts' denials of plaintiffs' visitation motions thus entailed a determination that visitation was not in the best interest of the children.[27] The issue is not subject to relitigation even though plaintiffs allege a retaliatory motive on the part of DCF.

In addition to being precluded, plaintiffs' claim fails to satisfy the plausibility standard. Plaintiffs' motions for visitation were denied several times prior to their requests that they be provided an ADA coordinator for their neglect proceedings,

Case 1:22-cv-00983-GTS-ML Document 6 Filed 02/07/23 Page 174 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

which took place in October 2011 and December 2012. Id. at 10-11, 79 A.3d 155. Even assuming the denials of visitation can be scrutinized for a possible retaliatory motive, notwithstanding repeated state court findings that the denials were appropriate, the sequence of events makes plaintiffs' retaliation claim implausible. See Natofsky, 921 F.3d at 353–54 (awarding summary judgment where record indicated plaintiff was demoted prior to taking protected action).

The existence of a non-retaliatory motive also makes the claim implausible. "Claims for retaliation are analyzed under the burden-shifting framework that is established for Title VII cases." Harvin v. Manhattan & Bronx Surface Transit Operating Auth., 767 Fed. App'x 123, 128 (2d Cir. 2019) (citing Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)). Once a plaintiff establishes a prima facie case of retaliation, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the [defendant's] explanation is merely a pretext.' " Treglia, 313 F.3d at 721 (quoting Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)). Plaintiffs cannot meet this burden.

### b. Denial of Requests for Support and Modifications

*18 Plaintiffs next claim that DCF retaliated against them for requesting modifications and supports by refusing to grant such requests. This theory is foreclosed as a matter of law. "Defendants' alleged failure to accommodate [plaintiffs'] disability subsequent to an ADA ... protected request cannot be bootstrapped into a viable disability retaliation claim." Missick v. City of New York, 707 F. Supp. 2d 336, 356 (E.D.N.Y. 2010) (citing Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 90 (D. Conn. 2006) ("[A] failure to accommodate cannot constitute retaliation for an employee's request for accommodation.")). If a plaintiff requests accommodation, there are two possible outcomes: acceptance of the request or denial. Denial of a non-meritorious request is a correct decision, not retaliation. Denial of a meritorious request is, by definition, disability discrimination for failure to accommodate. It cannot also be the basis of a retaliation claim.

Moreover, a claim that DCF retaliated against the plaintiffs by denying requests for accommodations is precluded. "It is well established that when the department takes custody of a minor child, the trial court has the authority to issue specific steps to the department to facilitate reunification with the parents." In re Leah S., 284 Conn. 685, 696, 935 A.2d 1021 (2007) (emphasis added). As discussed above, the decisions about which plaintiffs complain were decisions of the state courts, and I do not have jurisdiction to review them.

### c. Interference with Treatment from Preferred Providers

Finally, plaintiffs allege that DCF retaliated against them by interfering with their ability to seek or continue to seek treatment from their preferred providers. However, Ms. Hasemann's treatment with Ms. Guest was terminated by court order, not DCF. Plaintiffs also allege that "DCF contacted [Mr. Watley's] psychologist and the psychologist then attempted to convince" Mr. Watley to plead nolo contendre to DCF's termination petition, causing him to "los[e] all confidence in the psychologist." Am. Compl. ¶ 71. Plaintiffs do not state when this alleged contact occurred or whether it followed any protected activity. Accordingly, there are no allegations that allow for a reasonable inference of a causal connection between protected activity and this contact.

### 4. Count Four: Violation of Constitutional Rights Under § 1983

Plaintiffs seek money damages against former Commissioner Katz under § 1983 for depriving them of a Fourteenth Amendment right to substantive due process. They allege that she violated this right by (1) denying them the fundamental right to parent their children, and (2) taking the position that the ADA and RA did not apply to DCF's programs or services. Am. Compl. ¶¶ 128–34.[28] I agree with the defendants that plaintiffs' claim under § 1983 is foreclosed by Rooker-Feldman and the statute of limitations. I also agree that plaintiffs have failed to plead the elements of a cognizable substantive due process claim and any such claim is barred by qualified immunity.

### i. Rooker-Feldman

In Hoblock, as mentioned earlier, the Second Circuit stated that a substantive due process claim arising from termination

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 175 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

of parental rights in state court would be foreclosed by Rooker-Feldman. See 422 F.3d at 87. That is the situation presented here. Numerous other courts have applied Rooker-Feldman to bar claims in similar circumstances. See Voltaire, 2016 WL 4540837, at *10 (collecting cases); see also Edem v. Spitzer, 204 F. App'x 95, 96-98 (2d Cir. 2006) (dismissing procedural due process claim predicated on paternity proceedings); Johnson v. Queens Admin. for Children's Servs., 197 F. App'x 33, 34 (2d Cir. 2006) ("[T]o the extent that [plaintiff] was asserting [constitutional] claims regarding the adequacy of the Family Court proceedings, the District Court lacked subject matter jurisdiction under the Rooker-Feldman doctrine." (citation omitted)). Plaintiffs' claim under § 1983 must be dismissed on this basis.

### ii. Statute of Limitations

**\*19** Plaintiffs' § 1983 claim alleging deprivation of the right to parent their children also encounters the same statute of limitations problem as the claims under the ADA and RA. Once "court confirmation of the basis for removal is obtained, any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child." Southerland v. City of New York, 680 F.3d 127, 153 (2d Cir. 2012) (citations omitted). In other words, plaintiffs can recover for a constitutional violation only on the basis of the separation that preceded court confirmation – here, the 96-hour holds. See Mortimer v. City of New York, NO. 15-cv-7186(KPF), 2018 WL 1605982, at *15 (S.D.N.Y. Mar. 29, 2018) (dismissing for failure to state a claim mother's allegation of substantive due process violation because child's separation was pursuant to a court order). Section 1983 claims are subject to Connecticut's three-year personal injury statute of limitations. See Lounsbury v. Jeffries, 25 F.3d 131, 133–34 (2d Cir. 1994). The 96-hour holds occurred long before the filing of this action (and well before former Commissioner Katz arrived at DCF).

### iii. Failure to State a Claim

Plaintiffs' claim that former Commissioner Katz deprived them of a right to parent their children is unsupported by allegations permitting a reasonable inference that she was personally involved in any such deprivation. She became DCF commissioner in February 2011, and plaintiffs complain primarily of actions taken by DCF prior to 2008. See Am.

Compl. ¶ 81 (noting that plaintiffs "have had no contact or visitation" with their sons since 2008); In re Joseph W., 53 Conn. Supp. at 7-8, 79 A.3d 155 (noting that plaintiffs' parental rights were terminated in October 2008 and that the Supreme Court did not overturn the decision until June 28, 2011).[29] Because former Commissioner Katz did not become Commissioner until long after DCF took custody of the children, and years after plaintiffs last visited the children, the plausibility standard requires plaintiffs to allege specific acts or omissions on her part permitting a reasonable inference of a causal connection between her conduct and the loss of plaintiffs' right to parent the children. In other words, for this claim to cross the plausibility threshold, plaintiffs must allege facts showing what this defendant did or failed to do after 2011 that caused them to lose their parental rights. In the absence of such allegations, the claim must be dismissed.

Plaintiffs claim that former Commissioner Katz violated their rights under the Due Process Clause by taking the position that the ADA did not apply to DCF's activities. Construed favorably to the plaintiffs, the allegation appears to be that if she had recognized the applicability of the ADA earlier in her tenure as Commissioner, they would have regained custody. Viewed in light of the final trial court's finding that DCF's reunification efforts were "extraordinary," this allegation is too vague to satisfy the plausibility standard.

Moreover, "[t]o state a claim for a violation of th[e] substantive due process right of custody, a plaintiff must demonstrate that the state action depriving him of custody was 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.' " Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 275 (2d Cir. 2011) (quoting Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999)). Plaintiffs cannot show that former Commissioner Katz's failure to recognize the applicability of the ADA prior to the final termination of their parental rights supports a substantive due process claim under this stringent test. See Cty. of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense...." (quotation marks and citation omitted)).

### iv. Qualified Immunity

**\*20** Public officials are protected from being sued for damages under § 1983 if "their conduct does not

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 176 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

violate clearly established constitutional rights" or if "it was objectively reasonable for them to believe their acts did not violate those rights." ⚠ Holcomb v. Lykens, 337 F.3d 217, 220 (2d Cir. 2003). "A district court may grant a motion to dismiss based on this qualified immunity if 'the facts supporting the defense appear on the face of the complaint.' " Hyman v. Abrams, 630 Fed. App'x 40, 42 (2d Cir. 2015) (quoting 🚩 McKenna v. Wright, 386 F.3d 432, 435-36 (2d Cir. 2004)). Moreover, a court may conclude that qualified immunity applies without first determining that a federal right has been violated. See 🚩 Pearson v. Callahan, 555 U.S. 223, 237, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Following this approach, I conclude that even if plaintiffs could allege a violation of their right to substantive due process by former Commissioner Katz, qualified immunity would require that any such claim be dismissed.

Qualified immunity applies because it was not "clearly established at the time of the alleged misdeeds" that a state officer violated a parent's substantive due process rights by failing to direct the implementation of ADA policies and programs in child custody, neglect, and TPR proceedings. See ⚠ Holcomb, 337 F.3d at 220 (quoting 🚩 Patel v. Searles, 305 F.3d 130, 135 (2d Cir. 2002)). A constitutional right is clearly established for purposes of qualified immunity under 🚩 § 1983 if "existing precedent ... placed the statutory or constitutional question beyond debate." Cugini v. City of New York, 931 F.3d 604, 615 (2d Cir. 2019) (quoting 🚩 Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). Plaintiffs need not point to "a case directly on point," but must nonetheless find either "cases of controlling authority in their jurisdiction at the time of the incident" or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." See 🚩 al-Kidd, 563 U.S. at 741, 746, 131 S.Ct. 2074. Plaintiffs identify no such precedent. Rather, they cite cases discussing the substantive protection the Due Process Clause provides to the family relationship. See Plf. Mem. at 35 (citing 🚩 Patel v. Searles, 305 F.3d 130, 136 (2d Cir. 2002) (noting that the parent/child relationship warrants constitutional protection); Adler v. Pataki, 184 F.3d 35, 42 (2d Cir. 1999) (noting the existence of an individual right to intimate association); 🚩 Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999) (noting that the familial relationship is protected by the Due Process Clause)). The cited cases do not

demonstrate that the right allegedly violated here was clearly established.

The Supreme Court "has repeatedly told courts ... not to define clearly established law at a high level of generality." 🚩 Kisela v. Hughes, ─── U.S. ───, ───, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018). Just as a court may not reject a qualified immunity defense because "the right to be free from excessive force" was clearly established, qualified immunity cannot be denied in the circumstances presented here simply because the right to the sanctity of familial relationships was clearly established. See, e.g., 🚩 City of Escondido v. Emmons, ─── U.S. ───, ───, 139 S. Ct. 500, 503, 202 L.Ed.2d 455 (2019) (holding that the Ninth Circuit "contravened ... settled principles" by "defin[ing] the clearly established right at a high level of generality" as the right to be free from excessive force and, "[w]ith the right defined at that high level of generality," denying qualified immunity).

Plaintiffs provide one citation to a Supreme Court case for the proposition that it was clearly established that the ADA applied to DCF's programs. See Plf. Mem. at 36 (citing 🚩 Penn. Dep't of Corrections v. Yeskey, 524 U.S. 206, 209, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998)). Plaintiffs' quotation of Yeskey is taken out of context. [30] Moreover, even if Yeskey could be viewed as clearly establishing that the ADA literally applies to all state programs, including DCF's, Yeskey did not clearly establish that DCF's subsequent failure to implement the ADA would violate a right to substantive due process. The decision in 🚩 Yeskey contains no discussion of such a constitutional right.

**\*21** No case has been cited or found that treats a state agency's failure to implement the ADA as a violation of substantive due process. Cf. Spring v. Allegany-Limestone Cent. Sch. Dist., 655 Fed. App'x 25 (2d Cir. 2016) (holding that plaintiffs had stated an ADA/RA claim but not a substantive due process claim). The Supreme Court has cautioned against bootstrapping a statutory violation into a constitutional violation. See 🚩 Davis v. Scherer, 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."). Accordingly, former Commissioner Katz is entitled to qualified immunity.

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 177 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

C. Claim For Injunctive Relief

In a proper case, injunctive relief is available against DCF under the ADA/RA and against the incumbent Commissioner of DCF (here defendant Dorantes) under 🚩 § 1983. The amended complaint seeks injunctive relief in the form of an order

(i) requiring defendants to develop and implement policies and procedures addressing how ADA and Rehabilitation Act requirements apply to DCF programs, services and activities, including assessments, service planning and implementation, visitation, family support and safety requirements;

(ii) requiring defendants to complete a self-assessment, to inform parents with mental and/or psychological disabilities of their rights and DCF's obligations under the ADA and Rehabilitation Act; [and]

(iii) requiring defendants to implement a training program for all investigators, social workers, supervisors on the requirements and how DCF seeks to comply with the ADA and Rehabilitation Act with respect to its programs and services;

Am. Compl. at 27.

Defendants oppose plaintiffs' claim for injunctive relief on the same grounds they oppose the claims for damages. In addition, they contend that, under Article III of the Constitution, plaintiffs lack standing to seek the injunctive relief set forth above. Though the issue of plaintiffs' standing under Article III is not free from doubt, I conclude that their allegations are insufficient to confer standing.

Article III limits the judicial power of the federal courts to adjudicating "cases" and "controversies." The requirement of standing serves to implement this limitation. The requirement

"applies to each claim and form of relief sought." 🚩 New York v. U.S. Dep't of Homeland Sec., 408 F. Supp. 3d 334, ——, 2019 WL 5100372, at *3 (S.D.N.Y. 2019) (internal citations omitted). The requirement applies with particular force to claims for injunctive relief against governmental bodies in the nature of institutional reforms requiring significant public expenditures. As the Supreme Court has stated, without a "real need to exercise the power of judicial review, ... allowing courts to oversee legislative or executive action would significantly alter the allocation of power ...

away from a democratic form of government." 🚩 Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) (internal quotations omitted).

To establish that they have standing, plaintiffs must satisfy three elements:

First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... the result of the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

**\*22** 🚩 Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations omitted).

"Past injuries ... do not confer standing to seek injunctive relief unless the plaintiff[s] can demonstrate that [they are] likely to be harmed again in the future in a similar way." 🚩 Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016); see also 🚩 Steel Co. v. Citizens for a Better Env., 523 U.S. 83, 109, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." (quoting 🚩 O'Shea v. Littleton, 414 U.S. 488, 495-96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974))). Nor can plaintiffs establish standing based on their desire to prevent DCF from discriminating against others, no matter how sincere their desire may be. A plaintiff "may not seek redress for injuries done to others." 🚩 Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 166, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); cf. 🚩 Spokeo, Inc. v. Robins, —— U.S. ——, ——, 136 S. Ct. 1540, 1547 n.6, 194 L.Ed.2d 635 (2016) ("[E]ven named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.' " (quoting 🚩 Simon v. Eastern Ky. Welfare

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 178 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

Rights Org., 426 U.S. 26, 40, n.20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

To have standing to pursue injunctive relief, plaintiffs must allege (1) that they are currently experiencing harm due to DCF's illegal activity against them in the past, see Steel Co., 523 U.S. at 109, 118 S.Ct. 1003, or (2) that they face a substantial likelihood of harm due to illegal activity by DCF in the future. See Nicosia, 834 F.3d at 239. As to the first possibility, the amended complaint alleges that plaintiffs continue to experience emotional distress resulting from DCF's actions culminating in termination of their parental rights. See Am. Compl. ¶ 81-84. Accepting this allegation as true, plaintiffs' emotional distress does not give them standing to seek the injunctive relief requested by the amended complaint unless they can show a "substantial likelihood" that the injunctive relief – essentially, an order directing DCF to implement the ADA - will redress their emotional harm. See Vt. Agency of Nat. Res. V. U.S. ex rel. Stevens, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). Plaintiffs do not make this showing in responding to the motion to dismiss. See Plf. Mem. at 38-39. And it is difficult to see how such an injunction can relieve plaintiffs of the emotional distress they are likely to continue to suffer as a result of losing custody of their children. [31]

**\*23** As to the second possibility, plaintiffs have the burden of alleging facts showing "a sufficient likelihood that [they] will be affected by [DCF's] allegedly unlawful conduct in the future." Holmes v. Patllito, No. 5:12-cv-183, 2012 WL 6623794, at \*2 (D. Vt. Nov. 28, 2012) (quoting Wooden v. Bd. Of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1283 (11th Cir. 2001)), adopted by 2012 WL 6623690 (D. Vt. Dec. 19, 2012). Plaintiffs allege that they are currently caring for other children and plan to try to have or adopt other children. Am. Compl. ¶ 88-89. Accordingly, they argue, they "face the real risk that DCF may investigate or take other action against them based on their continued care and supervision of children." Plf. Mem. at 38. These allegations, accepted as true, are insufficient to demonstrate the "substantial likelihood" of future injury necessary for standing. In Lujan, the Supreme Court rejected an attempt to establish standing based on future possibilities. The Court stated: "Such 'some day' intentions, without any description of concrete plans, or indeed even any specification of when the some day will be - do not support a finding of the 'actual or imminent injury' that our cases

require." See 504 U.S. at 564, 112 S.Ct. 2130. Similarly, the possibility that DCF may one day seek to take action against either or both plaintiffs is necessarily conjectural rather than imminent. [32]

Plaintiffs do not attempt to distinguish their position from the case on which defendants principally rely, City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Lyons alleged that a police officer put him in a chokehold during a traffic stop, and sought an injunction broadly prohibiting police from using chokeholds. The Court concluded that Lyons' allegations of past misconduct "d[id] nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." Id. at 105, 103 S.Ct. 1660. Moreover, Lyons' allegation that the Los Angeles police "routinely appl[ied] chokeholds ... [fell] far short of the allegations that would be necessary to establish a case or controversy between these two parties." Id.

Unlike Lyons, plaintiffs have alleged that they may one day undertake to have or adopt children, which could cause DCF to take action. See id. at 106, 103 S.Ct. 1660 n.7 (suggesting that Lyons needed to "credibly allege that he faced a realistic threat from the future application of the City's policy"). [33] However, as defendants argue and as discussed above, plaintiffs' allegation that they plan to try to have or adopt children in the future is inadequate under the standard set forth in Lujan.

Plaintiffs' would have a stronger argument for standing if they alleged facts permitting a finding that they are refraining from trying to have or adopt children because they fear DCF will take action against them in violation of their federal rights. Even then, however, they would need to allege facts showing a sufficient likelihood that DCF would act in violation of their rights. Significant developments since this action was filed prevent them from demonstrating such a sufficient likelihood.

**\*24** In 2015, while the present action was on appeal, the U.S. Departments of Justice and Health and Human Services published a joint letter stating that Title II of the ADA does apply to programs of state child protection agencies. [34] The letter has been called "historic" and "ground-breaking."

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 179 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

Charisa Smith, Making Good on an Historic Federal Precedent: Americans with Disabilities Act (ADA) Claims and the Termination of Parental Rights of Parents with Mental Disabilities, 18 Quinnipiac Health L.J. 191, 192 (2015). HHS is now actively engaged with state agencies regarding compliance with ADA standards in neglect and TPR proceedings. [35] State courts have also taken steps to ensure that child protection proceedings comport with the ADA. See, e.g., In re Hicks/Brown, 500 Mich. 79, 893 N.W.2d 637, 640-41 (Mich. 2017) (holding that state agency had "duty under the ADA to reasonably accommodate a [parent's] disability" before terminating parental rights).

In 2016, in keeping with the DOJ/HHS letter, then-Commissioner Katz issued a memorandum stating: "Qualified individuals with a disability in child protection matters are entitled to individual assessments of their needs and full and equal access to opportunities to benefit from and participate in child welfare programs, services and activities that are equal to those extended to persons without disabilities." [36] Other publicly available documents issued by DCF described efforts to help train service providers to assist persons with cognitive limitations, and provided guidance to DCF caseworkers working with parents with disabilities. [37] In addition, the Connecticut Supreme Court recently confirmed that the requirements of the ADA are incorporated into Connecticut antidiscrimination law applicable to neglect and TPR proceedings. See In re Elijah C., 326 Conn. 480, 511, 165 A.3d 1149 (2017) ("[T]here is nothing in the record before us to suggest that the trial court deviated in any way from ADA principles, which ... are incorporated by reference into our state's own stringent antidiscrimination statutes, in adjudicating the neglect and termination petitions in the present case.").

 **\*25** Plaintiffs argue that, "given the quick timing required in child protections proceedings, DCF's actions would evade review" unless an injunction were already in place. Plf. Mem. at 39. The concept of an injury "evading review" is an exception to the mootness doctrine for injuries "too short to be fully litigated prior to [their] cessation or expiration." United States v. Sanchez-Gomez, — U.S. —, —, 138 S. Ct. 1532, 1540, 200 L.Ed.2d 792 (2018). The

exception does not apply here. Moreover, the possibility that future plaintiffs – or these plaintiffs in the future – could encounter an argument about mootness does not relieve plaintiffs of their obligation to satisfy standing requirements. Cf. Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) ("The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.").

Plaintiffs may be concerned that if they wait to request injunctive relief until DCF invokes a 96-hour hold and seeks an OTC, their request will be too late because, under the principle of Younger v. Harris, 401 U.S. 37 (1971), the federal court will have to abstain from interfering in what will then be an ongoing state proceeding. See Sprint Communications, Inc. v. Jacobs, 571 U.S. 69, 72-73, 134 S.Ct. 584, 187 L.Ed.2d 505 (2013). This possibility does not confer standing under Article III when the plaintiff's allegations do not support a finding that he or she faces an "imminent" injury, as required by the Supreme Court. Accordingly, I conclude that plaintiffs lack standing.

## IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss the amended complaint is hereby granted.

If plaintiffs believe they can further amend their allegations to state a claim that is not precluded and on which relief may be granted, they may file and serve a motion for leave to amend on or before January 24, 2020. The motion must be supported by a memorandum, with the proposed second amended complaint attached as an exhibit. If no such motion is filed, the amended complaint will be dismissed with prejudice and the Clerk will enter judgment accordingly.

So ordered this 23rd day of December 2019.

## All Citations

Not Reported in Fed. Supp., 2019 WL 7067043

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 180 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

## Footnotes

1       Counts one, two and three of the amended complaint are brought under the ADA and RA. These counts are construed as attempting to obtain damages and injunctive relief against DCF, as permitted by both statutes. Neither statute provides for recovery of damages against individuals, so I do not read these counts as attempting to recover damages from defendants Katz and Dorantes. See De Figueroa v. New York, 403 F.Supp.3d 133, 154-155 (E.D.N.Y. 2019). Count four of the amended complaint is brought under § 1983. It is well-settled that § 1983 does not provide a cause of action against a state agency, Basak v. N.Y. State Dep't of Health, 9 F. Supp. 3d 383, 389 (S.D.N.Y. 2014) (quoting Will v. Mich. Dep't of Police, 491 U.S. 58, 62-71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)), and that the cause of action it provides against state officials is available only if the individual was personally involved in the alleged deprivation of federal rights, see, e.g., Carter v. Broome County, 394 F. Supp. 3d 228, 243 (N.D.N.Y. 2019) (noting that supervisory liability under § 1983 requires an individual defendant's own "culpable action or inaction" and "personal involvement" in the violation). Accordingly, I read this count as attempting to state a claim for damages against former Commissioner Katz in her personal capacity and a claim for injunctive relief against Commissioner Dorantes in her official capacity.

2       In adjudicating a motion to dismiss, a district court may take judicial notice of "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, ... and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). In addition, the court may "take judicial notice of documents filed in other courts, ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991).

        Throughout this Ruling and Order, judicial notice is taken of factual findings and legal conclusions of state courts in the underlying proceedings. The findings are not relied on for their truth but only for their preclusive effect. See Bristol v. Nassau Cty., 685 Fed. App'x 26, 28 (2d Cir. 2017) (affirming appropriateness of district court's "judicial noticing of decisions in related state criminal proceedings" because "[t]hese self-authenticating, publicly available records satisfied" the judicial notice rule "and bore directly on the question of issue preclusion"); Apotex, Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 60 (2d Cir. 2016) (holding that a court's consideration of matters subject to judicial notice does not impermissibly convert a ruling on a motion to dismiss into one for summary judgment).

3       Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

4       It was commonly thought that the ADA/RA did not apply in child neglect and TPR proceedings on the ground that the primary concern in such a proceeding is the best interest of the child, not the best interest of the parent.

5       A court may take judicial notice of the dates of appointment or election of a public official. See, e.g., Gladden v. City of N.Y., No. 12-cv-7822 (PKC), 2013 WL 4647193, at *3 (S.D.N.Y. Aug. 29, 2013).

6       The state court found that Ms. Hasemann's "sense of reality impacted on her ability to be a fit mother," In re Kristina H, 2004 WL 886937, at *1 (finding that after Kristina's birth, the mother "was confused about whether there were two fetuses" and "reported she ha[d] delivered a brain").

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 181 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

7    Joseph Jr. was born in Pennsylvania after plaintiffs left Connecticut late in Ms. Hasemann's pregnancy. In re Joseph W., Nos. L15CP05008039A, L15CP05008191A, 2008 WL 4635639, at *4 (Conn. Super. Ct. Oct. 1, 2008), rev'd 121 Conn. App. 605, 997 A.2d 512 (2010). Joseph Jr. was removed from plaintiffs' custody by Pennsylvania authorities due to Ms. Hasemann's "reportedly bizarre behavior" and subsequently placed in DCF custody pursuant to an OTC. Id.; see also In re Joseph W., Jr., 53 Conn. Supp. 1, 36, 79 A.3d 155 (Super. Ct.), aff'd, 146 Conn. App. 468, 78 A.3d 276 (2013), cert. denied, 310 Conn. 950. Daniel was born in Connecticut and removed by DCF under a "ninety-six hour hold." Id. at 49, 79 A.3d 155.

8    The predictive neglect doctrine has been criticized. See, e.g., Alissa Bang, Note, What do Judges and Fortune Tellers Have in Common? Connecticut's Predictive Neglect Doctrine as a Basis for Premature Suspension of Parental Rights, 32 Quinnipiac Prob. L.J. 410, 411 (2019) ("[I]n practice, this doctrine is effectively discriminatory and severely disadvantageous for parents with psychiatric disabilities.").

9    Defendants argue that the Ex parte Young exception does not apply because plaintiffs do not have standing to seek an injunction. Def. Mem. at 34. Because a lack of standing eliminates a court's subject matter jurisdiction, Pinson v. JPMorgan Chase Bank, Nat'l Ass'n, 942 F.3d 1200, 1206 (11th Cir. 2019), defendants may well be correct. It would offend sovereign immunity to require a state to defend a suit in federal court even though subject matter jurisdiction is lacking. However, because I conclude that plaintiffs do not have standing to seek injunctive relief, I need not determine the applicability of Ex parte Young.

10   As plaintiffs note, and defendants do not contest, it does not matter for present purposes whether immunity is abrogated by the ADA or waived under the RA, so long as one of the two validly eliminates the state's immunity. "[T]he rights and remedies under Title II of the ADA are identical to those under the Rehabilitation Act." T.W. v. N.Y. St. Bd. of Law Examiners, No. 16-cv-3029 (RJD), 2019 WL 6034987, at *3 (E.D.N.Y. Nov. 14, 2019). At this stage, then, immunity need only fail under one statute or the other. See id.; Ross v. City Univ. of N.Y., 211 F. Supp. 2d 518, 528 (E.D.N.Y. 2016) ("Because sovereign immunity does not bar plaintiff's Rehabilitation Act claim, the court has subject matter jurisdiction over this action regardless of CUNY's immunity from the ADA claim. Consequently, there is no risk of violating CUNY's 'right not to be haled into court' when it is immune from suit.... [A]s a practical matter, this case will proceed on the same course regardless of whether CUNY may later be found immune from plaintiff's ADA claim.").

11   Plaintiffs allege that DCF's alleged misconduct meets the test of animus or ill will announced in Garcia. There is an unsettled question about the status of Garcia after the Supreme Court's decision in United States v. Georgia, 546 U.S. 151, 159, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006)(holding that the ADA's abrogation is valid as applied to suits alleging conduct that violates the Fourteenth Amendment). See Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178, 194-95 (2d Cir. 2015). Because I conclude that Connecticut waived its immunity under the RA, I do not need to resolve this question and therefore do not reach it.

12   Though there are "subtle differences" between the ADA and the RA, the standards governing liability under the two statutes are generally the same. Henrietta D., 331 F.3d at 272. Thus, "unless one of those subtle distinctions is pertinent ..., [courts] treat claims under the two statutes identically." Id. To establish a claim under the RA, a plaintiff must also establish "that the defendants receive federal funding." Id. DCF does not dispute that it receives federal funding.

13   Prior to Natofsky, plaintiffs bringing claims under the ADA could recover based on a "mixed-motive" standard rather than the more stringent but-for standard. See Parker v. Columbia Pictures Indus., 204 F.3d 326, 336 (2d Cir. 2000). However, in 2009, the Supreme Court held that distinctions in language between Title

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 182 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

VII, which allows for mixed-motive claims, and the ADEA foreclosed mixed-motive theories under the latter statute, and required but-for causation under the ADEA. See [] Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 174, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). After Gross, the Second Circuit joined several others in holding that, because the ADA's language more closely resembles the ADEA's language than it does Title VII's language, the ADA requires but-for causation. [] Natofsky, 921 F.3d at 348. Because the RA incorporates the ADA's causation standard, the RA also requires but-for causation after Natofsky. See [] id. at 346–47.

14    See, e.g., [] Green, 585 F.3d at 103 (noting that Rooker-Feldman would bar a [] § 1983 action following a final order permanently removing plaintiff's child from her custody); [⚠] Phifer v. City of N.Y., 289 F.3d 49, 57 (2d Cir. 2002) ("To the extent that Phifer alleges in her complaint that certain defendants who were associated with Amkia's case in the family court were motivated by racism in their recommendations, representations, or requests to the family court, we find that Rooker–Feldman bars these claims.").

15    See [] Johnson v. Myers, No. 10-cv-1964, 2014 WL 2744624, at *6 (E.D.N.Y. June 16, 2014) (Fourteenth Amendment claims based on child neglect investigation and prosecution barred by Rooker-Feldman), vacated on other grounds and remanded sub nom. Myers v. Patterson, 819 F.3d 625 (2d Cir. 2016); Skipp v. Conn. Judicial Branch, No. 3:14-CV-00141(JAM), 2015 WL 1401989, at *6 (D. Conn. Mar. 26, 2015) (stating that review of reasonable accommodations claims would "require me to sit in judgment of determinations made by state courts respecting accommodations that were made for plaintiff's disability"); [] Richter v. Conn. Judicial Branch, No. 3:12CV1638(JBA), 2014 WL 1281444, at *8 (D. Conn. Mar. 27, 2014) (applying Rooker-Feldman where plaintiff alleged state court judgments "were the result of discrimination under the ADA and have caused her injury"), aff'd, [] 600 F. App'x 804 (2d Cir. 2015).

16    At oral argument, plaintiffs' counsel stated that plaintiffs' damages "predated any judgment entered by [a] state court."

17    The first and final parts of the Rooker-Feldman test are not in serious dispute; prior to commencing this action, the plaintiffs repeatedly lost in state court. See In re Joseph W., Jr., 53 Conn. Supp. at 5-11, 35-36, 49-50, 61-62, 69-77, 79 A.3d 155 (discussing procedural history); In re Joseph W., Jr., 146 Conn. App. 468, 78 A.3d 276 (affirming the trial court judgment); In re Joseph W., Jr., 310 Conn. 950 (denying certiorari). Similarly, because an award of damages based on a state court judgment is equivalent for Rooker-Feldman purposes to an injunction overturning the judgment, the third element of the test is met. See supra (citing cases).

18    Rooker-Feldman bars review of the state courts' decision to actually terminate plaintiffs' parental rights. However, for purposes of this analysis, I assume that DCF's decision to seek termination of plaintiffs' parental rights can itself be the source of a redressable injury.

19    Defendants make this argument in the context of Rooker-Feldman. See Def. Reply at 5. But I think it is more appropriate to consider the argument as a basis for applying collateral estoppel.

20    See also Protecting the Rights of Parents and Prospective Parents with Disabilities, U.S. Dep't of Health & Human Servs. & U.S. Dep't of Justice (Aug. 10, 2015), https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html ("Under Title II of the ADA or Section 504 [of the RA], in some cases, a parent or prospective parent with a disability may not be appropriate for child placement because he or she poses a significant risk to the health or safety of the child that cannot be eliminated by a reasonable modification. This exception is consistent with the obligations of child welfare agencies and courts to ensure the safety of children.") (footnote marker

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 183 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

omitted) (citing 📁 Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 287, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); 28 C.F.R. § 35.139(a)-(b)).

21   Plaintiffs have not alleged with specificity what an ADA coordinator would have done to enable them to regain custody. They may believe that an ADA coordinator would have arranged for as yet unidentified but nonetheless significant accommodations in the form of supports and services that would have enabled them to achieve the specific steps required to regain custody. Assuming that is their position, they have not met their burden of alleging "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." 📁 Henrietta D., 331 F.3d at 281 (quoting 📁 Borkowski, 63 F.3d at 138).

22   The amended complaint alleges that "DCF moved too hastily to remove the children." Am. Compl. ¶ 99.

23   "Most Connecticut case law regarding the continuing course of conduct doctrine deals with medical malpractice, legal malpractice, or situations in which there are continuing misrepresentations," not discrimination. Lee, 939 F. Supp. 2d at 172 (citation omitted). However, in Lee, the court found that the plaintiff sufficiently alleged "that the defendants failed on a continuing basis to accommodate her disability" within the limitations period. Id.

24   See Conn. Gen. Stat. § 17a-111b(a) (ordering DCF to "make reasonable efforts to reunify a parent with a child unless the court ... has approved a permanency plan other than reunification pursuant to 📁 subsection (k) of section 46b-129"). The amended complaint alleges that DCF refused to allow plaintiffs any visitation after their parental rights were terminated in October 2008. Am. Compl. ¶¶ 77, 81. However, it was state court orders that prohibited visitation. See In re Joseph W., Jr., 53 Conn. Supp. at 72-73, 186–87, 79 A.3d 155 ("Although the parents consistently visited their children until the fall of 2008, they have been unable or unwilling to adequately address their housing, employment, mental health, medical and parenting issues. Consequently, their requests to renew contact with the boys were denied by the court in 2008 and 2011.").

25   In 📁 Loeffler itself, for example, the Second Circuit held that the children of a deaf father stated an associational discrimination claim because "they were compelled to provide sign language interpretation for the Hospital and were consequently taken out of school and exposed to their father's suffering." 📁 582 F.3d at 279–80. There was no argument that the children themselves were discriminated against.

26   There are limits on the kinds of associations that count for the purposes of an associational disability claim, but they are not relevant here. See McGRX, Inc. v. Vermont, No. 5:10-cv-1, 2011 WL 31022, at *5 (D. Vt. Jan. 5, 2011).

27   The final trial court concluded that "both parents failed to maintain a reasonable degree of safety for the children during supervised visitation," and that "[n]either parent made any measurable progress despite receiving significant parenting and treatment supports and extra visitation time." In re Joseph W., Jr., 53 Conn. Supp. at 168–69, 79 A.3d 155. The court concluded that "resuming visits ... is not in the boys' best interests" because "[w]hen the parents had visitation, they both demonstrated a lack of judgment and poor parenting skills.... Reinstating visits may cause the children emotional trauma and a reoccurrence of behavior problems." Id. at 192, 79 A.3d 155.

28   Plaintiffs also allege a violation of their fundamental right to parent their children under the First and Ninth Amendments. However, in this Circuit, claims "addressing the right to intimate association vis-a-vis parent-child relationships" are analyzed "under the principles of substantive due process rather than the First Amendment." Uwadiegwu v. Dep't of Soc. Servs. of the Cty. of Suffolk, 91 F. Supp. 3d 391, 398 (E.D.N.Y. 2015), aff'd, 639 F. App'x 13 (2d Cir. 2016).

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 184 of 185

Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)

29    The court may, on a motion to dismiss, take judicial notice of the date of appointment or election of a public official to demonstrate that the official could not have been personally implicated in a constitutional violation under ⚑ § 1983. See Gladden, 2013 WL 4647193, at *3.

30    Plaintiffs cite Yeskey for the proposition that "Title II [of] the ADA and the Rehabilitation Act extends to all programs, services, and activities of a state and its agencies, 'without any exception.' ⚑ Yeskey, 524 U.S. at 209, 118 S.Ct. 1952." Plf. Mem. at 36. The full quote from Yeskey states: "Here, the ADA plainly covers state institutions without any exception that could cast the coverage of prisons into doubt." ⚑ 524 U.S. at 209, 118 S.Ct. 1952 (emphasis added). Unlike the operation of state prisons, family law is an area that Congress and the Supreme Court has largely entrusted to state authorities.

31    In reaching this conclusion, I recognize that loss of parental rights can harm an individual's self-image, sense of self-worth, and reputation, which is a discrete type of harm different from the emotional distress caused by being separated from one's children. This type of harm is likely to be significant in most (if not all) cases involving loss of parental rights, and it may be especially painful for a person who has (or is perceived to have) a mental or psychological disability. I also recognize that this type of injury might well be relieved to a considerable extent by the prospect of being able to help bring about institutional reform of a state agency (not to mention actually obtaining such relief), as plaintiffs seek to do here. However, I conclude that even if this type of injury can be relied on to establish standing to seek injunctive relief in the nature of institutional reform, plaintiffs do not have standing because developments at both the federal and state level since this action was filed, summarized below, prevent them from demonstrating that this case involves a "real need to exercise the power of judicial review." ⚑ Summers, 555 U.S. at 493, 129 S.Ct. 1142.

32    Plaintiffs' allegation that DCF might take action against them is not unlike an allegation of a threat of future prosecution; to adequately demonstrate such an injury, a plaintiff cannot rely on a prosecution that is only "remotely possible." Am. Charities for Reasonable Fundraising Regulation, Inc. v. Shiffrin, 205 F.3d 1321, at *1 (2d Cir. 2000). In American Charities, the Second Circuit held that much more detailed allegations than those presented here were insufficient to plausibly allege a threat of future prosecution.

33    Lyons remains somewhat problematic for plaintiffs because the amended complaint alleges that they currently care for children, and there is no indication that DCF, although necessarily aware of plaintiffs' allegation, has engaged in any discriminatory conduct against them. This is not to suggest that if DCF were to find out in the future that Ms. Hasemann was expecting a child or seeking to adopt one, it would take no action. For purposes of this ruling, I assume that, at a minimum, DCF would conduct an investigation.

34    See U.S. Dep't of Justice, Civil Rights Division & U.S. Dep't of Health & Human Servs., Office for Civil Rights, Letter to Erin Deveney, Interim Comm'r of Dep't of Children & Families, Commonwealth of Massachusetts (hereinafter "DOJ/HHS Letter") (Jan. 29, 2015), available at: http://www.ada.gov/ma_docf_lof.pdf.

35    See, e.g., Press Release, HHS OCR Secures Voluntary Resolution and Ensures Child Welfare Programs in the Oregon Department of Human Services Protect Parents with Disabilities from Discrimination, U.S. Dep't of Health & Human Servs. (Dec. 4, 2019), available at: https://www.hhs.gov/about/news/2019/12/04/hhs-ocr-secures-voluntary-resolution-and-ensures-child-welfare-programs-in-the-odhs-protect-parents-with-disabilities-from-discrimination.html.

36    See Memorandum from Joette Katz, Americans with Disabilities Act, Conn. Dep't of Children & Families (Sept. 23, 2016), available at: https://portal.ct.gov/-/media/DCF/Diversity/2016ADAPolicyNoticeSignedpdf.pdf ( ). See also Nat. Res. Def. Council v. Dep't of Interior, —— F. Supp. 3d ——, ——, 2019 WL 4601722, at *9 (S.D.N.Y. 2019) (taking judicial notice of publicly available government documents).

Case 1:22-cv-00983-GTS-ML    Document 6    Filed 02/07/23    Page 185 of 185

**Watley v. Department of Children & Families, Not Reported in Fed. Supp. (2019)**

37    Joette Katz, <u>Annual Progress and Services Report 2017</u>, Conn. Dep't of Children & Families (June 30, 2016), available at: https://portal.ct.gov/-/media/DCF/DataConnect/pdf/APSR-2017-06302016--Final.pdf (noting that the Connecticut Parents with Cognitive Limitations Work Group, headed by DCF, "has trained close to 3,100 service providers through the work of an interdisciplinary, interagency rotating training team."); Conn. Dep't of Children & Families, <u>Early Childhood Practice Guide for Children Aged Zero to Five</u> (April 1, 2016), at 39-43, available at: https://portal.ct.gov/-/media/DCF/Policy/BPGuides/3-1-PG-Early-Childhood.pdf (providing guidance to caseworkers on assisting parents with disabilities).

---

**End of Document**                                       © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---